## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **DAVID L. de CSEPEL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 10-1261 (ESH)** |
| | ) | |
| **REPUBLIC OF HUNGARY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiffs David L. de Csepel, Angela Maria Herzog, and Julia Alice Herzog are descendants of Baron Mór Lipót Herzog, a Jewish Hungarian collector of art who amassed a collection of more than two thousand paintings, sculptures, and other artwork prior to his death in 1934. Plaintiffs allege that artwork comprising the Herzog Collection was seized by Hungary and Nazi Germany as part of a campaign of genocide against Hungarian Jews during World War II, and that at least forty works of art from the Herzog Collection are currently in the wrongful possession of Museum of Fine Arts (Szémpművészeti Múzeum) in Budapest, the Hungarian National Gallery, and the Museum of Applied Arts in Budapest (together, the "Museums"), as well as the Budapest University of Technology and Economics (the "University"), each of which is an agency or instrumentality of the Republic of Hungary (collectively, "defendants").

Plaintiffs have brought this action alleging that defendants breached certain bailment agreements entered into after World War II when they refused to return pieces of the Herzog Collection upon demand in 2008. Plaintiffs seek the return of these portions of the Herzog Collection, an accounting of all works of the Herzog Collection currently in defendants' possession, declaratory relief, and restitution based on unjust enrichment. Defendants have

moved to dismiss pursuant to Rule 12(b)(1) for lack of jurisdiction under the Foreign Sovereign

Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, under the doctrine of forum non

conveniens, and based on the 1973 Agreement between Hungary and the United States ("1973

Agreement").  In addition, defendants have moved to dismiss pursuant to Rule 12(b)(6) on the

grounds that plaintiffs' claims are barred by the applicable statute of limitations, the act of state

doctrine, the political question doctrine, and the doctrine of international comity.  For the

following reasons, defendants' motion is granted in part and denied in part.

## BACKGROUND

The following facts are drawn from the allegations in the Complaint, which the Court

accepts as true for purposes of evaluating a motion to dismiss, as well as the affidavits and other

evidence presented by the parties on the issue of jurisdiction.  *Phillips v. Fulwood*, 616 F.3d 577,

581 (D.C. Cir. 2010) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)); *Settles v. U.S. Parole

Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (court may consider facts beyond the complaint

when ruling on a Rule 12(b)(1) motion).[1]

## I.    THE HERZOG COLLECTION

Baron Mór Lipót Herzog, a well-known Jewish Hungarian art collector, amassed a

collection of more than two thousand paintings, sculptures and other artworks (the "Herzog

Collection").  (Compl. ¶¶ 1, 38.)  After Baron Herzog's death in 1934, and the death of his wife

in 1940, the Herzog Collection was divided among their three children—Erzsebét (Elizabeth)

Weiss de Csepel, István (Stephen) Herzog and András (Andrew) Herzog.  (Compl. ¶ 39.)

---

[1] The Court will grant in part defendants' Motion for Judicial Notice of Documents and Facts
(Dkt. No. 14), and take judicial notice of the existence of the Nierenberg litigation (including the
1999 Complaint and the 2008 decision by the Metropolitan Appellate Court) and the various
Hungarian laws referred to in this opinion.

The artworks comprising the Herzog Collection were among the valuable art and other objects looted and seized by Hungary, an ally of Nazi Germany during World War II.  (Compl. ¶ 1.)  Defendants are currently in possession of at least forty works of art from the Herzog Collection.  (Compl. ¶ 2; Opp. at 45.)

## II.      THE PARTIES

Plaintiff David L. de Csepel is a United States citizen who resides in Los Angeles, California.  (Compl. ¶ 6.)  He is the grandson of the late Elizabeth Weiss de Csepel, who became a U.S. citizen in 1952 and died in the United States in 1992.  (Compl. ¶¶ 6, 63, 78.)  Plaintiff de Csepel represents all of the heirs of Elizabeth Weiss de Csepel in this action, as well as the heirs of her brother, István Herzog, who died in Hungary in 1966.  (Compl. ¶¶ 40, 42.)

Plaintiffs Angela Maria Herzog and Julia Alice Herzog are Italian citizens who reside in Rome, Italy, and are the daughters of the late András Herzog.  (Compl. ¶¶ 7-8.)  Plaintiffs Angela Herzog and Julia Herzog represent the heirs of András Herzog in this action and, together with Plaintiff de Csepel, they also represent the heirs of their uncle, István Herzog.

Defendant Republic of Hungary is a foreign state as defined in 28 U.S.C. § 1603(a). (Compl. ¶ 9.)  Defendants Museum of Fine Arts, Hungarian National Gallery, Museum of Applied Arts and Budapest University of Technology and Economics are all agencies or instrumentalities of Hungary, as defined in 28 U.S.C. § 1603(b).  (Compl. ¶¶ 11-14.)

## III.     HUNGARY ALLIES WITH NAZI GERMANY AND BEGINS A CAMPAIGN OF GENOCIDE AGAINST HUNGARIAN JEWS

On November 20, 1940, Hungary agreed to the Tripartite Pact signed by Germany, Italy, and Japan on September 27, 1940, and thereby joined the Axis Powers.  (Compl. ¶ 46.)

During World War II, Hungary enacted various laws, modeled on Germany's Nuremberg laws, eliminating or severely restricting the public, economic and social rights of Jews.  Among

other things, these new laws defined "Jew" in racial terms, prohibited sexual relations or marriage between Jews and non-Jews, and excluded Jews from full participation in various professions.  (Compl. ¶¶ 44-45, 47; Opp. Lattmann Decl.) ¶¶ 6-16.)

During 1941 and 1942, thousands of Jews were deported by the Hungarian government to territories under German control, where they were brutally mistreated and massacred.  (Compl. ¶ 49.)  The Hungarian military and gendarme units also murdered hundreds of Jews and forced Jewish men into forced labor without providing them with adequate shelter, food, or medical care.  (Compl. ¶¶ 49-50.)  By March 1944, at least 27,000 Hungarian Jewish forced laborers—including András Herzog, the father of Plaintiffs Julia Herzog and Angela Herzog—had perished under these brutal conditions.  (Compl. ¶ 50.)

In March 1944, Adolf Hitler sent German troops into Hungary to ensure Hungary's loyalty and to assist the Hungarian government in resisting the advancing Russian army. (Compl. ¶ 51.)  Between May and July 1944, Hungarian authorities, working in collaboration with SS commander Adolf Eichmann, deported over 430,000 Jews—more than fifty percent of the entire pre-war Hungarian Jewish population.  (Compl. ¶ 52.)  By the time the Russians had overrun Hungary in early 1945, more than 500,000 of Hungary's pre-War population of 825,000 Jews were dead.  (*Id.*)

## IV.    THE LOOTING OF THE HERZOG COLLECTION

During the Holocaust, Hungarian Jews—including the Herzogs—were required to register their art treasures.  (Compl. ¶¶ 56-57.)  While the Herzog family attempted to protect their art by hiding the bulk of it in the cellar of one of the family's factories at Budafok, the Hungarian government and their Nazi collaborators discovered the hiding place, and the chests containing the art were opened in the presence of Denes Csanky, the director of the Museum of Fine Arts.  (Compl. ¶¶ 58-59.)  The art was taken to Adolf Eichmann's headquarters at the

Majestic Hotel in Budapest for his inspection.  (Compl. ¶ 60.)  Eichmann selected many of the

best pieces to display as trophies and then shipped them off to greater Germany.  (*Id*.)  The

remainder of the collection was taken over by the Museum of Fine Arts.  (*Id*.)  Other pieces from

the Herzog Collection were seized by the Hungarian government from homes, safe deposit

vaults, and other Herzog properties.  (Compl. ¶ 61.)

## V.   THE HERZOG FAMILY ESCAPES FROM HUNGARY

In May 1944, Elizabeth and her children, together with other members of the Herzog and

Weiss de Csepel families, fled to Portugal.  Elizabeth immigrated to the United States in 1946,

and became a U.S. citizen on June 23, 1952.  (Compl. ¶ 63.)  Plaintiffs Angela and Julia

Herzog—the daughters of András Herzog—escaped to Argentina and eventually settled in Italy.

(Compl. ¶ 64.)  István Herzog and some members of his family remained in Hungary, while

others escaped and settled in Switzerland.  (Compl. ¶ 64.)

## VI.   THE 1947 PEACE TREATY

After World War II, Hungary and the Allies entered into a Peace Treaty in 1947. (*See*

Opp. Benenati Decl. Ex. A.)  Article 27 of the Peace Treaty provided:

> Hungary undertakes that in all cases where the property, legal
> rights or interests in Hungary of persons under Hungarian
> jurisdiction have, since September 1, 1939, been the subject of
> measures of sequestration, confiscation or control on account of
> the racial origin or religion of such persons, the said property,
> legal rights and interests shall be restored together with their accessories
> or, if restoration is impossible, that fair compensation shall be
> made therefor[e].

(*Id.* art. 27(1).)

## VII.   THE POST-WAR FATE OF THE HERZOG COLLECTION

Plaintiffs assert that while the Hungarian government purported to "return" a handful of

items from the Herzog Collection to the Herzog Heirs in the years immediately following the

war, those "returns" were largely on paper or short-lived, and the vast majority of the Herzog Collection remained in the possession of Hungary, the Museums and the University.  (Compl. ¶¶ 70-71.)

Even as to those pieces of the Herzog Collection that were physically returned to the Herzog Heirs, Hungarian government officials allegedly harassed and threatened the Heirs to whom they were returned, including the lodging of false smuggling allegations, until they agreed to re-deposit the works with the museums according to new bailment agreements so that they could be displayed and exhibited by defendants.  (Compl. ¶¶ 72-73.)  In 1948, the Museum of Fine Arts exhibited certain pieces of the Herzog Collection with labels expressly acknowledging that they were "on deposit."  (Compl. ¶ 73.)

## VIII.  THE UNITED STATES FOREIGN CLAIMS SETTLEMENT PROCESS—THE FIRST HUNGARIAN CLAIMS PROGRAM

In 1947, a leftist bloc gained control of the Hungarian government, eventually leading to the creation of the Hungarian People's Republic in 1949.  (Country Profile: Hungary, U.S. Dep't of State (May 19, 2011), http://www.state.gov/r/pa/ei/bgn/26566.htm.)  All private industrial firms with more than ten employees were nationalized.  (*Id.*)  During the Communist era, Hungary did not recognize individual property rights.  (Compl. ¶ 93.)

Consequently, relations between the United States and Hungary soon deteriorated.  In 1951, the United States ordered the closure of all Hungarian consulates in the United States. (*See* Opp. Benenati Decl. Ex. R.)  Pursuant to the Trading with the Enemy Act, the United States already held certain Hungarian assets blocked by Executive Order 8389, 3 C.F.R. 645 (1938-1943).  (*Id.*)  In 1955, the United States decided to use those blocked assets to compensate United States claimants and amended the International Claims Settlement Act of 1949 to authorize the Foreign Claims Settlement Commission (the "Commission") to consider claims by

United States nationals against Bulgaria, Hungary, Italy, Romania and the former Soviet Union (the "First Hungarian Claims Program"). *See* Act of August 9, 1955, Pub. L. No. 84-285, 1955 U.S.C.C.A.N. (69 Stat. 570) 2745, 2748 (the "1955 Claims Amendment"). (*See also* Opp. Benenati Decl. Ex. R at 537.)

The 1955 Claims Amendment authorized the Commission to adjudicate claims of United States nationals against Hungary for Hungary's failure:

> (1) to restore or pay compensation for property of United States nationals as required by Articles 26 and 27 of the Treaty of Peace;
>
> (2) to pay effective compensation for the nationalization, compulsory liquidation or other taking, prior to August 9, 1955, of property of United States nationals; and
>
> (3) to meet obligations expressed in currency of the United States arising out of contractual or other rights acquired by United States nationals prior to September 1, 1939, and which became payable prior to September 15, 1947.

(Opp. Benenati Decl. Ex. R at 537.)

As of the effective date of the 1955 Claims Amendment, Elizabeth Weiss de Csepel— who had become a United States citizen on June 23, 1952—was the only United States citizen with an ownership interest in any portion of the Herzog Collection. (Compl. ¶ 63.)

After fleeing Hungary, the Herzog Heirs assert they were unable to get accurate information as to what had become of their property. (Compl. ¶ 75.) Elizabeth Weiss de Csepel believed at the time that certain artworks from the Herzog Collection that belonged to her had likely been nationalized by Hungary in 1954 as a result of Hungarian Museum Decree No. 13 of 1954 (the "1954 Museum Decree") (Bánki Decl., Ex. C).

Section 9(1) of the 1954 Museum Decree provided, in relevant part, that:

> At the entering into force of the Legislative Decree hereunder, those museum pieces in the safekeeping of the museum whose owner is unknown, or has left the country without permission, shall

be placed into State ownership, pursuant to the Legislative Decree
hereunder.

(Mot. Bánki Decl. Ex. C, p. 2 § 9(1); Opp. Lattmann Decl. ¶¶ 31-32.)

Because she and her family had fled Hungary during the Holocaust, Elizabeth Weiss de Csepel believed that Hungary would treat her as someone who "has left the country without permission" and apply the 1954 Museum Decree to her art, and she submitted an affidavit to the Commission to that effect.  (Opp. at 12.)  She filed a claim with the Commission for compensation for twelve pieces of the Herzog Collection which she knew to be in the possession of Defendant Museum of Fine Arts, seven of which she claimed to own outright and five of which she claimed to own jointly with her brothers, who were not United States citizens.  (*Id.*) Her claim also included real property, which she correctly believed had been nationalized pursuant to other decrees not relevant here.  (*Id.*)  Hungary was not involved in any way in the Commission process and had no input in the decisions made or the awards rendered by the Commission.  (*Id.*)

On April 13, 1959, the Commission awarded $210,000 to Elizabeth Weiss de Csepel for both the real estate and the artworks.  The Commission's Proposed, Final, and Amended Final decisions expressly reserved Elizabeth's rights against the Hungarian government to recover the balance of her claim. (*See* Mot. Ramirez Decl., Exs. A, C, & D.)

## IX.    THE 1973 AGREEMENT

In 1965, the United States began negotiations with Hungary in order to obtain compensation for the balance of the claims that had resulted in partial awards through the First Hungarian Claims Program.  (*See* Opp. Benenati Decl. Ex. R at 539.)  At the meeting between United States and Hungarian officials on June 17, 1966, George Spangler, the United States chief negotiator, raised the issue of certain "nationalized" art collections belonging to former

Hungarian citizens who had become naturalized citizens of the United States after the seizure of

the artworks.  Karolyi Reti, Hungary's chief negotiator, responded that "[a]rt collections had

never been nationalized in Hungary."  (*See* Opp. Benenati Decl. Ex. E at 237.)  Reti also stated

that the United States had no standing to press claims on behalf of claimants who were not

United States nationals at the time their paintings came into the custody of the Museum of Fine

Arts, and the United States negotiators agreed.  (*Id.* at 238.)

On March 6, 1973, the United States and Hungary entered into an executive agreement.

*See* Agreement Between the Government of the United States of America and the Government of

the Hungarian People's Republic Regarding the Settlement of Claims, March 6, 1973, 24 U.S.T.

522 (the "1973 Agreement").  The 1973 Agreement provided that, in exchange for the lump sum

payment of $18,900,000 by Hungary, there would be a "full and final settlement and . . .

discharge of all claims of the Government and nationals of the United States against the

Government and nationals of the Hungarian People's Republic which are described in this

Agreement."  *Id.*, art. 1, § 1.  The 1973 Agreement addressed four categories of claims:

> (1) property, rights and interests affected by Hungarian measures
> of nationalization, compulsory liquidation, expropriation or other
> taking on or before the date of this Agreement, excepting real
> property owned by the Government of the United States;

> (2) obligations expressed in currency of the United States arising
> out of contractual or other rights acquired by nationals of the
> United States prior to September 1, 1939, and which became
> payable prior to September 15, 1947;

> (3) obligations of the Hungarian People's Republic under Articles
> 26 and 27 of the Treaty of Peace between the United States and
> Hungary dated February 10, 1947, and

> (4) losses referred to in the note of December 10, 1952 of the
> Government of the United States to the Government of the
> Hungarian People's Republic.

*Id.*, art. 2.

## X.      THE FALL OF COMMUNISM

With the opening of Hungary to the West in 1989, the Herzog Heirs learned that many

pieces of the Herzog Collection were being openly exhibited at the Museums.  (Compl. ¶ 77.)

Tags under the paintings identified them as "From the Herzog Collection."  (*Id.*)

Elizabeth Weiss de Csepel, then 89 years old, attempted negotiations with the Hungarian

government to recover the art that belonged to her.  (Compl. ¶ 78.)  She obtained only six

paintings and a wood sculpture before her death in 1992—all of them works attributed to little

known artists.  (*Id.*)  The identifiable masterworks remained in the Museum of Fine Arts and the

Hungarian National Gallery.  (*Id.*)

In the early 1990s, the Hungarian Parliament enacted two compensation laws.  (Mot. at

15-16; Mot. Bánki Decl. Ex. F ("1991 Compensation Act"); Mot. Bánki Decl. Ex. G ("1992

Compensation Act").)  None of the Herzog Heirs filed claims for art under the 1991 or 1992

Compensation Acts.  (Pasztory Decl. ¶ 6.)

## XI.     NEGOTIATIONS WITH HUNGARY AND THE NIERENBERG LITIGATION

Following Elizabeth Weiss de Csepel's death in 1992, her daughter, Martha Nierenberg,

inherited her share of the Herzog Collection and continued her mother's efforts to recover the art.

(Compl. ¶ 79.)  In 1996, the Hungarian Minister of Culture and Education appointed a

Committee of Experts to determine who legally owned the Herzog Collection.  (Pasztory Decl.

¶ 8.)  The government appointed the Director of the Museum of Fine Arts and a legal

representative of the Ministry of Foreign Affairs to the Committee.  (*Id.*)  The Committee met on

several occasions in 1996 and 1997 and reviewed the ownership status of certain art objects that

Martha Nierenberg asserted were the property of the heirs of Elizabeth and István Herzog.  (*Id.*

¶¶ 9-10.)

## XII.   NIERENBERG LITIGATION

In October 1999, after what plaintiffs describe as "months of silence" from the Hungarian government, plaintiffs concluded that Hungary had no genuine intention of returning the art, and Martha Nierenberg filed a lawsuit in Hungary to recover ten paintings that belonged to her mother, Elizabeth Weiss de Csepel.  (Compl. ¶ 79.)  She later amended her complaint to include two additional paintings.  The Museum of Fine Arts, without explanation, returned one painting to her shortly after the litigation commenced.  However, the litigation proceeded with respect to the remainder of the paintings.  Plaintiffs Angela Herzog and Julia Herzog (as well as the sons of István Herzog—Stephen Gabriel Herzog and Peter Herzog) later intervened as defendants in the lawsuit, as there was initially a dispute (which was ultimately resolved) between them and Martha Nierenberg as to who owned certain of the artworks.  (Opp. Varga Decl. ¶¶ 7-8; Mot. Bánki Decl. Ex. M.)

On October 20, 2000, the Budapest Metropolitan Court ordered that all except one of the paintings be returned to Martha Nierenberg. (*See* Opp. Varga Decl. Ex. A.)  Among other things, the court rejected the defendants' argument that they had acquired ownership of the paintings by virtue of the 1954 Museum Decree, and agreed with Mrs. Nierenberg that the government had the paintings at issue in its possession only as "bailee."  (*See id*. at 34-38, 52.)

Defendants appealed the decision.  On November 29, 2002, the Supreme Court of Hungary vacated the judgment of the Metropolitan Court on the ground that the court erred in concluding that the paintings belonged to Elizabeth Weiss de Csepel, rather than other Herzog Heirs, in the absence of participation in the lawsuit by all of the Herzog Heirs. (*See* Opp. Varga Decl. Ex. B at 12-13.)  Therefore, the court remanded the case to the trial court for further proceedings.  (*Id*.)  The Supreme Court agreed with the lower court that the defendants had not established that the paintings had become state property as a result of Section 9 of the 1954

Museum Decree. (*See id.* at 14-16.)  The Supreme Court also agreed with the lower court that no

"nationalization ... or other taking" of the paintings had occurred as provided in the 1973

Agreement.  (*Id.* at 16)  However, the Supreme Court asked the lower court to consider whether,

in light of the compensation received by Elizabeth Weiss de Csepel from the United States

Foreign Claims Settlement Commission, defendants had a claim for adverse possession based on

their belief (even if erroneous) that they possessed the art as a result of the 1973 Agreement. (*See*

*id.* at 17-18.)

On remand, the Metropolitan Court ordered the return of one painting to Martha

Nierenberg on November 16, 2005, but otherwise dismissed the claim on the grounds of adverse

possession.  (*See* Opp. Varga Decl., Ex. C.)  However, the court agreed with the findings of the

prior two courts that Elizabeth Weiss de Csepel had left Hungary with the permission of the

Hungarian state in 1944, and that the defendants always knew who owned the art. (*See id.* at 22-

23.)  Therefore, the court agreed that the 1954 Museum Decree had not given the state ownership

of the art at issue.  (*Id.*)

On January 10, 2008, nine years after Martha Nierenberg commenced her lawsuit, the

Metropolitan Appellate Court dismissed Martha Nierenberg's claim in its entirety, holding that

the 1973 Agreement barred Elizabeth Weiss de Csepel because the United States had awarded

her compensation through the Foreign Claims Settlement Commission process. (*See* Mot. Bánki

Decl. Ex. M.)  The court also agreed with the lower court that the state had obtained ownership

via adverse possession. (*See* Mot. Bánki Decl., Ex. M at 14-15.)

## ANALYSIS

## I.      STANDARD OF REVIEW

When reviewing a facial challenge to the Court's subject matter jurisdiction pursuant to

Rule 12(b)(1), the Court must assume the truth of all factual allegations in the complaint,

construing them in the light most favorable to the plaintiff, even if some are subject to dispute by the opposing party. *See Republic of Austria v. Altmann*, 541 U.S. 677, 681 (2004); *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Nonetheless, plaintiffs bear the burden of establishing subject matter jurisdiction. *Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998). In addition, "[w]hen a court rules on a Rule 12(b)(1) motion, it may 'undertake an independent investigation to assure itself of its own subject matter jurisdiction,'" and it may consider "facts developed in the record beyond the complaint." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (quoting *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987)).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" such that a court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted). In ruling on a 12(b)(6) motion, a court may consider facts alleged in the complaint, documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim. *U.S. ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 24-25 (D.D.C. 2010).

## II.   JURISDICTION UNDER THE FSIA

### A.   Standard of Review

The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.*, provides the exclusive basis for asserting jurisdiction over a foreign state in a United States court. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-35 (1989) (citing 28 U.S.C. § 1604; 28 U.S.C. § 1330(a)); *accord Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 85 (D.C. Cir. 2005); *Agudas Chasidei Chabad v. Russian Fed'n*, 466 F. Supp. 2d 6, 14 (D.D.C. 2006), *rev'd in part on other grounds*, 528 F.3d 934 (D.C. Cir. 2008). In enacting the FSIA, Congress codified the "restrictive principle" of sovereign immunity, limiting the jurisdiction of American courts to hear claims against foreign states. *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004). Therefore, unless one of the statutory exceptions enumerated in 28 U.S.C. § 1605 is satisfied, a foreign state is immune from suit in United States courts. *See* 28 U.S.C. § 1604; *Amerada Hess*, 488 U.S. at 434-35 & n.3. Sovereign immunity is a threshold issue, as it goes to the Court's subject matter jurisdiction. *Altmann*, 541 U.S. at 961; *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1026 (9th Cir. 2010) (en banc).

The defendant-state has the ultimate burden of establishing immunity under the FSIA. *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994). Once the defendant makes a prima facie showing that it is a foreign state, the plaintiff bears the burden of asserting at least some facts showing that one of the FSIA exceptions applies. *Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008); *Crist v. Republic of Turkey*, 995 F. Supp. 5, 10 (D.D.C. 2000). The burden then shifts back to the defendant to prove, by a preponderance of the evidence, that the alleged exception does not apply. *Chabad*, 528 F.3d at 940.

To the extent that jurisdiction depends on particular factual propositions independent of the merits, the plaintiff must, on a challenge by the defendant, present adequate supporting evidence. *Id.* "For purely factual matters under the FSIA, however, this is only a burden of

production; the burden of persuasion rests with the foreign sovereign claiming immunity, which

must establish the absence of the factual basis by a preponderance of the evidence." *Id.* Where,

however, jurisdiction depends on the plaintiffs having asserted a particular *type* of claim, "there

typically is jurisdiction unless the claim is immaterial and made solely for the purpose of

obtaining jurisdiction or . . . wholly insubstantial and  frivolous, *i.e.*, the general test for federal-

question jurisdiction under *Bell v. Hood*, 327 U.S. 678, 682-83 (1946), and *Arbaugh v. Y & H

Corp.*, 546 U.S. 500, 513 & n.10 (2006)." *Chabad*, 528 F.3d at 940 (internal quotation marks

omitted) (alteration in original).  "The *Bell v. Hood* standard to be applied is obviously far less

demanding than what would be required for the plaintiff's case to survive a summary judgment

motion under Fed. R. Civ. P. 56." *Id.*

### B.     Expropriation Exception

Plaintiffs rely primarily on the FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3),

to challenge defendants' assertion of sovereign immunity.  Section 1605(a)(3) states in pertinent

part:

> A foreign state shall not be immune from the jurisdiction of courts
> of the United States or of the States in any case . . . in which rights
> in property taken in violation of international law are in issue and
> that property or any property exchanged for such property is
> present in the United States in connection with a commercial
> activity carried on in the United States by the foreign state; or that
> property or any property exchanged for such property is owned or
> operated by an agency or instrumentality of the foreign state and
> that agency or instrumentality is engaged in a commercial activity
> in the United States.

This exception consists of two distinct clauses, and plaintiffs argue that the Court has

jurisdiction under the second clause.  (Compl. ¶ 21.)  Therefore, in order to have jurisdiction, this

Court must find that: (1) "rights in property" are at issue; (2) the property was "taken in violation

of international law"; and (3) "the property at issue (or any property exchanged for it) [is] . . .

'owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality' engages in commercial activity in the United States." *Peterson*, 416 F.3d at 86-87 (quoting 28 U.S.C. § 1605(a)(3)).  As defendants do not dispute that "rights in property" (*i.e.*, the ownership rights to the Herzog Collection) are "in issue," the Court will proceed to the second element.

### 1.    Taking in Violation of International Law

A taking violates international law if: (1) it was not for a public purpose; (2) it was discriminatory; or (3) no just compensation was provided for the property taken.  *See Crist*, 995 F. Supp. at 10-11 (citing *Sidermann de Blake v. Republic of Argentina*, 965 F.2d 699, 711 (9th Cir. 1992)); *Cassirer*, 616 F.3d at 1027; *Restatement (Third) of Foreign Relations Law of the United States* § 712 (1987).  *See also* H.R. Rep. No. 94-1487, at 19-20 (describing phrase "taken in violation of international law" as including expropriations that are "arbitrary or discriminatory in nature").  At the jurisdictional stage, the Court need not decide whether the taking actually violated international law; as long as plaintiffs' claims are "substantial and non-frivolous," they provide a sufficient basis for the exercise of jurisdiction.  *Chabad*, 528 F.3d at 941-42.

The Complaint clearly alleges substantial and non-frivolous claims that the Herzog Collection was taken without just compensation and for discriminatory purposes.  Specifically, it alleges that despite efforts by the Herzog family to prevent the confiscation of their artwork by hiding the bulk of it in the cellar of one of the family's factories in Budafok, the Hungarian government, in collaboration with the Nazis, discovered the hiding place and confiscated its contents as part of a larger campaign of asset seizure and genocide against Hungarian Jews.  (Compl. ¶¶ 54-59.)  The artwork was then taken directly to Adolf Eichmann's headquarters, where Eichmann selected certain pieces to display as "trophies" before shipping them off to Germany.  (Compl. ¶ 60.)  Other pieces of the Herzog Collection were seized by the Hungarian

government from homes, safe deposit vaults, and other properties of the Herzog family. (Compl. ¶ 61.) Some of these works were sent abroad to Germany or elsewhere, while others remained in Hungary. (*Id.*)

Defendants argue that these seizures cannot be considered violations of international law, because both Ms. Nierenberg and Ms. Weiss de Csepel were Hungarian citizens, and therefore the seizure of their property by the Hungarian government did not violate international law. (Mot. at 34-35.) Indeed, is well-settled that a state's taking of the property of its own citizens, no matter how egregious, does not constitute an international law violation. *Dreyfus v. Von Finck*, 534 F.2d 24, 31 (2d Cir. 1976) (finding no international law violation where "aggrieved parties are nationals of the acting state," despite fact that taking was pursuant to Nazi racial decrees); *see also Altmann*, 541 U.S. at 728 (Breyer, J., concurring) (noting "consensus view" of lower courts that the FSIA expropriation exception's "reference to 'violation of international law' does not cover expropriations of property belonging to a country's own nationals"); *Altmann v. Republic of Aus.*, 317 F.3d 954, 968 (9th Cir. 2002) (plaintiff cannot be a citizen of the defendant country at the time of the expropriation, because "expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law.") (citing *Siderman de Blake*, 965 F.2d at 711); *Yang Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 102 (D.D.C. 2005) ("[C]onfiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law.").

Plaintiffs, however, argue that Hungary did not consider Ms. Nierenberg and Ms. Weiss de Csepel to be Hungarian citizens at the time of the seizures, as evidenced by the anti-Semitic laws passed by Hungary during World War II. (Opp. at 30.) Specifically, plaintiffs argue that as

of 1944, Hungarian Jews could not acquire citizenship by means of naturalization, marriage, or legalization (Opp. Lattmann Decl. ¶ 6); vote or be elected to public office (*id.* ¶ 7); be employed as civil servants, state employees, or schoolteachers (*id.*); enter into enforceable contracts (*id.*); participate in various industries and professions (*id.* ¶ 8); participate in paramilitary youth training or serve in the armed forces (*id.* ¶ 9); own property (*id.* ¶ 10); or acquire title to land or other immovable property (*id.* ¶ 11).  Moreover, all Hungarian Jews over the age of six were required to wear distinctive signs identifying themselves as Jewish, and were ultimately subject to complete forfeiture of all assets, forced labor inside and outside Hungary, and ultimately genocide. (*Id.* ¶¶ 14-17.)

Defendants argue in response that "plaintiffs['] own statements and submissions" undercut the assertion that their predecessors were not Hungarian citizens at the time of the taking in 1944.  (Reply at 9 n.7.)  Specifically, defendants point to a formal submission by Ms. Nierenberg's attorney to the Hungarian courts in 1999 that Ms. Nierenberg "did not surrender her Hungarian citizenship; she was not deprived of it; she was not dismissed from the ties of Hungarian citizenship."  (Reply Bánki Decl. Ex. F.)

Notwithstanding the fact that Ms. Nierenberg still considered herself to be a Hungarian citizen in 1944, it is clear that under these extraordinary facts, the government of Hungary thought otherwise and had *de facto* stripped her, Ms. Weiss de Csepel, and all Hungarian Jews of their citizenship rights.  Consequently, the alleged Hungarian "citizenship" of plaintiffs' predecessors does not preclude the application of the expropriation exception in this case.  *See Cassirer v Kingdom of Spain*, 461 F. Supp. 2d 1157, 1165-66 (applying expropriation exception to Nazi Germany's seizure of German national's property where plaintiff argued that Nazi citizenship laws precluded citizenship for Jews), *aff'd in part*, 616 F.3d 1019 (9th Cir. 2010)

("By [1939], German Jews had been deprived of their civil rights, including their German

citizenship.").  *Cf. Roboz v. Kennedy*, 219 F. Supp. 892, 894 (D.D.C. 1963) (finding that

plaintiffs were not "domiciled in, or a subject, citizen or resident of" Hungary under the

International Claims Settlement Act, because they had a firm intent to leave Hungary, had lost

their home, had no rights in law, and could not vote); *Kaku Nagano v. McGrath*, 187 F.2d 759,

768 (7th Cir. 1951) (noting that under the Trading with the Enemy Act, "our concept of a citizen

is one who has the right to exercise all the political and civil privileges extended by his

government" and that "[c]itizenship conveys the idea of membership in a nation").

Moreover, even if defendants are correct that the seizure of the Herzog Collection by

Hungary alone would not constitute a violation of international law, the Complaint also states a

substantial and non-frivolous taking in violation of international law based on the active

involvement of German Nazi officials in the taking of at least a portion of the Herzog Collection.

(Compl. ¶¶ 59-61.)  Specifically, the Complaint avers that the German Nazis assisted the

Hungarian government in the discovery of the bulk of the Herzog Collection in Budafok, and

that this artwork was taken directly to Adolf Eichmann's headquarters following its seizure.  (*Id.*

¶¶ 59-60.)[2]  The "plain language of the [FSIA] does not require that the foreign state against

whom the claim is made be the entity that took the property in violation of international law."

*Cassirer*, 616 F.3d at 1028, *cert. denied*, 2011 U.S. LEXIS 4928, No. 10-786 (June 27, 2011);

*see Altmann*, 317 F.3d at 968 (allowing suit to proceed against Austria under expropriation

---

[2] As to the remainder of the collection, while the Complaint states that it was seized "by the
Hungarian government" (Compl. ¶ 61), the statement of facts accompanying plaintiffs'
Opposition claims the involvement of the German Nazis in these subsequent seizures as well.
(Opp. at 7.)  To the extent a portion of the Herzog Collection was seized solely by the Hungarian
Government without the involvement of Nazi Germany, such seizures plainly cannot be said to
violate international law solely based on the involvement of Germany.

exception where Nazis allegedly stole six paintings in Austria with the assistance of the Austrian government).

In addition, defendants argue that Hungary has cured any previous violations of international law arising out of the taking of the Herzog Collection by way of the 1973 Agreement with the United States, pursuant to which Hungary paid the United States $18.9 million to resolve and extinguish claims by U.S. nationals relating to "measures of nationalization, compulsory liquidation, expropriation, or other taking" by Hungary.  (Opp. at 35-37.)  Moreover, Hungary argues that the Hungarian 1991 and 1992 Compensation Acts provided compensation to current and former Hungarian nationals whose property was taken in connection with wartime laws "restricting the public and economic expansion of Jews" or otherwise taken during the Communist era.  (*Id.*)

As explained below, the 1973 Agreement did not compensate plaintiffs for the 1944 takings of the Herzog Collection because it did not settle the claims of individuals—such as plaintiffs' predecessors—who were not United States citizens at the time of the takings. (*See infra* Part III.)  As for the post-Communist era compensation legislation, the 1991 Act applied only to Communist-era nationalization, and plaintiffs did not apply for or receive compensation under this Act.  (Opp. Lattmann Decl. ¶ 25.)  While the 1992 Compensation Act did allow for compensation for World War II-era claims, plaintiffs did not apply for or receive compensation for the Herzog Collection under this Act, and it appears that the Act itself does not purport to settle all such claims or preclude a legal action seeking the return of stolen goods in lieu of compensation.  (Opp. Pasztory Decl. ¶ 6; Opp. Lattman Decl. ¶ 30; Opp. Varga Decl. ¶ 17.)

In sum, the Court finds that plaintiffs' claim that the Herzog Collection was taken in violation of international law is substantial and non-frivolous, and therefore, it adequately satisfies the second requirement of the FSIA's expropriation exception.[3]

## 2.    Commercial Activity Nexus

The third requirement of the FSIA's expropriation exception requires a commercial activity nexus between the foreign state (or its agency or instrumentality) that owns or operates the property at issue and the United States.  28 U.S.C. § 1605(a)(3)  Plaintiffs here rely on the second clause of this requirement, which requires that the entity that owns or operates the property at issue be "engaged in a commercial activity in the United States." *Id.*  The FSIA defines commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act,"  *id.* § 1603(d), and courts have "broad discretion to 'determin[e] what is a commercial transaction for purposes of' the FSIA."  *Chabad*, 466 F. Supp. 2d at 24 (quoting H.R. Rep. No. 94-1487, at 16 (1976)) (internal quotation marks omitted) (alternations in original).  The term "commercial" distinguishes governmental acts from those that can be engaged in by private persons or entities. *Id.* (citing *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)) ("[W]hen a foreign government acts . . . in a manner of a private player within [a market], the foreign sovereign's acts are 'commercial' within the meaning of the FSIA." (alterations in original))

---

[3] Defendants argue in a footnote that plaintiffs have failed to exhaust their remedies in Hungary as to the thirty-two paintings described in this case that were not the subject of the 1999 Hungarian lawsuit.  (Mot. at 17 n.15.)  To the extent defendants argue that the Complaint should be dismissed on this basis, the Court will deny this motion.  The text of the § 1605(a)(3) contains no such requirement, and the D.C. Circuit has recently declined the invitation to impose one. *Chabad*, 528 F.3d at 948-49 (holding that it is "likely correct" that a plaintiff invoking the expropriation exception is not required to exhaust local remedies before litigating in the United States.)

Defendants argue that a separate definition of "commercial activity" set forth at 28

U.S.C. § 1603(e) should also apply here, and therefore, the necessary commercial activity under

the expropriation exception must involve "substantial contact" with the United States.  (Opp. at

37-39; *see* 28 U.S.C. § 1603(e).)  But the D.C. and Ninth Circuits have recently rejected this very

argument.  Section 1603(e) sets forth the definition of "commercial activity *carried on* in the

United States by a foreign state" (emphasis added), and applies it only to cases brought under the

first clause of § 1603(a)(3) (cases in which the property is alleged to be "present in the United

States in connection with commercial activity carried on in the United States by the foreign

state").  It does *not* apply to cases such as this one that are brought under the second clause of §

1603(a)(3).  As the D.C. Circuit recently explained when confronted with a similar challenge by

Russia:

> Congress took the trouble to use different verbs in the separate
> prongs, and to define the phrase in the first prong.  Russia wants us
> to turn that upside down and obliterate the distinction Congress
> drew.  Moreover, we see no anomaly in applying the "commercial
> activity definition set forth in § 1603(d). . . .  The substantiality
> requirement of § 1603(e) is thus inapplicable.

*Chabad*, 528 F.3d at 947; *accord Cassirer*, 616 F.3d at 1033 n.19 ("The second clause . . . is

subject to the broader definition of 'commercial activity' in § 1603(d), which does not mention

'substantial contact.'").

Plaintiffs have pled—and defendants admit—that the Museums and the University (both

agencies or instrumentalities of Hungary) are in possession of the pieces of the Herzog

Collection identified in the Complaint.  (Compl. ¶¶ 2, 15-20; Opp. at 45.)  Moreover, "possession

is sufficient to satisfy the 'owned or operated' requirement of 28 U.S.C. § 1605(a)(3)."  *Chabad*,

729 F. Supp. 2d at 147.  Moreover, plaintiffs have established for jurisdictional purposes that the

Museums and the University are engaged in "either a regular course of commercial conduct or a

particular commercial transaction or act" in the United States as of the commencement of this action.  28 U.S.C. § 1603(d).  Specifically, the Complaint alleges that the Museums and University have loaned art to museums located in the United States and received reciprocal benefits in exchange; encouraged United States tourism and allowed United States visitors to purchase admission tickets over the internet; published guidebooks in English featuring paintings from the Herzog Collection which are sold to visitors from the United States at the museum gift shop, which accepts U.S. credit cards; authored and promoted  books and other publications about the paintings, and sold these books online through Amazon; accepted orders for printed reproductions of the paintings directly from U.S. residents and shipped those prints directly to the U.S.; engaged in tourist advertising in the U.S. (including promotional brochures that promote works comprising a portion of the Herzog collection); and with respect to the University, participated in student exchange programs and the United States Fulbright Program. (Compl. ¶¶ 32-33.)  These examples are more than sufficient to amount to "commercial activity" for jurisdictional purposes under the FSIA.  *See Chabad*, 528 F.3d 934 at 948 (finding that contracts for the publishing and sale of documents and papers with U.S. publishing firms "easily satisf[ied]" the commercial activity requirement under § 1603(d)); *Cassirer*, 461 F. Supp. 2d  at 1173-76 (state-owned Foundation alleged to have, *inter alia*, sold posters, books, and licensed reproductions of images in the U.S., shipped gift-shop items to U.S. purchasers, and placed advertisements in magazines distributed in the U.S.).

Given this showing that one of the FSIA exceptions applies, the Court concludes that it has subject matter jurisdiction over plaintiffs' claims.[4]

---

[4] Plaintiffs also assert that this Court has jurisdiction under the FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2).  (Compl. ¶ 35; Opp. at 38-42.)  Because the Court finds that the expropriation exception applies, it need not address this argument.

III.     1973 AGREEMENT & CLAIMS SETTLEMENT COMMISSION

Defendant argues that plaintiffs' claims are governed by the 1973 Agreement, which they

argue settled and precluded all claims for the "nationalization, compulsory liquidation,

expropriation or other taking" of property between 1939 and 1973.  (Mot. at 16.)  As the FSIA

was adopted "[s]ubject to existing international agreements to which the United States is a party

at the time of the enactment of this Act [enacted Oct. 21, 1976]," 28 U.S.C § 1604, defendants

conclude that plaintiffs claims are barred and that this Court lacks jurisdiction.  (Opp. at 21-28.)

In response, plaintiffs correctly point out that the 1973 Agreement was based on the

concept of espousal, which is the process by which a state acts on behalf of its citizens to settle

claims against another state on their behalf, and as a result, the United States may only espouse

claims by persons who were United States citizens at the time of their injury.  *Dayton v.*

*Czechoslovak Socialist Republic*, 834 F.2d 203, 206 (D.C. Cir. 1987).

Defendants counter that the 1973 Agreement lacks an explicit provision that only claims

of U.S. nationals who were citizens at the time of the alleged taking are covered and

extinguished by the Agreement, citing contract cases for the "well-settled principle of contract

law, that the plain and unambiguous meaning of an instrument is controlling."  (Reply at 7.)  The

1973 Agreement, however, is an international treaty—not a private contract—and must be

interpreted as such.  While "[t]he interpretation of a treaty, like the interpretation of a statute,

*begins* with its text," *Medellin v. Texas*, 552 U.S. 491, 506 (2008) (emphasis added), a treaty is

"'an agreement among sovereign powers,'" and as such courts may consider "the negotiation and

drafting history of the treaty as well as 'the postratification understanding of signatory nations.'"

*Id.* at 507 (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996)).

Both Hungary and the United States expressly recognized the inherent limitations on

espousal authority during negotiations of the 1973 Agreement.  (Opp. Benenati Decl. Ex. E at

24

238 (minutes of negotiations of 1973 Agreement in which Hungary's chief negotiator

acknowledges (and the United States negotiator confirms) that the United States did not have

standing to espouse claims on behalf of persons who were not U.S. citizens at the time their

property was taken).)  Moreover, the State Department clearly and consistently recognized this

interpretation of the 1973 Agreement immediately after its execution.  (Opp. Benenati Decl. Ex.

H (1973 letter from State Department personnel explaining to a member of Congress that it is a

"universally accepted principle of international law that a state does not have the right to ask

another state to pay compensation to it for losses sustained by persons who were not its citizens

at the time of loss"); *id.* Ex. G (1973 letter from State Department personnel to potential claimant

explaining that "[u]nder customary international law, a state has standing to present a claim

against another state only if the claim belongs to one of its nationals and it has been owned by

the national from the date of its accrual to the date of settlement").)   Indeed, in a 2002 letter, the

State Department Office of the Legal Advisor stated:

> The [1973] Agreement settled and discharged certain claims
> against the Government of Hungary of U.S. nationals who were
> U.S. nationals at the time their claims arose.  It did not settle or
> discharge claims of U.S. nationals who became U.S. nationals after
> their claims arose.  This position has been conveyed consistently
> by the executive branch of the United States Government to
> Members of Congress and U.S. claimants. . . .  Additionally, we
> communicated this view long ago to the Government of Hungary;
> subsequently, we were informed by the head of Hungary's
> domestic compensation program that it shared this interpretation
> and had administered its program in a manner consistent with this
> view.

(*Id.* Ex. F.)  *See also Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982)

("Although not conclusive, the meaning attributed to treaty provisions by the Government

agencies charged with their negotiation and enforcement is entitled to great weight.") (citation

omitted).  Accordingly, even if the United States were able to settle and bar the claims of non-

citizens, it is clear that this was not the interpretation ascribed to the Agreement by the United States or Hungary at any time before, during, or after its negotiation (at least until Hungary took such a position in connection with this case).  Therefore, the 1973 Agreement can only settle and bar those of plaintiffs' claims that arose out of takings by Hungary between 1952 (the year Elizabeth Weiss de Csepel became a U.S. citizen)[5] and 1973.

Plaintiffs assert that the 1973 Agreement cannot bar any of their claims because there was no such "taking" between 1952 and 1973.  (Opp. at 45.)  Any relevant "takings," they claim, occurred during the Holocaust and in 2008 when Hungary repudiated the demand of Martha Nierenberg for the return of the art, thereby breaching the bailment created after World War II.  (Opp. at 45; Compl. ¶¶ 79, 94, 104, 107.)  The only potential United States citizen who could have been covered by the 1973 Agreement is Elizabeth Weiss de Csepel, and only then if there was a taking of her property between 1952 and 1973.

To the extent defendants argue that plaintiffs' art was taken pursuant to the 1954 Museum Decree, the Complaint alleges a substantial and nonfrivolous claim to the contrary.  The 1954 Museum Decree applied to art that was in the custody of a Hungarian museum and whose owner was either unknown or had left the country without permission.  (Opp. Lattman Decl. ¶ 32; Bánki Decl. Ex. C § 9(1).)  Plaintiffs assert that neither of these conditions applies to Ms. Weiss de Csepel's art, as defendants "always knew who owned the items from the Herzog Collection that were in their possession, and Elizabeth Weiss de Csepel cannot be considered to have left the country without permission." (Opp. at 47; Opp Pasztory Decl. ¶¶ 11-12; Opp. Varga Decl. ¶¶ 12-15.)

---

[5] Istaván Herzog, András Herzog, and their heirs were not American citizens at any point prior to 1973. (Opp. at 7, 45; Compl. ¶¶ 42, 63, 64.)

Defendants argue that the claim filed by Elizabeth Weiss de Csepel with the Foreign

Claims Settlement Commission under the First Hungarian Claims Program extinguished at least

a portion of plaintiffs' claims here, given that the Commission ultimately awarded partial

compensation to Ms. Weiss de Csepel for twelve works of art, "which were taken without

compensation by the Government of Hungary" pursuant to the 1954 Museum Decree.  (Mot.

Ramirez Decl. Ex. C at 2.)  Because the 1955 Claims Amendment (codified at 22 U.S.C. §

1641m) provides that "[t]he action of the Commission in allowing or denying any claim under

this title [22 U.S.C. §§ 1641 *et seq.*] shall be final and conclusive on all questions of law and fact

and not subject to review . . . by any court," defendants conclude that this Court lacks

jurisdiction to review plaintiffs' claims as to these twelve paintings.

Ms. Weiss de Csepel, however, was only partially compensated by the Commission,

receiving a payment of just $169,827 for both the artwork and the confiscated real property.

(Opp. Benenati Decl. Ex. D.)  Therefore, the award from the Commission under the First

Hungarian Claims Program did not prevent Ms. Weiss de Csepel from seeking additional

recovery from Hungary, including restitution of the property itself.  Section 313 of the 1955

Claims Amendment provided:

> Payment of any award made pursuant to section 303 or 305 shall
> not, unless such payment is for the full amount of the claim, as
> determined by the Commission to be valid, with respect to which
> the award is made, extinguish such claim, or be construed to have
> divested any claimant, or the United States on his behalf, of any
> rights against the appropriate foreign government or national for
> the unpaid balance of his claim *or for restitution of his property*.

Act of August 9, 1955, Pub. L. No. 84-285, 1955 U.S.C.C.A.N. (69 Stat. 570) 2745, 2748

(codified at 22 U.S.C. § 1641*l*) (emphasis added).  Plaintiffs are therefore not seeking to review

or overturn "the action of the Commission in allowing or denying any claim," 22 U.S.C. §§

1623(h), 1641(m), and accordingly, the 1955 Claims Amendment does not strip this Court of jurisdiction.

## IV.    FAILURE TO STATE A CLAIM

Defendants raise several challenges to plaintiffs' bailment claims pursuant to Rule 12(b)(6).  First, defendants assert that the 1947 Peace Treaty signed by Hungary cannot create private rights or provide for a private cause of action, such as an action for bailment, in the absence of express language providing for such an action in the treaty.  (Reply at 12-13.)  As the Peace Treaty does not contain such express language, defendants argue that "Plaintiffs' theory that the Peace Treaty purports to provide them with a private cause of action (bailment) against Hungary fails."  (*Id.* at 13.)  Plaintiffs' claims, however, do not depend on the existence of a bailment created by the Peace Treaty itself.  Rather, the Complaint alleges breach of express and/or implied bailment agreements between defendants and the Herzog family.  Specifically, the Complaint alleges:

> Hungary, the Museums and the University knew at all relevant times that the Herzog Heirs owned the Herzog Collection and that certain of the Herzog Heirs resided in the United States.  Hungary, the Museums and the University arranged with representatives of the Herzog Heirs to retain possession of most of the Herzog Collection, including the art belonging to the U.S. Herzog Heirs, so that the works could continue to be displayed in Hungary.  The post-war relationship between Hungary, the Museums, the University and the Herzog Heirs with respect to the Herzog Collection was in essence a bailment, whereby Defendants retained possession of the art and displayed it for financial fain in the Museums and the University.

(Compl. ¶ 36; *see also id.* ¶ 99 ("the Herzog Heirs and the representatives had no choice but to re-deliver possession, or to consent to Defendants' retention of possession of those portions of the Herzog Collection"); *id.* ¶¶ 70-73 (noting that defendants "recogniz[ed] the ownership rights of the Herzog Heirs to the Herzog Collection" and displayed the works "with labels

acknowledging that they were 'on deposit,'" defendants "harassed and threatened"

representatives of the Herzog family until they agreed to "return" the Herzog Collection to

defendants and to allow the artwork to remain in the defendants' physical possession).

Therefore, while plaintiffs' bailment claim is *consistent* with Hungary's representations

in the 1947 Peace Treaty (*see* Compl. ¶ 69 ("The 1947 Peace Treaty . . . confirmed that Hungary

was to act solely as a custodian or trustee of looted or heirless property")), plaintiffs do not assert

that the bailment was created by virtue of the Peace Treaty.[6]

Defendants further suggest that plaintiffs' bailment theory fails as a matter of law.  In the

District of Columbia, a bailment requires delivery by the bailor, acceptance by the bailee, and a

change of possession and control from one to the other.  *Bernstein v. Noble*, 487 A.2d 231, 234

(D.C. 1985).  Defendants suggest that because they *already possessed* the artwork at the time the

bailments were allegedly created, no "change in possession and control" could have occurred at

that time, thereby defeating the creation of a bailment.  (Reply at 14.)  Defendants' argument,

however, lacks legal support.  The cases cited by defendants stand for the unremarkable

proposition that a change in possession and control is a necessary condition for the creation of a

bailment.  *See Black Beret Lounge & Restaurant v. Meisnere*, 336 A.2d 532, 532 (D.C. 1975)

(no bailment where restaurant never had possession or control of coat left in an unattended

cloakroom); *Dumlao v. Atlantic Garage, Inc.*, 259 A.2d 360, 362 (D.C. 1969) (no bailment of

property in automobile trunk where hotel had no knowledge of the trunk's contents).  In other

---

[6] Plaintiffs have been less than clear in maintaining this distinction.  (*See* Opp. at 9 (referring to the "bailment relationship that Hungary agreed to in the 1947 Peace Treaty").)  As plaintiffs have now clarified that they do not "rely upon or challenge the terms, conditions, or validity of the Peace Treaty," or "seek to claim directly under the Peace Treaty" (Surreply at 5), defendants' arguments (*see* Reply at 2-4) challenging their ability to do so are moot.

words, no bailment can be created where the bailee never possesses the property at all or does not know that he has accepted the property.  These cases do not stand for the altogether different proposition that no bailment is created where the transfer of possession and control has *already occurred*.  *See* 8A Am. Jur. 2d Bailments § 40 (2011) (acknowledging existence of bailments arising "where the bailee is already in possession of the property"); *Hoffmann v. United States*, 17 F. App'x 980, 989 (Fed. Cir. 2001) (finding genuine issue of material fact as to the existence of an implied-in-fact bailment where property seized in 1945 and authorized Government officials subsequently made representations that it would be returned).  Here, since defendants admit to possession of the artwork in question (Opp. at 45), it is undisputed that the requisite transfer of possession and control from the Herzog family to defendants has occurred.

Defendants also argue that plaintiff cannot show that Hungary consented to the creation of a bailment, a deficiency they claim is dispositive because a bailment is a form of contract requiring mutual consent of the parties.  The assent of the parties to a bailment, however, may be implied from the conduct of the parties.  *Hoffman v. United States*, 266 F. Supp. 2d 27, 39 (D.D.C. 2003) ("An implied-in-fact bailment contract with the Government is created if property is seized and there is 'a promise, representation or statement by an authorized [G]overnment official' that the seized property will be returned." (quoting *Ysasi v. Rivkind*, 856 F.2d 1520, 1525 (Fed. Cir. 1988)) (internal quotation marks and citation omitted); 8A Am. Jur. 2d Bailments § 37 ("A contract of bailment may be implied from the circumstances of a transaction or from the words and acts of the parties evincing a purpose to enter into that relation toward the property.").  In addition, the law recognizes a so-called "constructive bailment" or "quasi-bailment" under circumstances "where the person having possession of a chattel holds it under such circumstances that the law imposes on him or her the obligation of delivering it to another,"

even without an explicit agreement between the bailor and the bailee.  *Id.* § 12; *id.* § 2 ("A constructive bailee is a person who acquires possession of another's property by mistake or accident, or by force of circumstances under which the law imposes upon him or her the duties of a bailee."); *see also First American Bank, N.A. v. District of Columbia*, 583 A.2d 993, 996-97 (D.C. 1990) (finding quasi-bailment where District impounded illegally parked vehicle).

Here, plaintiffs have pled that defendants, while recognizing the ownership rights of the Herzog Heirs, exercised possession and control over the Herzog Collection in such a manner as to imply a bailment relationship.  (*See* Compl. ¶¶ 36, 70-73, 99).  In addition, plaintiffs charge that Hungary made public representations concerning Holocaust-looted property in the 1947 Peace Treaty that are consistent with plaintiffs bailment theory.  (Compl. ¶ 69 ("The 1947 Peace Treaty among Hungary and the Allies confirmed that Hungary was to act solely as a custodian or trustee of looted or heirless property [and that] under no circumstances could Hungary itself possess any right, title or interest in the property.").)[7]  Accordingly, plaintiffs' allegations are sufficient at this stage to state a claim for bailment.  *See Rosner v. United States*, 231 F. Supp. 2d 1202, 1214-15 (S.D. Fla. 2002) (denying motion to dismiss claim for breach of implied-in-fact contract of bailment where government accepted possession of plaintiffs' property with the express knowledge that the property belonged to plaintiffs; never claimed to be the owner of the property; took possession of the property with the express intent of undertaking to return the property to its rightful owners; stored and guarded the property so that it could be returned to its

---

[7] As noted above (*see supra* note 4), the Court is not suggesting that the Peace Treaty itself created the alleged bailment.  Rather, it serves as evidence of the relationship between the parties at that time.

rightful owners; and indicated, expressly and through applicable laws, that the property would be returned).[8]

## V.     FORUM NON CONVENIENS

Defendants argue that the Court should dismiss the action under the doctrine of forum non conveniens.  In deciding forum non conveniens claims, the Court must first determine whether an adequate alternative forum for the dispute is available, and if so, whether a balancing of the private and public interest factors strongly favors dismissal.  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 & n.22 (1981).  There is a substantial presumption in favor of a plaintiff's choice of forum, *see Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."); *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005), and a determination under the doctrine is a discretionary one, *see Am. Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994).

The burden is on the defendants to satisfy the threshold requirement of demonstrating the existence of an adequate alternate forum with jurisdiction over the case.  *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996).  Defendants argue that Hungary is an adequate alternate forum, and at least two district courts in the past ten years have reached a similar conclusion.  *See Moscovits v. Magyar Cukor Rt.*, 00-cv-0031, 2001 U.S. Dist. LEXIS 9252, at *14 (S.D.N.Y. June 29, 2001) (granting motion to dismiss on forum non conveniens grounds because Hungary was an adequate alternative forum); *Dorfman v. Marriott Int'l Hotels, Inc.*, 99-

---

[8] Defendant has also moved to dismiss plaintiffs' additional claims for conversion, constructive trust, accounting, declaratory relief, and restitution based on unjust enrichment on the grounds that they are not independent causes of action, but rather are predicated on plaintiffs' bailment claim.  (Reply at 16-18.)  As the Court finds that the Complaint does state a claim for bailment, defendants' challenge to these additional claims must also be rejected.

cv-10396, 2001 U.S. Dist. LEXIS 642, at *23 (S.D.N.Y. Jan 26, 2001) (noting that Hungary is an adequate forum).  Hungarian courts demonstrably have jurisdiction to hear plaintiffs' claims, as evidenced by the Nierenberg litigation that occurred there between 1999 and 2008.  Plaintiffs assert that the Hungarian courts cannot provide them with appropriate redress because, in their view, "Hungarian courts consider any claims to the Herzog Collection to be barred by the passage of time."  (Opp. at 52.)  As the opinion from the Nierenberg litigation makes clear, however, the Hungarian courts have not taken a uniform position with regard to all Holocaust-era artwork, or even as to the entire Herzog Collection.  Rather, the Metropolitan Appellate Court (as well as the lower Hungarian courts) analyzed plaintiffs' claim to each piece of art separately, taking account of the particular factual circumstances and history surrounding each painting  before arriving at its decision.  (*See* Mot. Bánki Decl. Ex. M.)  Having already lost their case in Hungary as to the eleven pieces of art at issue there, plaintiffs may well be justified in their belief that they would lose a similar case regarding the rest of the Herzog Collection.  But a foreign forum "is not inadequate merely because it has less favorable substantive law." *El-Fadl*, 75 F.3d at 678.

Assuming, therefore, that Hungary is an adequate alternative forum, the Court nevertheless concludes that defendants have failed to show that the balance of private and public factors favors dismissal in this case.  The relevant private interest factors are: (1) "relative ease of access to sources of proof"; (2) "availability of compulsory process for attendance of unwilling" witnesses; (3) cost of attendance of witnesses; (4) enforceability of a judgment, if obtained; and (5) "other practical problems that make trial of a case easy, expeditious and inexpensive." *Am Dredging*, 510 U.S. at 448 (citing *Gulf Oil*, 330 U.S. at 508).  Relevant public interest factors include: (1) the preference for deciding local controversies at home, and

conversely (2) the preference for resolving significant issues in a more central forum; (3) in diversity cases, the familiarity of the forum with applicable state law; and (4) the burden of jury duty on citizens of a forum unrelated to the case. *Id.* at 448-49 (citing *Gulf Oil*, 330 U.S. at 508-09).

As to the private interest factors, Hungary maintains that as the events at issue in this action took place in Hungary, any relevant witnesses that are still alive are most likely located in Hungary and speak Hungarian or Magyar as their first language. (Mot. at 42.)  In addition, Hungary notes that it is "a democratic nation, recognized member of the European Union, and is the [former] president of the European Union," and thus "it cannot be reasonably asserted that Plaintiffs (or their predecessors) could not receive a fair trial in that country." (*Id.*)  Plaintiffs counter that many relevant witnesses—namely, plaintiffs themselves as well as Martha Nierenberg—all live outside Hungary.  Language concerns, therefore, do not shift the balance in favor of Hungary, as relevant depositions and documents would require translation regardless of where this matter is heard. *See Chabad*, 466 F. Supp. 2d at 29 (rejecting cost of translating documents as a significant factor where documents would require translation regardless of forum).  In addition, plaintiffs note that the Court has the power to attach Hungary's property in the United States in aid of executing any judgment rendered under the FSIA. *See* 28 U.S.C. § 1610(a)(3), (b)(2).  Thus, as to the private factors, it cannot be concluded that they favor dismissal.

As for the public factors, Hungary argues that Hungarian courts have an interest in having local controversies decided at home and are better able to interpret and apply both current and historical Hungarian laws as they apply to plaintiffs' claims. (Mot. at 42; Reply at 38.)  This showing by Hungary does little more than state the public interest factors, and falls far short of

demonstrating that the "strong presumption" in favor of plaintiffs' choice of forum should be disturbed. *Piper Aircraft*, 454 U.S. at 255. This Court is a designated forum for all actions brought under the FSIA, *see* 28 U.S.C. § 1391(f)(4), and is familiar with the issues of law presented by such a case. *See, e.g.*, *Chabad*, 466 F. Supp. 2d 6. Moreover, "there is a public interest in resolving issues of significant impact in a more central forum, such as this one." *Id.* at 29-30 (citing *Gulf Oil*, 330 U.S. at 509). As this is not a diversity case, but one implicating matters of international law, either Hungary or the United States may have to deal with foreign legal concepts. *See Gulf Oil*, 330 U.S. at 509. Finally, the Court notes that there is no burden on potential jurors, as jury trials are not available in suits brought under the FSIA. *Chabad*, 466 F. Supp. 2d at 30.

For all of these reasons, the Court denies defendants' motion to dismiss on forum non conveniens grounds.

## VI. STATUTE OF LIMITATIONS

Defendants argue that plaintiffs' claims are barred by the applicable statute of limitations. Motions to dismiss "based on a limitations defense are disfavored because resolution generally requires the development of a record and the adjudication of factual issues." *Malewicz v. City of Amsterdam*, 517 F. Supp. 2d 322, 335 (D.D.C. 2007) (citing *Richards v. Mileski*, 662 F.2d 65, 73 n.13 (D.C. Cir. 1981). "Dismissal on statute of limitations grounds is only appropriate when the complaint establishes the defense on its face." *Id.*

The statute of limitations at issue here is the District of Columbia's three-year statute for claims relating to "the recovery of personal property or damages for its unlawful detention." D.C. Code § 12-301(2); *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1025 n.7 (D.C. Cir. 1982) ("The applicable statute of limitations [in a FSIA case] is determined by the local law of the forum."). The District of Columbia followed the "discovery rule," which provides that a cause

of action accrues "when the plaintiff knows or through the exercise of due diligence should have known of the injury." *District of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995). Here, plaintiffs' claims are based on the repudiation of bailments created at the end of World War II.  Accordingly, "a claim for conversion accrues when the plaintiff demands the return of the property and the defendant refuses, or when the defendant takes some action that a reasonable person would understand to be either an act of conversion or inconsistent with a bailment." *Malewicz*, 517 F. Supp 2d. at 335 (citing *In re McCagg*, 450 A.2d 414, 416 (D.C. 1982)).

Defendants claim that numerous events have transpired since the end of World War II that have triggered the three-year statute of limitations, including Elizabeth Weiss de Csepel's claim before the Foreign Claims Settlement Commission in 1959, plaintiffs' learning that "many pieces of the Herzog collection were being openly exhibited" in Hungary (Compl. ¶ 77), Ms. Weiss de Csepel's death in 1992 (Compl. ¶¶ 78, 79), and the filing of the Nierenberg litigation in Hungary in 1999.  Thus, at the very least, Hungary argues, the statute of limitations expired in October 2002, three years after Ms. Nierenberg filed suit in Hungary following the collapse of negotiations between plaintiffs and the Hungarian government.

In response, plaintiffs assert that Ms. Weiss de Csepel was mistaken in her belief in the late 1950s that Hungary had nationalized a portion of the Herzog Collection pursuant to the 1954 Museum Decree because plaintiffs were unable to obtain accurate information as to what had become of the Collection during the Communist era.  (Compl. ¶¶ 75, 93.)  Moreover, defendants have failed to point to actions of the *defendants* (as opposed to Ms. Weiss de Csepel) in the late 1950s with respect to the Herzog Collection "that a reasonable person would understand to be

either an act of conversion or inconsistent with a bailment." *See Malewicz*, 517 F. Supp 2d. at 335.

In any event, plaintiffs assert that their claims should be equitably tolled during the Communist era. A statute of limitations may be equitably tolled "when the plaintiff 'despite all due diligence . . . is unable to obtain vital information bearing on the existence of his claim.'" *Chung v. U.S. Dept. of Justice*, 333 F.3d 273, 278-79 (D.C. Cir. 2003) (quoting *Currier v. Radio Free Europe*, 159 F.3d 1363, 1367 (D.C. Cir. 1998) (alteration in original). The Complaint alleges precisely this—that plaintiffs were unable to obtain information about the fate of the Herzog Collection during the Communist era and would not have been able to obtain relief even had they obtained such information, given that Hungary did not have an independent judiciary (or even recognize most individual property rights) during this period. (Compl. ¶¶ 75, 76, 93.)

Although plaintiffs may have learned additional information concerning the whereabouts of the Herzog Collection between 1989 and 1999, plaintiffs argue that their bailment action had not yet accrued at this time. "Where a demand and refusal are relied on to show a conversion, the refusal must be absolute and unconditional . . . . A refusal which is not absolute, but is qualified by certain conditions which are reasonable and justifiable . . . is not a sufficient basis for a conversion action." *Malewicz*, 517 F. Supp 2d. at 335 (citing 90 C.J.S Trover & Conversion § 45 (2006)); *see also* Restatement (Second) of Torts § 240 ("[O]ne in possession of a chattel who is in reasonable doubt as to the right of a claimant to its immediate possession does not become a converter by making a qualified refusal to surrender the chattel to the claimant for the purpose of affording a reasonable opportunity to inquire into such right.").

The Complaint alleges that the Herzog Heirs "promptly commenced negotiations with the Hungarian government following the collapse of Communism in 1989" (Compl. ¶ 94), and

that these negotiations continued until Ms. Nierenberg filed suit in Hungary in 1999.  (Compl. ¶¶ 77-79.)  Moreover, the Complaint further states that "for years, Hungary actively misled the Herzog Heirs into believing that it accepted their ownership rights to the Herzog Collection, was giving their claims serious consideration, and repeatedly advised them that it would reach a favorable decision, at which time they could decide if any further action would be required." (Compl. ¶ 94.)  Assuming plaintiffs can establish these facts, plaintiffs' bailment action could not have arisen during the period in which they were engaged in good-faith negotiations with the Hungarian government, as defendants had not yet "absolutely and unconditionally" refused plaintiffs' demand for return of the Collection.

Finally, plaintiffs suggest that their claims should be tolled during the pendency of the Nierenberg litigation.  While the District of Columbia has no provision automatically tolling the applicable statutes of limitation during the pendency of actions in foreign courts, plaintiffs argue that the claims should be equitably tolled during this period.  (Opp. at 60-61.)  As the Court has noted previously in the administrative context, in certain circumstances it may be "appropriate to equitably toll statutes of limitations under D.C. law where claimants first sought to exhaust their available administrative remedies."  *Owens v. District of Columbia*, 631 F. Supp. 2d 48, 57 (D.D.C. 2009); *accord Pettaway v. Teachers Ins. & Annuity Ass'n of Am.*, 547 F. Supp. 2d 1, 5-6 (D.D.C. 2008) (finding "good cause to equitably toll the District of Columbia's three-year statute of limitations" for plaintiff's ERISA claim because she pursued her rights diligently through mandatory channels for exhausting administrative remedies); *Waldau v. Coughlin*, No. 95-1151, 1996 WL 312197, at *9 (D.D.C. June 3, 1996) (concluding that plaintiff's efforts to administratively exhaust claims through Merits Systems Protective Board tolled statute of limitations for *Bivens* claims under D.C. law); *cf. Gull Airborne Instruments, Inc. v. Weinberger*,

694 F.2d 838, 844 & n.8 (D.C. Cir. 1982) (rejecting laches defense where delay in filing suit resulted from exhausting administrative remedies because, *inter alia*, "it would be an injustice to unsuccessful bidders [on government procurement contracts] if we now penalized them merely for exhausting those administrative remedies" and because plaintiff's "many attempts to receive administrative relief served to put the government on notice that [plaintiff] was not sleeping on its rights").

Defendants cite several cases which stand for the proposition that the District of Columbia does not automatically toll statutes of limitations where a plaintiff mistakes her remedy by filing in the wrong venue or otherwise commits procedural error. *See Carter v. Wash. Metro. Area Transit Auth.*, 764 F.2d 854, 857 (D.C. Cir. 1985). But even defendants do not claim the plaintiff erred by litigating this matter in Hungary before filing here. Rather, defendants allege that plaintiffs were *required* to exhaust their remedies in Hungary prior to filing suit here (Mot. at 17 n.15 & 18), a fact that, if anything, supports plaintiffs' plea for equitable tolling. In addition, to the extent that Hungary made representations during the Nierenberg litigation "that it would reach a favorable decision, at which time they could decide if any further action would be required" (Compl. ¶ 94), this could serve as additional evidence to support equitable tolling. *See Young v. United States*, 535 U.S. 43, 50 (2002) (equitable tolling permitted in situations "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass").

The Court therefore concludes that the Complaint states fact which, if true, could support a finding that this action is timely. Accordingly, the Court declines to resolve this issue on a motion to dismiss.

## VII.    ACT OF STATE DOCTRINE

Hungary invokes the act of state doctrine, which "'precludes the courts of this country from inquiring into the validity of public acts of a recognized foreign sovereign power committed within its own territory.'"  *World Wide Minerals v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)).  The doctrine rests on the view that such judgments might hinder the conduct of foreign relations by the branches of government empowered to make and execute foreign policy, *Sabbatino*, 376 U.S. at 423-25, and applies whenever either "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign."  *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990).  The act of state doctrine "'is not a jurisdictional limit on courts,'" *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir. 1992) (quoting *Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989)), and a motion to dismiss based on the act of state doctrine is therefore properly considered under Rule 12(b)(6), not Rule 12(b)(1).  In order to dismiss a complaint under Rule 12(b)(6) based on the act of state doctrine, the Court "must be satisfied that there is no set of facts favorable to the plaintiffs and suggested by the complaint which could fail to establish the occurrence of an act of state."  *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1534 (D.C. Cir. 1984), *rev'd on other grounds*, 471 U.S. 1113 (1985).

The "key question" in determining whether the act of state doctrine applies, is "whether the act in question is truly a *sovereign* act—that is, an act '*jure imperii*,' an act that is taken 'by right of sovereignty.'"  *Malewicz*, 517 F. Supp. 2d at 338 (quoting *Black's Law Dictionary* 854 (7th ed. 1999)).  By contrast, "purely commercial" acts do not require deference under the act of state doctrine.  *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 698 (1976)

As an initial matter, plaintiffs' primary claim for bailment does not implicate the act of state doctrine.  Plaintiffs allege that they entered into a series of bailment agreements with defendants after World War II, and that defendants have breached these bailments by refusing to return the property.  The actions challenged by plaintiffs, therefore, are not "sovereign acts," but rather *commercial* acts that could be committed by any private university or museum.  Such "purely commercial" acts do not require deference under the act of state doctrine.  *Id.* (repudiation of debts a "purely commercial act"); *see Malewicz*, 362 F. Supp. 2d at 314 ("There is nothing 'sovereign' about the act of lending art pieces, even though the pieces themselves might belong to a sovereign.")

The question of jurisdiction under the FSIA (*see supra* Part II), requires this Court to determine whether the Herzog Collection was taken in violation of international law, a question that may implicate the act of state doctrine.  *See Sabbatino*, 376 U.S. at 428 ("[T]he [Judicial Branch] will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit . . . even if the complaint alleges that the taking violates customary international law.")

To the extent the Court is being asked to pass judgment on the acts of a foreign sovereign, however, the sovereigns involved are Nazi Germany and their allies in the World War II-era Hungarian government.   Confronted by similar facts, courts have consistently held that the act of state doctrine does not apply to the Nazi taking of Jewish property during the Holocaust. *See Chabad*, 466 F. Supp 2d at 26 (declaring such takings "manifestly illegal"); *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 130 (E.D.N.Y. 2000) ("The wholesale rejection of the Vichy government at the close of World War II render[s] the Act of State doctrine wholly inapplicable to this case.")  There is no reason to apply a different standard to the actions taken

by Hungary toward its Jewish population during World War II.  (*See* Compl. ¶¶ 54-57; Opp.

Lattmann Decl. ¶¶ 4-18.)  Moreover, the balance of factors weighs against applying the act of

state doctrine where "the government which perpetuated the challenged act of state is no longer

in existence."  *Sabbatino*, 376 U.S. at 428.  Thus, it will not be invoked here.

## VIII.   POLITICAL QUESTION DOCTRINE

With the exception of a single footnote that cited no supporting authority (Opp. at 25

n.19), defendants failed to raise their argument for dismissing this case on political question

grounds until their reply brief, where they devote more than nine pages to the issue.  This is

plainly insufficient under this Circuit's precedents.  *See Sugar Cane Growers Coop. of Fla. v.

Veneman*, 289 F.3d 89, 93 n.3 (D.C. Cir. 2002) ("a footnote at the end of their opening brief does

not suffice" to raise a claim on appeal); *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3

(D.C. Cir. 1999) ("We need not consider cursory arguments made only in a footnote."); *Bean

Dredging, LLC v. United States*, 2011 U.S. Dist. LEXIS 32966, at *14 n.5 (D.D.C. Mar. 29,

2011) (same).

But even if the Court were to consider this argument, it would reject it.  The political

question doctrine is firmly rooted in separation-of-powers principles and instructs that courts

should decline to adjudicate matters which have "in any measure been committed by the

Constitution to another branch of government."  *Baker v. Carr*, 369 U.S. 186, 211 (1962).

Defendants argument that plaintiffs' claims have been committed to the Executive branch

are based entirely on the notion that plaintiffs' claims are addressed and settled by the 1947

Peace Treaty and the 1973 Agreement between Hungary and the United States.  (Reply at 20-

24.)  Plaintiffs' claims, according to defendants, disrupt the Executive branch's determination

that Hungarian claims should be settled through the Foreign Claims Settlement Commission and

call into question the "sufficiency of the[se] compensation schemes."  This argument is

meritless.  Plaintiffs do not challenge the "sufficiency" of the 1973 Agreement or the awards by the Commission, they claim that such measures *do not apply to them at all*.  *See supra* Part III. Nor do plaintiffs' claims require the Court to, as defendants would have it, "evaluate the U.S. foreign policy as well as the sufficiency of the compensation schemes put in place by the United States, other United Nations, and Hungary."  (Reply at 24.)  Rather, they charge that Hungary has breached certain agreements regarding specific artwork in a manner that does not implicate existing international compensatory frameworks at all.  As such, plaintiffs' claims do not implicate separation-of-powers concerns that would justify invocation of the political question doctrine.

## IX.   INTERNATIONAL COMITY

Finally, defendants assert that plaintiffs' claims are barred by the doctrine of international comity, and ask that this Court respect the prior judgment of the Hungarian courts in the Nierenberg litigation by dismissing this case.  (Mot. at 52-56.)

Unlike domestic judgments, foreign judgments are not automatically entitled to preclusive effect in United States courts.  *Hilton v. Guyot*, 159 U.S. 113 (1895).  Instead, "the theory often used to account for the *res judicata* effects of foreign judgments is that of comity." *In re Arbitration Between Int'l Bechtel Co. & Dep't of Civ. Aviation of the Gov't of Dubai*, 300 F. Supp. 2d 112, 117 (D.D.C. 2004); *see also Hilton*, 159 U.S. at 164.  Under the doctrine of international comity, "the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or on appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact" if

> there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own

> country and those of other countries, and there is nothing to show
> either prejudice in the court, or in the system of laws under which
> it was sitting, or fraud in procuring the judgment, or any other
> special reason why the comity of this nation should not allow it full
> effect . . . .

*Id.* at 202.

The judgment in the Nierenberg litigation involved the claims of only a single plaintiff, Martha Nierenberg, and applied only to eleven paintings claimed to be solely owned by her and known to be in the custody of defendants.  The instant matter involves two additional plaintiffs (in addition to Ms. Nierenberg's son), two additional defendants (the Museum of Applied Arts and the University), and over 40 pieces of art, most of which were not at issue in the Nierenberg litigation.  Consequently, the Nierenberg litigation cannot have preclusive effect as to the pieces of artwork not at issue in that litigation.  *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002) ("a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies *based on the same cause of action*") (emphasis added).

As for plaintiffs' claim for the return of the eleven artworks at issue in the Nierenberg litigation, the Court will grant defendants' motion to dismiss on comity grounds.  "[T]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts" unless the foreign judgment is somehow "contrary to . . . crucial public policies." *Laker Airways Ltd. V. Sabena, Belgian World Airlines*, 731 F.2d 909, 931, 937 (D.C. Cir. 1984).  Ms. Nierenberg litigated her claim to twelve pieces of the Herzog Collection in Hungary for over eight years, asserting causes of action similar to those set forth here.  The Nierenberg litigation resulted in the return of one piece of artwork and a lower court judgment for the return of ten others.  (Opp. Varga Decl. ¶¶ 7-8, Ex. A.)  This decision was ultimately overturned by the Metropolitan Court of Appeals in a sixteen-page decision that examined the factual circumstances surrounding each of the eleven paintings still at issue.  (Mot. Bánki Decl.,

Ex. M.)  The Metropolitan Court of Appeals ultimately determined that Ms. Nierenberg's claim

had been extinguished by the 1973 Agreement, and that additional defendants had acquired title

through adverse possession.  (*Id.*)

Plaintiffs charge that the Hungarian courts "improperly held that the 1973 Agreement

covered takings" that were plainly outside its scope, thereby violating the "strong public interest"

of the United States "in ensuring that its executive agreements . . . are interpreted correctly.

(Opp. at 70.)  Plaintiffs further allege that Hungary "has a long history of avoiding accepting

responsibility for its acts of genocide during World War II and has consistently avoided any

meaningful attempt to restitute property—and especially art—belonging to Hungarian Jews."

This is precisely the type of "mere assertion" by a party that a foreign judgment "was erroneous

in law or in fact" that the Supreme Court has held *may not* be grounds for declining to respect the

results of foreign judgments.  *Hilton*, 159 U.S. at 202.  Plaintiffs do not assert, as they must, that

there has not been an "opportunity for a full and fair trial" in Hungary "before a court of

competent jurisdiction, conducting the trial upon regular proceedings."  *Id.*  Defendants appeared

in the prior case, and plaintiffs have not charged that Hungary's judiciary is unable "to secure an

impartial administration of justice" in actions against the Hungarian government or its agencies

or instrumentalities.  *Id.*  Moreover, the record is devoid of evidence of "either prejudice in the

court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or

any other special reason why the comity of this nation should not allow it full effect."  *Id.*

## CONCLUSION

For the foregoing reasons, defendants' Motion to Dismiss is granted as to plaintiffs' claims to the eleven pieces of artwork at issue in the Nierenberg litigation but denied in all other respects.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   September 1, 2011