**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **DAVID L. de CSEPEL,** *et al.* ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **No. 1:10-cv-01261(ESH)** |
| ) | |
| **REPUBLIC OF HUNGARY,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS REPUBLIC
OF HUNGARY, THE HUNGARIAN NATIONAL GALLERY, THE MUSEUM OF FINE
ARTS, THE MUSEUM OF APPLIED ARTS, AND THE BUDAPEST UNIVERSITY OF
TECHNOLOGY AND ECONOMICS FOR CERTIFICATION PURSUANT TO 28 U.S.C.
§ 1292(b) TO APPEAL ISSUES ARISING FROM THIS COURT'S SEPTEMBER 1, 2011,
<u>DECISION AND ORDER</u>**

Defendants Republic of Hungary, The Hungarian National Gallery, The Museum of Fine

Arts, The Museum of Applied Arts, and The Budapest University of Technology and Economics

(collectively "Hungary"), by and through their attorneys, hereby respectfully submit this Reply

Memorandum in support of their Motion, pursuant to 28 U.S.C. § 1292(b), to certify five issues

arising from this Court's September 1, 2011, Memorandum Opinion and Order (the "Order")

granting, in part, and denying, in part, Hungary's Motion to Dismiss the Complaint.

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ANALYSIS.............................................................................................................................. 1

I.      STANDARD FOR 28 U.S.C. § 1292(b) CERTIFICATION ............................................ 1

II.     SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION EXISTS
       REGARDING EACH ISSUE RAISED.......................................................................... 2

      A.     Forum Non Conveniens ...................................................................... 3

      B.     Statute of Limitations......................................................................... 5

      C.     Political Question............................................................................... 7

      D.     Bailment............................................................................................ 9

      E.     Act of State ...................................................................................... 12

III.    CERTIFICATION OF THE COURT'S INTERNATIONAL COMITY RULING
       IS NOT AUTHORIZED BY 28 U.S.C. § 1292(b) ......................................................... 13

CONCLUSION...................................................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Agudas Chasidei Chabad v. Russian Fed'n*, 466 F. Supp. 2d 6 (D.D.C. 2006) ......................12, 13

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ...............................................................8

*APCC Servs., Inc. v. Sprint Commc'ns Co.,* 297 F. Supp. 2d 90 (D.D.C. 2003).......................2, 14

*Baldwin County Welcome Center v. Brown*, 466 U.S. 147 (1984)...................................................5

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ......................................................13

*Bell v. Morrison*, 1 Pet. 351, 7 L.Ed. 174 (1828)...........................................................................5

*BlackRock, Inc. v. Schroders PLC*, No. 07 Civ. 3183, 2007 U.S. Dist. LEXIS 39279
(S.D.N.Y. May 30, 2007)...........................................................................................................4

*Bodner v. Banque Paribas*, 114 F. Supp. 2d 117 (E.D.N.Y. 2000)..............................................12

*BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73 (D.D.C. 2003)....................................4

*Burnett v. New York Central R. Co.*, 380 U.S. 424 (1965) .............................................................5

*Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234 (2d Cir. 2004) ...........................4

*Chase Sec. Corp. v. Donaldson*, 325 U.S. 304 (1945)...................................................................5

*Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30
(D.D.C. 2002) ...........................................................................................................................4

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962).......................................................................11

*Dayton v. Czechoslovak Socialist Republic*, 672 F. Supp. 7 (D.D.C. 1986) ..................................6

*de Csepel v. Republic of Hungary*, Civ. No. 10-1261 (ESH), 2011 U.S. Dist. LEXIS
98573 (D.D.C. Sept. 1, 2011) ..............................................................................................5, 12

*Detroit Inst. of Art v. Ullin*, No. 06-10333, 2007 U.S. Dist. LEXIS 28364 (E.D.Mich.
Mar. 31, 2007).........................................................................................................................15

*Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003) ...............................................................7

*Dorfman v. Marriott Int'l Hotels, Inc.*, 99 Civ. 10496 (CSH), 2001 U.S. Dist. LEXIS 642
(S.D.N.Y. Jan. 26, 2001)............................................................................................................5

*DRFP, L.L.C. v. The Republica Bolivariana de Venezuela*, No. 2:04-cv-793, 2009 WL
948764 (S.D. Ohio Apr. 1, 2009)...............................................................................................5

*Dunbar v. Seger-Thomschitz*, 615 F.3d 574 (5th Cir. 2010)................................................15

*Felter v. Kempthorne*, 473 F.3d 1255 (D.C. Cir. 2007).....................................................5

*First Fed. Sav. & Loan Ass'n v. Anderson*, 681 F.2d 528 (8th Cir. 1982) .....................11

*First Union Nat'l Bank v. Paribas*, 135 F. Supp. 2d 443 (S.D.N.Y. 2001).....................5

*Gerling Global Reins. Corp. v. Nelson*, 123 F. Supp. 2d 1298 (N.D. Fla. 2000).........15

*Gonzalez v. Naviera Neptuno A.A.*, 832 F.2d 876 (5th Cir. 1987)) ................................4

*Hilton v. Guyot*, 159 U.S. 113 (1895) ......................................................................13, 15

*Hoang Van Tu v. Koster*, 364 F.3d 1196 (10th Cir. 2004) ............................................6

*In re Holocaust Victims' Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000) ............10

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ...............11

*In re World War II Era Japanese Forced Labor Litig.*, 114 F. Supp. 2d 939 (N.D. Cal. 2000) ..........................................................................................................................7

*Iragorri v. United Techs Corp.*, 274 F.3d 65 (2d Cir. 2001) (en banc) .........................4

*Irwin v. Department of Veterans Affairs*, 498 U.S. 89 (1990) ........................................5

*Irwin v. WWF, Inc.*, 448 F. Supp. 2d 29 (D.D.C. 2006) ................................................4

*Iwanowa v. Ford Motor Co.*, 67 F. Supp 2d 424 (D.N.J. 1999) ....................................8

*Kelberine v. Societe Internationale*, 363 F. 2d 989 (D.C. Cir. 1965) ...........................7

*Macharia v. United States*, 238 F. Supp. 2d 13 (D.D.C. 2002) ...................................11

*Missouri K. & T. R. Co. v. Harriman*, 227 U.S. 657 (1913).........................................5

*Mondy v. Secretary of the Army*, 845 F.2d 1051 (D.C. Cir. 1988) ................................5

*Morris v. People's Republic of China*, 478 F. Supp. 2d 561 (S.D.N.Y. 2007) .............6

*Moscovits v. Magyar Cukor Rt.*, 00 Civ. 0031 (VM), 2001 U.S. Dist. LEXIS 9252, (S.D.N.Y June 29, 2001)...............................................................................................5

*Museum of Fine Arts v. Seger-Thomschitz*, 623 F.3d 1 (1st Cir. 2010)........................15

*Online Payment Solutions Inc. v. Svenska Han-Delsbanken AB*, 638 F. Supp. 2d 375 (S.D.N.Y. 2009) ............................................................................................................4

*Orkin v. Taylor*, 487 F.3d 734 (9th Cir. 2007)..............................................................15

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005) .....................................................................6

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).........................................................3

*Smith-Haynie v. District of Columbia*, 155 F.3d 575 (D.C. Cir. 1998) ........................5

*Strategic Value Master Fund v. Cargill Fin. Services Corp.*, 421 F. Supp. 2d 741
   (S.D.N.Y. 2006)...........................................................................................................4

*Swint v. Chambers County Comm'n*, 514 U.S. 35 (1995) ...............................................1

*Telephone Sys. Int'l, Inc. v. Network Telecom PLC*, 303 F. Supp. 2d 377 (S.D.N.Y. 2003) ..........4

*Toledo Museum of Art v. Ullin*, 477 F. Supp. 2d. 802 (D. Ohio 2006)..........................15

*United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158 (D.D.C. 2007)..........5

*United States v. BCCI Holdings (Lux.), S.A.*, 46 F.3d 1185 (D.C. Cir. 1995)...............11

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) ..........................8, 9

*United States v. Kubrick*, 444 U.S. 111 (1979)................................................................5

*United States v. Marion*, 404 U.S. 307 (1971).................................................................5

*Von Saher v. Norton Simon Museum of Art*, 592 F. 3d 954 (9th Cir. 2010)..................15

*Walsh v. Ford Motor Co.*, 807 F.2d 1000 (D.C. Cir. 1986)............................................2

*Webb v. United States*, 21 Cl. Ct. 137 (Cl. Ct. 1990) ......................................................6

*Wesley Theol. Seminary of the United Methodist Church v. United States Gypsum Co.*,
   No. 85-1606, 1986 U.S. Dist. LEXIS 22246 (D.D.C. July 25, 1986) ......................11

*World Wide Minerals v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002)......13

*Zivkovich v. Vatican Bank*, 242 F. Supp. 2d 659 (N.D. Cal. 2002) ........................8, 9, 10

## FEDERAL STATUTES

28 U.S.C. § 1291...........................................................................................................1, 16

\* 28 U.S.C. § 1292(b) ............................................................................................... *passim*

Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq.* ......................12

### Other Authorities

\*    *Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims*, March 6, 1973, 24 U.S.T. 522, T.I.A.S. 7569, 938 U.N.T.S. 167.................................................... *passim*

American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas, Report, 148 (1946)..........................................................15

Hungarian Act No. XXV of 1991 ...............................................................14

Hungarian Act No. XXIV of 1992...............................................................14

Hungarian Act No. X of 1997.....................................................................14

Hungarian Government Resolution 1035/1997 .............................................14

Hungarian Government Resolution 1091/2007 .............................................14

Hungarian Government Resolution 1024/2011 .............................................15

*Hungary's Response to Herzog Collection Lawsuit Avoids the Case's Merits; Country Continues to Circumvent Justice by Opposing the Lawsuit*, Business Wire, February 17, 2011.................................................................................................8

www.lootedart.com..................................................................................8

Interpretation of Peace Treaties, Advisory Opinion, 1950 I.C.J. 65 (May 30)..............................10

\*    Treaty of Peace with Hungary, Feb. 10, 1947, 61 Stat. 2109 ................................................ *passim*

## PRELIMINARY STATEMENT

As noted in its Motion for Certification, Hungary has the right, under 28 U.S.C. § 1291, to an immediate appeal of that portion of the Order that denied Hungary's motion seeking dismissal on the grounds of Hungary's foreign sovereign immunity.  On September 26, 2011, Hungary filed a motion requesting certification for interlocutory appeal of the following five issues arising from this Court's Order:

1.      Whether the doctrine of *forum non conveniens* warrants dismissal;

2.      Whether the District of Columbia's statute of limitations bars claims relating to the remaining artworks;

3.      Whether this case presents non-justiciable political questions;

4.      Whether Plaintiffs' bailment claim states a viable cause of action; and

5.      Whether the Court should apply the act of state doctrine to bar Plaintiffs' claims.

As Hungary demonstrated in its Memorandum of Points and Authorities in Support of its Motion for Certification, the five issues satisfy the requirements set forth in 28 U.S.C. § 1292(b) as (1) each of these five issues involves a controlling question of law; (2) a substantial ground for difference of opinion exists as to this Court's ruling on all five issues; and (3) an immediate appeal would materially advance the disposition.  Moreover, all five issues are case dispositive – resolution of any one of the issues in Hungary's favor would result in dismissal of the action.  Accordingly, the Court should grant Hungary's Motion for Certification.

## ANALYSIS

## I.      STANDARD FOR 28 U.S.C. § 1292(b) CERTIFICATION

District courts have "first line discretion to allow interlocutory appeals."  *Swint v. Chambers County Comm'n*, 514 U.S. 35, 47 (1995).  The Court may exercise its discretion and certify a non-final order for interlocutory appeal when "(1) the order involves a controlling

question of law; (2) a substantial ground for difference of opinion concerning the ruling exists; and (3) an immediate appeal would materially advance the litigation." *APCC Servs., Inc. v. Sprint Commc'ns Co.*, 297 F. Supp. 2d 90, 95 (D.D.C. 2003) (citing 28 U.S.C. § 1292(b) and *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1002 n.2 (D.C. Cir. 1986)).  Because the five issues identified by Hungary satisfy all three requirements, the Court should certify these issues for interlocutory appeal.

## II.   SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION EXISTS REGARDING EACH ISSUE RAISED

Plaintiffs cannot reasonably dispute that the five issues raised by Hungary involve controlling questions of law.[1]  Nor can Plaintiffs assert that review of these issues would not materially advance litigation, as reversal of the Court's ruling on any of the five issues would completely dispose of the case.  Rather, Plaintiffs contend that this Court should deny Hungary's motion on the ground that no substantial grounds for difference of opinion concerning any of the rulings exists.

Plaintiffs contend that the Court should not grant Hungary's Motion for Certification because "[a] broader appeal is likely to lead to a slower decision from the Circuit Court." (Opposition to Motion for Certification at 2.)  Hungary asserts that prompt review of these dispositive issues will cause little delay as the action is already properly stayed for the duration of Hungary's appeal, as a matter of right, of the Court's ruling on the jurisdictional question. Further, the appellate court's review of the case-dispositive issues set forth above is both

---

[1] Plaintiffs' Opposition states that Hungary has failed to demonstrate that "each of [the five] issues constitutes a 'controlling question of law' as required by Section 1292(b)."  (Opp. to Mot. for Cert. at 6.)  Plaintiffs, however, offer no support for this assertion, relying instead on the contention that no substantial ground for difference of opinion exists.  As all five issues raise case-dispositive grounds for dismissal, it is patently evident that the issues involve "controlling questions of law."

efficient and prudent as resolution in Hungary's favor of any of the issues advanced here will dispose of the case in its entirety.  In light of the importance of the issues present in the Motion for Certification, the benefit of guidance from the appellate court, and the potential time and expenses saved by having these case dispositive issues addressed at this stage of the proceedings, Plaintiffs' characterization of appellate review as an "unnecessary luxury," (Opp. to Mot. for Cert. at 2) is unsupported.

A.      *Forum Non Conveniens*

Citing an unpublished decision from New York, Plaintiffs contend that the "discretionary nature of the court's determination of the *forum non conveniens* issue makes such a decision 'an inappropriate one for interlocutory certification.'"  (Opp. to Mot. for Cert. at 8.)  Hungary recognizes that a court's findings are entitled to deference "where the court has considered all relevant public and private interest factors, and where the balance of these factors is reasonable." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981).  Hungary respectfully asserts, however, that the Court did not properly balance the relevant factors.  Recognizing the validity of the judicial system in Hungary and the due process accorded Martha Nierenberg, Plaintiff de Csepel's aunt, the Court recognized that Hungary provides an adequate forum for this dispute. The Court found that the United States is the proper forum to resolve this dispute, however, despite the fact that: (1) only one of three named plaintiffs is a U.S. citizen; (2) none of the events involving the alleged taking of the artworks at issue in the case took place in the United States; (3) most of the relevant documents are likely to be found in Hungary and in the Hungarian language; (4) witnesses (if they are alive) are likely to be in Hungary; (5) Hungarian courts are likely in a better position to interpret and apply current and historical Hungarian laws; (6) Hungarian (rather than United States') courts have a greater interest in resolving this local

case; (7) Plaintiffs' claims would not be subject to a statute of limitations in Hungary; and (8) Hungarian courts are familiar with many of the issues in this case as ownership of eleven of the artworks listed in the Complaint were litigated for almost a decade in Hungary.

More importantly, for certification purposes, Hungary asserts that the Court neglected to analyze the viable remaining claims when it weighed the public and private factors.  With most, if not all, of David de Csepel's direct claims no longer part of the lawsuit, the connection between Hungary, the Italian Plaintiffs, and this Court is even more attenuated.[2]  Because there is a substantial ground for difference of opinion as to whether the relevant factors weigh in favor of a U.S. forum, s*ee, e.g., Irwin v. WWF, Inc.*, 448 F. Supp. 2d 29, 35-36 (D.D.C. 2006) (quoting *Gonzalez v. Naviera Neptuno A.A.*, 832 F.2d 876, 879 (5th Cir. 1987)); *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 86 (D.D.C. 2003); *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 39 (D.D.C. 2002); *Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 238-39 (2d Cir. 2004); *Iragorri v. United Techs Corp.,* 274 F.3d 65, 73-74 (2d Cir. 2001) (en banc); *Online Payment Solutions Inc. v. Svenska Han-Delsbanken AB*, 638 F. Supp. 2d 375, 381 (S.D.N.Y. 2009); *BlackRock, Inc. v. Schroders PLC*, No. 07 Civ. 3183, 2007 U.S. Dist. LEXIS 39279, at *12-13, *15 (S.D.N.Y. May 30, 2007); *Strategic Value Master Fund v. Cargill Fin. Services Corp.*, 421 F. Supp. 2d 741, 766 (S.D.N.Y. 2006); *Telephone Sys. Int'l, Inc. v. Network Telecom PLC*, 303 F. Supp. 2d 377, 384-85 (S.D.N.Y. 2003); *First Union Nat'l Bank v. Paribas*, 135 F. Supp. 2d 443, 447 (S.D.N.Y. 2001);

---

[2]  Plaintiffs assert, for the first time, that Plaintiff de Csepel represents heirs of István Herzog who are "largely United States citizens."  (Opp. to Mot. for Cert. at 11.)  This is a new factual assertion not included in the Complaint.  Moreover, to the extent that David de Csepel "has a direct interest in numerous artworks . . . as the representative of the heirs of Elizabeth Weiss de Csepel," (Opp. to Mot. for Cert. at 11,) such claims are time barred as they should have been raised by Martha Nierenberg in her lawsuit.

*DRFP, L.L.C. v. The Republica Bolivariana de Venezuela*, No. 2:04-cv-793, 2009 WL 948764, at **2-3 (S.D. Ohio Apr. 1, 2009), the Court should certify this issue for review.[3]

### B. Statute of Limitations

Hungary asserts that a substantial ground for difference of opinion exists as to whether the statute of limitations that governs Plaintiffs' claims should be tolled pending the Nierenberg litigation.[4]  Despite Plaintiffs' assertions to the contrary, no case law mandates that tolling is appropriate or necessary in this action.  "The court's equitable power to toll the statute of limitations will be exercised only in extraordinary and carefully circumscribed instances." *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 579-80 (D.C. Cir. 1998) (*quoting Mondy v. Secretary of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988)); *see also Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96 (1990); *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151 (1984); *Felter v. Kempthorne*, 473 F.3d 1255, 1260 (D.C. Cir. 2007) (noting that to benefit from equitable tolling, a plaintiff must demonstrate "(1) that [she] has been pursuing

---

[3] That substantial ground for difference of opinion exists is evident as this Court, *see de Csepel v. Republic of Hungary*, Civ. No. 10-1261 (ESH), 2011 U.S. Dist. LEXIS 98573, at *73-76 (D.D.C. Sept. 1, 2011), and others, *Moscovits v. Magyar Cukor Rt.*, 00 Civ. 0031 (VM), 2001 U.S. Dist. LEXIS 9252, at *14 (S.D.N.Y June 29, 2001); *Dorfman v. Marriott Int'l Hotels, Inc.*, 99 Civ. 10496 (CSH), 2001 U.S. Dist. LEXIS 642, at *23 (S.D.N.Y. Jan. 26, 2001), have recognized Hungary as an adequate and appropriate forum.

[4] "A plaintiff cannot sit on his hands and plead confusion; to do so subverts the purpose of the statute of limitations and exploits the equities of the tolling doctrine." *United States ex rel. Purcell v. MWI Corp.* 520 F. Supp. 2d 158, 172 (D.D.C. 2007).  Statutes of limitation "afford[ ] plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *United States v. Kubrick*, 444 U.S. 111, 117 (1979) (citing *United States v. Marion*, 404 U.S. 307, 322, n.14 (1971); *Burnett v. New York Central R. Co.*, 380 U.S. 424, 428 (1965); *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945); *Missouri K. & T. R. Co. v. Harriman*, 227 U.S. 657, 672 (1913); *Bell v. Morrison*, 1 Pet. 351, 360, 7 L.Ed. 174 (1828)).

[her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way" (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

Plaintiffs fail to offer evidence of any "extraordinary circumstances" sufficient to warrant equitable tolling of claims that arose decades ago.[5]  Moreover, the cases cited by Plaintiffs and the Court involve tolling in administrative scenarios.  Even if, however, equitable tolling was to apply in this context, such tolling should apply only to claims for artworks to which Martha Nierenberg had an ownership interest – only those paintings (the eleven dismissed by this Court's Order) were the subject of litigation that could theoretically be deemed to have tolled a statute of limitation.[6]  The Complaint offers no justification for the Italian Plaintiffs' election not to claim or litigate the other artworks at issue in this lawsuit.[7]

Because Plaintiffs offer no evidence that the Italian Plaintiffs (and the unidentified heirs) ever made claims to the artworks that remain in this case, they can provide no reasonable justification for equitably tolling their claims, especially with the lack of authority to support application of the tolling theory to the facts here.  Thus, Hungary contends that there is a

---

[5]  That Hungary was a communist country until 1989 does not toll the Plaintiffs' claims.  *See Hoang Van Tu v. Koster*, 364 F.3d 1196, 1199-1200 (10th Cir. 2004); *Morris v. People's Republic of China*, 478 F. Supp. 2d 561, 572 (S.D.N.Y. 2007); *Dayton v. Czechoslovak Socialist Republic*, 672 F. Supp. 7, 13 (D.D.C. 1986) (noting that nationalization/expropriation claims brought in 1985 against Communist government were time barred); *Webb v. United States*, 21 Cl. Ct. 137, 142 (Cl. Ct. 1990).

[6]  Plaintiffs assert, for the first time, that Martha Nierenberg's lawsuit was brought "in Hungary because – and only because – domestic law suggested at the time that exhaustion of remedies in the foreign state was <u>required</u> before a United States court would hear her claim."  (Opp. to Mot. for Cert. at 21.)  This is a new factual assertion not included in the Complaint.

[7]  Plaintiffs assert that this Court "correctly recognized" that the Complaint did not establish that the statute of limitation for a theoretical bailment had run because "there was no demand or refusal sufficient to trigger the running of a statute of limitations."  (Opp. to Mot. for Cert. at 11.)  Hungary asserts that eight years of protracted litigation constitutes a clear refusal and, thus, there is substantial ground for difference of opinion as to whether a lawsuit filed by Plaintiff de Csepel's aunt against Hungary in 1999 set running a statute of limitation.

substantial ground for difference of opinion as to whether any claims brought by Plaintiffs

should be equitably tolled to avoid the applicable statute of limitations.

    C.    *Political Question*

    Hungary contends that Plaintiffs' claims are non-justiciable political questions governed

by the Treaty of Peace with Hungary, Feb. 10, 1947, 61 Stat. 2109 ("1947 Treaty") and the

Agreement Between the Government of the United States of America and the Government of the

Hungarian People's Republic Regarding the Settlement of Claims, March 6, 1973, 24 U.S.T.

522, T.I.A.S. 7569, 938 U.N.T.S. 167 ("1973 Agreement") which "settle[ed] questions still

outstanding" between Hungary and the United States, 1947 Treaty, and "settled and discharged"

all claims by U.S. Nationals against Hungary and its nationals, 1973 Agreement.  *See, e.g., In re*

*World War II Era Japanese Forced Labor Litig.*, 114 F. Supp. 2d 939, 945 (N.D. Cal. 2000),

*aff'd*, *Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003) (determining that the 1951 Peace

Treaty with Japan precludes all claims arising out of actions taken by its nationals during World

War II); *Kelberine v. Societe Internationale*, 363 F. 2d 989, 991-92 (D.C. Cir. 1965) (affirming

dismissal, in part, on nonjusticiability grounds).

    Citing district and circuit court decisions, Plaintiffs contend that this action, which clearly

involves the resolution of Holocaust-era compensation and restitution claims, does not venture

into the exclusive provenance of the Executive.[8]  However, as noted in Hungary's Motion, such

claims are a matter

---

[8] Plaintiffs' Complaint is replete with references to the Holocaust, (*see, e.g.,* Complaint ¶¶ 1, 3, 5, 27-31, 36, 41-62, 91-92,) and Plaintiffs' (and their attorneys) have commented publicly that this lawsuit is an effort to make Hungary "justify its looting from the Jews that it murdered and not hide behind a wall of lies," *Hungary's Response to Herzog Collection Lawsuit Avoids the Case's Merits; Country Continues to Circumvent Justice by Opposing the Lawsuit*, Business Wire, February 17, 2011, *available at* http://www.businesswire.com/news/home/20110217006916/en/Hungary%E2%80%99s-
*(Footnote continued on next page)*

> *well within the Executive's responsibility for foreign affairs*. Since claims remaining in the aftermath of hostilities may be "sources of friction" acting as an "impediment to resumption of friendly relations" between the countries involved, there is a "longstanding practice" of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries. The issue of restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and although resolution of private claims was postponed by the Cold War, securing private interests is an express object of diplomacy today . . . .

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420-21 (2003) (emphasis added); *see also*

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) (recognizing that the

Constitution relegates issues of foreign policy to the political departments of the government)'

*Zivkovich v. Vatican Bank*, 242 F. Supp. 2d 659, 669 (N.D. Cal. 2002) ("The existence of treaties

and negotiations involving the type of claim sought to be resolved here are the result of

diplomatic efforts between nations, and constitute further evidence that claims here are beyond

the reach of this Court."); *Iwanowa v. Ford Motor Co.*, 67 F. Supp 2d 424, 447-55 (D.N.J. 1999)

(citing to a number of treaties entered into for the purpose of compensating victims of World

War II).

Because controlling and persuasive authority underscores that resolution of Plaintiffs'

claims implicate the Executive's foreign affairs powers, Hungary contends that substantial

grounds exist for a difference of opinion as to whether Plaintiffs' claims present non-justiciable

political questions. *See Zivkovich*, 242 F. Supp. 2d at 670 (dismissing action as involving

nonjusticiable political question because, inter alia, "the case would require the Court to sit in

judgment of actions taken during World War II . . . . Such determinations implicate international

---

*(Footnote continued from previous page)*
Response-Herzog-Collection-Lawsuit-Avoids-Case%E2%80%99s. *See also* www.lootedart.com (Plaintiffs' website) ("The [*de Csepel v. Hungary*] suit is widely regarded by art experts as the world's last unresolved Holocaust art claim of this magnitude.").

policy, intrusion into which the Constitution has left to the executive branch) (citing *Curtiss-Wright*, 299 U.S. at 320).

D.      Bailment

Hungary contends that substantial grounds exist for a difference of opinion as to whether Plaintiffs' bailment claim is viable.  Aside from the fact that the cause of action is vague and poorly defined, the claim fails on the merits.[9]  The Complaint offers no evidence that Hungary entered into a bailment contract (express or implied) with Plaintiffs or their predecessors regarding any of the artwork at issue in this case.[10]  Contrary to the Court's finding, there is no evidence offered by Plaintiffs to show that Hungary recognizes any ownership rights by the Plaintiffs (or their predecessors).[11]

The Complaint itself predicates the bailment claim on Article 27 of the 1947 Peace Treaty, stating that the "1947 Peace Treaty among Hungary and the Allies confirmed that Hungary was to act solely as a custodian or sole trustee of looted or heirless property . . ."

---

[9]  This Court noted that Plaintiffs' have been "less than clear" in terms of defining the parameters of the bailment claim (or claims).  (Order at 29, n.6.)

[10]  Plaintiffs contend that their complaint alleges a "a separate, substantial and non-frivolous 'taking' of certain of Plaintiffs' property in 2008 when Defendants repudiated Martha Nierenberg's demand for a dissolution of the bailments that had come into effect after World War II as a result of the Peace Treaty and otherwise."  (Opp. to Mot. to Dismiss at 30, n.15.) Plaintiffs' argument is specious and is offered as an attempt to avoid the District's three-year statute of limitations.  There was no repudiation in 2008 – in 2008, after eight years of litigation, the Hungarian courts recognized Hungary as the owner of eleven artworks.  By the terms of the Complaint, Plaintiffs' purported bailment was created in 1947 and repudiated in 1997 or October 1999, at the latest, when, according to Plaintiffs, "after months of silence from the government," it was "apparent that Hungary had no genuine intention of returning the art."  (Complaint ¶ 79.)

[11]  Plaintiffs' Complaint asserts that in 1948, certain pieces from the Herzog collection were exhibited with labels noting that the artworks were "on deposit."  (Complaint ¶ 73.)  If this passive action can be deemed to create or imply a bailment with Plaintiffs, the time period for bringing a claim has long expired as the 1999 lawsuit against Hungary makes evident Hungary's refusal to recognize any alleged ownership rights by Plaintiffs and their predecessors.

(Complaint ¶ 69.)  The 1947 Treaty, however, created a relationship between Hungary and the Allies, not between Hungary and the Plaintiffs; nothing in the 1947 Treaty itself can be read to convert a failure to adequately comply with Article 27 into a bailment with a private cause of action for individuals.  Moreover, if Hungary has not fulfilled its obligations under Article 27, Article 40 of the 1947 Treaty contains specific directions for resolving any disputes regarding Article 27.  In 1949, the United States and United Kingdom petitioned the International Court of Justice to hold Hungary (as well as Bulgaria and Romania) accountable for alleged breaches of their human rights obligations set forth in Article 2 of the 1947 Treaty.  The language of each article is similar.  *Compare* 1947 Treaty, art. 2 ("Hungary shall take all measures necessary to secure to all persons under Hungarian Jurisdiction . . ."), with 1947 Treaty, art. 27 ("Hungary undertakes that in all cases where the property, legal rights or interests in Hungary of persons under Hungarian jurisdiction . . .").  Like Article 27, any dispute regarding Hungary's obligations to comply with Article 2 is governed by Article 40.  The Court held that to resolve such a dispute, the parties were required to utilize the dispute resolution procedures set forth in Article 40 of the 1947 Treaty.  *See* Interpretation of Peace Treaties, Advisory Opinion, 1950 I.C.J. 65 (May 30).  Plaintiffs' claims, which challenge Hungary's satisfaction of obligations under Article 27, must be raised, to the extent they can be raised, in accordance with Article 40.  Such dispute resolution procedures can be employed only by sovereigns, not individuals.[12]

---

[12] Plaintiffs' attempts to recharacterize their nonjusticiable claims as "bailments" does not make them viable.  *See Zivkovich*, 242 F. Supp. 2d at 666 (dismissing wartime claims as nonjusticiable political questions despite plaintiffs attempts to re-characterize claims); *In re Holocaust Victims' Assets Litig.*, 105 F. Supp. 2d 139, 148-49 (E.D.N.Y. 2000) (noting that the issue of justiciability was a "reality check" for those who "believe that strong moral claims are easily converted into successful legal causes of action").

Plaintiffs contend that other causes of action would remain "even if the Court's conclusion with respect to Plaintiffs' bailment claim were reversed," (Opp. to Mot. for Cert. at 16) because the "Court did not reach that argument," (Opp. to Mot. for Cert. at 16, n.7) in its decision.  Consequently, Plaintiffs suggest that Hungary's request to certify the Court's bailment finding does not involve a "controlling question of law as to which . . . an immediate appeal may materially advance the ultimate termination of litigation . . . ."  (Opp. to Mot. for Cert. at 16 (quoting 28 U.S.C. § 1292(b).))

However, as explained at length in Hungary's Motion to Dismiss, Plaintiffs' remaining claims – constructive trust, accounting, declaratory relief, and restitution – fail because they are not independent causes of action.  *See, e.g., United States v. BCCI Holdings (Lux.), S.A.*, 46 F.3d 1185, 1190 (D.C. Cir. 1995) ("A constructive trust is a remedy that a court devises after litigation."); *Macharia v. United States*, 238 F. Supp. 2d 13, 31 (D.D.C. 2002) (dismissing claim because "a constructive trust is not an independent cause of action"); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962) (noting that a suit for an accounting is equitable in nature); *First Fed. Sav. & Loan Ass'n v. Anderson*, 681 F.2d 528, 533 (8th Cir. 1982) ("It is well settled that the declaratory judgment statute is strictly remedial in nature and does not provide a separate basis for subject matter jurisdiction."); *Wesley Theol. Seminary of the United Methodist Church v. United States Gypsum Co.*, No. 85-1606, 1986 U.S. Dist. LEXIS 22246, **10-11 (D.D.C. July 25, 1986) (dismissing restitution claim because it is not an independent cause of action, but "is merely a type of remedy that an injured plaintiff may request under certain circumstances"); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1017 (N.D. Ill. 2000).  Thus, Hungary's certification request regarding the Court's bailment finding involves a "controlling issue of law" because Plaintiffs' Complaint will not include a viable cause of action if the appellate court

reverses this Court's finding and holds that Plaintiffs' Complaint failed to state a viable bailment claim.

Because there is substantial ground for a difference of opinion whether Plaintiffs' Complaint contains a cognizable and viable cause of action for a bailment, Hungary requests that the Court certify this issue.[13]

E.      Act of State

As noted in its Motion, Hungary's alleged taking, not the alleged bailment, is the sovereign act at issue here – this is the act for which an exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq.* would strip Hungary of its presumptive sovereign immunity.  It is not disputed that such an act is sovereign in nature – such a taking could not have been accomplished by a private actor.  Citing *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117 (E.D.N.Y. 2000) and *Agudas Chasidei Chabad v. Russian Fed'n*, 466 F. Supp. 2d 6 (D.D.C. 2006), the Court found, however, that because the taking is attributed in the Complaint to Nazi Germany and/or the World War II-era Hungarian government, the act of state doctrine should not be applied.  These cases, however, are inapposite because they involved a government that was wholly rejected or because the alleged taking took place in a foreign country.  *See Bodner*, 114 F. Supp. 2d at 130 ("The wholesale rejection of the Vichy government at the close of World war II render[s] the [a]ct of [s]tate doctrine wholly inapplicable to this case."); *Agudas Chasidei Chabad*, 466 F. Supp. 2d at 26 (noting that "irrespective" of "whether the Soviet

---

[13] The Court recognized, and the Complaint concedes, that during the communist era "Hungary did not recognize individual property rights."  (Complaint ¶ 93); *see also de Csepel*, 2011 U.S. Dist. LEXIS 98573, at *10.  If, as Plaintiffs admit, Hungary did not recognize private property claims during the Communist era, it is inconceivable that Hungary could (or would) enter into a bailment agreement with individuals.

Army's taking of the Archive as spoils of war at the conclusion of World War II was an official

government act," the taking "occurred in Poland and not in Soviet territory").

Because "[t]he act of state doctrine 'precludes the courts of this country from inquiring

into the validity of the public acts of a recognized foreign sovereign power committed within its

own territory,'" *World Wide Minerals v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir.

2002) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)), and no case

law is directly applicable to the facts of this case, Hungary respectfully asserts that there is a

substantial ground for difference of opinion as to the propriety of the Court's refusal to apply the

act of state doctrine.[14]

## III.   CERTIFICATION OF THE COURT'S INTERNATIONAL COMITY RULING IS NOT AUTHORIZED BY 28 U.S.C. § 1292(b)

Plaintiffs seek certification of a sixth issue in an "alternative cross-motion."  [Docket No.

45.]  Plaintiffs now contend that if the Court certifies the five issues raised in Hungary's Motion

for Certification, the Court should certify its finding that principles of international comity

preclude re-litigation of claims resolved in eight years of litigation in Hungary.  The Court

should decline the invitation.

As an initial matter, the Court correctly held that principles of international comity

counsel against re-litigation of claims resolved fully in a foreign court.  Because Plaintiffs have

not asserted that there was not an "opportunity for a full and fair trial," *Hilton v. Guyot*, 159 U.S.

113 (1895), in Hungary or offered any other viable reason why this Court should not accord full

effect to the Hungarian Court's decision, there is no basis to disturb this Court's sound decision.

---

[14]  The Complaint states that "some pieces of the Herzog collection were physically returned to representatives of the Herzog heirs" after World War II.  (Complaint ¶ 72.)  If those artworks were subsequently taken by Hungary's then-communist government, such a taking was unquestionably an act of state.

Moreover, Plaintiffs' issue cannot satisfy 28 U.S.C. § 1292(b).  As discussed above, a court may exercise its discretion and certify a non-final order for interlocutory appeal when "(1) the order involves a controlling question of law; (2) a substantial ground for difference of opinion concerning the ruling exists; and (3) an immediate appeal would materially advance the litigation." *APCC Services, Inc.*, 297 F. Supp. 2d at 95.  Plaintiffs' issue fails on all three grounds.

First, the Court's international comity ruling is unlikely to involve a controlling question of law as reversal of this Court's comity finding would not save court or party resources.  *Id.* at 95-96.  Rather, the issue would be subject to additional discovery and briefing at the District Court level, and eventual appeal.  Second, Plaintiffs fail to demonstrate how reversal would materially advance this litigation in any way – as discussed earlier, if the appellate court was to reverse this Court's finding, litigation would be prolonged.  *See id.*

The real dispute here, however, regards whether there is substantial ground for difference of opinion regarding this Court's international comity finding.  Hungary asserts that Plaintiffs are unable to demonstrate the requisite substantial ground.  Plaintiffs' challenge to the merits of the Hungarian action – the challenge that they do not like the results – is not a basis for displacing long-recognized principles of comity.  Plaintiffs recognize that the "issue of Holocaust looted art is a highly sensitive one in Hungary."  (Opp. to Mot. for Cert. at 21.)  In an attempt to resolve those issues, Hungary enacted numerous compensation laws and funds (including Hungarian Act No. XXV of 1991, Hungarian Act No. XXIV of 1992, Hungarian Act No. X of 1997, Hungarian Government Resolution 1035/1997, Hungarian Government Resolution 1091/2007, Hungarian Government Resolution 1024/2011, and the MagyarországiZsidó Örökség Közalapítvány

(Hungarian Jewish Heritage Fund)) to address any outstanding obligations under the 1947 Treaty.

Plaintiffs contend, for the first time, that Martha Nierenberg believed that she was "required" to litigate her claims in Hungary and that to recognize those legal proceedings "penalize[s]" her for bringing her claims in Hungary.  (Opp. to Mot. for Cert. at 21.)  Plaintiffs are not being penalized for the prior lawsuit any more than a party in the United States would be "penalized" by not being permitted to re-litigate in the District of Columbia the exact claims that were raised and fully litigated in an earlier lawsuit in another state.  Plaintiffs are unhappy with the results of the Hungarian court's decision – that disappointment does not provide any legal basis for disregarding eight years of protracted litigation in which Ms. Nierenberg was represented by attorneys and was afforded due process.  The Complaint fails to offer any evidence suggesting "either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason," *Hilton*, 159 U.S. at 202, that would warrant against applying international comity to the Hungarian decision.[15]

---

[15]  Plaintiffs assert that recognizing the Nierenberg decision "is repugnant to United States public policy."  (Opp. to Mot. for Cert. at 21.)  After nearly of decade of litigation in Hungary, Martha Nierenberg's claims to eleven other artworks were rejected.  Hungary submits that it is not the public policy of the United States to recognize only those decisions in which United States citizens prevail.  Courts throughout this country have disposed of analogous claims.  *See Dunbar v. Seger-Thomschitz*, 615 F.3d 574, 576-77 (5th Cir. 2010); *Museum of Fine Arts v. Seger-Thomschitz*, 623 F.3d 1, 14 (1st Cir. 2010); *Orkin v. Taylor*, 487 F.3d 734, 741-42 (9th Cir. 2007);  *Von Saher v. Norton Simon Museum of Art*, 592 F. 3d 954, 967-68 (9th Cir. 2010); *Detroit Inst. of Art v. Ullin*, No. 06-10333, 2007 U.S. Dist. LEXIS 28364, *7-*8 (E.D.Mich. Mar. 31, 2007); *Toledo Museum of Art v. Ullin*, 477 F. Supp. 2d. 802, 806 (D. Ohio 2006); *Gerling Global Reins. Corp. v. Nelson*, 123 F. Supp. 2d 1298, 1302 (N.D. Fla. 2000).

It was United States public policy after World War II to return property to Hungary for that country to handle any further action.  At the Potsdam Conference in July of 1945, President Truman formally adopted a policy of "external restitution," under which the "looted art was returned to the countries of origin – not to the individual owners."  *Von Saher*, 592 F. 3d at 958 (citing American Commission for the Protection and Salvage of Artistic and Historic Monuments

*(Footnote continued on next page)*

Independent of Hungary's appeal of this Court's jurisdictional finding under the FSIA, brought as a matter of right under 28 U.S.C. § 1291, Hungary has viable grounds for seeking certification of the five issues put forth in its Motion for Certification.  Absent Hungary's Motion for Certification, Plaintiffs would have no conceivable basis for appealing the Court's comity finding at this stage.  If the appellate court reverses this Court on *any* issue presented by Hungary in its motion for certification, the entire case must be dismissed.  Thus, there is no need to waste judicial resources at this stage to review the eleven artworks recognized as belonging to Hungary.  If, however, the appellate court affirms this Court on *all* grounds, then the action will return to this Court and there will be an opportunity to review, at the proper time, this Court's findings regarding the eleven artworks.  As a non-dispositive issue that (1) does not involve a controlling question of law, (2) does not involve a substantial ground for difference of opinion concerning the Court's ruling, and (3) would not materially advance the litigation, the Court should reject Plaintiffs' attempt to bootstrap the Court's comity finding onto Hungary's certifiable issues.

## **CONCLUSION**

For the foregoing reasons, Hungary respectfully requests that the Court certify for interlocutory appeal the Order denying, in part, Hungary's motion to dismiss, on the following

---

*(Footnote continued from previous page)*
in War Areas, Report, 148 (1946)).  Plaintiffs' challenge to Hungary's right to dispose of artwork conflicts with United States public policy.

Hungary signed the 1947 Treaty, with Article 27's obligation to restore (or if restoration was impossible, provide fair compensation for) property that had been the subject of confiscation "on account of racial origin or religion."  1947 Treaty, art. 27.  Decades later, Hungary and the United States entered into the 1973 Agreement which specifically referenced Article 27 and Hungary's obligations.  It is contrary to public policy for a U.S. court to now take subject matter jurisdiction over claims which arose from wartime events in Hungary – claims which were contemplated and addressed by the U.S. government in the 1947 Treaty and the 1973 Agreement.

issues: (1) whether the doctrine of *forum non conveniens* warrants dismissal in this matter; (2) whether the District of Columbia's statute of limitations bars claims relating to the remaining artworks; (3) whether this case presents non-justiciable political questions; (4) whether Plaintiffs' bailment claim states a viable cause of action; and (5) whether the Court should apply the act of state doctrine to bar Plaintiffs' claims.  Because there is no legal basis under 28 U.S.C. § 1292(b) to certify the Court's finding that principles of international comity preclude re-litigation of the eleven artworks at issue in the Nierenberg lawsuit, Hungary respectfully requests that this Court deny Plaintiffs' Alternative Cross-Motion for Certification.

Dated: October 28, 2011                     Respectfully submitted,

                                            _____/s/ D. Grayson Yeargin_____
                                            D. Grayson Yeargin (Bar No. 476324)
                                            David D. West (Bar No. 990695)
                                            NIXON PEABODY LLP
                                            401 Ninth Street, N.W., Suite 900
                                            Washington, D.C.  20004-2128
                                            Telephone: (202) 585-8000
                                            Facsimile: (202) 585-8080
                                            gyeargin@nixonpeabody.com
                                            dwest@nixonpeabody.com
                                            **Counsel for Defendants**

                                            Thaddeus J. Stauber
                                            Sarah Erickson André
                                            Gas Company Tower
                                            NIXON PEABODY LLP
                                            555 West Fifth Street
                                            Los Angeles, CA 90013
                                            Telephone: (213) 629-6000
                                            Facsimile: (213) 629-6001
                                            tstauber@nixonpeabody.com
                                            sandre@nixonpeabody.com
                                            **Counsel for Defendants**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 28th day of October, 2011, I caused a true and correct copy of the foregoing Reply Memorandum in Support of Motion of Defendants Republic of Hungary, The Hungarian National Gallery, The Museum of Fine Arts, The Museum of Applied Arts, and The Budapest University of Technology and Economics for Certification Pursuant to 28 U.S.C. § 1292(b) to Appeal Issues Arising From This Court's September 1, 2011, Decision and Order to be filed electronically with the United States District Court for the District of Columbia using the ECF system which will send a notification of such filing to the following:

Michael Dewayne Hays
Daniel D. Prichard
DOW LOHNES PLLC
1200 New Hampshire Avenue, N.W.
Suite 800
Washington, D.C., 20036
*Counsel for Plaintiffs*

Michael S. Shuster
Sheron Korpus
Alycia Regan Benenati
Dorit Ungar
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019-6799
*Counsel for Plaintiffs*

_____/s/ D. Grayson Yeargin_____
D. Grayson Yeargin