**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **DAVID L. de CSEPEL, et al.,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 10-1261 (ESH) |
| ) | |
| **REPUBLIC OF HUNGARY, et al.**, ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM OPINION**

Defendants the Republic of Hungary, the Hungarian National Gallery, the Museum of Fine Arts, the Museum of Applied Arts, and the Budapest University of Technology and Economics have moved, pursuant to Federal Rule of Civil Procedure 12(b)(1), to dismiss this case for want of subject matter jurisdiction.  (Mot. to Dismiss by the Republic of Hungary, the Hungarian National Gallery, the Museum of Fine Arts, the Museum of Applied Arts, and the Budapest University of Technology and Economics [ECF No. 86] ("Defs.' Mot.").)

Plaintiffs David L. de Csepel, Angela Maria Herzog, and Julia Alice Herzog are descendants of Baron Mór Lipót Herzog, a Jewish Hungarian art collector who assembled a substantial art collection (the "Herzog Collection") prior to his death in 1934.  Plaintiffs allege that Hungary and Nazi Germany seized the Herzog Collection during World War II, and that at least 40 of the pieces are still in defendants' possession.  Plaintiffs brought this suit alleging that defendants breached bailment agreements entered into after World War II when they refused to return pieces from the Herzog Collection in 2008.

On February 15, 2011, defendants filed a motion to dismiss, which this Court granted in part and denied in part, holding that it had subject matter jurisdiction under the expropriation

exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(3). *See de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 132-33 (D.D.C. 2011). The D.C. Circuit affirmed in part and reversed in part. *de Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013). Without addressing the expropriation exception, the Circuit held that plaintiffs' complaint alleged sufficient facts to confer subject matter jurisdiction pursuant to the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2). *See id.* at 601. On remand, this Court ordered discovery to proceed. *de Csepel v. Republic of Hungary*, No. 10-cv-1261 (D.D.C. Dec. 9, 2013). Discovery is ongoing and scheduled to end on July 28, 2015.

Defendants now assert that, in light of the documentary evidence produced to date, plaintiffs cannot carry their burden of proving that this Court has subject matter jurisdiction. In particular, defendants claim that the commercial activity exception to the FSIA does not apply. Plaintiffs respond that there exists sufficient evidence to satisfy the commercial activity exception and that, in any event, it would be premature for this Court to rule on the matter prior to the close of discovery. Alternatively, plaintiffs maintain that this Court has subject matter jurisdiction pursuant to the expropriation exception.

For the reasons stated below, this Court will deny defendants' motion without prejudice pending the close of fact discovery on February 27, 2015.

## BACKGROUND

The background of this case has already been described by this Court and the Court of Appeals. *de Csepel*, 714 F.3d at 594-97; *de Csepel*, 808 F. Supp. 2d at 120-26. The Court will therefore only recount the procedural history and facts relevant to this motion.

Baron Mór Lipót Herzog was a Jewish Hungarian art collector who amassed a collection of over 2,000 paintings, sculptures, and other pieces of artwork. (Compl. [ECF No. 1]

("Compl.") ¶ 38.) After his death in 1934 and his wife's death in 1940, the Herzog Collection passed to his three children, Erzsébet (Elizabeth) Weiss de Csepel, István (Stephen) Herzog, and András (Andrew) Herzog. (*Id.* ¶ 39.)

During the Holocaust, Hungarian Jews, including the Herzogs, were required to register their art treasuries. (*Id.* ¶ 56.) The Herzog family attempted to hide their Collection, but the Hungarian government and their Nazi collaborators discovered its location and seized it. (*Id.* ¶¶ 58-61.)

Several of the Herzog heirs and their families escaped from Hungary during the war: Elizabeth fled to Portugal and settled in the United States in 1946, becoming a U.S. citizen on June 23, 1952. (*Id.* ¶ 63.) Angela and Julia Herzog, Andrew's daughters, escaped to Argentina and eventually settled in Italy. (*Id.* ¶ 64.) Stephen remained in Hungary. (*Id.* ¶¶ 42, 64.)

Following Germany's defeat, several pieces of the Herzog Collection were returned to the family. (*Id.* ¶ 72.) However, plaintiffs allege that much of the Collection has remained in defendants' possession. (*Id.* ¶¶ 70, 73.) Plaintiffs have submitted documentary evidence that arguably suggests that Hungarian officials understood that these pieces of art were the property of the Herzog family and that defendants were merely acting as custodians. For example, in a memorandum dated November 10, 1947, Dr. Gyula Ortutay, the Minister of Religion and Public Education, wrote that several pieces of the Herzog Collection had recently been returned to Hungary from Germany. (*See* Decl. of Alycia Regan Benenati ("Benenati Decl."), Ex. D [ECF No. 89-6] at HUNG010996.) The memorandum lists several pieces that were the "property of the minor heirs of the late András Herczog" and several other pieces that were "the property of István Herczog." (*Id.*) It then notes that "the artworks could only be released [to the owners] in return for the repatriation duty" and that all but two of the pieces "remain in the care of the office

of the ministerial commission to this day." (*Id.*) In a memorandum dated November 20, 1948, Ministerial Commissioner Sandor Jeszensky wrote that his office had "found a solution under which it is able to place works from the Herzog collection at the disposal of the Museum of Fine Arts, as a temporary deposit, for the purpose of exhibiting them." (Benenati Decl., Ex. F [ECF No. 89-8] at HUNG011376-77.) The memorandum goes on to list eleven pieces, many of which are subjects of this litigation. (*Id.* at HUNG011377; *see also* Pls.' Mem. of P. & A. in Opp. to Defs.' Mot. to Dismiss [ECF No. 89] ("Pls.' Opp.") at 10-11.) Finally, in a letter dated May 3, 1950, Dr. Emil Oppler, the Herzog family attorney, offered several paintings "for deposit with the Museum of Fine Art," noting that "[t]he owner of the paintings and other works of art is Mrs. Alfonz Weiss, née Erzsébet Herzog." (Benenati Decl., Ex. H [ECF No. 89-10] at HUNG012663.) The letter lists the paintings and states that Dr. Oppler is "authorized to entrust the Museum of Fine Art with the safekeeping and handling of these works of art, while maintaining the ownership title to the deposit." (*Id.*) Again, many of the listed pieces are the ones plaintiffs now seek. (*See* Pls.' Opp. at 11-12.)

"Following the end of World War II, the Herzog family began a seven-decade struggle to reclaim the Collection." *de Csepel*, 714 F.3d at 595. Their efforts are described in *de Csepel*, 808 F. Supp. 2d at 123-26. Among these efforts, Martha Nierenberg, Elizabeth Weiss de Csepel's daughter, filed suit in Hungary in October 1999 to recover twelve paintings that belonged to her mother. *Id.* at 125. In 2008, the Hungarian Metropolitan Appellate Court dismissed Nierenberg's claim in its entirety. *Id.* at 126. Thereafter, plaintiffs commenced this lawsuit, and on September 1, 2011, this Court granted in part and denied in part defendants' motion to dismiss. *Id.* at 145. The Court sustained jurisdiction under the expropriation exception to the FSIA, 28 U.S.C. § 1605(a)(3). It noted that "defendants do not dispute that

'rights in property' . . . are 'in issue.'" *Id.* at 128.  It further found that "the Herzog Collection was taken in violation of international law" when "the Hungarian government, in collaboration with the Nazis, discovered the hiding place [of the Collection] and confiscated its contents." *Id.* at 129, 131.  Finally, it held that there was a "commercial activity nexus between the foreign state . . . that owns or operates the property at issue and the United States." *Id.* at 131-32.  The Court did not reach the question of whether it had jurisdiction under the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2).  *Id.* at 133 n.4.

The D.C. Circuit affirmed this Court's jurisdictional holding on alternative grounds.  It held that "the family's claims fall comfortably within the FSIA's commercial activity exception." *de Csepel*, 714 F.3d at 598.  In so doing, it first found that "Hungary's repudiation of bailment agreements with respect to the Collection constitutes an act taken in connection with a commercial activity." *Id.* at 599; *see also id.* at 600 ("The complaint . . . alleges that, by entering into bailment agreements to retain possession of the expropriated artwork and later breaching those agreements by refusing to return the artwork, Hungary took affirmative acts beyond the initial expropriation to deprive the family of their property rights in the Collection."). It next found that the complaint alleged that Hungary's repudiation of the bailment agreement "caused a 'direct effect' in the United States." *Id.* at 599; *see also id.* at 601 ("Although the complaint never expressly alleges that the return of the artwork was to occur in the United States, we think this is fairly inferred from the complaint's allegations that the bailment contract required specific performance – i.e., return of the property itself – and that this return was to be directed to members of the Herzog family Hungary knew to be residing in the United States."). The Circuit therefore affirmed this Court's judgment "without ruling on the availability of the expropriation exception." *Id.* at 598.

On remand, this Court entered a Scheduling Order setting forth deadlines for document discovery, fact witness depositions, and expert discovery. *de Csepel v. Republic of Hungary*, No. 10-cv-1261 (D.D.C. Dec. 9, 2013). The Scheduling Order also established a briefing schedule for defendants' motion to dismiss pursuant to Rule 12(b)(1). *Id.* at *3. Those dates were modified by a Minute Order on March 12, 2014, pursuant to a joint motion by the parties. As amended, document discovery was to conclude on August 15, 2014, fact depositions would conclude by December 19, 2014, and all discovery would end by May 19, 2015. Defendants' motion to dismiss was filed on May 14, 2014, as provided by the amended Scheduling Order. (Defs.' Mot. at 26.) In a Minute Order dated June 26, 2014, Magistrate Judge Kay granted plaintiffs' motion for an extension of time to file their opposition after the parties represented that document production would be substantially complete by June 30, 2014. Plaintiffs filed their opposition on July 25, 2014. (Pls.' Opp. at 41.) Defendants filed their reply on August 25, 2014. (Reply Br. in Supp. of Mot. to Dismiss by the Republic of Hungary, the Hungarian National Gallery, the Museum of Fine Arts, the Museum of Applied Arts, and the Budapest University of Technology and Economics [ECF No. 90] ("Defs.' Reply") at 26.)

This Court ordered additional briefing on two topics. *de Csepel v. Republic of Hungary*, No. 10-cv-1261 (D.D.C. Oct. 20, 2014). First, it "request[ed] that plaintiffs provide supplemental briefing on their argument that the ruling on the instant motion be delayed." *Id.* at *1. In particular, the Court instructed plaintiffs to "specify what additional discovery will 'establish the terms of the relevant bailment agreements to the extent they have not been produced or were not written, the scope and effect of those agreements, and the relevant dates and circumstances of breach' as it relates to this Court's jurisdictional analysis under the commercial activity exception, 28 U.S.C. § 1605(a)(2)." *Id.* (quoting Pls.' Opp. at 40). Second,

the Court requested briefing on the following question: "Assuming that 28 U.S.C. § 1605(a)(2) does not apply to the claims of some or all plaintiffs, would the expropriation exception, 28 U.S.C. § 1605(a)(3), nevertheless provide subject matter jurisdiction over all three plaintiffs' claims alleging breach of the bailment agreements in 2008?" *Id.* at *2. The Court stated that "[f]or purposes of this question, the Court does not intend to revisit whether the property was taken in violation of international law or, as pled in plaintiffs' Complaint, that the expropriation occurred during World War II." *Id.* Both parties filed their supplemental briefs and responses thereto.

Finally, on November 17, 2014, pursuant to a joint motion by the parties, Magistrate Judge Kay extended the discovery deadlines. Depositions of fact witnesses are now scheduled to be completed by February 27, 2015, and discovery closes on July 28, 2015. *See de Csepel v. Republic of Hungary*, No. 10-cv-1261 (D.D.C. Nov. 17, 2014).

## ANALYSIS

As a threshold matter, the Court must determine whether it is appropriate at this time to rule on defendants' motion to dismiss for lack of subject matter jurisdiction. "The district court retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction,' but it must give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction . . . .'" *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179-80 (D.C. Cir. 1984)). A "district court has discretion to allow discovery if it 'could produce [facts] that would affect [its] jurisdictional analysis.'" *Al Maqaleh v. Hagel*, 738 F.3d 312, 325 (D.C. Cir. 2013) (alterations in original) (quoting *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994)). And a district court "should allow for limited jurisdictional

discovery if a plaintiff shows a non-conclusory basis for asserting jurisdiction and a likelihood that additional supplemental facts will make jurisdiction proper." *Intelsat Global Sales & Mktg., Ltd. v. Cmty. of Yugoslav Posts Tels. & Tels.*, 534 F. Supp. 2d 32, 34 (D.D.C. 2008).

Under the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States" unless one of several exceptions applies. 28 U.S.C. § 1604. Plaintiffs are seeking additional discovery to prove that this Court has jurisdiction pursuant to the commercial activity exception to the FSIA. (*See* Pls.' Opp. at 40.) To invoke this exception, plaintiffs must show that "the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

Plaintiffs argue that "it would be premature for this Court to grant the Motion while discovery is ongoing." (Pls.' Opp. at 40 (emphasis omitted).) They assert that "further discovery – including fact and expert depositions – is necessary to establish the terms of the relevant bailment agreements to the extent they have not been produced or were not written, the scope and effect of those agreements, and the relevant dates and circumstances of breach." (*Id.*) They further claim that "[f]act and expert discovery is . . . necessary concerning applicable Hungarian law and how it was interpreted and applied (which is not purely a legal issue)." (*Id.*)

In response to this Court's request for additional briefing, plaintiffs clarified what they expected to uncover in depositions that would be relevant to subject matter jurisdiction. Plaintiffs intend to depose representatives of the five defendants. (*See* Supplemental Decl. of Alycia Regan Benenati [ECF No. 93-1] ("Benenati Supplemental Decl.").) They claim that depositions of these representatives are necessary to "confirm Hungary's knowledge of the ownership of the Herzog Collection and treatment of the Collection throughout the relevant

8

period." (Pls.' Supplemental Mem. of P. & A. in Opp. to Defs.' Mot. to Dismiss [ECF No. 93] at 4.)  This issue is relevant to discovery, plaintiffs argue, because, if defendants "never knew the exact distribution of the Herzog collection among the different heirs," then defendants would have "understood that [they were] entering into deposit agreements that required [them] to return art to persons residing in the United States." (*Id.*)  Relatedly, plaintiffs assert that "[f]act witness testimony is . . . required to confirm that Hungary knew at all relevant times that Elizabeth Weiss de Csepel and other members of the Herzog family resided in the United States at the time the relevant bailment agreements were created and repudiated." (*Id.*)  Finally, plaintiffs assert that fact and expert testimony is necessary to show that

> (i) oral deposit agreements were common during the relevant period; (ii) that the Museums would not have been able to hold the art in the absence of such written or oral deposit agreements; (iii) that deposit agreements – whether written or oral – during the relevant period contained an implicit obligation of specific performance (*i.e.,* return of the art); and (iv) that Plaintiffs and their predecessors always had the right to demand that their art be returned to the United States by requesting export permits, particularly after Hungary joined the European Union in 2004 and became bound by the laws of the European Union concerning export of certain categories of cultural goods.

(*Id.* at 5.)

Defendants respond that their motion is ripe for consideration.  They emphasize that "Hungary has provided Plaintiffs with 20,869 pages of documents" and that "Plaintiffs have not asserted that they have not had sufficient time to review all of the documents Hungary produced." (Defs.' Reply at 24-25.)  They claim that "Plaintiffs' supplemental brief is silent as to what information Hungarian deponents could offer regarding the 'direct effect' a purported bailment (or bailments) could have on the United States." (Resp. by the Republic of Hungary, the Hungarian National Gallery, the Museum of Fine Arts, the Museum of Applied Arts, and the Budapest University of Technology and Economics to Pls.' Supplemental Br. [ECF No. 97] at

9

4.) In particular, they contend that the depositions will not yield any evidence that a bailment "involving artworks attributable to István [or András] would . . . cause a *direct* effect in the United States" since those agreements would not "contemplate performance in the United States." (*Id.* at 6.)

The Court will refrain from ruling on the merits of defendants' motion until fact depositions conclude. First and most critically, the Court of Appeals has already determined that plaintiffs have pled facts sufficient to establish subject matter jurisdiction under the commercial activity exception. *See de Csepel*, 714 F.3d at 599-601. And the documentary evidence produced thus far provides some support for the complaint's assertion that there existed an understanding between the parties that defendants were mere custodians of the Herzog Collection. (*See, e.g.*, Benenati Decl., Ex. D, at HUNG010996; Benenati Decl., Ex. F, at HUNG011376-77; Benenati Decl., Ex. H, at HUNG012663.) These documents make plausible plaintiffs' claim that depositions will shed light on the terms of the alleged bailment agreements. Next, plaintiffs have represented that they intend to pursue facts relevant to subject matter jurisdiction in depositions with defendants' representatives. For example, one of plaintiffs' deposition topics for the Republic of Hungary is "Hungary's knowledge concerning which member(s) of the Herzog family owned each of the Artworks described in Topic 1 prior to the commencement of this action." (Benenati Supplemental Decl., Ex. A [ECF No. 93-2] at 5.) The Court agrees with plaintiffs that defendants could have information on this topic and that plaintiffs' jurisdictional argument would be bolstered by evidence that defendants treated the Herzog Collection as an indivisible group. To be sure, some of the documentary evidence produced thus far distinguishes between artwork owned by the Herzog heirs individually. (*See, e.g.*, Benenati Decl., Ex. D, at HUNG010996.) But other evidence indicates that at least some of

defendants treated the Collection as a unitary whole. (*See, e.g.*, Benenati Decl., Ex. U [ECF No. 89-23] at HUNG002382 ("The Museum of Fine Arts never knew the exact distribution of the Herzog collection among the different heirs. They have always treated the collection as one.").) The scheduled fact depositions could clarify this issue in a way that would support plaintiffs' jurisdictional arguments. In short, the Court believes that fact depositions "could produce [facts] that would affect [its] jurisdictional analysis." *Goodman Holdings*, 26 F.3d at 1147. It will therefore deny the instant motion without prejudice and allow defendants to file a new motion to dismiss when fact depositions conclude.[1]

As a final matter, the Court notes that it has held that there is an alternative ground for jurisdiction, which has been largely ignored by the parties. This Court originally held that it had subject matter jurisdiction under the expropriation exception to the FSIA, 28 U.S.C. § 1605(a)(3), but the Court of Appeals did not address that exception. *de Csepel*, 714 F.3d at 598. Notwithstanding a request for supplemental briefing, defendants have provided little reason for this Court to change its original conclusion that the seizure of the Herzog Collection during World War II brings plaintiffs' claims under the expropriation exception. *See de Csepel*, 808 F. Supp. 2d at 128-33. Instead, in its briefing, defendants argue that the 2008 decision by the Hungarian courts was not a taking in violation of international law. (*See* Supplemental Br. in Supp. of Mot. to Dismiss by the Republic of Hungary, the Hungarian National Gallery, the Museum of Fine Arts, the Museum of Applied Arts, and the Budapest University of Technology and Economics [ECF No. 92] at 7 ("The 2008 judgment was not a violation of international law . . . .").) Defendants make this argument notwithstanding the direction from the Court that it

---

[1] Plaintiffs have failed to provide details about their expected expert depositions or to explain how those depositions will bear on this Court's jurisdictional analysis. As such, the Court will only postpone its jurisdictional ruling for the duration of fact depositions.

11

did "not intend to revisit whether the property was taken in violation of international law or, as pled in plaintiffs' Complaint, that the expropriation occurred during World War II." *de Csepel v. Republic of Hungary*, No. 10-cv-1261, at *2 (D.D.C. Oct. 20, 2014). In future briefing, the Court requests that the parties address fully the validity of the Court's prior holding that the expropriation exception provides subject matter jurisdiction.

## CONCLUSION

For the reasons stated herein, defendants' motion to dismiss is denied without prejudice pending the close of fact discovery. A separate Order accompanies this Memorandum Opinion.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   December 12, 2014