# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **DAVID L. de CSEPEL,** *et al.* | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **vs.** | )  **No. 1:10-cv-01261 (ESH)** |
| | ) |
| **REPUBLIC OF HUNGARY,** *et al.*, | ) |
| | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |

## RENEWED MOTION TO DISMISS BY THE REPUBLIC OF HUNGARY, THE HUNGARIAN NATIONAL GALLERY, THE MUSEUM OF FINE ARTS, THE MUSEUM OF APPLIED ARTS, AND THE BUDAPEST UNIVERSITY OF TECHNOLOGY AND ECONOMICS

Defendants Republic of Hungary, The Hungarian National Gallery, The Museum of Fine Arts, The Museum of Applied Arts, and The Budapest University of Technology and Economics ("Hungary"), by and through their attorneys, hereby respectfully move to dismiss the above-captioned action.  This Motion is based on the Memorandum of Points and Authorities and supporting declarations, submitted herewith for the Court's consideration.

## ORAL HEARING REQUESTED

Pursuant to Local Rule 7(f), Hungary hereby respectfully requests an oral hearing on this Motion.


Dated: May 18, 2015                              Respectfully submitted,


                                                 */s/ Emily C. Harlan*

                                                 Emily C. Harlan (Bar No. 989267)

                                                 NIXON PEABODY LLP
                                                 401 Ninth Street, N.W., Suite 900
                                                 Washington, D.C.  20004-2128
                                                 Telephone: (202) 585-8000
                                                 Facsimile: (202) 585-8080
                                                 eharlan@nixonpeabody.com


                                                 Thaddeus J. Stauber *(pro hac vice)*
                                                 Sarah Erickson André *(pro hac vice)*
                                                 Irene Tatevosyan *(pro hac vice)*

                                                 NIXON PEABODY LLP
                                                 555 West Fifth Street, 46th Floor
                                                 Los Angeles, CA 90013

                                                 ***Counsel for Defendants Republic of Hungary,
                                                 The Hungarian National Gallery, The Museum
                                                 of Fine Arts, The Museum of Applied Arts, and
                                                 The Budapest University of Technology and
                                                 Economics***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DAVID L. de CSEPEL**, *et al.* )<br><br>)<br>)<br>)<br>)<br>**Plaintiffs,** )<br>)<br>**vs.** )<br>)<br>**REPUBLIC OF HUNGARY**, *et al.*, )<br>)<br>)<br>**Defendants.** )<br>)<br>) | **No. 1:10-cv-01261 (ESH)** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF RENEWED MOTION TO DISMISS BY THE REPUBLIC OF HUNGARY, THE**
**HUNGARIAN NATIONAL GALLERY, THE MUSEUM OF FINE ARTS, THE**
**MUSEUM OF APPLIED ARTS, AND THE BUDAPEST UNIVERSITY OF**
**TECHNOLOGY AND ECONOMICS**

Defendants Republic of Hungary, The Hungarian National Gallery, The Museum of Fine Arts, The Museum of Applied Arts, and The Budapest University of Technology and Economics (collectively "Hungary" or "Defendants"), by and through their attorneys, hereby respectfully submit this Memorandum of Points and Authorities in support of their renewed Motion to Dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction.

# TABLE OF CONTENTS

**Page(s)**

I.     Introduction ........................................................................................................... 1

II.    Background ............................................................................................................ 6

     A.     Relevant Factual Background ......................................................................6

     B.     Relevant Procedural History .....................................................................15

III.   Standard of Review Under Federal Rule of Civil Procedure 12(b)(1) ............................. 18

IV.    The FSIA's Commercial Activity Exception Does Not Provide the Court with Subject
     Matter Jurisdiction over Hungary ..................................................................... 20

     A.     The Court Cannot "Infer" a Bailment for the Forty-Four Individual
           Artworks, Each the Sole and Separate Property of One of Three Herzog
           Siblings ..................................................................................................20

     B.     Plaintiffs Provide No Evidence of a "Direct Effect" in the United States,
           as Required by the Commercial Activity Exception ...............................25

          1.     Plaintiffs Cannot Demonstrate that the Purported Bailments
                between András Herzog (or His Heirs) and Defendants Created a
                "Direct Effect" in the United States as Required by the Commercial
                Activity Exception .......................................................................26

          2.     Plaintiffs Cannot Demonstrate that the Purported Bailment between
                István Herzog (or His Heirs) and Defendants Created a "Direct
                Effect" in the United States as Required by the Commercial
                Activity Exception .......................................................................29

          3.     Plaintiffs Cannot Demonstrate that the Purported Bailments
                 between Erzsébet Weiss de Csepel (or Her Heirs) and Defendants
                Created a "Direct Effect" in the United States as Required by the
                Commercial Activity Exception ....................................................32

          4.     For All Purported Bailments, the location of any "Direct Effect" is
                Hungary, not the United States ......................................................33

     C.     Historical Facts and Applicable Law Undermine the Existence of Valid
           Bailments ...............................................................................................38

V.     The FSIA's Expropriation Exception Does Not Provide the Court with Subject Matter
     Jurisdiction over Hungary ................................................................................ 40

     A.     The FSIA's Treaty Exception Precludes the Court from taking Jurisdiction
           over Hungary under the Expropriation Exception ...................................41

          1.     Expropriation Claims are Addressed by the Peace Treaty, which
                Conflicts Expressly with the FSIA ...............................................42

2.      The 1973 Agreement Reiterated and Expanded Upon the
        Settlement of Taken Property Claims by Specifically Including
        Claims that Relate to Article 27 of the Peace Treaty ................................46

3.      The Appellate Panel's Reasoning Supports Hungary's Argument
        that the Treaty Exception Precludes Application of the
        Expropriation Exception...........................................................................48

B.    This Court Lacks Subject Matter Jurisdiction under the FSIA's
      Expropriation Exception over Claims Associated with the Heirs of István
      and András Herzog, as Plaintiffs Failed to Exhaust their Remedies In
      Hungary...........................................................................................................52

VI.   Conclusion ..................................................................................................... 58

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Abelesz v. Magyar Nemzeti Bank*,
    692 F.3d 661 (7th Cir. 2012) ....................................................5, 54, 55, 56, 57, 58

*Adler v. Fed. Republic of Nigeria*,
    107 F.3d 720 (9th Cir. 1997) .........................................................................34

*Agrocomplect, AD v. Republic of Iraq*,
    524 F. Supp. 2d 16 (D.D.C. 2007) ...............................................................26, 32

\* *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
    528 F.3d 934, 949 (D.C. Cir. 2008) ...........................................5, 19, 31, 33, 54, 58

*Alberti v. Empresa Nicaraguense de la Carne*,
    705 F.2d 250 (7th Cir. 1983) .........................................................................31, 39

*Allen v. Russian Fed'n*,
    522 F. Supp. 2d 167, 189 (D.D.C. 2007) ............................................................ 31

\* *Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989).............................................................1, 42, 44, 45, 51

*Bao Ge v. Li Peng*,
    201 F. Supp. 2d 14 (D.D.C. 2000) .................................................................25

\* *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
    734 F.3d 1175 (D.C. Cir. 2013) ....................................................19, 25, 26, 31, 32

*Bell Helicopter Textron Inc. v. Islamic Republic of Iran*,
    892 F. Supp. 2d 219 (D.D.C. 2012) ...............................................................26, 32, 33

*BPA Int'l, Inc. v. Kingdom of Sweden*,
    281 F. Supp. 2d 73 (D.D.C. 2003) .................................................................32

*Browning v. Clinton*,
    292 F.3d 235 (D.C. Cir. 2002) .........................................................................19

*Cassirer v. Kingdom of Spain*,
    461 F. Supp. 2d 1157 (C.D. Cal. 2006) ..............................................................53

*Caterpillar, Inc. v. Williams*,
    482 U.S. 386 (1987)........................................................................48, 49

*Chuidian v. Philippine Nat'l Bank*,
    912 F.2d 1095 (9th Cir. 1990) .........................................................................31, 39

*City of Monterey v. Del Monte Dunes,*
526 U.S. 687 (1999)............................................................................................53

*Corzo v. Banco Central de Reserva del Peru,*
243 F.3d 519 (9th Cir. 2001) ............................................................................34

*Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada,*
600 F.3d 661 (D.C. Cir. 2010)..............................................................26, 31, 32

*Daliberti v. Republic of Iraq,*
97 F. Supp. 2d 38 (D.D.C. 2000) .......................................................................19

\* *de Csepel v. Republic of Hungary,*
714 F.3d 591 (D.C. Cir. 2013) .................................................................. *passim*

*de Csepel v. Republic of Hungary,*
808 F. Supp. 2d 113 (D.D.C. 2011) ..............................................................15, 41

*De Los Santos Mora v. New York,*
524 F.3d 183 (2d Cir. 2008).............................................................................45

*De Sanchez v. Banco Central de Nicaragua,*
770 F.2d 1385 (5th Cir. 1985) .....................................................................31, 39

*Dreyfus v. Von Finck,*
534 F.2d 24 (2d Cir. 1976).................................................................................45

*Fischer v. Magyar Államvasutak Zrt.,*
777 F.3d 847 (7th Cir. 2015) ...................................................5, 54, 55, 56, 57, 58

*Fischer v. Magyar Államvasutak Zrt.,*
No. 10 C 868, 2013 WL 4525408 (N.D. Ill. Aug. 20, 2013).................................55

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
905 F.2d 438 (D.C. Cir. 1990) ...........................................................................18

*Garb v. Republic of Poland,*
440 F.3d 579 (2d Cir. 2006).........................................................................31, 39

*Global Index., Inc. v. MKAPA,*
290 F. Supp. 2d 108 (D.D.C. 2003 ....................................................................37

*Goodman Holdings v. Rafidain Bank,*
26 F.3d 1143 (D.C. Cir. 1994) .............................................................................1

*Greenpeace, Inc. (U.S.A.) v. France,*
946 F. Supp. 773 (C.D. Cal. 1996) ..........................................................53, 54, 55

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
  602 F.3d 69 (2d Cir. 2010) ............................................................................32, 33

*Gutch v. Fed. Republic of Germany*,
  444 F. Supp. 2d 1 (D.D.C. 2006) ...............................................................................41

*Haven v. Rzeczpospolita Polska (Republic of Poland)*,
  68 F. Supp. 2d 947 (N.D. Ill. 1999) .....................................................................31, 39

*Idas Resources N.V. v. Empresa Nacional de Diamantes de Angola E.P.*,
  No. 06-00570 (ESH), 2006 WL 3060017 (D.D.C. Oct. 26, 2006) .........................................37

*Jin v. Ministry of State Sec.*,
  475 F. Supp. 2d 54 (D.D.C. 2007) .............................................................................33

*Joseph v. Office of the Consultate Gen. of Nigeria*,
  830 F.2d 1018 (9th Cir. 1987) .............................................................................21, 22

*Kettey v. Saudi Ministry of Educ.*,
  53 F. Supp. 3d 40 (D.D.C. 2014) ..............................................................................33

*Kiobel v. Royal Dutch Petrol. Co.*,
  133 S. Ct. 1659 (U.S. 2013) .................................................................................56

*Matta-Ballesteros v. Henman*,
  896 F.2d 255 (7th Cir. 1990) ................................................................................45

*McManus v. District of Columbia*,
  530 F. Supp. 2d 46 (D.D.C. 2007) ............................................................................19

*Medellin v. Texas*,
  552 U.S. 491 (2008) .........................................................................................45

*Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*,
  995 F. Supp. 14 (D.D.C. 1998) ......................................................................54, 55, 58

*Moore v. United Kingdom*,
  384 F.3d 1079 (9th Cir. 2004) .....................................................................42, 44, 45

*Norton v. Larney*,
  266 U.S. 511 (1925) ......................................................................................21, 28

*Orkin v. Swiss Confederation*,
  770 F. Supp. 2d 612 (S.D.N.Y. 2011) .....................................................................52, 53

*Peterson v. Royal Kingdom of Saudi Arabia*,
  416 F.3d 83 (D.C. Cir. 2005) .................................................................................29

*Phoenix Consulting Inc. v. Republic of Angola*,
    216 F.3d 36 (D.C. Cir. 2000) ........................................................................18, 19

*Prakash v. Am. Univ.*,
    727 F.2d 1174 (D.C. Cir. 1984) ..................................................................18, 19

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    389 F.3d 192 (D.C. Cir. 2004) ...........................................................................19

*Princz v. Fed. Republic of Germany*,
    26 F.3d 1166 (D.C. Cir. 1994) ...........................................................................25

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992).............................................................................21, 25, 29, 33

*Republic of Austria v. Altmann*,
    541 U.S. 677 (2004).............................................................................................53

*Rong v. Liaoning Province Gov't*,
    362 F. Supp. 2d 83 (D.D.C. 2005) .....................................................................45

*Rong v. Liaoning Province Gov't*,
    452 F.3d 883 (D.C. Cir. 2006) ......................................................................20, 34

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993).....................................................................................18, 21

*Shipping Fin. Servs. Corp. v. Drakos*,
    140 F.3d 129 (2d Cir. 1998).................................................................................21

*Siderman de Blake v. Republic of Argentina*,
    965 F.2d 699 (9th Cir. 1992) ..............................................................................41

*Simon v. Republic of Hungary*,
    37 F. Supp. 3d 381 (D.D.C. 2014) .............................................................4, 50, 51

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004).............................................................................................56

*Terenkian v. Republic of Iraq*,
    694 F.3d 1122 (9th Cir. 2012) ............................................................................33

*United States ex. rel. Lujan v. Gengler*,
    510 F.2d 62 (2d Cir. 1975)..................................................................................45

*United States ex rel. Saroop v. Garcia*,
    109 F.3d 165 (3d Cir. 1997)................................................................................45

*United States v. Belmont,*
   301 U.S. 324 (1937)..................................................................................45

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n,*
   33 F.3d 1232 (10th Cir. 1994) .....................................25, 26, 30, 32, 34

*Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De*
   *Navigation, (C.N.A.N.),*
   730 F.2d 195 (5th Cir. 1984) ..............................................................52

*Virtual Countries, Inc. v. Republic of South Africa,*
   300 F.3d 230 (2d Cir. 2002)..........................................................26, 32

*Weltover, Inc. v. Argentina,*
   941 F.2d 145 (2d Cir. 1991)..........................................................33, 34

*Wilderness Soc. v. Griles,*
   824 F.2d 4 (D.C. Cir. 1987) .................................................................19

*World Holdings, LLC v. Fed. Republic of Germany,*
   613 F.3d 1310 (11th Cir. 2010) ...........................................................42

*Zappia Middle E. Const. Co. Ltd. v. Emirate of Abu Dhabi,*
   215 F.3d 247, 251 (2d Cir. 2000)..........................................4, 5, 52, 53

*Zedan v. Kingdom of Saudi Arabia,*
   849 F.2d 1511 (D.C. Cir. 1988) .........................................30, 31, 32, 33

## FEDERAL STATUTES

28 U.S.C. § 1330 *et seq*.............................................................................1

28 U.S.C. § 1603(d) ...................................................................................20

28 U.S.C. § 1604.............................................................................1, 18, 41

28 U.S.C. § 1605(a)(2).................................................................................20

28 U.S.C. § 1605(a)(3).......................................................................15, 52, 53

## FEDERAL RULES

Federal Rule of Civil Procedure 12(b)(1) ...............................1, 3, 18, 19, 21

Federal Rule of Civil Procedure 12(b)(6) ...........................................15, 48

Additional Authorities

\* Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, March 6, 1973, 24 U.S.T. 522, T.I.A.S. 7569, 938 U.N.T.S. 167 ("1973 Agreement")................................................................................................ *passim*

Council Regulation (EC) No 116/2009 of 18 December 2008 on the Export of Cultural Goods, 2009 O.J. (L 39) (European Union)..............................................................35

H.R. Rep. No. 94-1487 at 17, reprinted in 1976 U.S.C.C.A.N. 6604, 6616................42, 45, 51, 52

Hungarian Act No. XIX of 1924.................................................................................34

Hungarian Act No. XI of 1929 ...................................................................................34

Hungarian Act No. IV of 1978 on the Criminal Code ...............................................34

Hungarian Act No. XXV of 1991 ...............................................................................11

Hungarian Act No. XIV of 1992.............................................................................11, 12

Hungarian Act No. LXIV of 2001 ..............................................................................34

Hungarian Act No. CXCV of 2013..........................................................................14, 57

Hungarian Civil Code Act No. V of 2013 ..................................................................36

Hungarian Civil Code of 1959, Art. 278.....................................................................36

Hungarian Civil Code of 1959, Art. 466.....................................................................36

Hungarian Decree No. 14/2010 ..................................................................................34

Hungarian Government Decree No. 449/2013 (XI.28.) ..........................................14, 57

Hungarian Museum Decree No. 13 of 1954 ...............................................................12

Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, Advisory Opinion, 1950 I.C.J. 65, at 75 (May 30) ...............................................................43

Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, Advisory Opinion, 1950 I.C.J. 221, at 224-26 (July 18) .....................................................43

Restatement (Third) of the Foreign Relations Law of the United States § 713 cmt. f (1987)..................................................................................................................55

The Export of Objects of Cultural Interest (Control), 2003, No. 2759 (United Kingdom)..........35

\*     Treaty of Peace with Hungary, Feb. 10, 1947, 61 Stat. 2065 T.I.A.S 1651 ("Peace
Treaty") ........................................................................................................................ *passim*

UNESCO Database of National Cultural Heritage Laws ............................................................35

## I.      Introduction

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330 *et seq*., provides that a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605-1607 of this chapter."  28 U.S.C. § 1604; *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  In 2013, by "drawing all reasonable inferences from the complaint in the family's favor," and finding that the requisite "direct effect" could be inferred from Plaintiffs' Complaint, the U.S. Court of Appeals for the D.C. Circuit found that Plaintiffs "alleged facts that, if true," could satisfy the FSIA's commercial activity exception.  *de Csepel v. Republic of Hungary*, 714 F.3d 591, 598-99, 601 (D.C. Cir. 2013).  The case returned to this Court.

On May 14, 2014, Hungary filed a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(1), asserting this Court lacked subject matter jurisdiction over Hungary under the commercial activity exception on the grounds that: (1) Plaintiffs failed to provide evidence of a bailment and a court cannot "infer" a bailment agreement at this stage, and (2) Plaintiffs can provide no evidence of the requisite "direct effect" in the United States.  Dkt. No. 86.  After considering the briefs filed by the parties, this Court denied the motion without prejudice, based not on the merits but to allow for additional discovery.  Dkt. No. 100.  The Court authorized Hungary to renew its motion to dismiss at the close of fact discovery, to allow Plaintiffs an opportunity to conduct depositions that "could produce [facts] that would affect [the Court's] jurisdictional analysis."  Dkt. No. 100 at 11 (quoting *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994)).  In the opinion, the Court also directed the parties to "address fully the validity of the Court's prior holding that the expropriation exception provides subject matter jurisdiction."  Dkt. No. 100 at 12.

The parties have completed fact discovery, conducting fact witness depositions in February and April. No document or testimony revealed a "direct effect" in the United States. Through discovery, Plaintiffs confirmed that each artwork was inherited separately as sole and separate property of one of the three Herzog siblings, only one of whom later became a United States citizen. Through discovery, Plaintiffs confirmed that thirty-two of the forty-four claimed artworks were individually and separately inherited by two non U.S. citizen Herzog siblings and their heirs. Attached as Exhibit 1 to the Declaration of Irene Tatevosyan, submitted herewith, is a chart identifying the heir to which each artwork is attributed (András – 25, István – 7, Erzsébet – 12). Neither András Herzog's heirs (Italian Plaintiffs Angela and Julia Herzog, who have always resided in Hungary or Italy) nor the artworks attributed to András Herzog have any connection to the United States. In fact, Plaintiff Angela Herzog testified that she never thought of artworks attributed to András Herzog going to the United States, and that neither she nor her sister have any agreements to share their claimed artworks with their U.S. relations. Thus no "direct effect" can be drawn between any artworks inherited by the Italian Plaintiffs, Plaintiff de Csepel, or other heirs and the United States.

Through discovery, the parties determined that thirty-four of the forty-four artworks are listed in the museums' "Core" inventory books. Ten artworks (András – 7, István – 1, Erzsébet – 2) are identified in the museum so-called "deposit inventory books." Tatevosyan Decl., Exhs. 1-4. In addition, discovery has confirmed that 19 of the artworks were legally and physically returned after World War II, two were never taken during World War II, fifteen were seized and forfeited in the 1950s for export violations, and eleven were claimed by Erzsébet as taken in the 1950s during the Communist Era. While the deposit inventory book registrations could provide indicia that ten of the forty-four artworks may have been considered bailments by one or both

parties at some time, even if this Court were to find that, at the Rule 12(b)(1) stage, Plaintiffs could advance a colorable claim of bailment with respect to these ten artworks, such claims do not provide this Court with a basis for asserting jurisdiction, as no "direct effect" in United States can be established.  The lack of any meaningful connection between the United States and either the artworks inherited by András (a Hungarian citizen) and his daughters, the Italian Plaintiffs, or the artworks inherited by István (also a Hungarian citizen with nonparty, non-U.S. heirs), precludes any finding of "direct effect."  Nor is there a non-financial connection between Plaintiff de Csepel and purported bailments with Hungary regarding the artworks attributable to Ms. Weiss de Csepel.  Without this requisite "direct effect," the FSIA's commercial activity exception cannot be utilized to strip Hungary of its presumptive immunity.

The FSIA's expropriation exception is similarly unavailing as a jurisdictional basis.  To the extent that Plaintiffs seek to re-cast their claims as seeking a remedy for a taking in violation of international law based on a World War II taking, rather than for the repudiation of bailments, Plaintiffs' claims are covered by the *Treaty of Peace with Hungary*, Feb. 10, 1947, 61 Stat. 2065 T.I.A.S. 1651 ("Peace Treaty") and *Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims*, *U.S.-Hung.*, March 6, 1973, 24 U.S.T. 522 (the "1973 Agreement").  (This is why Plaintiffs tailored their claim as one for a "bailment.")  As both Agreements predate (and conflict with) the FSIA, the FSIA's treaty exception prevents this Court from taking jurisdiction over Hungary under the expropriation exception.  Moreover, discovery confirmed that, in compliance with the Peace Treaty, nineteen of the claimed artworks were legally and physically returned. And two of the claimed artworks did not come into Defendants' possession until the 1950s and 1960s, through seizure or donation.  Finally, at least fifteen artworks were seized by Hungary

following the 1950 smuggling conviction of Mrs. István Herzog.  This taking through established forfeiture provisions does not violate international law, particularly when it occurred in the Communist era as to Hungarian citizens.  These artworks, therefore, cannot be considered property "taken in violation of international law" in connection with World War II.

The appellate panel found that Plaintiffs' claims "fall outside the [Peace] Treaty's scope," *de Csepel*, 714 F.3d at 602, because they are premised on a bailment theory – not a violation of international law.  *See also Simon v. Republic of Hungary*, 37 F. Supp. 3d 381, 420-21 (D.D.C. 2014) (recognizing that war-time taken property claims clearly fall *inside* the Peace Treaty's scope).  If Plaintiffs' claims are not bailments, they no longer "fall outside the [Peace] Treaty's scope."  *de Csepel*, 714 F.3d at 602; *see also Simon*, 37 F. Supp. 3d at 420-21.  Discovery confirmed that each artwork is the distinct, separate property of one of three heirs and that each artwork has a unique provenance.  The artworks do not fit squarely into either of the FSIA exceptions invoked by Plaintiffs' Complaint.

Moreover, Plaintiffs have exhausted claims to only eleven of twelve artworks attributable to Erzsébet Weiss de Csepel, advanced here by Plaintiff David de Csepel, as his aunt, Martha Nierenberg challenged Hungary's possession of eleven artworks during litigation in Hungary.  Neither the Italian Plaintiffs nor Istvan's heirs has challenged in Hungarian, Swiss, or Italian courts Hungary's possession of artworks attributable to István (seven artworks) or András Herzog (twenty-five artworks).  While their heirs were brought into Ms. Nierenberg's lawsuit, they chose not to pursue their claims.

Courts recognize that a "taking" violates international law when that taking was accomplished "without payment of the prompt adequate and effective compensation required by international law."  *Zappia Middle E. Const. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247,

251 (2d Cir. 2000).  Consequently, a court cannot determine whether the alleged taking violated international law until it is shown that the offending sovereign cannot (or will not) provide "adequate and effective compensation."  *Id.*  It follows that unless Hungary is given the opportunity to remedy the alleged violation of international law and until Plaintiffs can demonstrate that Hungary is unable or unwilling to provide a remedy, Plaintiffs have failed to demonstrate a violation of international law with respect to those claims associated with István and András Herzog.  *See Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 949 (D.C. Cir. 2008) (recognizing that a "plaintiff who chooses to litigate in this country in disregard of the postdeprivation remedies in the 'expropriating' state may have trouble showing a 'tak[ing] in violation of international law.'"  (citation omitted)).  And to the extent that a 2008 decision from a Hungarian court is argued to constitute a "breach" of a bailment providing this court with jurisdiction under the expropriation exception, this "breach" cannot apply to the heirs of András and István Herzog, as they did not participate actively in the Hungarian litigation and the 2008 decision did not adjudicate their claims.  *See* Dkt. No. 15-4.

As affirmed recently by the U.S. Court of Appeals for the Seventh Circuit, principles of comity embodied in international law favor giving the accused state an opportunity to "redress it by its own means, within the framework of its own legal system" before permitting the same alleged taking to be prosecuted in a foreign court.  *Fischer v. Magyar Államvasutak Zrt.*, 777 F.3d 847, 855 (7th Cir.  2015) (quoting *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 680 (7th Cir. 2012)).  Thus, this Court should not exercise subject matter jurisdiction over claims associated with the non-U.S. citizen plaintiffs who have not sought local redress in Hungary.  *See id.*; *see also Agudas Chasidei Chabad of U.S.*, 528 F.3d at 949.

II.     **Background**

   A.     **Relevant Factual Background**[1]

   This action involves the disputed ownership of forty-four individual and separate

artworks once attributable to the collection of Baron Mór Lipót Herzog that have been in

Defendants' possession and public display in Budapest for approximately fifty to seventy years.

Following the death of Baron Herzog (in 1934) and his wife (in 1940), the Herzog collection was

divided among the couple's three children: Erzsébet (Herzog) Weiss de Csepel, István Herzog,

and András Herzog.

   In 1943, the Herzog family sought to save their artworks from damage and confiscation

by hiding the bulk of the collection in the cellar of one of the family's factories.  Compl. ¶ 58.

On March 19, 1944, Germany invaded Hungary and occupied it until the Soviet Red army forced

the Germans out of Hungary in the spring of 1945.  Sometime prior to May 23, 1944, the

artworks were discovered.  *Id.* ¶ 59.  It appears that some of the artworks were transferred to

Germany, while the rest were stored in Hungary.  *Id.* ¶¶ 59-61.

   In May 1944, many members of the Herzog and Weiss de Csepel families left Hungary.

*Id.* ¶ 63.  Ms. Weiss de Csepel and her children reached Portugal in June 1944, and eventually

arrived in the United States in 1946.  *Id.* ¶ 63.  Plaintiffs Angela and Julia Herzog left Hungary

following their father's deportation and death, with both obtaining Italian citizenship.  *Id.* ¶ 41;

Tatevosyan Decl., Exh. 5 at No. 3.  It appears that István Herzog, a Hungarian citizen, remained

in Hungary, where he died in 1966.  Compl. ¶ 42; Tatevosyan Decl., Exh. 5 at No. 3.

   In 1947, Hungary signed the Peace Treaty with the Allies.  Pursuant to the Peace Treaty,

Hungary agreed to take responsibility for making restitution to Hungarian nationals or those

---

[1] As Hungary's two prior motions to dismiss contained detailed factual and procedural history of
relevant events, Hungary provides an abridged recitation of relevant facts.

"under Hungarian jurisdiction" due to discrimination during World War II.  *Id.* art. 27(1).  The Peace Treaty was ratified on June 14, 1947, and entered into force on September 15, 1947.

Hungary's post-war provisional government, dominated by the Hungarian Communist Party (MKP), was replaced in November 1945 after elections that gave majority control of a coalition government to the Independent Smallholders' Party.  Following a few years of "coalition government," the Communists ultimately came to power and had established a one-party dictatorship by 1948-49.  During the Communist era, "Hungary did not recognize individual property rights . . . ."  Compl. ¶ 93.

After the war, some pieces from the Herzog collection were returned to members of the Herzog family.  *Id.* ¶ 72; Dkt. No. 15-3, complaint filed in Hungary in 1999 by Martha Nierenberg ("In relation to the Herzog Collection, the return process also went smoothly."). Nineteen artworks were legally and physically returned to Erzsébet Weiss de Csepel and András and István Herzog or their representatives.  Decl. I. Tatevosyan, Exhs. 6-16; Exh. 76.  Other artworks were legally released and remained with Defendants.  Compl. ¶¶ 75, 70-73; Tatevosyan Decl. Exh. 17 (legally releasing works "under the ownership of András Herzog").

In 1948, internal documents raised the concern that artworks attributed to András Herzog might be smuggled out of Hungary.  *See id.* at Exh. 18.  The documents also note the government's concern that artworks attributable to István Herzog had already been smuggled out of Hungary.  *See id.*

Later that year, Hungary brought smuggling charges against István Herzog's first wife, Ilona Kiss, when it discovered that she had smuggled artworks attributable to István Herzog out of Hungary in violation of long-established Hungarian laws that prohibited the export of cultural patrimony.  As result of the criminal proceedings (1948-1952), twenty artworks were seized

and/or forfeited to the Hungary, as permitted by statute, fifteen of which are in this lawsuit. Tatevosyan Decl., Exhs. 19-21; Exh. 77.  The return of additional artworks to the heirs or their representatives was halted.  *See id.* at Exh. 22 at HUNG011044 (identifying as "seized and impounded" artworks attributed to the "late András Herzog"); Exh. 23 at HUNG012663.

In 1949, a letter from the State Security Office of the Ministry of the Interior stated "that the András Herzog artworks and paintings deposited with the Museum of Fine Arts constitute the property of the Hungarian Republic and as such they are to be handled as national property."  *Id.* at Exh. 24 at HUNG011998.

In 1954, Mrs. Maria Parravicini, the mother of the Italian Plaintiffs, had an art dealer contact the Hungarian government with an offer to purchase several of the artworks her daughters inherited, specifically seven El Greco paintings.  *See id.* at Exh. 25 at HUNG013079. The letter suggested that the purchase price could be paid to Hungary at its Legation in Berne, Switzerland in exchange for the paintings being handed over to Mrs. Parravicini at the same location in Switzerland.  *Id.* at HUNG013080.  Included on the list of the seven El Greco paintings are three of the artworks named in the Complaint.  Compl. ¶ 16(vii)-(ix); *see also* Tatevosyan Decl., Exh. 26 at HUNG013043-044.  Internal Hungarian communications described the request: "a Hungarian countess having emigrated to the West would like to purchase, through an agent paintings by Greco, which once were her family's property, but now have long since been owned by the Museum of Fine Arts."  *Id*. at HUNG013073.  After noting that the paintings, "the majority of which really constitute the Museum of Fine Arts' property, and are of great value" were "**not** for sale either domestically or abroad," and that "[n]o museum ever sells such paintings," the letter writer noted the serious ramifications of even considering the request: "If

we only did as much as enter negotiations of this kind, we would be fuelling propaganda against our country."  Tatevosyan Decl., Exh. 26 at HUNG013070-071.

Ms. Weiss de Csepel, Plaintiff de Csepel's grandmother, became a U.S. citizen on June 23, 1952.  Compl. ¶ 63.  On a date prior to April 13, 1959, Ms. Weiss de Csepel filed a claim with the Foreign Claims Settlement Commission ("FCSC").  In her claim, Ms. Weiss de Csepel sought $553,715.00 plus interest as compensation for real property and artwork nationalized or taken by Hungary during the Communist Era.  Tatevosyan Decl., Exh. 27 at 1.  In the amended, final decision, the FCSC awarded Ms. Weiss de Csepel $457,290.80 and $28,944.42 in interest, for a total award of $486,235.22.  *Id.* at Exh. 28 at 2.  At least ten of the twelve artworks for which Ms. Weiss de Csepel sought (and was awarded) compensation are included in Plaintiffs' Complaint.  *See id.* at Exh. 27 at 2.

In 1952, the Cranach painting (Compl. at 16(vi)), came into Hungary's possession for the first time when it was seized by the State Security Authority from Dr. Henrik Lóránt.  Tatevosyan Decl., Exh. 29 at HUNG008654 and HUNG008664.  The Ferenczy painting, (Compl. at 19(i)), attributed by Plaintiffs to András Herzog, was purchased by the Museum of Fine Arts, Budapest at an auction in 1961.  *See id.* at Exh. 30; Exh. 31.  In 1963, the Opie painting (Complaint at 16(xiii)) came into Hungary's possession, when the artwork was given to the Museum of Fine Arts by the possessor.  *See id.* at Exh. 32 at HUNG016025-034.

In 1966, Ms. Weiss de Csepel made inquiries to Defendants regarding the Opie painting.  *See id.* at Exh. 33 at HERZOG00000320.  Hungary responded that it was "not able to acknowledge Erzsébet Herzog's [Weiss de Csepel's] property claim to the painting of John Opie, representing a 'Girl in red [d]ress', because the named object is forming the property of the Hungarian Government."  *Id.* at HERZOG00000323.  A copy of this statement was included in a

letter submitted by Ms. Weiss de Csepel's attorneys in support of her supplemental claim to the

Foreign Claims Settlement Commission, No. HUNG-2-865.  *See* Tatevosyan Decl., Exh. 33 at

HERZOG00000320-23.  Also in 1966, Hungary affirmatively recognized that artworks once

attributable to Ms. Weiss de Csepel could not leave the country due to their enormous cultural

and artistic import.  *See id.* at Exh. 34 at HUNG016120 ("What must be emphasized with great

stress is that at issue are items of inestimable museum and artistic value, whose export out of the

country cannot be allowed under any circumstances.").

In 1973, the United States and Hungary signed the 1973 Agreement, by which Hungary

agreed to pay a lump sum to the United States to settle claims by U.S. nationals for

nationalization, expropriation, or other takings prior to 1973.  The negotiating parties discussed

claims advanced by Ms. Weiss de Csepel, including claims for real property and artworks in this

lawsuit.  *See id.* at Exh. 35 at HUNG00001969-970; Exh. 36 at HUNG009213-219; Exh. 37 at

HUNG004351; Exh. 38.  In March 1973, the Financial Services Authority informed the Ministry

of Culture that the 1973 Agreement settled claims to artworks attributable to U.S. nationals,

including eleven artworks claimed in this action.  *See id.* at Exhs. 39-41.  In 1977, Ms. Weiss de

Csepel was awarded compensation by the FCSC for the Cranach and Opie artworks.  *See, e.g.*,

*id.* at Exhs. 42, 43.  The awards specifically reference the 1973 Agreement in the award.  *See id.*,

Exh. 42 at HERZOG00000328; Exh 43 at HERZOG00000329-330 (noting that the FCSC "is

given jurisdiction" by the 1973 Agreement).

In 1989, Ms. Weiss de Csepel asked Defendants to return to her those artworks that were

inherited by her and held by Defendants as "deposits."  Shortly thereafter, Defendants returned

three artworks once attributable to the Herzog Collection to Ms. Weiss de Csepel's

representative, artworks for which she did not make FCSC claims.  *See* Tatevosyan Decl.,

Exh.44 at HUNG003055; Exh. 45 at HUNG003058.  The artworks were returned with the

admonition that under Hungarian law, the artworks could not be removed from Hungary.  *See*

*id.*, Exh. 44 at HUNG003055.

In the early 1990s, the Hungarian Parliament enacted compensation laws to address

damage suffered by individual property owners at the hands of the State.  As a result of these

laws, current and former Hungarian citizens were entitled to compensation for property

expropriated, nationalized, or otherwise taken by the Hungarian State.  On June 26, 1991,

Hungary passed Act XXV of 1991 "On the Partial Compensation for Damages Unjustly Caused

by the State to Private Property Owners in Order to Settle Ownership Relations" ("1991

Compensation Act").  Novak Decl., Exh. 1 (Hungarian Act No. XXV of 1991).  The 1991

Compensation Act provides partial compensation for individuals "whose private property had

been aggrieved by the application of regulations which were enacted following June 8, 1949,"

when the Communist government began nationalizing private property.  *Id*. at Section 1(2).

Under the terms of the 1991 Compensation Act, a wide range of individuals are entitled

to compensation, including Hungarian citizens and individuals "who were Hungarian citizens

when the grievance was incurred."  *Id*. at Section 2(1)(b).  The 1991 Compensation Act states

that damages arising due to the application of legal regulations enacted between May 1, 1939,

(the date of the first act "restricting the public and economic expansion of Jews") and June 8,

1949, are subject to a separate act.  *Id*. at Section 1(3).  The 1991 Compensation Act notes that

"[n]o compensation is due to a person whose claim has been settled through an international

convention."  *Id*. at Section 2(5).

On April 7, 1992, the Hungarian Parliament passed Act XIV of 1992 "On Providing, in

Order to Settle Ownership Relations, Partial Compensation for Damages Unjustly Caused by the

-11-

State of Properties of Citizens through the Enforcement of Legal Rules Framed from 1 May 1939 to 8 June 1949" ("1992 Compensation Act").  Novak Decl., Exh. 2 (Hungarian Act No. XIV of 1992).  The 1992 Compensation Act supplements the 1991 Compensation Act and deals specifically with wartime and post wartime property deprivations that occurred between May 1, 1939, and June 8, 1949.  *Id.* at Section 1(2), Section 2(3).  The 1992 Compensation Act specifically provides compensation for "damage caused through the application of legal rules prescribing the mandatory depositing or impounding of certain assets," as required by several acts, including specifically, the 1954 Museum Decree.  *Id.* at Section 3, Schedule 2(6); *see also id.* at Exh. 3 (Hungarian Museum Decree No. 13 of 1954).

In the early 1990s, several members of the Herzog family, including Plaintiff Angela Maria Herzog, Plaintiff Julia Alice Herzog, Ms. Weiss de Csepel, John de Csepel (Plaintiff David de Csepel's father), and Ms. Nierenberg applied for, and received, compensation for the nationalization of flats, arable land, factories, and business companies.  Tatevosyan Decl., Exh. 46 at HUNG017674-679.  In 1997, Hungary enacted Act X of 1997 on the Enforcement of Article 27 (2) of Act XVIII of 1947 on the Paris Peace Treaty, implemented by Government Decree 1035/1997 (IV.10.) on the Establishment of the Hungarian Jewish Heritage Public Foundation.

In 1998, Julia Herzog wrote to the Museum of Fine Arts in Hungary from Rome, Italy to request the return of several artworks (owned by her and her sister, as heirs of András Herzog) to be placed in her Budapest apartment.  Tatevosyan Decl., Exh. 47 at HUNG020630.

In 1999, Martha Nierenberg (daughter of Ms. Weiss de Csepel, aunt to Plaintiff David de Csepel, and cousin to Plaintiffs Julia and Angela Herzog) filed a lawsuit in Hungary seeking restitution of certain artworks once inherited by her mother.  Ms. Nierenberg represented to the

courts that the artworks were held as sole, separate, and distinct property of the three Herzog

siblings and their heirs.[2]  Dkt. No. 15-3 (complaint filed in Hungary in 1999 by Martha

Nierenberg).  In 2000, shortly after the lawsuit was filed, Defendants returned to Ms. Nierenberg

one of the artworks sought in her complaint with the admonition that a preservation order was

placed on the artwork to ensure that it would not be removed from Hungary.  Tatevosyan Decl.,

Exh. 49 at HUNG018326-327; Exh. 50 at HUNG017543; Exh. 51 at HUNG017428, Exh. 52 at

HUNG017540, Exh. 53 at HUNG017506.

In her complaint, Ms. Nierenberg claimed full ownership of artworks (she asserted

attributable to Erzsébet Weiss de Csepel) and identified additional artworks separately

attributable to András and István Herzog.  Dkt. No. 15-3.  To ensure that the interests of all three

Herzog siblings were represented, the heirs of András and István Herzog – including Stephan

and Peter Herzog (sons of István Herzog) and Plaintiffs Julia and Angela Herzog (daughters of

András Herzog) – retained counsel and were brought into the lawsuit as co-defendants.

Through more than eight years of litigation, submission of numerous documents and

party briefings, open court hearings, and appeals by both sides, the Hungarian courts closely

---

[2] At the May 24, 2004, hearing before the Metropolitan Court, Dr. Tamás Varga, attorney for
Martha Nierenberg, stated:

> On the basis of Section 6 of [Baron Mór Lipót Herzog and wife's joint] will, it can be
> established that the testators provided that their heirs divide the works of art belonging
> to the estate into three equal parts, and also stipulated that if no agreement is reached
> between the heirs in this respect then an arbitration court proceeding should follow in
> accordance with Act 1911 on Arbitration Court Proceedings, as in force at the time,
> and they also specified the name of the arbitrators.

> To my knowledge, and as far as Plaintiff is aware, no such arbitration court
> proceeding took place, which implies that the heirs divided the estate regularly, and, as
> per such division, no co-ownership of each item of the estate was established but each
> item came to be owned by the heirs separately.

Tatevosyan Decl., Exh. 48 at HUNG005011; *see also* Dkt. No. 15-3 (complaint filed in Hungary
in 1999 by Ms. Nierenberg).

examined the provenance and ownership of each individual artwork.  In 2008, the courts, after

examining each artwork separately, concluded that Hungary was the rightful owner of the eleven

artworks based on several legal grounds, including the application of the 1973 Agreement, and

adverse possession.  *See* Dkt. No. 15-4.  Ms. Nierenberg did not seek review of the decision by

the Hungarian Supreme Court.  Despite their representation and the fact that artworks attributed

to their predecessors were identified in the complaint, the heirs of András and István Herzog did

not pursue or litigate their claims.  *See* Tatevosyan Decl., Exh. 54 at HERZOG00003757

(Defendants' English translation).

     In 2012, a government minister was appointed to prepare and coordinate the tasks in

order to resolve outstanding Holocaust reparation claims.  In 2013, Hungary enacted legislation

(449/2013 (XI.28)) to create a formal claims process in Hungary to facilitate the return of

artworks held in public collections that were "entrusted to the Hungarian state for the purpose of

safekeeping and not with the intention that they would be confiscated."  Stauber Decl., Exh. 5 at

1; *see also* Novak Decl., Exh. 7 (Government Decree 449.2013 (XI.28)) and Exh. 8 (Hungarian

Act CXCV of 2013).  The new legislation "revers[es] the burden of proof," Stauber Decl., Exh. 7

at 1, placing the burden of proving ownership on Hungary, not on the claimant, thereby

"chang[ing] the mechanism of recovery," *id.* at Exh. 6 at 1.  In 2013, Hungary created the 2014

Memorial Committee.[3]

     Plaintiffs have not filed a claim in Hungary pursuant to the 2013 legislation.

---

[3] *See also* http://www.claimscon.org/2013/07/hungary-releases-millions/;
http://holocaustmemorialyear2014.gov.hu/ (Hungarian Holocaust Memorial Year 2014);
http://hdke.hu/en (Holocaust Memorial Center); http://hungary.usembassy.gov/bell
_04162015.html (Remarks by Ambassador Bell on Memorial Day of the Victims of Hungarian
Holocaust); https://www.holocaustremembrance.com/about-us/chairmanship (Hungary assumed
the Chairmanship of the International Holocaust Remembrance Alliance for 2015).

### B.      Relevant Procedural History

On July 27, 2010, David de Csepel (grandson of Erzsébet Weiss de Csepel and nephew of Martha Nierenberg) and Julia and Angela Herzog (the Italian-citizen daughters of András Herzog), filed their Complaint in this action.[4]  Dkt. No. 1.  On February 15, 2011, Hungary moved to dismiss Plaintiffs' Complaint.  Dkt. No. 15.  On September 1, 2011, this Court issued a Memorandum Opinion and an Order granting, in part, Hungary's motion to dismiss.  Dkt. No. 33-34; *de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113 (D.D.C. 2011).  The Court found that "Plaintiffs rely primarily on the FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), to challenge defendants' assertion of sovereign immunity."  *de Csepel*, 808 F. Supp. 2d at 128.  Addressing the Complaint's allegations of a war-time taking, the Court opined that Plaintiffs' Complaint alleged "substantial and non-frivolous claims that the Herzog Collection was taken without just compensation and for discriminatory purposes."  *Id.*  This Court also recognized Hungary's international comity defense, dismissing eleven of forty-four claims.  *See id.* at 144-45.  Both parties appealed.

On April 19, 2013, a three-judge panel of the U.S. Court of Appeals for the D.C. Circuit reversed this Court's international comity finding (without questioning the merits of the Court's analysis), asserting that this Court's finding was premature.  *See de Csepel v. Hungary*, 714 F.3d at 598-99.  The panel affirmed this Court's denial of the remainder of Hungary's Rule 12(b)(6) motion to dismiss.  *See id.* at 598-99.  Finding that the commercial activity exception's requisite "direct effect" could be inferred by Plaintiffs' Complaint and "drawing all reasonable inferences from the complaint in the family's favor," the panel found that Plaintiffs "alleged facts that, if true," would satisfy the commercial activity exception.  *Id.* at 601.

---

[4] On April 21, 2015, Plaintiff Angela Herzog testified that she has never read the Complaint. Stauber Decl., Exh. 11.

At Plaintiffs' request, the Court ordered full discovery to proceed.  On April 30, 2014, the parties exchanged responses to the first round of discovery.  Hungary asked Plaintiffs to provide facts supporting a "direct effect" in the United States in connection with Erzsébet Weiss de Csepel, András Herzog, István Herzog, or their heirs and their bailment claims.  *See* Tatevosyan Decl., Exh. 5 at Nos. 14, 31; Exh. 55 at Nos. 27, 32, and 33.  Plaintiffs offered no substantive answers and no relevant documents; instead, Plaintiffs offered only objections.

By November 2014, Hungary had produced over 20,800 pages of historical documents translated into English (and has since produced more than 500 additional pages), and its production included documents dating from the early 1900s to the present.  Hungary also answered thirty-five interrogatories and provided seven representatives for depositions.

On October 20, 2014, this Court issued an order directing the parties to submit supplemental briefing on two topics.  Dkt. No. 91.  Both parties filed their supplemental briefs and responses thereto.  On October 24, 2014, Plaintiffs served five Rule 30(b)(6) deposition notices on Hungary.  None of these documents expressly sought information relating to a "direct effect" in the United States.

On December 12, 2014, after both parties had filed their supplemental briefs and responses thereto, this Court issued an order denying Hungary's motion to dismiss without prejudice, permitting Hungary to renew its motion to dismiss following the conclusion of fact depositions and directing the parties to address in future briefings whether the FSIA's expropriation exception could provide an alternative basis for subject matter jurisdiction.  Dkt. Nos. 100, 101.  Depositions concluded on April 22, 2015.[5]  Additional discovery provided no evidence of a "direct effect" as to any of the Plaintiffs or Herzog heirs.

---

[5] The following depositions were taken by Plaintiffs' counsel in February 2015 in Hungary:

Rather, the opposite was confirmed – the Italian claimants, who have always lived in

Hungary and Italy: (1) have little to no connection to the United States or to the U.S. claimants,

(2) there is no meaningful connection between the United States and their claimed artworks, (3)

do not own any property in the United States, (4) consider the artworks attributable to their

father, András, as their own separate artworks not shared with any of their other relatives, (5) do

not have an agreement to share any artworks with the U.S. heirs; (6) never thought their artworks

would go to the U.S., (7) are not aware of any written or oral agreements to evidence bailments,

(8) do not have any agreement indicating that any of the artworks would ever go to the U.S., and

---

- Dr. Zoltán Molnár – from 1999 to 2004: Director General of Hungary's Treasury Assets Agency (1999-2004); Deputy Director General of the Hungarian State Holding Company (MNV Zrt.) (2010-12); Administrative State Secretary of the Ministry of Justice (since 2014)
- Dr. Izabella Bencze – Deputy Director General of the Hungary's Treasury Assets Agency (1999-2004)
- Dr. István Kiss – Senior Officer of the Ministry of Finance, Department of International Financial Relations (1964-1989)
- Mr. Kornél Farkas – Senior Museologist/Archivist, Museum of Fine Arts

The following depositions were taken by Plaintiffs' counsel in April 2015 in Hungary:

- Dr. Balázs Sámuel – Head of Office, Museum of Fine Arts;
- Ms. Mária Mihály – Deputy Director, Museum of Fine Arts, Budapest
- Dr. Henrietta Galambos, Head of Legal Department, Museum of Fine Arts, Budapest

The following deposition was taken by Hungary's counsel in April 2015 in Italy:

- Plaintiff Angela Maria Herzog

Agreement was reached between the parties such that:

- Plaintiff David de Csepel will not produce any testimony or evidence beyond any documents already produced.
- Plaintiff Julia Herzog agreed to respond to questions rather than be deposed, and will not provide any testimony or evidence beyond any documents already produced.
- If either Plaintiff does later seek to offer in testimony, then they may be promptly deposed.

Decl. T. Stauber, ¶¶ 2-11.

(9) authenticated a letter in which Julia Herzog, living in Rome, requested that artworks attributable to her father be sent to her apartment in Budapest.  And, not a single one of the more than 20,000 historical documents or deposition testimony produced any evidence of a promise, practice, or even expectation of performance of an alleged bailment agreement involving Hungary or its museums in the United States.

III.    **Standard of Review Under Federal Rule of Civil Procedure 12(b)(1)**

The basic premise of the FSIA is that foreign sovereigns are immune from suit in the United States *unless* the action falls under one of the specific exceptions enumerated in the statute.  *See* 28 U.S.C. § 1604.  Under the FSIA, the foreign sovereign has "immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits."  *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) (quoting *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990)).  The special circumstances of a foreign sovereign require the court to engage in more than the usual pretrial factual and legal determinations.  *See Foremost-McKesson*, 905 F.2d at 449.  The U.S. Court of Appeals for the D.C. Circuit has noted that it is particularly important that the court "satisfy itself of its authority to hear the case" before trial.  *Id.* (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179 (D.C. Cir. 1984)).

Where a defendant's motion to dismiss for lack of subject matter jurisdiction challenges only the legal sufficiency of the plaintiffs' jurisdictional allegations, the court can take the plaintiffs' factual allegations as true and determine whether such allegations bring the action within any of the immunity exceptions raised by the plaintiff.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993); *Phoenix Consulting*, 216 F.3d at 40.  Where, however, the motion challenges the factual basis of the court's subject matter jurisdiction, "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed

-18-

by the defendant." *Phoenix Consulting*, 216 F.3d at 40; *see also Browning v. Clinton*, 292 F.3d

235, 242 (D.C. Cir. 2002); *Wilderness Soc. v. Griles*, 824 F.2d 4, 16 (D.C. Cir. 1987).

This Circuit has recognized that "[w]hen a foreign sovereign disputes the fact(s) upon

which the district court's subject matter jurisdiction depend(s), the court 'must go beyond the

pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling

upon the motion to dismiss.'" *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d

192, 197 (D.C. Cir. 2004) (citation omitted).  In reviewing a motion to dismiss filed under Rule

12(b)(1), the Court can no longer "infer" subject matter jurisdiction, and "must go beyond the

pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling

upon the motion to dismiss." *Id.*  This Court "retains 'considerable latitude in devising the

procedures it will follow to ferret out the facts pertinent to jurisdiction.'" *Phoenix Consulting*,

216 F.3d at 40 (citation omitted); *see also Prakash*, 727 F.2d at 1179.

Once a foreign-sovereign defendant asserts immunity, the plaintiff bears the burden of

producing evidence to show that there is no immunity and that the court has jurisdiction over the

plaintiff's claims.  *See Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 42 (D.D.C. 2000); *Bell

Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)

(recognizing that "the FSIA begins with a presumption of immunity, [under] which the plaintiff

bears the initial burden to overcome by producing evidence that an exception applies"); *Agudas

Chasidei Chabad of U.S.*, 528 F.3d at 940.  Not until the Plaintiffs satisfy that burden of

production does Hungary bear the burden of persuasion to show that an exception to the FSIA

does not apply.  *See Bell Helicopter*, 734 F.3d at 1183; *Agudas Chasidei Chabad of U.S.*, 528

F.3d at 940.  Absent subject matter jurisdiction over a case, the court must dismiss it.  *See

McManus v. District of Columbia*, 530 F. Supp. 2d 46, 62 (D.D.C. 2007).

**IV.**    **The FSIA's Commercial Activity Exception Does Not Provide the Court with Subject Matter Jurisdiction over Hungary**

The D.C. Circuit, examining the Complaint on its face, found that Plaintiffs' Complaint invokes the provision of the commercial activity exception that abrogates sovereign immunity in any case where "the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2); *see also de Csepel*, 714 F.3d at 598-99.  To satisfy this exception, "1) the lawsuit must be based upon an act that took place outside the territory of the United States; 2) the act must have been taken in connection with a commercial activity[;] and 3) the act must have caused a direct effect in the United States."  *Rong v. Liaoning Province Gov't*, 452 F.3d 883, 888-89 (D.C. Cir. 2006).  Because Hungary's actions "obviously occurred outside the United States, the exception's applicability turns on: (1) whether Hungary's repudiation of bailment agreements with respect to the Collection constitutes an act taken in connection with a commercial activity and (2) whether this act caused a 'direct effect' in the United States."  *de Csepel*, 714 F.3d at 598-99.  Now that fact discovery has been completed, it is clear that no "direct effect" exists to provide this Court with jurisdiction over Hungary.

**A.**    **The Court Cannot "Infer" a Bailment for the Forty-Four Individual Artworks, Each the Sole and Separate Property of One of Three Herzog Siblings**

Under the first prong, the court must assess "[t]he commercial character of an activity . . . by reference to the nature of the . . . particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).  The question is "not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives," but "whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce."

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (internal quotation marks omitted). Concluding that the alleged bailments were not premised solely on the Peace Treaty and acknowledging that the "Herzog Collection was initially expropriated by the Hungarian government," *de Csepel*, 714 F.3d at 600, the appellate court reasoned that a breach of a bailment (or bailments) could theoretically satisfy *Weltover*, as a bailment is a form of contract, and a foreign state's participation in a contract is the type of activity in which a "private player within the market" engages, *id.* at 599 (quoting *Saudi Arabia*, 507 U.S. at 360 (internal quotation marks omitted).

In reaching this conclusion, however, the appellate court drew an inference: the panel inferred that the forty-four individual artworks – collected by Baron Herzog during his lifetime and later divided among his three children as their sole and separate property – are a single entity. This inference is not supported by the facts, which demonstrate that each artwork was inherited by one of three siblings and that each artwork itself has a unique provenance that precludes a court from grouping the artworks all together. Thus, an inference of a single bailment comprising all forty-four artworks that were the distinct, separate property of one of three heirs can no longer be drawn in Plaintiffs' favor when the Court analyzes Hungary's Rule 12(b)(1) motion. *See Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) ("[W]hen the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is *not made by drawing from the pleadings inferences favorable to the party asserting it*." (emphasis added) (citing *Norton v. Larney*, 266 U.S. 511, 515 (1925) ("It is quite true that the jurisdiction of a federal court must affirmatively and distinctly appear and *cannot be helped by presumptions or by argumentative inferences drawn from the pleadings*." (emphasis added))), *see also Joseph v. Office of the*

*Consulate Gen. of Nigeria*, 830 F.2d 1018, 1023-25 (9th Cir. 1987) (analyzing separately

whether each of the plaintiff's claims came within an exception to foreign sovereign immunity).

Plaintiff de Csepel's predecessor in interest, Martha Nierenberg, argued plainly to the

Hungarian courts that the artworks were divided among the three sibling heirs as sole and

separate property.  Tatevosyan Decl., Exh. 48 at HUNG005011.  Ms. Nierenberg maintained that

Hungary could return specific property to her, without risk that the separate and distinct

ownership rights of the heirs of András or István would be affected.  *See id.*  The Italian

Plaintiffs sent a letter to the Museum of Fine Arts in June, 2000, stating that in Baron Mór Lipót

Herzog's will, "regarding his artwork collection, he specified that the artworks be divided

equally among the three siblings."  *Id.*, Exh. 56.  Further, in their discovery responses, Plaintiffs

affirmatively identified the specific artworks inherited by each heir.  *See id.*, Exh. 5 at No. 7;

Exh. 1.  Italian Plaintiffs Angela and Julia Herzog confirmed in discovery via their own

testimony that the artworks the two sisters inherited from their father, András, are their sole

property.  Stauber Decl., Exh. 11 at 18:6-9, 28:21-29:18; Exh. 12.  The Italian Plaintiffs also

confirmed that they have no ownership interest in the artworks inherited by their aunt and uncle,

Erzsébet and István.  *See id.*, Exh. 11 at 28:5-11; Exh. 12.[6]

---

[6]As this Court acknowledged, "some of the documentary evidence produced thus far
distinguishes between artwork owned by the Herzog heirs individually."  Dkt. No. 100 at 10
(referencing Dkt. 89-6 at HUNG010996) (listing artworks belonging to the minor heirs of
András and artworks belonging to István).  This Court also noted that fact depositions could
clarify the issue of whether Hungary "treated the Collection as a unitary whole," Dkt. No. 100 at
10-11 (citing to HUNG002382 ("The Museum of Fine Arts never knew the exact distribution of
the Herzog collection among the different heirs.  They have always treated the collection as
one."))
    The depositions have clarified this issue.  Dr. Sámuel, the Leader of the Secretariat of the
General Directorate of the Museum of Fine Arts, was asked about this exact document and
explained that while art historians may consider the Herzog Collection one unit for historical
reasons, these historical reasons are not the equivalent of treating the artworks legally as one
unit.  Stauber Decl., Exh. 4 at 76:20-25; Exh. 9; Exh. 10 at 58:13-22.

The historical documents produced by Hungary also refer to individual Herzog heirs as owners of particular artworks, indicating an awareness by Hungary and its museums of the separate ownership of the distinct pieces of artwork going back to at least the late 1940s.[7]  *See* Tatevosyan Decl., Exhs. 6-16, 76 (documents showing legal and physical return of nineteen artworks to representatives of specific heirs); Exh. 57 at HUNG010996 (1947 letter from the Office of the Ministerial Commissioner listing several artworks as "the property of the minor

---

[7] In 1997, Dr. Miklós Mojzer, the former director of the Museum of Fine Art, stated in an "Expert Committee" meeting with Martha Nierenberg's counsel,

> According to the museum practice, the artworks were not recorded by their owners.  At the Museum of Fine Arts, the Herzog Collection was recorded within the so-called "Herzog Contingent".  The Herzog Contingent was managed as a unit, even if the artworks belonged to different Herzog heirs.  Accordingly, no reference other than "Herzog" was made in the inventory records.

Stauber Decl., Exh. 8.  He later stated that, "[t]he Museum of Fine Arts never knew the exact distribution of the Herzog Collection among the different heirs.  They have always treated the collection as one."  Stauber Decl., Exh. 9.  Upon review via discovery, the historical documents do not support these statements.  In addition, when asked about these statements in his deposition, Dr. Sámuel responded:

> It is possible the term to treat a collection as one does make senses for an art historian or for a museum employee.  The interpretation of the phrase "to treat the collection as one" gives rise to much more difficulties for legal purposes.  Even in the previous court proceeding there were 11 or 12 objects identified item by item. In this case we're talking some 44 items.  In a legal sense, each item has a different history.  Hence, the term "to treat a collection as one" cannot be understood in a legal sense.

Stauber Decl., Exh. 4 at 76:20-25.  Similarly, Ms. Mária Mihály, the Deputy Director, Museum of Fine Arts, explained her understanding of the term "Herzog Collection" when asked about one particular entry:

| Q | Below the acquisition line it says "origin from the Herzog Collection Budapest." What does that designation signify to you? |
|---|---|
| A | It signifies this particular artwork used to be part of the Herzog Collection. |
| Q | And what do you understand the term "Herzog Collection" to mean? |
| A | I have no authorization to answer this question. Art historians believed that this used to be a single collection. |

Stauber Decl., Exh. 10 at 58:13-22.

heirs of the late András Herzog" and another set of artworks as "the property of István Herzog");
Stauber Decl. Exh. 2 (data sheet for Corot painting (Compl. ¶ 16(iii)), listing acquisition as
"András Herzog Collection, 1946"); Tatevosyan Decl., Exh. 22 at HUNG011044 (identifying as
"seized and impounded" artworks attributed to the "late András Herzog"); Exh. 23 at
HUNG012663.  A close look at the artworks listed in documents as coming from "the Herzog
Collection" indicates that several of these artworks are listed elsewhere in contemporaneous (or
earlier) documents that identify a particular Herzog heir.[8]  Thus, the mere presence of references
to a "Herzog Collection" cannot be read in isolation to conclude the artworks were treated as part
of a single unit for legal ownership purposes.  The full historical record, rather, indicates that
attributions to specific Herzog siblings predated and coexisted alongside references to the
general museological identifier the "Herzog Collection," which is customary museum practice
for referring to major collections.

But even if Hungary had somehow treated artworks originating from the Herzog
collection "as a whole," this would not have changed the legal situation, confirmed both by
historical documents and Plaintiffs in this action, that the Herzog-heirs did not have a shared
ownership interest in the whole collection.  Rather, each of them had a distinct ownership
interest in those particular artworks of the collection he or she inherited.  Any alleged
infringement of these ownership interests by Hungary affected only the heir with the ownership
interest in question, and not the other heirs, no matter how Hungary registered the artworks.

---

[8] For example, Deposition Exhibit 28 lists as a mode of acquisition "inventoried from the Herzog
Collection in 1955," yet refers to the same painting by Corot as Depo. Exh. 27, which referenced
András Herzog specifically next to the date 1946.  Stauber Decl., Exhs. 2, 3.

### B.   Plaintiffs Provide No Evidence of a "Direct Effect" in the United States, as Required by the Commercial Activity Exception

In responding to the second prong identified by the appellate panel, the court must examine whether Plaintiffs meet their burden of proving that Hungary promised or expected to perform specific obligations in the United States when the parties entered into the alleged bailment(s).  "Interference with a property right does not necessarily demonstrate a 'direct effect' under the FSIA."  *Bell Helicopter*, 734 F.3d at 1184.  Courts recognize that "an effect is direct if it follows as an *immediate consequence* of the defendant's activity."  *Weltover*, 504 U.S. at 618 (citation and punctuation omitted) (emphasis added).  Immediacy implies no "unexpressed requirement of 'substantiality' or 'foreseeability,' " but rather "ensures that jurisdiction may not be predicated on purely trivial effects in the United States."  *Id.*[9]

A direct effect "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption."  *Bell Helicopter*, 734 F.3d at 1184 (quoting *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994)); *see also Weltover*, 504 U.S. at 618; *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 24 (D.D.C. 2000).  Thus, an effect is not direct if: (1) "[m]any events and actors necessarily intervened" between the act perpetrated overseas and the impact felt here, *Bell Helicopter*, 734 F.3d at 1184, or (2) the effects are attenuated, remote, or speculative, *see Weltover*, 504 U.S. at 618.  "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States."  *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232,

---

[9] The Supreme Court acknowledged that the commercial activity exception did not explicitly "contain[ ] any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Weltover*, 504 U.S. at 618.  But the Court was careful to note that when permitting a court to take jurisdiction over a foreign sovereign because of a commercial act, the "direct effect" in the United States can be neither nominal nor negligible.  *See id.* ("Of course the generally applicable principle *de minimis non curat lex* ensures that jurisdiction may not be predicated on purely trivial effects in the United States" and recognizing that the "direct effect" cannot be "too speculative," "remote," or "attenuated").

1238 (10th Cir. 1994); *see also id.* at 1239; *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 236-37 (2d Cir. 2002); *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 892 F. Supp. 2d 219, 226 n.8 (D.D.C. 2012).

"A financial loss in the United States, when all the acts giving rise to the claim occur outside this country, is insufficient to show the 'direct effect' in the United States that FSIA requires." *Id.* at 227 (citation omitted); *Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16, 30-31 (D.D.C. 2007). Nor is the "direct effect" requirement satisfied where a "plaintiff's U.S. citizenship furnished the only connection between the commercial activity and the United States." *Bell Helicopter*, 734 F.3d at 1185 (quoting *Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*, 600 F.3d 661, 665 (D.C. Cir. 2010)).

The commercial activity exception is not triggered because, as fact discovery has confirmed, Plaintiffs cannot demonstrate the requisite "direct effect" in the United States with respect to any of the artworks claimed in this lawsuit.

> **1.** **Plaintiffs Cannot Demonstrate that the Purported Bailments between András Herzog (or His Heirs) and Defendants Created a "Direct Effect" in the United States as Required by the Commercial Activity Exception**

The Complaint fails to identify a single connection between Angela and Julia Herzog (Italian residents and citizens of Italy and Hungary) or their claimed artworks and the United States. Plaintiffs, following exchange of discovery, have failed to identify any facts or meaningful connections between the Italian Plaintiffs and the United States.

To the extent that an alleged bailment between the Italian Plaintiffs and Defendants anticipated return of the artworks associated with András Herzog to his heirs, there is no evidence to suggest that such an action would cause a "direct effect" in the *United States*. Stauber Decl., Exh. 11 at 8:15-10:4, 25:6-26:3. Rather, the evidence is to the contrary. In the

1954 letter seeking to purchase certain artworks, Ms. Parravicini asked that the artworks be turned over to her in *Switzerland*.  Tatevosyan Decl., Exh. 25 at HUNG0013079-81.  In 1998, Plaintiff Julia Herzog sent a letter from Rome to the director of the Museum of Fine Arts in which Ms. Herzog asserted that she and her sister were the owners of certain artworks in Hungary's possession.  *See id.* at Exh. 47.  Ms. Herzog did not ask that the artworks be sent to the United States; nor did she request that they be sent to Italy.  *Id.*  Instead, she noted that she wished to "place some of the paintings in my own apartment" in *Budapest*.  *Id.*

On April 22, 2015, Hungary's counsel deposed Plaintiff Angela Herzog.  Hungary's counsel asked Ms. Herzog where she would put the artworks attributed to her father, should they be returned to her.

| Q | So would you like to have them returned to you here in Italy? |
|---|---|
| A | I don't know what to say.  I should think about this. |
| Q | Have you ever thought about it before? |
| A | No. |
| Q | Have you ever thought about having them returned to you in Hungary? |
| A | I have never thought about this. |
| Q | You have never thought about – |
| A | No. |
| Q | Have you ever thought about having them returned to you in the United States? |
| A | I have never – I have never thought about this.  I will think about this later. |

Stauber Decl., Exh. 11 at 23:25-24:24.  Plaintiffs' counsel stated that Plaintiff Julia Herzog would not provide any testimony to contradict her sister's testimony, and offered, in lieu of a deposition, to answer written questions submitted by Hungary's counsel.  *See id.* at Exh. 12.  Ms. Julia Herzog confirmed that she wrote the 1998 letter asking that artwork be sent to her apartment in Budapest, identified above, and that she still owns an apartment in Budapest.  *See*

*id.*  The Italian Plaintiffs also confirmed that they do not own (and have not owned in the past)

property or a bank account in the United States.  *Id.*; Exh. 11 at 11:22-12:3.

The Italian Plaintiffs had limited contact with Herzog heirs in the United States aside from

a visit to the United States in 2004.  Stauber Decl., Exh. 12; Exh. 11 at 12:5-13:2, 19:16-21.

Beyond birthday cards, the Italian Plaintiffs have no recollection of correspondence or

conversations with the U.S. Herzog heirs before or after 2004.  Stauber Decl., Exh. 12; Exh. 11

at 13:3-5.  The Italian Plaintiffs have no agreement to share the artworks they inherited solely

with their U.S. relatives.  Stauber Decl., Exh. 12; Exh. 11 at 28:21-29:18.  Plaintiff Angela

Herzog has never met U.S. Plaintiff David de Csepel.  Stauber Decl., Exh. 11 at 20:2-4.  She was

also not aware of the Hungarian lawsuit until after it was filed.  *Id.* at 20:15-24.  When asked

about the present lawsuit, Plaintiff Angela Herzog responded:

| Q | Have you ever reviewed the complaint that was filed in the United States lawsuit? |
|---|---|
| A | No. |
| Q | Have you ever reviewed any of the papers that have been filed in the lawsuit at all? |
| A | I don't have any documents. |
| Q | Did you review any of the documents that were filed in the U.S. lawsuit? |
| A | No. |

Stauber Decl., Exh. 11 at 16:2-10.

As the Court is not permitted to draw inferences supporting subject matter jurisdiction in

Plaintiffs' favor, *see Norton*, 266 U.S. at 515, and there is no plausible support or evidence to

demonstrate (or even suggest) a "direct effect" in the United States from Defendants' alleged

bailment with András Herzog or his heirs, this Court lacks subject matter jurisdiction over

Hungary with regards to claims for the twenty-five artworks identified by the Italian Plaintiffs as

the sole and separate property of András Herzog (Compl. ¶¶ 16(iii), (vii)-(ix), (xii), (xiii)-(xvi),

(xxiv)-(xxxiii), (xxvi), 17(i), (v), 18(i)-(ii), 19(i)).  *See Weltover*, 504 U.S. at 618; *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 90 (D.C. Cir. 2005).

> **2.    Plaintiffs Cannot Demonstrate that the Purported Bailment between István Herzog (or His Heirs) and Defendants Created a "Direct Effect" in the United States as Required by the Commercial Activity Exception**

The heirs of István Herzog inherited any remaining ownership rights to the portion of the Herzog Collection – seven artworks – designated as Istvan's sole and separate property.  As with the claims associated with the heirs of András Herzog, Plaintiffs provide no documentary evidence or affidavits to demonstrate a "direct effect" in the United States caused by (or relating to) the alleged bailment between István Herzog (or his heirs) and Hungary.  This explains Plaintiffs' failure to respond to Hungary's inquiries regarding "direct effect," and regarding any conceivable impact in the United States from an alleged bailment between Hungary and István Herzog or his heirs, with anything beyond objections.

To the contrary, historical evidence demonstrates that any effect as to the seven artworks attributed to István would have had been in Hungary, or perhaps Switzerland.  Documents submitted to the Hungarian courts by Martha Nierenberg, as well as information contained in Plaintiffs' discovery responses, state that when István, a Hungarian citizen, died in Hungary in 1966, he left his estate to non-U.S. citizen, non-party heirs: his sons Stephan (Hungarian and Swiss citizenship; Swiss residence) and Péter (Hungarian citizenship and residence) and his second wife Mária Bertalanffy (Hungarian citizenship and residence).  Tatevosyan Decl., Exh. 5 at Nos. 2-3.  Plaintiffs offer no evidence (and no suggestion) that these individuals have (or had) any connection to the United States.

Plaintiffs assert that before her death in 1999, Ms. Bertalanffy executed a will leaving her 1/3 interest in Istvan's estate to Erzsébet Weiss de Csepel's sons, Gabriel and John de Csepel,

both of whom are identified by Plaintiffs as citizens of Hungary and the United States.[10]
Tatevosyan Decl., Exh. 5 at Nos. 2-3.  Per Plaintiffs' discovery responses, Gabriel died in 1997,
predeceasing Ms. Bertalanffy (who has since died), leaving his interest to his brother John and
sister Martha Nierenberg.  *Id*. at No. 2.  According to Plaintiffs, Peter and Stephen (both non-
U.S. citizens and residents of Hungary and Switzerland, respectively) together have a 2/3 interest
in Istvan's estate; John de Csepel and Ms. Nierenberg (both Hungarian and United States'
citizens) have a 1/3 interest in the estate, only since 1999.  *Id*. at Nos. 2-3.

 The Court must look beyond a facial connection to the United States to determine
whether the theoretical impact cause by Hungary's purported bailment caused a "substantial and
foreseeable" effect in the United States, *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514
(D.C. Cir. 1988), or whether the impact in the United States was minor and more akin to "ripples
caused by an overseas transaction [that] manage eventually to reach the shores of the United
States," *United World Trade*, 33 F.3d at 1238, that does not rise to the level of a "direct effect."
Until 1999 – after the deaths of both Gabriel Herzog and Ms. Bertalanffy – all interest in Istvan's
estate was held by non-U.S. citizens and non-U.S. residents.  Thus, unless the alleged bailment
relating to the della Quercia sculpture (which was seized by the tax authorities in 1949 and
inventoried in 1958, Tatevosyan Decl., Exh. 58 at HUNG011770, Exh. 2 at HUNG017214)  – or
*any* of his artworks – was somehow created *after* 1999, there is no rational or legal basis to
suggest that the alleged bailment could have any effect – direct or otherwise – in the United
States.

---

[10]  Plaintiffs' identify Maria Bertalanffy as having received a 1/3 interest in István's estate.
Plaintiffs did not, as requested, provide the citizenship or place of residence of Ms. Bertalanffy
prior to her death.  According to information produced in the Nierenberg litigation, Ms.
Bertalanffy lived in Gödöllő, Hungary, prior to her death in March 8, 1999.  Tatevosyan Decl.,
Exhs. 59-60.

To the extent that a "direct effect" was generated in connection with István Herzog's artworks, it took place in Hungary, when artworks were seized and forfeited following criminal proceedings in the 1950s where István Herzog was resident as a Hungarian citizen. Tatevosyan Decl., Exhs. 19-21 and 77. Such a seizure is not a "commercial" act. *See, e.g., Garb v. Republic of Poland*, 440 F.3d 579, 588 (2d Cir. 2006); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106 (9th Cir. 1990); *De Sanchez v. Banco Cent. de Nicaragua*, 770 F.2d 1385, 1398 (5th Cir. 1985); *Alberti v. Empresa Nicaraguense de la Carne*, 705 F.2d 250, 254 (7th Cir. 1983); *Haven v. Rzeczpospolita Polska (Republic of Poland)*, 68 F. Supp. 2d 947, 954 (N.D. Ill. 1999).

That two non-party U.S. citizens may now have some connection to István's estate is the result of Ms. Bertalanffy's will, not István's will or the terms of an alleged bailment, and does not lead to a direct effect in the United States. Consequently, any impact this alleged bailment could have on the United States is neither "substantial" nor "foreseeable." *Zedan*, 849 F.2d at 1514. As Plaintiffs cannot identify any evidence of a legally significant act in the United States, the connection to the United States did not "flow[] in a straight line without deviation or interruption," *Allen v. Russian Fed'n,* 522 F. Supp. 2d 167, 189 (D.D.C. 2007), and U.S. citizenship alone is not sufficient to demonstrate a "direct effect," *Cruise Connections*, 600 F.3d at 665, Plaintiffs have not met their burden to produce evidence of a "direct effect" regarding the artworks attributed to István Herzog. *See Bell Helicopter*, 734 F.3d at 1183; *Agudas Chasidei Chabad of U.S.*, 528 F.3d at 940; *FG Hemisphere Assocs. v. Dem. Rep. Congo*, 447 F.3d 835, 842 (D.C. Cir. 2006).

### 3. Plaintiffs Cannot Demonstrate that the Purported Bailments between Erzsébet Weiss de Csepel (or Her Heirs) and Defendants Created a "Direct Effect" in the United States as Required by the Commercial Activity Exception

As with the heirs of István and András, discovery revealed no evidence of a "direct effect" in the United States stemming from an alleged bailment between Defendants and Erzsébet Weiss de Csepel (the only Herzog heir with a connection to the United States) with regards to any of the twelve artworks attributed to her.

Even where there may be a link between a commercial activity and the United States, courts continue to recognize that the FSIA's "direct effect" requirement is not satisfied where a "plaintiff's U.S. citizenship furnished the only connection between the commercial activity and the United States." *Bell Helicopter*, 734 F.3d at 1185 (quoting *Cruise Connections*, 600 F.3d at 665). Nor is the requirement satisfied when the loss to the U.S. citizen plaintiff is purely financial. *See Zedan*, 849 F.2d at 1511 (finding no direct effect where contract was made in Saudi Arabia and defendant's breach led to financial loss to U.S. citizen plaintiff and the contract did not require that money be forwarded to a specific address in the United States); *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 81 (D.D.C. 2003) ("A financial loss in the United States, when all the acts giving rise to the claim occurred outside this country, is insufficient to show the 'direct effect' in the United States that FSIA requires."); *see also Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 78 (2d Cir. 2010); *Virtual Countries*, 300 F.3d at 240-44; *United World Trade*, 33 F.3d at 1237.

The evidence as to Plaintiff de Csepel's claims demonstrates that "all the acts giving rise to the [bailment] claim[s] occurred outside this country," *Agrocomplect*, 524 F. Supp. 2d at 30-31, and does not identify that "something legally significant actually happened in the United States," *Bell Helicopter*, 892 F. Supp. 2d at 226. Plaintiffs fail to carry their burden because they

cannot point to any evidence to demonstrate a "direct effect" in the United States. *Agudas Chasidei Chabad of U.S.*, 528 F.3d at 940; *FG Hemisphere Assocs.*, 447 F.3d at 842. This Court lacks subject matter jurisdiction, despite David de Csepel's U.S. citizenship.[11]

### 4. For All Purported Bailments, the Location of Any "Direct Effect" is Hungary, Not the United States

In determining where the effect is directly felt, courts in this Circuit "look to the place where legally significant acts giving rise to the claim occurred rather than to where merely incidental or eventual effects are felt." *Jin v. Ministry of State Sec.*, 475 F. Supp. 2d 54, 63 (D.D.C. 2007) (citing *Zedan*, 849 F.2d at 1515); *see also Kettey v. Saudi Ministry of Educ.*, 53 F. Supp. 3d 40, 50 (D.D.C. 2014) ("In determining where the effect is directly felt, courts look to the place where legally significant acts giving rise to the claim occurred rather than to where merely incidental or eventual effects are felt." (citation omitted)); *Bell Helicopter*, 892 F. Supp. 2d at 226 ("Moreover, according to the D.C. Circuit, a direct effect requires that 'something legally significant actually happened in the United States.'" (quoting *Zedan*, 849 F.2d at 1515)); *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1134 (9th Cir. 2012) (quoting *Zedan*, 849 F.2d at 1515); *Guirlando*, 602 F.3d at 75 (quoting *Zedan*, 849 F.2d at 1515).

In *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145 (2d Cir. 1991), a decision unanimously affirmed by the Supreme Court, *see Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992), the U.S. Court of Appeals for the Second Circuit recognized that courts "often look to the place where legally significant acts giving rise to the claim occurred" to determine the

---

[11] Plaintiffs assert that the non-U.S. citizen and non-party heirs assigned their rights to U.S. citizen Plaintiff David de Csepel. The Italian Plaintiffs confirmed, however, that they did not assign rights to Plaintiff de Csepel, nor does the Complaint allege the Italian sisters assigned any rights. Stauber Decl., Exhs. 11-12. Moreover, these assignments, made in June and August of 2008, occurred *after* the Nierenberg litigation was concluded in January 2008 – when Plaintiffs alleged in their complaint the "bailment" breach occurred – and long after any alleged bailment was created. Tatevosyan Decl., Exh. 61. Such assignments cannot create a means by which the non-U.S. citizen heirs can manufacture a jurisdiction-conferring connection to the United States.

location of a "direct effect." *Weltover*, 941 F.2d at 152; *Rong*, 452 F.3d at 892 (Henderson, J.,

concurring); *see also United World Trade*, 33 F.3d at 1239; *Adler v. Fed. Republic of Nigeria*,

107 F.3d 720, 727 (9th Cir. 1997); *Corzo v. Banco Central de Reserva del Peru*, 243 F.3d 519,

525-26 (9th Cir. 2001) (if cause of action arises entirely in foreign country, "[t]he fact that

United States computer companies might have been affected by . . . breaches [resulting from

Peruvian bank's act] is jurisdictionally irrelevant").

Historical documents and practice demonstrate that Hungary did not have any

expectation of performance in the United States.  The discovery record demonstrates that none of

these artworks would (or could) leave Hungary without Hungary's express permission, pursuant

to export regulations that pre-date World War II, even if they were to leave Defendants'

possession.  Hungary, like many European countries, has laws created to maintain and protect its

cultural patrimony.[12]  This Court took judicial notice of Hungarian laws that prevent the export

---

[12] In 1929, the Hungarian Government passed Hungarian Act No. XI of 1929, which required that
movables of "artistic, academic, historical, or museological relevance" be registered.
Declaration of Zoltán Novak, Exh. 9 (Hungarian Act No. XI of 1929).  This registration applied
to all Hungarian citizens.  *See id.*  The law was designed to prevent individuals from taking items
of cultural significance out of Hungary and required that any person seeking to remove such
property must first obtain permission from the government.  *See id.*  The law also provided that if
anyone attempted to take such property out of the country, they would be subject to criminal
prosecution, pursuant to Hungarian Act No. XIX of 1924, and the property would be confiscated.
*See id.* at Exh. 10 (Hungarian Act No. XIX of 1924).

Current Hungarian law prohibits the final export of artwork of historical and cultural
significance, like the artworks in question, and prevents even temporary export unless permission
is first sought and granted.  Novak Decl., Exh. 11 (Hungarian Act No. LXIV of 2001); Exh. 12
(Hungarian Decree No. 14/2010); Exh. 13 (Hungarian Act No. IV of 1978 on the Criminal Code
§ 216/B); "National Legislation for the Protection of Cultural Heritage," produced by Hungary's
National Office of Cultural Heritage, available at http://www.koh.hu/dokumentumok/kulfoldi/
hungary_(2006)_en.pdf; *see also* Novak Decl., Exh. 14 (Hungarian Act No. IV of 1978 on the
Criminal Code § 77); Novak Decl. Exh. 15.  The Hungarian appellate court's decision in 2008
refers explicitly to this export limitation on artworks of historical and cultural significance, citing
Hungarian Act No. LXIV of 2001 on the Protection of Cultural Heritage, which discussed
"protected art objects," and explaining that the law poses a barrier to a replevin claim.  "Since

of artwork of historical and cultural significance, like the artwork in question, unless permission

is first sought and granted.  *See* Dkt. No. 14 (Defendants' Motion for Judicial Notice); Dkt. No.

34, Order, dated September 1, 2011, granting, in part, Defendants' Motion for Judicial Notice.

The laws protect the artwork itself and are not dependent in any way on the identity or

citizenship of the owner.  The laws permit an owner to sell the protected artwork, provided that

the artwork does not leave Hungary.[13]  Thus, there is no evidence (or support for an inference)

that Hungary would anticipate, in any bailment, specific performance in the United States.  *See*

Sámuel Decl. ¶¶ 7-8.  To the contrary, Hungary expressly recognized that these particular

Herzog works could not leave the country.  *See* Tatevosyan Decl., Exh. 34 at HUNG016120

(referring to Weiss de Csepel artworks, "[w]hat must be emphasized with great stress is that at

issue are items of inestimable museum and artistic value, whose export out of the country cannot

be allowed under any circumstances.").

---

1949, Hungarian authorities have not permitted the final export of artworks that, due to their
cultural significance, fell under artwork protection."  Decl. B. Sámuel, ¶ 6.

     Many countries have similar laws protecting the removal of historically-significant
objects.  *See, e.g.,* The Export of Objects of Cultural Interest (Control), 2003, No. 2759 (United
Kingdom), available at: http://www.unesco.org/ culture/natlaws/media/pdf/gb/gb_
exportobjculturalinterest2003_engorof.pdf; Council Regulation (EC) No 116/2009 of 18
December 2008 on the Export of Cultural Goods, 2009 O.J. (L 39) (European Union), available
at: http://eur-ex.europa.eu/LexUriServ/Lex UriServ.do?uri=OJ:L: 2009:039:0001:0007:en:PDF;
*see also* UNESCO Database of National Cultural Heritage Laws (identifying more than 1800
national and multi-national cultural heritage laws governing movable property) available at:
http://www.unesco.org/culture/natlaws/.

[13] Plaintiffs are well-acquainted with these laws.  In 1948, Hungary brought smuggling charges
against István Herzog's first wife, Ilona Kiss, when it discovered that Ms. Kiss had smuggled
artworks attributable to István Herzog out of Hungary in violation of Hungarian law, resulting in
the seizure and forfeiture of numerous artworks that are part of this lawsuit. Tatevosyan Decl.,
Exhs. 19-21 and 77.  In 1989, when Hungary returned three artworks to Erzsébet Weiss de
Csepel, having recognized her ownership claim to these works, the transfer documents required
that the artworks could not leave Hungary.  *See id.,* Exh. 44 at HUNG003055.  In 2000, when
Hungary returned an artwork to Martha Nierenberg, the transfer documents required that the
artwork could not leave Hungary.  *See id.,* Exh. 75 at HUNG002405.

Additionally, under Hungarian law, any bailment between the Plaintiffs and Hungary, unless specifically stated, called for performance in Hungary. First, the Hungarian Civil Code applicable to Plaintiffs' claims provides that, absent legislation or agreement by the parties, the place of performance of a contract is the domicile or place of business of the *obligor* which is, in this case, Hungary. *See* Novak Decl., Exh. 4 (Hungarian Civil Code of 1959, Art. 278), Exh. 6 (Hungarian Civil Code Act No. V of 2013 §§ 6:37(1), 6:364(6)).[14] Second, Hungary is the place of performance of any purported deposit contract between Plaintiffs and Hungary, as the Hungary Civil Code of 1959 provides that "[a] thing deposited shall be returned at the place of custody." Novak Decl., Exh. 5 (Hungarian Civil Code of 1959, Art. 466). In this case, all alleged deposits are held in the defendant Hungarian institutions.

As there is no evidence of a bailment, contract, or deposit that specifically identifies the United States – or any other location – as the place of performance, Hungarian law would not recognize any place of performance other than Hungary. Moreover, Hungary's cultural patrimony laws affirmatively preclude culturally significant artworks from leaving the country. For this reason, when the Hungarian National Gallery returned one artwork to Martha Nierenberg, it required that her representative acknowledge in a legal document that the artwork would not be taken out of Hungary. Tatevosyan Decl., Exh. 50 at HUNG017543, Exh. 49 at HUNG018326-327.

---

[14] Article 278 of the Hungarian Civil Code provides:

(1) The place of performance is the domicile or registered place of business of the obligor, unless

    a) it is otherwise provided by legal regulation,

    b) the object or purpose of the service suggests otherwise,

    c) the object of the service is at a different location, which is known to the parties.

Novak Decl., Exh. 4 (Hungarian Civil Code of 1959, art. 278), *see also* Exh. 6 (Hungarian Civil Code Act No. V of 2013 §§ 6:37(1), 6:364(6)).

In *Idas Resources N.V. v. Empresa Nacional de Diamantes de Angola E.P.*, No. 06-00570 (ESH), 2006 WL 3060017 (D.D.C. Oct. 26, 2006) (Huvelle, J.), an unpublished decision that predates the decisions listed above, this Court noted in a footnote that other circuits use the "legally significant" test.  While not commenting on the test itself, the opinion notes

> "As a factual matter, however, in almost every case, in this circuit and others, involving the direct effect exception, the existence or absence of an expressly designated place of payment has been decisive." [*Global Index., Inc. v. MKAPA*, 290 F. Supp. 2d 108, 114 (D.D.C. 2003).] Therefore, absent an expressly designated place of payment, the only possible way of establishing a direct effect by nonpayment "that courts of this circuit have even considered" is a "*consistent history of payment in the [United States].*" *Id.* at 114 n.8 (emphasis added).

*Idas Resources N.V.*, 2006 WL 3060017, at \*9.  As Plaintiffs can point to no evidence that the United States was "expressly designated" as the place of performance, or that there is a "consistent history" of specific performance in the United States to suggest that performance was "supposed" to occur in the United States – with respect to any conceivable bailment – this decision undermines a finding of direct effect.  *See id.*, *see also* Sámuel Decl. ¶¶ 7-8.

In sum, Plaintiffs cannot prove a "direct effect" in the United States with respect to any of the artworks at issue in this action because: (1) the Italian Plaintiffs have no connection to the United States; (2) the Italian Plaintiffs, by Plaintiff Angela Herzog's admission, never thought about the artworks coming to the United States; (3) no heir of István Herzog had a connection – residence – to the United States prior to 1999; (4) the effect of any impact in the United States associated with a bailment between Plaintiff de Csepel and Hungary is tied solely to citizenship and theoretical financial loss, not to a legally significant action or event; (5) under Hungarian law, Hungary – not the United States – is the place of performance of the alleged bailments; (6) the relevant events all occurred in Hungary; and (7) the artworks could not leave Hungary even if Defendants were to return them.

### C.   Historical Facts and Applicable Law Undermine the Existence of Valid Bailments

As noted above, through discovery, the parties determined that thirty-four of the forty-four artworks are listed in museum "core" inventory books, while ten artworks are listed in "deposit" inventory books.  Tatevosyan Decl., Exh. 1.  While this may be some evidence of a "bailment" with respect to ten artworks, these inventory books are internal registration books and not bailment agreements.  With respect to the thirty-four artworks, even internal registration does not suggest any bailment as these artworks have been registered in the core inventories, hence considered state property, for several decades.  Documents produced by both parties relating to these artworks makes clear that neither Plaintiffs' predecessors nor Hungary's Communist government considered themselves to be participants in a "bailment" regarding any of the artworks.

A portion of the artworks were seized by Hungary in connection with a criminal indictment and conviction against Mrs. István Herzog for smuggling artworks out of Hungary, in violation of long-standing patrimony laws.  *See* Tatevosyan Decl., Exh. 19 at HUNG008085-087 (indictment against Ilona Kiss, former wife and guardian of István Herzog relating to unauthorized removal from Hungary of artworks, fifteen of which are named in the Complaint); Exh. 21 at HUNG008014 (memorandum, dated November 28, 1950, regarding execution of criminal forfeiture of artworks, fifteen of which are named in the Complaint); Exh. 77; Exh. 22 at HUNG011044 (identifying as "seized and impounded" artworks attributed to the "late András Herzog"); Exh. 23 at HUNG012663; Exh. 62 at HUNG016081 (1966 letter from the Ministry of Cultural Affairs stating items from István are state property "partly under the title of purchase from István Her[zog], who remained in Hungary, or as a result of seizure in exchange for a tax

debt, and partly based on the court judgment ordering the confiscation of property against Mrs. István Her[zog] based on the smuggling artworks out of the country.").[15]

Additional artworks were confiscated or acquired by the Hungarian government during the 1950s and 1960s.  Tatevosyan Decl., Exh. 33 at HERZOG00000320 (correspondence regarding the John Opie and Lucas Cranach artworks which, according to a letter dated January 12, 1976, was "the property of the State of Hungary" (Opie) or "acquired by the Hungarian state . . .by policemen seizing it and turning it over to the Government" (Cranach) in the early 1960s"), Exh. 29 at HUNG008654 and HUNG008664; Exh. 32 at.  Such seizures and confiscations are not commercial activities.  *See, e.g., Garb*, 440 F.3d at 588 ("a State's exercise of its power to expropriate property within its borders is a decidedly sovereign act" that does not fall within "commercial activity"); *Chuidian*, 912 F.2d at 1106; *De Sanchez*, 770 F.2d at 1398; *Alberti*, 705 F.2d at 254; *Haven,* 68 F. Supp. 2d at 954.

In 1949, a letter from the State Security Office of the Ministry of the Interior was sent to Mr. Jeszenszky to inform him "that the András Herzog artworks and paintings deposited with the Museum of Fine Arts constitute the property of the Hungarian Republic and as such they are to be handled as national property."  Tatevosyan Decl., Exh. 24 at HUNG011998.  In 1954, internal

---

[15] One of the documents addressed in the Court's December 12, 2014, Opinion (Dkt. No. 100 at 10) as providing some support for the bailment theory, Dkt. No. 89-10, was an offer of artworks as deposits stating the "majority of the paintings are under impoundment by the Financial Police," and listed artworks that were seized in connection with these criminal proceedings. Tatevosyan Decl., Exh. 23 (Dkt. 89-10) at HUNG012663; Exh. 63 (Dkt. No. 89-18) at HUNG015593.  The other two documents listed by the Court, Dkt. Nos. 89-6 and 89-8, referenced artworks repatriated following World War II that were held pending redemption by their owners (through the payment of a repatriation duty).  *Id.* at Exh. 57 (Dkt. 89-6); Exh. 64 (Dkt. 89-8).  Many of these artworks, however, were returned legally and *later* seized in connection with the smuggling prosecution.  *Id.* at Exh. 17; Exh. 22 (Dkt. 89-22); Exh. 77; Exh. 23 at HUNG012663.  ("[T]he Financial Police may not consent to the safe custody [i.e. handling as deposits] of these works of art before the prosecutor's decision regarding their legal status.").

communications about Maria Parravicini's offer to purchase several El Greco paintings in

Switzerland stated the paintings,

> the majority of which really constitute the Museum of Fine Arts' property, and
> are of great value are **not** for sale either domestically or abroad. No museum ever
> sells such paintings . . . If we only did as much as enter negotiations of this kind,
> we would be fueling propaganda against our country.  We would find it a cultural
> scandal ourselves if a museum in any other country were to consider selling
> major artworks of national cultural significance.

Tatevosyan Decl., Exh. 26 at HUNG013070-071.  In 1966, prompted by a claim by the Weiss

family, the Ministry of Culture stated that the Weiss de Csepel paintings were state property.  *See*

*id.* at Exh. 34 at HUNG016120.  In response to inquiries about specific artworks made by Martha

Nierenberg's representatives during the Nierenberg litigation, a Hungarian official responded

that the referenced artworks (the Borsos and Brocky works included in this Complaint) constitute

Hungarian property.  *See id.* at Exhs. 65-70.  These are the acts of a sovereign taking actions over

state property, not a commercial actor.

Plaintiffs' own documents illustrate that their predecessors did not believe the artworks

were subject to a "bailment."  *See, e.g*., Tatevosyan Decl., Exh. 71 at HERZOG00000011

(identifying artworks listed in Plaintiffs' Complaint, and noting "[t]hese paintings were

confiscated by the Communist Hungarian Government in 1954, and to claimant's knowledge,

many of them . . . are on exhibit in the Museum of Fine Arts at Budapest"); Exh. 25 (letter from

Maria Parravicini asking to purchase certain artworks identified in this lawsuit); Exh. 72 at

HUNG002644 (Power of Attorney authorizing Julia Herzog "to request on [Angela Herzog's]

behalf the return of property *confiscated* in Hungary during the last war.") (emphasis added).

## V.     The FSIA's Expropriation Exception Does Not Provide the Court with Subject Matter Jurisdiction over Hungary

In its December 12, 2014, Opinion, this Court directed the parties to "address fully the

validity of the Court's prior holding that the expropriation exception provides subject matter

jurisdiction." Dkt. No. 100 at 12. The Court referenced its prior holding "that the seizure of the Herzog Collection during World War II brings plaintiffs' claims under the expropriation exception." *Id.* at 11 (citing *de Csepel*, 808 F. Supp. 2d at 128-33). For the reasons set forth below, Hungary respectfully submits that: (1) the appellate panel's decision in this action, as applied by another Judge of this Court, precludes this Court from taking jurisdiction over Hungary under the FSIA's expropriation exception; (2) historical documents produced during fact discovery confirm that (a) two claimed artworks came into Hungary's possession for the first time in the 1950s and 1960s, and (b) nineteen artworks were returned to Erzsébet, András, and István or their representatives after the war pursuant to the 1947 Treaty (and were subsequently seized by the Hungary and/or forfeited to the state following criminal conviction) and are not subject to the expropriation exception; (3) the twelve artworks attributable to Erzsébet Weiss de Csepel were covered by the 1973 Agreement, precluding application of the expropriation exception to these claims; and (4) relevant, persuasive case law advocates against taking jurisdiction over Plaintiffs' non-exhausted claims which, unless and until exhausted, are not established as "takings in violation of international law."

A.     **The FSIA's Treaty Exception Precludes the Court from taking Jurisdiction over Hungary under the Expropriation Exception**

As a threshold matter, "a court adjudicating a claim against a foreign state must determine whether the FSIA provides subject matter jurisdiction over the claim." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 706 (9th Cir. 1992). The FSIA, by its own terms, applies "[s]ubject to existing international agreements to which the United States is a party at the time of enactment . . . ." 28 U.S.C. § 1604; *see also Gutch v. Fed. Republic of Germany*, 444 F. Supp. 2d 1, 6 n.3 (D.D.C. 2006). "All immunity provisions in sections 1604 through 1607 are made subject to 'existing' treaties and other international agreements to which the United States

is a party.  In the event an international agreement expressly conflicts with [the FSIA], the

international agreement would control."  H.R. Rep. No. 94-1487 at 17, reprinted in 1976

U.S.C.C.A.N. 6604, 6616; *see also World Holdings, LLC v. Fed. Republic of Germany*, 613 F.3d

1310, 1315 (11th Cir. 2010) (quoting *Amerada Hess*, 488 U.S. at 442).

### 1. Expropriation Claims are Addressed by the Peace Treaty, which Conflicts Expressly with the FSIA

Because the Peace Treaty was in effect when the FSIA was enacted, this Court must

analyze whether the Peace Treaty applies to this case and, if so, whether the Peace Treaty

"expressly conflict[s]" with the FSIA.  *Amerada Hess*, 488 U.S. at 422; *Moore v. United*

*Kingdom*, 384 F.3d 1079, 1084-88 (9th Cir. 2004).  If the Peace Treaty applies and conflicts with

the FSIA, the Peace Treaty and its dispute resolution procedures control and preclude jurisdiction

by this Court.  *See id.*; *see also* H.R. Rep. No. 94-1487 at 17, *reprinted in* 1976 U.S.C.C.A.N. at

6616 (noting the FSIA cannot alter the provisions of "agreements to which the United States is a

party," where such an agreement "call[s] for exclusive nonjudicial remedies through arbitration

or other procedures for the settlement of disputes").

The Peace Treaty affirmatively states its intention to "settle questions still outstanding"

between Hungary and the other signatories arising from World War II.  Peace Treaty, intro., at

2110.  Article 27 of the Peace Treaty provides:

> Hungary undertakes that in all cases where the property, legal rights or interests in Hungary of persons under Hungarian jurisdiction have, since 1 September 1939, been the subject of measures of sequestration, confiscation or control on account of the racial origin or religion of such persons, the said property, legal rights and interests shall be restored together with their accessories or, if restoration is impossible, that fair compensation shall be made therefor.

Peace Treaty, art. 27(1), at 2124.  By including Article 27, the signatory countries agreed the

subject matter of addressing responsibility for making restitution to Hungarian nationals or those

"under Hungarian jurisdiction" due to discrimination during World War II was a *treaty* matter,

not something to be left for domestic law or private parties to resolve.  Should a Peace Treaty

signatory believe Hungary is not meeting its obligations under the Peace Treaty, Article 40

provides the exclusive mechanism for enforcement.  *See* Interpretation of Peace Treaties with

Bulgaria, Hungary and Romania, Advisory Opinion, 1950 I.C.J. 65, at 75 (May 30);

Interpretation of Peace Treaties with Bulgaria, Hungary and Romania, Advisory Opinion, 1950

I.C.J. 221, at 224-26 (July 18).

Plaintiffs assert in the Complaint that their predecessors were deprived of property

(artwork) in Hungary during World War II because they were Jewish.  Thus, Plaintiffs'

predecessors are precisely the individuals identified in Article 27 – individuals who were

"persons under Hungarian jurisdiction" whose "property, legal rights or interests" were subject

to "measures of sequestration, confiscation or control on account of racial origin or religion . . .

."  Peace Treaty, art. 27(1), at 2124.  Because Plaintiffs' claims relate to "the property, legal

rights or interests in Hungary of persons under Hungarian jurisdiction [who] have, since

September 1, 1939, been the subject of measures of sequestration, confiscation or control on

account of the racial origin or religion of such persons," Plaintiffs' claims fall within Article 27

of the Peace Treaty.

Documents submitted by Jewish organizations and interest groups as the Peace Treaty

was being drafted include specific requests for inclusion in the Peace Treaty of language

"designed to secure and safeguard the rights of the Jews, individually and collection."

Tatevosyan Decl., Exh. 73 at HERZOG00000904.  The documents request that articles in the

finalized Peace Treaty include specific language addressing the status of Jews in Hungary and

the return of property "to all members of groups which were the object of racial, nazi, or facist

discrimination or persecution, wherever resident or domiciled."  Tatevosyan Decl., Exh. 74 at

HERZOG00000916; *see also id*. at HERZOG00000910, HERZOG00000912,

HERZOG00000918, HERZOG00000921; Exh. 73 at HERZOG00000906.

The authors of the documents noted that "[t]he present [post-war] Hungarian Government

has manifested its favourable disposition towards the Hungarian Jews and has taken steps to

restore their rights."  Tatevosyan Decl., Exh. 74 at HERZOG00000910.  The authors state,

however, that "in light of past history and the realities of the present time," such additions to the

draft Peace Treaty were necessary to "remove the problem of a just and permanent settlement of

the status of the Jewish people of Hungary from the province of purely domestic guarantees and

to adopt a definitive solution on the international plane."  *Id*.  A key issue as the Peace Treaty did

not create or permit individual claims.

The Court must next look to whether relevant portions of the Peace Treaty "expressly

conflict" with the FSIA.  *Amerada Hess*, 488 U.S. at 442; *Moore*, 384 F.3d at 1084-85.  Noted

above, Article 40 of the Peace Treaty provides the sole device for asserting a challenge to Article

27 of the Peace Treaty – including challenges to the adequacy of performance of any of the

Peace Treaty's provisions.  Article 40 sets forth a specific process for resolving any dispute

raised in connection with Article 27.  It provides that disputes not settled by direct diplomatic

negotiations are to be referred to the Heads of the Diplomatic Missions from the Soviet Union,

the United Kingdom, and the United States.  Peace Treaty, art. 40, at 2131.

Neither Article 40 nor any other provision of the Peace Treaty contemplates – or permits

– resolution of property right disputes through private civil litigation in the United States.

Allowing this case to proceed would "expressly conflict" with the Peace Treaty and Article 40's

specific guidelines for resolving disputes relating to Article 27.  As the Peace Treaty controls and

precludes application of the FSIA, this Court cannot assert jurisdiction over Hungary.  *See*

*Amerada Hess*, 488 U.S. at 442; *Moore*, 384 F.3d at 1084-85; *see also* H.R. Rep. No. 94-1487 at 17, *reprinted in* 1976 U.S.C.C.A.N. at 6616.

Plaintiffs do not have standing to challenge the terms, conditions, validity, or performance of the Peace Treaty because they are individuals, not sovereigns. *See United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 168 (3d Cir. 1997); *Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir. 1990); *United States ex. rel. Lujan v. Gengler*, 510 F.2d 62, 67 (2d Cir. 1975).

That treaties do not create privately enforceable rights is presumed "in the absence of express language to the contrary." *Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008). If a party to a treaty wishes to create a private right of action, "[courts] ordinarily expect expression of these obligations to be unambiguous." *De Los Santos Mora v. New York*, 524 F.3d 183, 202 (2d Cir. 2008). Neither Article 27 nor any other provision of the Peace Treaty includes any language providing for a private cause of action. Plaintiffs are not sovereigns and, thus, may not challenge the terms or validity of the Peace Treaty or Hungary's performance thereunder.[16]

---

[16] Nineteen of the artworks were legally and physically returned after World War II to Erzsébet, András and István or their representatives. Tatevosyan Decl., Exhs. 6-16 and 76. Thus, any World War II "taking in violation of international law" was remedied; a subsequent, post-war taking – a taking, moreover, by a sovereign, from its citizens (those seven artworks attributable to István) – in a state seizure or post-conviction forfeiture – does not violate international law. *See Rong v. Liaoning Province Gov't*, 362 F. Supp. 2d 83, 101 (D.D.C. 2005) (recognizing that "expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law." (citation omitted); *see also United States v. Belmont*, 301 U.S. 324, 332, (1937) ("What another country has done in the way of taking over property of its nationals . . . is not a matter for judicial consideration here. Such nationals must look to their own government for any redress to which they may be entitled."); *Dreyfus v. Von Finck*, 534 F.2d 24, 31 (2d Cir. 1976) (recognizing that "violations of international law do not occur when the aggrieved parties are nationals of the acting state").

2.      **The 1973 Agreement Reiterated and Expanded Upon the Settlement of Taken Property Claims by Specifically Including Claims that Relate to Article 27 of the Peace Treaty**

In exchange for a lump sum payment from Hungary of $18,900,000, the United States and Hungary signed the 1973 Agreement, which settled and discharged all claims against Hungary and its nationals for the taking of property prior to March 1973 for the purpose of "effecting a settlement of all outstanding claims and advancing economic relations between the two Governments," including all obligations arising out of Article 27 of the Peace Treaty.  1973 Agreement, intro; *id.* at art. 1.  By its own terms, the expansive language of the 1973 Agreement settled all claims relating to: (1) "property, rights and interests affected by Hungarian measures of nationalization, compulsory liquidation, expropriation, or other taking on or before" March 1973; (2) Hungary's obligations "under Articles 26 and 27" of the Peace Treaty; and (3) "Hungarian property lost as a result of World War II."  1973 Agreement, arts. 2(1), 2(3), 6(2)(iii).  Such claims were discharged "whether or not they have been [previously] brought to the attention of" Hungary.  1973 Agreement, art. 6(1).  Because (1) Plaintiffs' predecessor (Erzsébet Weiss de Csepel) was a U.S. national at the time the Agreement went into effect, (2) Plaintiffs' claims related to "Hungarian property lost as a result of World War II," and (3) Plaintiffs' claims are subject to Article 27 of the Peace Treaty, the 1973 Agreement, like the Peace Treaty, bars Plaintiffs' claims.  The negotiating parties discussed claims advanced by Ms. Weiss de Csepel, including claims for real property and artworks in this lawsuit.  *See* Tatevosyan Decl., Exhs. 35-38.

Plaintiffs deposed Dr. István Kiss about the 1973 Agreement.  Dr. Kiss participated in the negotiations that led to the Agreement and with the drafting of the Agreement itself.  Stauber Decl., Exh. 1 at 18:20-19:3; 93:10-16.  Dr. Kiss testified about the political discrepancy between

the American and Hungarian delegations during the first stage of the negotiations, based on the

clear differences in the political and economic philosophies of the two governments:

> The American delegation explained that any state has the right to carry out nationalization measures for common or public interest. But – but it is mandatory for any such state getting out such measures to give effective compensation – immediate compensation, full compensation, and effective compensation. . . . That was the opinion of the American party as they explained. They said this is the principle applied in international law. On the Hungarian side the answer of the Hungarian party was very short. . . . According to socialist international law, nationalization can be carried without – without giving compensation. So positions were that far away from each other.

*Id.* at 23:1-24. Dr. Kiss acknowledged a statement made by the Hungarians during the first

phase of negotiations, that art collections have never been nationalized in Hungary, but explained

that ultimately the 1973 Agreement covered all U.S.-related claims, whether made or not,

including claims for artwork from World War II to the 1973 Agreement. *Id.* at 80:2-16, 81:8-

82:13. In fact, during the first phase, Hungary disputed the legal merits of many of the claims

put forward by the American delegation. *Id.* at 22:1-7, 90:2-91:9. But in the second phase,

Hungary was willing to settle all types of claims, with a lump sum calculated as a percentage of

the whole claimed sum. *Id.* at 24:8-25:23, 31:18-32:1, 45:23-46:23, 55:13-57:7.

The Agreement, as concluded, reflects this approach: it settles all types of claims, arising

not only from nationalization, but also from expropriation and any other type of taking that the

American delegation put forward. Such claims included claims for artworks that Hungary seized

and placed in public collections without the former owner's consent. The 1973 Agreement

contained an express exception for a piece of property owned by the United States government;

it did not, however, contain an exception for artworks. *Id.* at 94:25-95; 95:22-97:3, 98:18-99:24.

Thus, the 1973 Agreement speaks for itself, including, unless specifically excepted, all property

rights and interests affected by measures of nationalization, compulsory liquidation, expropriation, or other takings. *Id.* at 97:6-99:24.

On March 14, 1973, the Financial Institutions Authority sent a letter to the Ministry of Culture, informing it that the 1973 Agreement settled "claims of US nationals concerning works of art." Tatevosyan Decl., Exh. 41 at HUNG2307-308. The letter identifies the artworks of several U.S. nationals and notes that "paintings that formerly belonged to the Weiss de Csepel family as listed in our letter of May 10, 1966" are within the scope of settled claims. *Id.* The referenced and attached May 10, 1966, letter lists twelve artworks claimed by the Weiss de Csepel family. *Id.* at Exh. 40 at HUNG002297-298; *see also id.* at Exhs. 27-28. Eleven of the works are included in this lawsuit.

Accordingly, Defendants reassert that Plaintiff de Csepel's claims were addressed under the 1973 Agreement, as Ms. Weiss de Csepel submitted a claim to the FCSC and received compensation. The expropriation exception, therefore, does not provide this court jurisdiction over Plaintiff de Csepel's claims, especially as to the artworks that were returned to her representatives following World War II and taken during the Communist Era or in the case of the Cranach not first taken until 1952 or the Opie until 1963. *See, e.g.*, Tatevosyan Decl., Exhs. 43-43 (pursuant the 1973 Agreement, awarding compensation to Erzsébet Weiss de Csepel for loss of the Cranach and Opie artworks).

> **3.   The Appellate Panel's Reasoning Supports Hungary's Argument that the Treaty Exception Precludes Application of the Expropriation Exception**

On April 19, 2013, the appellate panel affirmed this Court's finding that, at the Rule 12(b)(6) stage, Plaintiffs had pleaded subject matter jurisdiction. *See de Csepel*, 714 F.3d at 598-99. In so doing, the panel did not rule on the availability of the expropriation exception. Noting that Plaintiffs are the "masters of the complaint," *id.* at 598 (quoting *Caterpillar, Inc. v.*

-48-

*Williams*, 482 U.S. 386, 395 (1987)), and that Plaintiffs "repeatedly emphasize[] that their claims are firmly rooted in bailment," the panel analyzed subject matter jurisdiction under the FSIA's commercial activity exception, *id.  See also id.* ("The family's claims, they reiterate, are nothing 'more than straightforward bailment claims that are cognizable in a United States court.'" (quoting Plaintiffs/Appellees' Br. at 26)).

Notwithstanding the fact that the panel identified Plaintiffs' claim as a bailment potentially subject to the commercial activity exception, not a taking in violation of international law covered by the expropriation exception, the panel addressed Hungary's treaty exception argument.  *See id.* at 601-03.  The panel summarized Hungary's argument that Peace Treaty articles 27 and 40, taken together "establish an exclusive treaty-based mechanism for resolving all claims seeking restitution of property discriminatorily expropriated during World War II from individuals subject to Hungarian jurisdiction."  *Id.* at 602.  The panel did not reject Hungary's interpretation of the Peace Treaty; nor did it find an absence of conflict between the FSIA and the Peace Treaty.  Rather, the panel rejected Hungary's proposed application of the treaty exception argument

> [F]or the simple reason that [Plaintiffs'] claims fall outside the Treaty's scope. Article 27 concerns property discriminatorily expropriated during World War II. As we have explained, however, the family's claims rest not on war-time expropriation but rather on breaches of bailment agreements formed and repudiated after the war's end.

*de Csepel*, 714 F.3d at 602.  Next, addressing this Court's finding that the 1973 Agreement did not expressly conflict with the FSIA because of the scope of the Agreement and the citizenship of one Plaintiffs' predecessor, the panel noted

> We need not settle the question of *whom* the Agreement covers because we can easily resolve the issue by examining *what claims* the Agreement covers. To repeat, the Herzog family seeks to recover for breaches of bailment agreements

formed and repudiated after World War II, not for the initial expropriation of their
property during the war.

*Id.* at 603.  In sum, the panel reasoned that because Plaintiffs' claims relate to post-war bailments

– not wartime takings – the treaty exception is inapplicable.

Accordingly, this Court's "original conclusion that the seizure of the Herzog Collection

during World War II brings plaintiffs' claims under the expropriation exception," Dkt. No. 110

at 11 – cannot be squared with the panel's subsequent reasoning that it is the *nature of the claim*

– post-war bailment versus war-time taking in violation of international law – that controls the

analysis.  Plaintiffs' claims are for *either* (1) violations of alleged bailment agreements, under the

FSIA's commercial activity exception, *or* (2) "takings in violation of international law," under

the FSIA's expropriation exception.  The FSIA does not anticipate or permit a hybrid exception –

some sort of "bailment" in "violation of international law" – as Plaintiffs creatively plead.  *See*

Dkt. No. 98 (Plaintiffs' Opp. to Hungary's First Supp. Resp.) (noting that but for the war, there

would be no bailment).

Another Judge of this Court has already applied the panel's interpretation of the FSIA's

treaty exception to find that the Peace Treaty barred the wartime takings claims of other

Hungarian plaintiffs.  *See Simon*, 37 F. Supp. 3d at 420-21.  In *Simon*, the plaintiffs sought

compensation for property taken from them during the Holocaust.  *See id.* at 391.  The plaintiffs

invoked the FSIA's expropriation exception.  *See id.* at 399  n.15.  Much as it had done before

this Court, Hungary challenged that the Peace Treaty governed the plaintiffs' war-time takings

claims.  *See id*. at 406-07.  Because that Peace Treaty pre-dated and conflicted with the FSIA,

Hungary asserted, no exception to the FSIA applied to strip Hungary of its sovereign immunity.

*See id.*  The court agreed with Hungary, granting the motion to dismiss.  *See id.* at 424.

The *Simon* court was careful to distinguish the actions on the ground that *Simon* involved allegations of a war-time taking, while this action involved post-war bailments. *See id.* at 421 ("At issue in *de Csepel* were the efforts of the heirs of a major Hungarian Jewish art collector to reacquire art objects that were 'loaned' to the Hungarian state immediately after World War II. . . . Specifically, the [*de Csepel* panel] explained that the 'family's claims rest not on war-time expropriation but rather on breaches of bailment agreements formed and repudiated after the war's end.'" (citations omitted); *see also id.* at 422.

The *Simon* court recognized that the plaintiffs' claims against the Hungarian defendants pertained to "property or rights expropriated during World War II," and that the "exclusive mechanism for resolution of disputes regarding 'the interpretation or execution' of the [Peace] Treaty was provided in Article 40." *Id.* at 424. Therefore, the court found, "the [Peace] Treaty constitutes an 'existing agreement' to which the United States was a party prior to the enactment of the FSIA that 'expressly conflicts' with the FSIA, meaning the [Peace] Treaty controls." *Id.* at 424 (quoting *Amerada Hess*, 488 U.S. at 442; H.R. Rep. 94-1487 at 18; S.R. Rep. 94-1310 at 17 (1976)). As a result, the court recognized that the Hungarian defendants "are entitled to sovereign immunity except as modified by the 1947 [Peace] Treaty and, consequently, the plaintiffs' claims must be dismissed for lack of subject matter jurisdiction." *Id.*[17]

As the *de Csepel* appellate panel's decision counsels, if Plaintiffs' claims are for war-time takings – takings for which the United States and Hungary entered into international treaties to resolve – then the treaty exception precludes this Court from taking jurisdiction over Hungary under the FSIA's expropriation exception.

---

[17] The *Simon* court did not reach the question of whether the 1973 Agreement, which was intended to resolve all outstanding claims of U.S. nationals, applied to bar the plaintiffs' claims as the court found that the claims could be resolved by reliance on the Peace Treaty alone. 37 F. Supp. 3d at 421 n.30.

**B.** **This Court Lacks Subject Matter Jurisdiction under the FSIA's Expropriation Exception over Claims Associated with the Heirs of István and András Herzog, as Plaintiffs Failed to Exhaust their Remedies In Hungary**

The FSIA's expropriation exception abrogates sovereign immunity in any case "in which rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."  28 U.S.C. § 1605(a)(3).  The FSIA does not define "taken," but legislative history recognizes that the "taking" was not intended to be recognized in perpetuity as the "taking" itself could be remedied.

The legislative history and case law make clear that the phrase "taken in violation of international law" refers to "the nationalization or expropriation of property *without payment of the prompt adequate and effective compensation required by international law*," including "takings which are arbitrary or discriminatory in nature."  *Zappia*, 215 F.3d at 251 (emphasis added) (quoting H.R. Rep. No. 94-1487, at 19).  Therefore, courts recognize that "the term 'taken' thus clearly refers to acts of a sovereign, not a private enterprise, that deprive a plaintiff of property *without adequate compensation*."  *Id.* (emphasis added) (citation omitted).

Numerous courts have recognized that a failure to provide adequate compensation is a factor necessary to transform an unlawful taking into a "violation of international law." *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation, (C.N.A.N.)*, 730 F.2d 195, 204 (5th Cir. 1984) (recognizing that "the legislative history of the FSIA indicates that section 1605(a)(3) was intended to subject to United States jurisdiction any foreign agency or instrumentality that has nationalized or expropriated property *without compensation*" (emphasis added)); *Orkin v. Swiss Confederation*, 770 F. Supp. 2d 612, 616 (S.D.N.Y. 2011) (recognizing that "the term 'taken' . . . refers to acts of a sovereign . . . that

deprive a plaintiff of property *without adequate compensation*" (emphasis added) (citation omitted)); *Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157, 1164 (C.D. Cal. 2006) (noting that "'[t]he term "taken"  . . . clearly refers to acts of a sovereign, not a private enterprise, that deprive a plaintiff of property *without adequate compensation*.'" (emphasis added) (quoting *Zappia*, 215 F.3d at 251)).

A foreign country's ability to remedy a violation of international law has been recognized repeatedly in the exhaustion of remedies context.  In *Greenpeace, Inc. (U.S.A.) v. France*, 946 F. Supp. 773 (C.D. Cal. 1996), Ninth Circuit Judge Kim M. Wardlaw, then a district court judge, recognized that in order to determine whether a "taking violation of international law" exists to subject a foreign sovereign to the jurisdiction of a U.S. court, a claimant must first bring the claim to the offending sovereign, to permit that country to resolve, remedy, or justify the taking. *Id*. at 783.  It follows logically that only where the offending country refuses to resolve, remedy, or compensate for the taking should a U.S. court step in to right the wrong.

The U.S. Court of Appeals for the D.C. Circuit recognized that exhaustion, although not statutorily mandated, may be necessary to determine whether the taking in violation of international law has been remedied or still requires redress.

> Russia advances a more compelling theory based upon Justice Breyer's concurrence in *Republic of Austria v. Altmann*, 541 U.S. 677, 124 S. Ct. 2240, 159 L. Ed. 2d 1 (2004), which noted that a plaintiff seeking relief under § 1605(a)(3) "may have to show an absence of remedies in the foreign country sufficient to compensate for any taking" and that a "plaintiff who chooses to litigate in this country in disregard of the postdeprivation remedies in the 'expropriating' state may have trouble showing a 'tak[ing]' in violation of international law.'" *Id.* at 714, (alteration in original).  Thus Justice Breyer draws on a substantive constitutional theory – that there simply is no unlawful taking if a state's courts provide adequate postdeprivation remedies.  *Id.* (citing *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 721, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999), and alluding to cases applying that doctrine).

*Agudas Chasidei Chabad of U.S.*, 528 F.3d at 949.  The D.C. Circuit ultimately excused the

claimant's failure to exhaust remedies, allowing the claim to move forward in the United States

only after confirming that the "only remedy Russia has identified is on its face inadequate," and,

therefore, the taking *could not* be remedied by Russia.  *Id.*; *see also Millicom Int'l Cellular, S.A.

v. Republic of Costa Rica*, 995 F. Supp. 14, 23 (D.D.C. 1998) ("As a threshold matter, a claimant

cannot complain that a 'taking' or other economic injury has not been fairly compensated, and

hence violates international law unless the claimant has first pursued and exhausted domestic

remedies in the foreign state that is alleged to have caused the injury." (citing *Greenpeace*, 946

F. Supp. at 783)).

Most recently, the Seventh Circuit held twice that Hungary could not be forced to submit

to the jurisdiction of a U.S. court unless the claimants had demonstrated that Hungary could not

remedy its prior taking in violation of international law.  *See Abelesz*, 692 F.3d at 679-80, *aff'd*,

*Fischer*, 777 F.3d at 855.  The *Abelesz/Fischer* actions concerned the discriminatory taking (by

Hungary's national bank) of property from Hungarian Jews during World War II.  Reversing the

district court's finding that it had subject matter jurisdiction under the FSIA's expropriation

exception, the appellate court found that the plaintiffs failed to demonstrate a violation of

international law because they had not given Hungary an opportunity to remedy the taking.

The Seventh Circuit in *Abelesz* declined to read a statutory exhaustion requirement into

the FSIA.  *See* 692 F.3d at 678.  The court recognized, however, that "[w]hether a plaintiff must

exhaust domestic remedies to assert a claim for expropriation in violation of international law is

a different question."  *Id.* at 679.  In other words, the panel reasoned that while a claimant may

not be required by the language of the FSIA to first exhaust a claim in the foreign jurisdiction,

exhaustion is necessary to determine whether the taking can be remedied by the offending

-54-

sovereign and, if the answer is no, only then should the court address whether a U.S. court can step in to provide a remedy to the claimant.  *See id*.; *see also id*. at 680 (citing *Millicom Int'l Cellular*, 995 F. Supp. at 23; *Greenpeace*, 946 F. Supp. at 783; Restatement (Third) of the Foreign Relations Law of the United States § 713 cmt. f (1987)).

Like the *Chabad* court, the Seventh Circuit court noted that if the claim could not be remedied, then exhaustion was not required.  The Seventh Circuit recognized that the role of a U.S. court in such a case is to act as a surrogate venue *only when*, and *if*, the offending country is unwilling to remedy the wrong.

> Hungary, a modern republic and member of the European Union, deserves a chance to address these claims.  That is not to say that U.S. courts have no place in this sort of case.  If plaintiffs choose to pursue their claims in Hungary but find the way barred by inaction or hostility, the U.S. courts may be available to consider their claims.  But Hungary should first have the opportunity to address these alleged takings, by its own means and under its own legal system, before a U.S. court steps in to resolve claims against a part of the Hungarian national government for these actions taken in Hungary so long ago.

*Abelesz*, 692 F.3d at 682; *see also id*. at 684.  On remand, the district court dismissed the action without prejudice.  *See Fischer v. Magyar Államvasutak Zrt.*, No. 10 C 868, 2013 WL 4525408 (N.D. Ill. Aug. 20, 2013).  Because "Plaintiffs fall short of providing a legally compelling reason for not pursuing their remedies in Hungarian courts, and Plaintiffs have not convincingly shown that the Hungarian courts are clearly a sham or inadequate, or that such court proceedings will be unreasonably prolonged," the plaintiffs failed to provide the court with "a legally compelling reason for plaintiffs' failure to exhaust."  *Id.* at *1.

The Seventh Circuit affirmed the district court's dismissal, noting that "principles of international comity make clear that these plaintiffs must attempt to exhaust domestic remedies before foreign courts can provide remedies for those violations."  *Fischer*, 777 F.3d at 852.  The Seventh Circuit recognized that "[a]t bottom, international law favors giving a state accused of

taking property in violation of international law an opportunity to 'redress it by its own means, within the framework of its own legal system' before the same alleged taking may be aired in foreign courts." *Fischer*, 777 F.3d at 855 (quoting *Abelesz*, 692 F.3d at 680).  Moreover, "hearing these claims in a United States court 'without even giving Hungarian courts an opportunity to address them' would be an 'extraordinary step.'" *Id.* (quoting *Abelesz*, 692 F.3d at 684).[18]  Thus, exhaustion, while not statutorily obligated, is necessary because the offending sovereign is entitled to address its alleged violation of international law before it can be forced to submit to the jurisdiction of a U.S. court.  Where the offending sovereign can remedy or resolve the taking, a U.S. court should not inject itself into the dispute, but allow the sovereign to address the taking.

Here, Plaintiffs have exhausted claims to only eleven of the twelve artworks attributed to Plaintiff de Csepel, as those claims were advanced by Martha Nierenberg in the course of her litigation in Hungary.  Other Herzog family members asserting ownership rights to the property of István and András Herzog – including the Italian Plaintiffs – were brought into the lawsuit and represented by counsel, but they did not pursue their claims, electing not to exhaust their claims in Hungary.  *See* Tatevosyan Decl., Exh. 54 at HERZOG00003757 (Defendants' English translation) (Italian Plaintiffs declaring "we do not intend to participate actively in the lawsuit; that is, we will not present to the court the evidence at our disposal").

---

[18] It is a "well-established rule that exhaustion of domestic remedies is preferred in international law as a matter of comity."  *Fischer*, 777 F.3d at 859 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) (indicating that "in an appropriate case" international law may require that "the claimant must have exhausted any remedies available in the domestic legal system"); *Kiobel v. Royal Dutch Petrol. Co.*, 133 S. Ct. 1659, 1674 (U.S. 2013) (Breyer, J., concurring in the judgment) (highlighting the limiting principles, such as exhaustion and *forum non conveniens*, that "help to minimize international friction")).

Thus, unless and until Plaintiffs raise claims for artworks attributable to István and András Herzog (and the unexhausted claim held by Plaintiff de Csepel) to a Hungarian court, and unless and until Plaintiffs show that Hungary is unable or unwilling to address, remedy, or resolve the purported takings, no "taking in violation of international law" has been established that could allow this Court to take jurisdiction over Hungary with respect to these claims. *Fischer*, 777 F.3d at 855; *Abelesz*, 692 F.3d at 679-80.  And to the extent that the 2008 Hungarian court decision could constitute a "breach of the bailment agreements," as posited by the Court, Dkt. No. 91 at 2, that theoretical "taking" cannot apply to the heirs of István and András Herzog.  As they did not pursue their claims in Hungary – i.e., they did not advance a bailment claim to Hungary – their bailments have not been "breached."

Plaintiffs' non-exhausted claims are not barred in Hungary.  As noted in prior briefs, Hungary affirmatively removed a statute of limitations bar to claims relating to the Holocaust. And Hungary's well-established judiciary and constitutionally-mandated separation of powers ensures that the Plaintiffs could bring their unexhausted claims to an impartial Hungarian Court. The Seventh Circuit panel noted, too, that there are numerous judicial remedies available to foreign claimants wishing to bring war-time taken property claims in Hungarian courts – judicial remedies that are "sufficiently promising that plaintiffs should be required to bring suit in Hungary before their suits may proceed in the United States."  *Fischer*, 777 F.3d at 861.

Finally, recent legislation in Hungary sets forth a formal process through which claimants can provide evidence of ownership and seek return of artworks held by the State.  Under this legislation, it is Hungary's burden to establish ownership, with the claimant retaining the right to challenge any decision in Hungarian courts.  *See* Decl. Z. Novak, Exh. 7 (Government Decree No. 449/2013 (XI.28.)), *see also id.* at Exh. 8 (Hungarian Act CXCV of 2013).

Because a "taking in violation of international law" cannot be accurately assessed until the offending sovereign has first had the opportunity to remedy the alleged violation, *see Millicom*, 995 F. Supp. at 23, and "international law favors giving a state accused of taking property in violation of international law an opportunity to 'redress it by its own means, within the framework of its own legal system' before the same alleged taking may be aired in foreign courts," *Fischer*, 777 F.3d at 855 (quoting *Abelesz*, 692 F.3d at 680), Hungary submits that this Court should not take subject matter jurisdiction over claims associated with the non-U.S. citizen plaintiffs as the András and István Plaintiffs have failed to exhaust their remedies in Hungary with respect to those claims.  *See Fischer*, 777 F.3d at 855; *Abelesz*, 692 F.3d at 679-80; *Agudas Chasidei Chabad of U.S.*, 528 F.3d at 949.

## VI.   Conclusion

For the reasons set forth above, Defendants respectfully request that the Court grant this motion and dismiss Plaintiffs' Complaint on the ground that this Court lacks subject matter jurisdiction over Hungary.

Dated: May 18, 2015                              Respectfully submitted

                                                 */s/ Emily C. Harlan*
                                                 Emily C. Harlan (Bar No. 989267)

                                                 NIXON PEABODY LLP
                                                 401 Ninth Street, N.W., Suite 900
                                                 Washington, D.C.  20004-2128
                                                 Telephone: (202) 585-8000
                                                 Facsimile: (202) 585-8080
                                                 eharlan@nixonpeabody.com

                                                 Thaddeus J. Stauber *(pro hac vice)*
                                                 Sarah Erickson André *(pro hac vice)*

Irene Tatevosyan *(pro hac vice)*

NIXON PEABODY LLP
555 West Fifth Street, 46th Floor
Los Angeles, CA 90013

**Counsel for Defendants Republic of Hungary, The Hungarian National Gallery, The Museum of Fine Arts, The Museum of Applied Arts, and The Budapest University of Technology and Economics**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of May, 2015, I caused the foregoing

Renewed Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof to

be served, via the Court's ECF electronic filing system, upon the following counsel of record in

this matter:

Michael D. Hays
Alyssa T. Saunders
Cooley LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004

Michael Shuster
Dorit Ungar Black
Holwell Shuster & Goldberg LLP
125 Broad Street
New York, NY 10017

Alycia Regan Benenati
Sheron Korpus
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019

_/s/ Emily C. Harlan_____