## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | )
|---|---|
| **DAVID L. de CSEPEL,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 10-1261 (ESH)** |
| | ) |
| **REPUBLIC OF HUNGARY,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

_____)

### MEMORANDUM OPINION

Defendants the Republic of Hungary, the Hungarian National Gallery, the Museum of Fine Arts, the Museum of Applied Arts, and the Budapest University of Technology and Economics have moved, pursuant to Federal Rule of Civil Procedure 12(b)(1), to dismiss this case for want of subject matter jurisdiction.  (Defendants' Renewed Motion to Dismiss, May 18, 2015 [ECF No. 106] ("Defs.' Ren. Mot.").)  It is defendants' third motion to dismiss plaintiffs' claim on jurisdictional grounds, but the first Rule 12(b)(1) motion filed and argued with the full benefit of jurisdictional and merits fact discovery.

Plaintiffs David L. de Csepel, Angela Maria Herzog, and Julia Alice Herzog are descendants of Baron Mór Lipót Herzog, a Jewish Hungarian art collector who assembled a substantial art collection (the "Herzog Collection") prior to his death in 1934.  Plaintiffs allege that Hungary and Nazi Germany seized the Herzog Collection during World War II.  Plaintiffs brought this suit alleging that defendants breached bailment agreements entered into after World War II when they refused to return the pieces from the Herzog Collection to the plaintiffs in 2008.

On February 15, 2011, defendants filed a motion to dismiss, which this Court granted in part and denied in part, holding that it had subject matter jurisdiction under the expropriation exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(3).  *See De Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 132-33 (D.D.C. 2011).  The D.C. Circuit affirmed in part and reversed in part.  *De Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013).  Without addressing the expropriation exception, the D.C. Circuit held that plaintiffs' Complaint alleged sufficient facts to confer subject matter jurisdiction pursuant to the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2).  *See id.* at 601.  On remand, this Court ordered discovery to proceed.  (Order, Dec. 9, 2013 [ECF No. 82].)  All fact discovery is now complete.

Defendants assert that, in light of the evidence produced in discovery, plaintiffs cannot carry their burden of proving that this Court has subject matter jurisdiction.  In particular, defendants claim that neither the FSIA's commercial activity exception nor its expropriation exception applies to plaintiffs' claim.

For the reasons stated below, this Court finds that it has subject matter jurisdiction under the expropriation exception to the FSIA, but that plaintiffs cannot show a factual basis for their claim of jurisdiction under the statute's commercial activity exception.

## BACKGROUND

The factual history of this case has already been described in great detail by this Court and the Court of Appeals at 714 F.3d at 594-97; 808 F. Supp.2d at 120-26; and 75 F. Supp.3d 380, 382-85 (D.D.C. 2014).  The Court will therefore focus on the procedural history and facts relevant to this motion.

## I.   FACTS

Baron Mór Lipót Herzog was a Jewish Hungarian art collector who amassed a collection of over 2,000 paintings, sculptures, and other pieces of artwork.  After his death in 1934 and his wife's death in 1940, the Herzog Collection was divided up amongst his three children, Erzsébet Herzog (Elizabeth Weiss de Csepel), István (Stephen) Herzog, and András (Andrew) Herzog. (Complaint, July 27, 2010 [ECF No. 1] ("Compl.") ¶ 39; *see also* Defs.' Ren. Mot., Declaration of Irene Tatevosyan ("Tatevosyan Decl."), Ex. 5.)

During the Holocaust, Hungarian Jews, including the Herzogs, were required to register their art treasuries.  In 1943, the Herzog family sought to save their artworks from damage and confiscation by hiding the bulk of the collection in the cellar of one of the family's factories. Sometime prior to May 23, 1944, the artworks were discovered by the Hungarian government and its Nazi collaborators and were seized.  It appears that some of the artworks were transferred to Germany and other territories of the Third Reich, while the rest were stored in Hungary.

Several of the Herzog heirs and their families escaped from Hungary during the war: Elizabeth fled to Portugal and settled in the United States in 1946, becoming a U.S. citizen on June 23, 1952.  Plaintiffs Angela and Julia Herzog left Hungary following the deportation and death of their father András and settled eventually in Italy.  István remained in Hungary until his death in 1966.

Forty-four pieces from the Herzog Collection are at issue in this litigation.  According to interrogatory responses from plaintiffs, twenty-four are owned by the heirs of András Herzog, twelve are owned by the heirs of Erzsébet Herzog, and eight are owned by the heirs of István Herzog.  (*See id.*)  Defendants concede that forty of the forty-four artworks named in plaintiffs'

Complaint are still in the museums' possession.[1]  They also concede that forty-two of the forty-four properties were seized by Hungary and the Nazis during the Holocaust as part of Germany's campaign of genocide against the Jews.  The remaining two artworks appear to have been first acquired well after World War II.  In 1952, Lucas Cranach the Elder's "The Annunciation to Saint Joachim" (Compl. ¶ 16(vi)) was seized by the State Security Authority from an attorney, Dr. Henrik Lorant.  (Tatevosyan Decl. at Ex. 29).  The Cranach seems to have been placed in Lorant's house by Ferenc Kelemen, who claims to have been keeping it safe for Erzsébet Herzog.  (*Id.*)  In 1963, John Opie's "Portrait of a Lady" (Compl. ¶ 16(xiii)) was donated to the Museum of Fine Arts by an individual named Endre Gyamarthy.  (Tatevosyan Decl. at Ex. 32.)  It is unclear from the record how Gyamarthy came to possess the painting.

        Following the conclusion of the war, certain artworks from the Herzog Collection that had been scattered across Nazi-occupied Europe were shipped back to Hungary, consistent with the Allies' post-war restitution policy.  (Plaintiffs' Opposition to Ren. Mot., June 24, 2015 [ECF No. 110] ("Pls.' Opp'n") at 7.)  A one-party Communist dictatorship would eventually come to power in 1948, beginning a period during which "Hungary did not recognize individual property rights."  (Compl. ¶ 93.)  However, in the years between the end of World War II and the start of Communist rule (1946-1948), the post-war coalition government in Hungary made some effort to return property confiscated during the Holocaust to its rightful owners.

---

[1]  Defendants state that four of the forty-four properties named in plaintiffs' Complaint are not in their inventories: "Fair in Szolnok City" by Lajos Deak Ebner (Compl. ¶17(v)), "Four Ancient Egyptian Sculptures, Statues And Steles" (Compl. ¶ 16(xxxiii)), "A Terracotta Group of The Virgin and Child" (16xxiii), and "Four ancient silver coins" (16xxxv).  The evidence suggests that at least three of the properties—the Ebner, Egyptian sculptures, and Terracotta Virgin—may have been returned to the Herzog family's custody in 1947.  (*See* Tatevosyan Decl. at Exs. 12, 14, 15.)  The present whereabouts of these pieces of art is unknown from the record.

The parties dispute how much of the art collection seized from the cellars of the Herzog factory was actually returned to the family.  As best as the Court can determine, fifteen of the properties seized during the Holocaust *were*, at least temporarily, physically transferred into the custody of the Herzog family members or their legal representatives in the late 1940s.  (*See* Tatevosyan Decl. at Exs. 7, 9, 10, 11, 14, 15.)  All of these transfers occurred in Budapest. Pursuant to multiple customs and smuggling laws from the 1920s prohibiting the export of cultural patrimony,[2] the transfers were conditioned upon the explicit agreement that the paintings remain in Hungary.  (*See id.* at Ex. 18 (letter from Ministerial Commissioner Sandor Jeszensky about the release of Herzog paintings noting that the "handover protocol" requires "that the art works in question may not…be removed from the country's territory")).  Indeed, in every known instance in which art from the Herzog Collection was physically returned to the family, the art was handed over in Budapest and has remained there.  (*See id.* at Exs. 44, 45, 49.)  Plaintiffs concede that no member of the Herzog family has ever asked Hungary to return art to the United States.  (*See* Hearing Transcript, Dec. 2, 2015 [ECF No. 118] ("Hearing Transcript"), at 29.)

Ten additional artworks at issue in the Complaint appear to have been legally released to the family on paper, but plaintiffs dispute whether they were ever actually returned to their physical custody.  (Opp'n at 8 (stating that "these 'returns' were largely on paper or short-lived, and the vast majority of the Herzog Collection either remained in, or was ultimately returned to, Defendants' possession"); Tatevosyan Decl. at Exs. 8, 12, 18.)  Defendants agree that at least some of the properties that Hungary released to Herzog ownership were never physically handed

---

[2]   *See* Hungarian Act XIX of 1924 on Customs Law Regulations, Act, Smuggling of Prohibited Goods, Ch. II, § 164; Act XI of 1929, The Exploration of Movable Artifacts and Other Objects for Museum Display and Their Protection, Ch. III, § 26 (restricting the export of certain items of cultural significance).

over to plaintiffs or their family members.  (Defs.' Ren. Mot. at 7 (citing Tatevosyan Decl. at Ex.

17).)  Plaintiffs have produced compelling documentary evidence suggesting why many of these

"paper releases" were never consummated.  The financial burden of accepting and removing the

art to other countries was enormous.  A December 9, 1947 Report by the Ministerial

Commissioner in charge of repatriating art collections to Hungary discusses the return of

privately owned artworks from Germany on the so-called "Art Treasure Train and the Silver

Train" in the following way:

> At acceptance, the owners are obliged to pay a duty fee of 11 per cent of the value of the
> privately owned artworks returned from Germany.  It is understandable that the owners of
> larger collections and artworks of higher value do not hurry to take out their artworks,
> knowing that such items are in a good place. Thus, I still have 192 artworks in my
> custody from the consignments of the Art Treasure Train and Silver Train.

(Pls.' Opp'n, Declaration of Alycia Benenati ("Benenati Decl. II"), Ex. 6.)  For those owners

who fled the Holocaust and made their new home outside the country—such as Erzsébet,

András, and their heirs—they would not only have to pay this "repatriation duty" but also an

exorbitant fee to obtain an export license.  (*See* Tatevosyan at Ex. 18 ("According to legislation

in force…[and] latest practice, export permits are issued by the National Bank, based on the

estimate of the Museum of Fine Arts, in which case 40% of the estimated value [of the painting]

is payable for the export permit.")  Not surprisingly, this resulted in many Herzog artworks

remaining in the custody of Hungarian museums.  In a memorandum dated November 10, 1947,

Dr. Gyula Ortutay, the Minister of Religion and Public Education, wrote that several pieces of

the Herzog Collection had recently been returned to Hungary from Germany, but notes that "the

artworks could only be released [to the owners] in return for the repatriation duty" and that all

but two of the pieces "remain in the care of the office of the ministerial commission to this day."

(Pls.' Opposition to Second Motion to Dismiss, July 25, 2014 [ECF No. 89], Declaration of

Alycia Benenati ("Benenati Decl. I"), Ex. D.); *see also* Tatevosyan Decl. at Ex. 12 (museum

document categorizing Greco and Santi paintings as having been "released" but still in

museums' custody because "repatriation duty has not yet been paid"), Ex. 18 (Memorandum

from Ministerial Commissioner stating that, while he returned certain Herzog paintings upon

payment of the repatriation duty, others "remain in my custody").

In some cases, Hungary appears to have used the repatriation and export fees as leverage

to pressure the Herzogs into depositing or even donating certain artworks to the museums.  (*See*

Benenati Decl. I at Ex. F (1948 memorandum from Ministerial Commissioner Jeszensky writing

that his office had "found a solution under which it is able to place works from the Herzog

collection at the disposal of the Museum of Fine Arts, as a temporary deposit, for the purpose of

exhibiting them"); Tatevosyan Decl. at Ex. 18 ("Director General István Genthon also has a

confidential suggestion whereby the export of the Herzog art works that are to be returned might

be permitted if the painting entitled 'Christ on the Mount of Olives' by Greco was donated to the

Museum of Fine Arts.").)  Many of the Herzog properties retained by Hungary are now listed in

the museums' "Deposit" rather than "Core" inventories.  (Tatevosyan Decl. at Ex. 1.)

Most of the artworks that Hungary *did* temporarily return to the Herzog family were

subsequently re-seized by Hungary in 1952 as part of a criminal action.  After allegedly

discovering that the former wife of István Herzog (Ilona Kiss) had attempted to illegally smuggle

Herzog art out of the country in 1948, the Communist regime prosecuted Kiss, resulting in

forfeiture proceedings.  In all, twenty artworks were seized by the state, fifteen of which are at

issue in this lawsuit.  (*See id.* at Exs. 19-21, 77.)  Hungary claims to own these properties as a

result of a legal criminal seizure.  After the smuggling action, Hungary halted the return of

additional artworks to the Herzog heirs or their representatives.  (*See id.* at Ex. 22.)

Although Hungary appears to have retained a substantial portion of the Herzog art in a custodial role on behalf of the family, there is evidence of one express bailment agreement, wherein a Herzog heir directly contracted to deposit art with a museum.  In a letter dated May 3, 1950, an attorney named Dr. Emil Oppler offered a list of paintings, including ten pieces of art named in the Complaint, on behalf of Erzsébet Herzog for deposit with the Museum of Fine Arts in Budapest.  (*See id.* at Ex. 23.)  An actual "deposit contract" seems to have been finalized, signed, and delivered by a different Herzog attorney (Henrik Lorant) on March 30, 1951. (*See id.* at Ex. 63.)

Thus, of the forty artworks in this lawsuit that defendants still possess, the properties appear to fall into roughly four categories: (1) art acquired by defendants *after* the Holocaust; (2) art confiscated during the Holocaust that was never returned to plaintiffs; (3) art confiscated during the Holocaust that was returned to plaintiffs, and then subsequently seized back by criminal forfeiture; and finally, (4) art confiscated during the Holocaust that was returned to plaintiffs, and then subsequently deposited with the museums by the 1950 bailment agreement.

Over the last few decades, the Herzog heirs have sought to recover art from the Herzog Collection from Hungary (some of it at issue in this lawsuit and some not).  In 1989, Erzsébet Herzog (who was then Elizabeth Weiss de Csepel) requested that the Museum of Fine Arts return certain paintings to her.  The Museum agreed to hand over the paintings in Budapest, but under a preservation order such that the paintings could not leave the country—and to this day, they remain in Hungary. (*See* Tatevosyan Decl. at Ex. 44; Hearing Transcript at 35.)  In 1998, Julia Herzog (heir of András) wrote to the Museum of Fine Arts from Rome, Italy to request that several artworks not named in the Complaint be returned to her so that she could keep them in

her Budapest apartment.  (*Id.* at Ex. 47.)  The artworks requested by Julia were apparently never

returned.  (Hearing Transcript at 27.)

In 1999, Martha Nierenberg (daughter of Erzsébet) filed a lawsuit in Hungary seeking the

return of certain artworks once inherited by her mother, many of which are at issue in the present

lawsuit.  In her complaint, Nierenberg claimed full ownership of all twelve artworks at issue in

the 1999 lawsuit and separately identified additional artworks in the Herzog Collection that she

attributed to her siblings.  To ensure that the interests of all three Herzog siblings were

adequately represented, the heirs of István and András Herzog were brought into the lawsuit as

co-defendants.  Despite the fact that their property interests had been identified in Nierenberg's

complaint, the other heirs declined to litigate their claims.  (*Id.* at Ex. 54.)  In 2003, defendants

returned one piece of art sought in her complaint to Nierenberg's representative in Budapest,

with the instruction that a preservation order was placed on the painting to ensure that it would

not be removed from Hungary.  (*Id.* at Ex. 49.)  In 2008, however, the Hungarian Metropolitan

Appellate Court dismissed Nierenberg's claim for the remaining eleven artworks in its entirety.[3]

## II.    FOREIGN SOVEREIGN IMMUNITIES ACT

Under the Foreign Sovereign Immunities Act, "a foreign state shall be immune from the

jurisdiction of the courts of the United States" unless one of several enumerated exceptions

applies.  28 U.S.C. § 1604.  Plaintiffs rely on the statute's "expropriation" and "commercial

activity" exceptions to establish subject matter jurisdiction over their claim.

The expropriation exception abrogates sovereign immunity in any case where "rights in

property taken in violation of international law are in issue" and "that property or any property

---

[3]   It is unclear why plaintiffs' Complaint only includes ten of the eleven pieces of art that were
subject to the Nierenberg lawsuit.

exchanged for such property is owned or operated by an agency or instrumentality of the foreign

state and that agency or instrumentality is engaged in a commercial activity in the United States."

28 U.S.C. § 1605(a)(3).  The commercial activity exception abrogates sovereign immunity in any

case

> in which the action is based upon [i] a commercial activity carried on in the United States
> by the foreign state; or [ii] upon an act performed in the United States in connection with the
> commercial activity of the foreign state elsewhere; or [iii] upon an act outside the territory of
> the United States in connection with a commercial activity of the foreign state elsewhere that
> causes a direct effect on the United States."

28 U.S.C. § 1605(a)(2).

### III.    1947 AND 1973 TREATIES

After World War II, Hungary and the Allies entered into a Peace Treaty in 1947.  Treaty

of Peace with Hungary (1947 Treaty), Feb. 10, 1947, 61 Stat. 2065, 41 U.N.T.S. 135.  The 1947

Treaty is an "international agreement[ ] to which the United States [was] a party at the time of

the enactment of" the FSIA in 1976.  28 U.S.C. § 1604.  The treaty settled a number of issues

arising out of wartime hostilities, covering topics as varied as the location of Hungary's post-war

frontiers and the regulation of Hungarian railway rates.  *See* 1947 Treaty at Arts. 1, 34.  The

Treaty also contained provisions addressing the payment of compensation for (or the restoration

of) property rights and interests seized by the Hungarian government during World War II.

Article 26 pertained to property rights and interests formerly held by non-Hungarian nationals

and Article 27 addressed "persons under Hungarian jurisdiction" or Hungarian nationals.  *Id.* at

Art. 27(1).  It provided:

> Hungary undertakes that in all cases where the property, legal rights or interests in
> Hungary of persons under Hungarian jurisdiction have, since September 1, 1939, been
> the subject of measures of sequestration, confiscation or control on account of the racial
> origin or religion of such persons, the said property, legal rights and interests shall be
> restored together with their accessories or, if restoration is impossible, that fair
> compensation shall be made therefor[e].

(*Id.*)

10

On March 6, 1973, the United States and Hungary entered into an executive agreement. *See* Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, March 6, 1973, 24 U.S.T. 522 (the "1973 Agreement").  The 1973 Agreement provided that, in exchange for the lump sum payment of $18,900,000 by Hungary, there would be a "full and final settlement and ... discharge of all claims of the Government and nationals of the United States against the Government and nationals of the Hungarian People's Republic which are described in this Agreement." *Id.* at Art. 1, § 1.  The 1973 Agreement addressed four categories of claims, including "property, rights and interests affected by Hungarian measures of nationalization, compulsory liquidation, expropriation or other taking on or before the date of this Agreement" and "obligations of the Hungarian People's Republic under Articles 26 and 27 of the Treaty of Peace between the United States and Hungary dated February 10, 1947.

## IV.   HUNGARIAN LAWS

The Court has taken judicial notice of two Hungarian laws that remained in force throughout the relevant time frame of this case.[4]  First, Act XIX of 1924 on Customs Law Regulations subjects the following individuals to criminal liability:

---

[4]   *See* Hungarian Act XIX of 1924 on Customs Law Regulations, Act, Smuggling of Prohibited Goods, Ch. II, § 164; Act XI of 1929, The Exploration of Movable Artifacts and Other Objects for Museum Display and Their Protection, Ch. III, § 26 (restricting the export of certain items of cultural significance).

The Court took judicial notice of these laws pursuant to Federal Rule of Evidence 201. (*See* Order, Sept. 1, 2011 [ECF No. 34] (granting in part and denying in part defendants' Motion for Judicial Notice of Documents and Facts, Feb. 15, 2011 [ECF No. 14]).)  The Court now concludes that Rule 201 was not the proper vehicle for seeking judicial notice of foreign laws; however, it takes judicial notice that the aforementioned laws appear as Hungarian legislation, pursuant to Rule 44.1 of the Federal Rules of Civil Procedure. *See* Advisory Committee Notes, Fed. R. Evid. 201(a) ("Judicial notice of matters of foreign law is treated in Rule 44.1 of the Federal Rules of Civil Procedure.")

*a)* any person who, despite prohibition, wilfully transports customable or custom-free goods, the import, export, or transport of which is prohibited, across the customs border by surpassing the customs office or the customs guard officers, or by false declaration of goods, or by deceiving the customs office or the customs guard officers…

*c)* any person who, despite export prohibition, wilfully fails to return to the customs area within the required time any goods, whether subject to customs duty or duty-free, that are subject to export prohibition but permitted to leave the country in the course of return-voucher or pre-registration procedures… In addition to the fines, the confiscation of the goods shall also be ordered, regardless whether such goods are owned by the convict or someone else.

Act XIX of 1924 on Customs Law Regulations, Act Ch. 2, Smuggling of Prohibited Goods, § 164.

Second, the 1929 Hungarian Act XI covers *The Exploration of Movable Artifacts and Other Objects for Museum Display (Collection, Excavation, Etc.) and Their Protection*. It mandates that "relics originating from Hungary or those significant with regards to the history of the Hungarian nation" must be specially registered, and may "only be exported from the territory of the country with the prior permission of the Council or the body assigned in a decree." *Id.*, Ch. III, § 26. Individuals may apply for an export permit for a given object, but for those culturally important objects requiring registration, "the export permit may be denied without reasoning…[and] the movable may be redeemed for some national or other public collection." *Id.* Moreover, even if the export permit for a specially classified movable is issued, the licensee is required to pay an export fee to the National Fund of Public Collections. *Id.* Section 44 of the

---

Defendants have also moved for judicial notice of six additional Hungarian laws relating to customs restrictions on the export of cultural patrimony and Hungarian contract law. (Motion to Take Judicial Notice of Hungarian Laws, May 18, 2015 [ECF No. 107].) Defendants' apparent purpose in offering these laws is to inform the Court's analysis under the FSIA's commercial activity exception as to the alleged bailment agreements between Hungary plaintiffs. Because all six of these laws were passed *after* the alleged bailment agreements were executed, the Court denies defendants' motion on grounds of relevance.

1929 law subjects any individual violating the terms of Section 26 to the criminal penalties for smuggling enumerated in Act XIX of 1924.  *Id.*, Ch. VI, § 44.

## V.      PROCEDURAL HISTORY

In 2010, plaintiffs commenced this lawsuit, and on September 1, 2011, this Court sustained jurisdiction under the expropriation exception to the FSIA, 28 U.S.C. § 1605(a)(3).  *De Csepel*, 808 F. Supp. 2d at 132-33.  It noted that "defendants do not dispute that 'rights in property' . . . are 'in issue.'"  *Id.* at 128.  It further found that plaintiffs had sufficiently alleged in their Complaint that the "the Herzog Collection was taken in violation of international law" when "the Hungarian government, in collaboration with the Nazis, discovered the hiding place [of the Collection] and confiscated its contents."  *Id.* at 129, 131.  Finally, it held that there was a "commercial activity nexus between the foreign state . . . that owns or operates the property at issue and the United States."  *Id.* at 131-32.  The Court did not reach the question of whether it had jurisdiction under the commercial activity exception to the FSIA.  *Id.* at 133 n.4.

The D.C. Circuit affirmed this Court's jurisdictional holding on alternative grounds and held that "the family's claims fall comfortably within the FSIA's commercial activity exception."  *De Csepel*, 714 F.3d at 598.  In assessing the commercial character of the alleged bailment agreements between the Herzogs and Hungary, the D.C. Circuit found that a bailment is a form of a contract, and "a foreign state's repudiation of a contract is precisely the type of activity in which a private player within the market engages."  *Id.* at 599 (citations omitted).  Thus, Hungary's repudiation of the bailment agreements as to the Herzog Collection constituted an act taken in connection with a commercial activity.  In addition, by "drawing all reasonable inferences from the Complaint in the family's favor," the Circuit Court concluded that plaintiffs had adequately alleged that Hungary's repudiation of the bailment agreement caused a direct

effect in the United States.  *Id.* at 601 ("Although the complaint never expressly alleges that the return of the artwork was to occur in the United States, we think this is fairly inferred from the complaint's allegations that the bailment contract required specific performance – i.e., return of the property itself – and that this return was to be directed to members of the Herzog family Hungary knew to be residing in the United States.").

The appellate decision also took up defendants' arguments that the FSIA's treaty exception deprived the courts of subject matter jurisdiction.  The panel reasoned that the Herzog family's claims fell outside the scope of the 1947 Peace Treaty and 1973 Agreement—while the treaties govern claims relating to takings during World War II, "the family's claims rest not on war-time expropriation but rather on breaches of bailment agreements formed and repudiated after the war's end."  *Id.* at 602.  Accordingly, the panel determined that neither the Peace Treaty nor the 1973 Executive Agreement between Hungary and the United States negated subject matter jurisdiction.  The Circuit therefore affirmed this Court's judgment "without ruling on the availability of the expropriation exception."  *Id.* at 598.

Thereafter, this Court entered a Scheduling Order setting forth deadlines for document discovery, fact witness depositions, and expert discovery.  (Order, Dec. 9, 2013 [ECF No. 82].)  Prior to the conclusion of fact discovery, defendants filed a second motion to dismiss for want of subject matter jurisdiction.  (Defs.' Second Mot. to Dismiss, May 14, 2014 [ECF No. 86].)  Defendants argued that, based on the documentary evidence produced to date, plaintiffs had not met their burden of production as to two elements of the commercial activity exception.  After considering the briefs filed by the parties, this Court denied the motion without prejudice in order to allow plaintiffs to engage in additional fact discovery.  *See De Csepel*, 75 F. Supp. 3d at 386-87.  The Court authorized Hungary to renew its motion to dismiss after plaintiffs had had an

opportunity to conduct depositions that "could produce [facts] that would affect [the Court's] jurisdictional analysis."  *Id.* at 387; *see also Al Maqaleh v. Hagel,* 738 F.3d 312, 325 (D.C. Cir. 2013) (A "district court has discretion to allow discovery if it could produce [facts] that would affect [its] jurisdictional analysis").  In its opinion, the Court also directed the parties to "address fully the validity of the Court's prior holding that the expropriation exception provides subject matter jurisdiction," which the D.C. Circuit had not addressed.  *Id.* at 387 ("Notwithstanding a request for supplemental briefing, defendants have provided little reason for this Court to change its original conclusion that the seizure of the Herzog Collection during World War II brings plaintiffs' claims under the expropriation exception.").

Following the close of fact discovery, defendants renewed their motion to dismiss, arguing that neither the expropriation exception nor the commercial activity exception applied to plaintiffs' claims.  Plaintiffs filed an Opposition, defendants filed their Reply (Defendants' Reply in Support of their Motion to Dismiss, July 9, 2015 [ECF No. 112] ("Defs.' Reply")), and plaintiffs were allowed to file a Sur-Reply in order to respond to defendants' new argument that none of the Hungarian museums holding the Herzog art qualified as an "agency or instrumentality" of a foreign state as required by Section 1605(a)(3) of the FSIA.  (Pls.' Sur-Reply, July 17, 2015 [ECF No. 115].)

The Court heard arguments on December 2, 2015, and ordered supplemental briefing on three issues: (1) whether artwork legally released to plaintiffs after World War II could still qualify as property "taken in violation of international law" under Section 1605(a)(3) of the FSIA; (2) whether post-war seizures of art by Hungary's Communist government could qualify as *independent* takings under the expropriation exception; and (3) whether, under recent Hungarian laws or regulations issued since 2013 that establish compensation programs for

takings during World War II, any claimants have recovered property pursuant to those programs, how many Jewish claimants have recovered property pursuant to those programs, and whether Hungary permitted any such recovered artwork to be removed from the country.  (Order, Dec. 2, 2015 [ECF No. 117].)

Plaintiffs claim subject matter jurisdiction under both the FSIA's commercial activity and expropriation exceptions, and the Court has elected to consider both grounds anew for a number of reasons.  First, the Court is now in a position to evaluate the factual basis of commercial activity jurisdiction, given the extensive record of evidence obtained during discovery.  Although the D.C. Circuit has already found jurisdiction under that exception, it did so by drawing factual inferences from the Complaint, which have now been challenged by defendants based on facts developed during discovery.  Second, the D.C. Circuit's 2016 decision in *Simon v. Hungary*, 812 F.3d 127 (D.C. Cir. 2016), has provided controlling authority regarding the FSIA's expropriation exception.  Like this case, the *Simon* litigation involves individuals who allege property seizures by Hungary during the Holocaust, and the D.C. Circuit's ruling addressed the same treaty preclusion and exhaustion arguments raised here.  Given this important precedent and the development of a far more robust factual record, the Court is better able to scrutinize the two relevant statutory exceptions to the FSIA to determine whether it has subject matter jurisdiction over plaintiffs' claim.

## ANALYSIS

### I.   STANDARD OF REVIEW

At the outset, the Court addresses the standards by which it assesses whether, following fact discovery, plaintiffs' claims fall within the terms of either statutory exception.

When a foreign sovereign attacks the factual basis for subject matter jurisdiction under one of the statute's exceptions, "the court may not deny the motion to dismiss merely by

assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).  It must, instead, "go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  *Price v. Socialist People's Libyan Arab Jamahiriya,* 389 F.3d 192, 197 (D.C. Cir. 2004) (citation omitted).  The Court "retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." *Phoenix Consulting,* 216 F.3d at 40.

To the extent a defendant disputes the factual predicate for subject matter jurisdiction under one of the FSIA's exceptions, the plaintiff bears the burden of production to demonstrate evidence of jurisdiction.  *See Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013) (recognizing that "the plaintiff bears the initial burden to overcome by producing evidence that an exception applies"); *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008).  The burden of persuasion, however, "rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence."  *Chabad,* 528 F.3d at 940.

In FSIA cases where the plaintiff's claim on the merits directly mirrors the jurisdictional standard, the plaintiff need only show that its claim is "non-frivolous" at the jurisdictional stage and need not definitively prove its claim as it would at the merits stage.  *See Simon,* 812 F.3d at 141 (citing *Bell v.* Hood, 327 U.S. 678, 682 (1946)).  For example, where plaintiffs bring a basic expropriation claim asserting that its property had been taken without just compensation in violation of international law, that same showing is necessary to establish jurisdiction under the FSIA's expropriation exception.  *See, e.g.*, *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela,* 784 F.3d 804, 812 (D.C. Cir. 2015); *Chabad*, 528 F.3d at 938; *see also*

Restatement (Third) of the Foreign Relations Law of the United States § 712(1) (Am. Law Inst. 1987).  When, however, the jurisdictional and merits inquiries do not overlap, there is no occasion to apply the "exceptionally low bar" of non-frivolousness at the jurisdictional stage. *Helmerich,* 784 F.3d at 812.  Thus, when facts independent of the necessary elements of a plaintiff's substantive cause of action must be established, courts "ask for more than merely a non-frivolous argument…[and] assess whether the plaintiffs' allegations satisfy the jurisdictional standard."  *Simon*, 812 F.3d at 141.

In this case, neither the expropriation exception nor the commercial activity exception directly mirrors plaintiffs' claims, as both jurisdictional hurdles require elements independent of their substantive causes of action.  Expropriation jurisdiction and plaintiffs' cause of action are separate.  As in *Simon*, plaintiffs assert property taken in violation of international law "only to give rise to jurisdiction under the FSIA's expropriation exception," not to establish liability on the merits.  *Id*.  By contrast, the commercial activity exception and plaintiffs' substantive claims share one common element—both require the existence of bailment agreements; however, to satisfy the commercial activity exception, plaintiffs must provide a factual basis for a "direct effect on the United States" caused by Hungary's repudiation of the commercial agreement, a showing that bears solely on jurisdiction under § 1605(a)(2).  Plaintiffs therefore benefit from the more forgiving "non-frivolous" standard only as to demonstrating the existence of bailment agreements with Hungary.

## II.    COMMERCIAL ACTIVITY EXCEPTION

Plaintiffs first argue that their claim falls within the FSIA's commercial activity exception to immunity.  The commercial activity exception is divided into three alternative clauses, any of which is grounds for jurisdiction: a foreign state is not immune from suit in any

case "in which the action is based upon" (1) "a commercial activity carried on in the United States by the foreign state;" (2) "an act performed in the United States in connection with the commercial activity of the foreign state elsewhere;"; or (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere that causes a direct effect on the United States."  28 U.S.C. § 1605(a)(2).

## A.  First and Second Clauses

Not surprisingly, plaintiffs have never before invoked either of the first two clauses as bases for jurisdiction.  Now, however, they belatedly argue that their claims are based upon commercial acts in the United States and offer the first two clauses as alternative grounds for jurisdiction.  Neither basis has merit.

To satisfy either of the first two clauses of the commercial activity exception, a plaintiff's cause of action must be *based upon* acts in the United States.  The Supreme Court first addressed the meaning of "based upon" in the commercial activity exception in *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), where an American couple brought a tort action against the Saudi government for false imprisonment outside the U.S., but argued that, because the Saudis recruited and hired Nelson within the country to work in a hospital, the action was based upon domestic acts.  The Court rejected plaintiffs' argument, and instead, narrowly interpreted "based upon" to signify "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Id.* at 349.  The phrase "requires something more than a mere connection with, or relation to, commercial activity."  *Id.*; *see also OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 392 (2015) (citing *Nelson* to emphasize that the commercial acts must form the "gravamen of the complaint").  The D.C. Circuit has consistently applied *Nelson*'s interpretation of "based upon."  *See Odhiambo v. Republic of Kenya*, 764 F.3d 31, 36-38 (D.C.

Cir. 2014) (rejecting plaintiff's argument for jurisdiction under both of the first two clauses of the commercial activity exception, because the cause of action was based on an extraterritorial breach of contract and the only commercial acts inside the country were unnecessary to his claim); *see also Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1145-46 (D.C. Cir. 1994) (holding, based on *Nelson*, that the fact that plaintiff kept his money in banks within the U.S. was only collaterally related to his cause of action for dishonoring a letter of credit).

Plaintiffs' actual cause of action is not based upon Hungary's solicitation of U.S. tourists or other limited activities in the U.S., as they now assert (Pls.' Opp'n at 43-44), but on the post-war bailments and actions that took place in Hungary.  Moreover, plaintiffs' own statements contradict their new argument.  (*See id.* at 27 (asserting that "discovery has only confirmed that Plaintiffs' claims are 'based upon' Defendants' repudiation of various post-war bailment agreements"); *De Csepel*, 714 F.3d at 598 (quoting plaintiffs' insistence that their cause of action consists of "nothing more than straightforward bailment claims").)  Plaintiffs emphasize that their Complaint asserts claims for conversion, constructive trust, accounting, and unjust enrichment, but "every one of [these] other substantive claims…appears to stem from the alleged repudiation of the bailment agreements." *De Csepel*, 714 F.3d at 598.  As the D.C. Circuit has made plain, plaintiffs' cause of action is based on bailments allegedly formed outside the U.S. and breached outside the U.S.  Under *Nelson,* the fact that Hungary's museums also engage in commercial activity in the U.S. is not sufficiently tethered to the "gravamen" of plaintiffs' claim for either of the first two clauses of the commercial activity exception to apply.[5]

---

[5]   The only case plaintiffs offer in support of their overbroad interpretation of "based upon" is a Ninth Circuit decision which pre-dates the Supreme Court's opinions in *Nelson* and *Sachs.  See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992).

**B. Third Clause—Direct Effect**

To satisfy the third clause of the commercial activity exception, a plaintiff's claim must be based upon a commercial act outside the U.S. that "causes a direct effect on the United States." 28 U.S.C. § 1605(a)(2). Defendants do not dispute that Hungary's actions took place outside the United States, nor do they quarrel with the D.C. Circuit's conclusion that bailment agreements are commercial acts. They contend, instead, that evidence produced during jurisdictional discovery demonstrates a conspicuous absence of any possible *direct effect* that such alleged bailments could have had on the United States. The D.C. Circuit found such a direct effect by "fairly inferring" from the Complaint's bare allegations that the alleged bailment agreements required specific performance in the United States—in this case, delivery of the bailed artwork to the Herzogs living in the United States. Because defendants have attacked the factual basis of that inference, this Court must "go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Price,* 389 F.3d at 197 (citation omitted).

In *Odhiambo v. Republic of Kenya*, the D.C. Circuit recently held that "this Court's cases draw a very clear line…breaching a contract that establishes or *necessarily contemplates* the United States as a place of performance causes a direct effect in the United States, while breaching a contract that does not establish or necessarily contemplate the United States as a place of performance does not." 764 F.3d at 40 (emphasis added). It is therefore not strictly necessary for a contract to expressly designate the U.S. as a place of performance, as long as the parties clearly understood it at the time the contract was executed. The *Odhiambo* Court clarified the rule by discussing its application in the Circuit's prior decision in this case: "Hungary's knowledge—from the moment the bailment agreement was formed—that

21

performing its contractual obligations would require it to return the artwork to owners in the United States was crucial to the [*De Csepel*] Court's finding of a direct effect." *Id.*

The relevant question then is whether Hungary and the plaintiffs formed any bailment agreements that "necessarily contemplate[d]" the U.S. as the place of performance.  In other words, did Hungary agree to any bailments that obligated Hungary—either explicitly or implicitly—to return artwork to Herzog heirs *in the United States*?

The group of family members who resided in the United States is limited to Erzsébet Herzog (who moved to the U.S. in 1946) and her heirs.[6]  It is not enough for a bailment breach to have simply caused financial injury to Erzsébet or one of her American heirs while they resided in the United States; on the contrary, the original agreement itself must have obligated Hungary to deliver the art (or compensation) across the ocean.  *See Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511, 1514 (D.C. Cir. 1988) (finding there was no direct effect in breach of contract with American citizen employed abroad); *Allen v. Russian Federation*, 522 F. Supp. 2d 167, 189-90 (D.D.C. 2007).  The universe of possible bailment contracts that could have plausibly envisioned performance in the United States is thus relatively narrow: agreements by which Hungary accepted art inherited by Erzsébet, agreements by which Hungary *thought* it was accepting art inherited by Erzsébet, or agreements by which Hungary accepted art inherited by

---

[6]   András and his heirs settled in Italy, but plaintiffs point out that two of István's heirs became United States citizens in 1998 and assigned all of their rights in the litigation to the American plaintiffs in 2008.  These facts are irrelevant for all possible bailments here.  The relevant inquiry is the place of performance contemplated *at the time of an agreement.*  It does not matter that certain plaintiffs (or their ownership rights) migrated to the United States following bailment formation.

other Herzogs, but nevertheless incurred an obligation to return the artwork to the Herzogs who resided in the United States.[7]

Plaintiffs have produced at least some evidence that thirty-three of the forty-four artworks in the Complaint are being held by Hungary in a custodial role, so they may be subject to some form of bailment. For twenty-three of those thirty-three artworks, however, the evidence of bailment is, at best, circumstantial. (*See, e.g.*, Tatevosyan Decl. at Ex. 1 (Herzog properties listed in the museums' "deposit" inventories, suggesting the pieces were loaned); *id.* at Ex. 13 (government memorandum referring to Herzog artwork "safeguarded" by the government); *id.* at Ex. 64 (letter to Hungarian minister listing Herzog pieces being transported to museums as a "temporary deposit"); Benenati Decl. II at Ex. 8 (Hungarian archives, listing Herzog artworks as

---

[7]   Plaintiffs argue that, at the jurisdictional stage, the Court's inquiry should be holistic, rather than piecemeal. (Pls.' Opp'n at 37-38.) According to plaintiffs, defendants have sometimes ignored the divisions of individual ownership and treated the Herzog Collection as a single entity, so the Court should not analyze the properties piece-by-piece. In the context of the commercial activity exception, they maintain that any bailment involving Herzog art should qualify because Hungary allegedly understood, as a general matter, that some members of the Herzog family resided in the United States. (*Id.* at 2 (arguing that defendants' act had a direct effect on *all* Herzog heirs, whatever their citizenship, because "they affected their heirs collectively").

   Under both the law and the facts of this case, the Court finds the holistic approach to make little sense. When the facts have warranted it, courts have applied the FSIA's statutory exceptions to separate events and arrangements impacting a unitary group of property, even where individual books, paintings, or other properties may arguably constitute a single "collection." *See, e.g.*, *Chabad*, 528 F.3d at 938-39 (where a collection of rabbinical scholarship and books were at issue, the court separately analyzed the "Library" part and the "Archive" part of the collection because the two portions were confiscated years apart and under different circumstances). Second, plaintiffs have admitted that the individual artworks at issue in this case were split up among the three siblings in 1940 and have identified precisely which siblings inherited each artwork. (*See* Tatevosyan Decl. at Ex. 5.) The Herzog Collection has not enjoyed a unified history of seizure, bailment, and custodial transfer. Each artwork (not to mention each bailment) has followed a different fact pattern.

   For purposes of commercial activity jurisdiction and the 'direct effect' test, it would be nonsensical to ignore that certain paintings and bailments—by virtue of the residency of their owners—may have plausibly required Hungary to return the art to United States, while others could not.

"deposited in the custody of the Office of the Ministerial Commissioner").)  Although this type of evidence may suggest that the twenty-three artworks are being held as constructive bailments, the Court has no evidence upon which to find an express or implied *contractual agreement* that contemplated performance in the United States.[8]  The fact that defendants hold certain paintings from the Herzog Collection on deposit is simply not enough to infer a direct effect on the United States.

In contrast, ten artworks from the Complaint are named in an express bailment dated May 3, 1950, in which Dr. Emil Oppler offered eighteen works of art on behalf of Erzsébet Herzog for deposit with the Museum of Fine Arts in Budapest.[9]  (Tatevosyan Decl. at Ex. 23.)  The 1950 Oppler bailment constitutes the only evidence in the record of an express deposit contract.  In addition, it only involves Erzsébet Herzog, who was already living in the United States in 1950, although she would not become a U.S. citizen until 1952, and it is unclear whether all ten of the pieces were actually owned by Erzsébet at the time of the agreement.[10]

Nothing in any of the documents relating to the 1950 bailment mentions a place of performance, a method of returning the art, the United States, or anything about Erzsébet's domicile.  Nor would Hungary have had any reason to understand such a performance obligation to be implied.  On the contrary, all relevant evidence in the record suggests that the Museum of

---

[8]  The Court is unaware of any legal precedent finding jurisdiction under the FSIA's commercial activity exception without any evidence of an actual agreement or contract, and plaintiffs' counsel was unable to offer such a case during oral argument.  (Hearing Transcript at 25.)

[9]  Although the Oppler offer of deposit is dated May 3, 1950, and the letters of acceptance from the government are dated May 19 and May 26, 1950, the actual "deposit contract" appears to have been finalized, signed, and delivered by a different Herzog attorney named Henrik Lorant on March 30, 1951. (*See* Tatevosyan Decl. at Ex. 63.)

[10]  According to plaintiffs' interrogatory responses, Erzsébet only owned seven of the ten pieces from the Complaint that were included in the 1950 bailment. Three of the ten were owned by her brother András, who never had any connection to the U.S. (*See* Tatevosyan Decl. at Ex. 5.)

Fine Arts likely would have expected performance to occur in Budapest.  Under Hungarian law in 1950, an individual would have been subject to criminal smuggling charges were they to attempt to export "movable artifacts and other objects for museum display" or "those significant with regards to the history of the Hungarian nation" out of the country without either purchasing a license or obtaining special permission from the government.  *See* Hungarian Act XI of 1929, Ch. 3, On Certain Issues with Regard to Museums, Libraries, and Archives; *see also* Hungarian Act XIX of 1924, Ch. 2, On Customs Law Regulations.  Upon returning repatriated art to its rightful owners in the post-war years, Hungary's standard "handover protocol" included an instruction prohibiting the owner from removing the art from the country's territory. (Tatevosyan Decl. at Ex. 18.)

Performance in Budapest is also perfectly consistent with the customs and practices established by other transfers of art between Hungary and the Herzog family.  The Court finds in the record eleven separate times that Hungary returned confiscated art to legal representatives of the family, totaling seventy-seven artworks released back into their custody after World War II (the vast majority of which is not at issue in the present litigation).  In every single instance, the art was handed over in Budapest.

Most relevant of all is Hungary's partial performance as to the 1950 bailment agreement *itself.*  In 1989, Erzsébet requested that the Museum of Fine Arts return to her three of the eighteen paintings that are named in the 1950 bailment: Adoration of the Magi (Italian, 18th c.), Adoration of the Shepherds (Italian, 18th c.), and Portrait of a Woman (Dutch, 17th c.).  (*See* Tatevosyan Decl. at Ex. 23; Hearing Transcript at 35 (plaintiff's counsel admits that the artworks "are listed in that same…May 1950 deposit agreement").)  The Director-General of the Museum responded that an agent could pick up the paintings in Budapest, but that due to the customs

regulations and preservation order attached to such artifacts, they could not leave the country.

(*See id.* at Ex. 44 ("According to your request we will hand over the requested paintings to your authorized agent in Budapest.  Pursuant to the respective legal provisions we put preservation order on the paintings, therefore the paintings may not be exported but may be sold in Hungary.").)  Erzsébet apparently did not object, since her attorney picked up the paintings within two weeks.  (*See id.* at Ex. 45.)  In 2003, the Hungarian National Gallery responded to a request from another American Herzog heir, Martha Nierenburg, by releasing a fourth painting from the 1950 Bailment (Munkacsy's "Portrait of Christ") "under protection by the Office for the Protection of Cultural Heritage" to Nierenberg's agent in Budapest. (*Id.* at Exs. 51, 52; Hearing Transcript at 35.)  None of these four paintings are at issue in this case.  However, the two times that Hungary has responded to a request to perform pursuant to the 1950 bailment, it behaved the same way it has always behaved when returning art from the Herzog Collection: it handed over the property in Budapest and instructed the owner not to take it outside Hungary's borders.  In fact, all four paintings from the 1950 bailment that have been returned still remain in Hungary. (*See* Hearing Transcript at 35.)

The 1950 bailment agreement contained no hints regarding Hungary's future obligations. But if there was any unspoken understanding at all regarding performance, it is decidedly implausible that it obligated Hungary to return art to the United States.  Given the legal restrictions on exporting art from the country and the pattern of conduct between Hungary and the Herzog family (including Erzsébet herself), there is no basis to conclude that either party understood the bailment as implying such a performance requirement.[11]

---

[11]   One of the Italian heirs, Angela Herzog (heir of András) admitted in her deposition testimony that she had "never thought about" whether she would like the art returned to Italy, the United States, or any other particular destination.  (*See* Defs.' Ren. Mot., Declaration of Thaddeus J.

Plaintiffs' argument that export remains possible with Hungary's consent (Pls.' Opp'n at 40-41) misunderstands the legal standard.  The relevant inquiry is whether the agreement *necessarily contemplated* the U.S. as the place of performance at the time of contract formation, not whether the requisite performance is possible after the fact.  There is simply not a scintilla of evidence that Hungary incurred an obligation—implied or express—to return any artwork to the United States.  Moreover, the fact that Hungary has the option, if it wishes, to grant a permit or consent to export does not help plaintiffs' case. (*See* Tatevosyan at Ex. 18 (letter to Hungarian Minister reiterating that "[a]ccording to legislation in force, in the case of export the state has an option on [repatriated art]").)  Where "the alleged effect depends solely on a foreign government's discretion" in performing upon an agreement, breach of that agreement can have no direct effect on the United States.  *Helmerich & Payne v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 818 (D.C. Cir. 2015); *see also Westfield v. Federal Republic of Germany*, 633 F.3d 409, 415 (6th Cir. 2011) (whether the plaintiff planned to demand or move the art to the United States was irrelevant because the dispositive issue is whether "Germany ever promised to deliver the art to the United States" or was "obligated itself to do anything in the United States").

Plaintiffs also maintain that they "always had the ability to request export of their artworks to the United States."  (Pls.' Opp'n at 41.)  Nobody can stop plaintiffs from requesting export of their art from Hungary, but it would be just that: a request, not a demand.  Nothing in the deposit agreement legally endowed plaintiffs with any future discretion over the place of performance.  In the cases from other circuits cited by plaintiffs, that is precisely the situation.

---

Stauber, Ex. 11.)  And in fact, Angela and her sister Julia sent a letter in 1998 to the Museum of Fine Arts requesting that it return various artworks to them.  Although the Italians heirs' request was ultimately unsuccessful, it specifically noted that they planned to keep the returned paintings in an apartment in Budapest.  (*See* Tatevosyan Decl. at Ex. 47.)

*See, e.g.*, *Hanil Bank v. PT Bank Negara Indonesia*, 148 F.3d 127, 132 (2d Cir. 1998) (finding direct effect on the United States where letter of credit gave the plaintiff the discretion to choose the place for payment); *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 727 (9th Cir. 1997) (finding direct effect in the United States where agreement gave plaintiff broad discretion to name any bank for payment); *see also DRFP L.L.C. v. Republica Boliviarana de Venezuela*, 622 F.3d 513, 517 (6th Cir. 2010) (finding direct effect where "the parties implicitly agreed to leave it to the bearer to demand payment of the notes anywhere," including the United States).

There is no question that plaintiffs have presented evidence of express and implied bailments between the Herzogs and Hungary, some of which involve Herzogs residing in the United States.  But that is not enough for the commercial activity exception to apply.  There is no evidence that the bailment agreements placed any restriction on the mode of Hungary's performance at the time of execution; nor any indication that the contractual relationship vested plaintiffs with any future power to do so.  The D.C. Circuit's prior ruling in this case rested on the inference that the bailment agreements "required [Hungary] to return the artwork to owners in the United States." *Odhiambo*, 764 F.3d at 40 (construing *De Csepel*, 714 F.3d at 601).[12]  But the evidence soundly refutes that inference, so the Court cannot find subject matter jurisdiction under the FSIA's commercial activity exception.

## III.   EXPROPRIATION EXCEPTION

This Court ruled in 2011 that plaintiffs' Complaint alleged a cause of action falling squarely within the expropriation exception, which abrogates sovereign immunity in any case

---

[12]   The *De Csepel* Court contrasted Hungary's alleged promise to perform specific obligations in the United States with a Sixth Circuit case in which the plaintiffs had not alleged that the foreign state "ever promised to deliver the art collection to the United States." 714 F.3d at 601 (quoting *Westfield*, 633 F.3d at 415).

where "rights in property taken in violation of international law are in issue" and "that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."  28 U.S.C. § 1605(a)(3).

The D.C. Circuit did not address this Court's conclusion, but its recent decision in *Simon v. Hungary* has clarified a number of issues relevant to subject matter jurisdiction under the expropriation exception.  First, a court is not limited to solely those jurisdictional grounds under the FSIA that overlap with a plaintiff's substantive claim.  In its *De Csepel* opinion, the Court of Appeals reasoned that, because "the Herzog family seeks to recover not for the original expropriation of the Collection, but rather for the subsequent breaches of bailment agreements," it was "incumbent upon [the panel] to address Hungary's jurisdictional challenge in light of the bailment claims the family actually brings."  714 F.3d at 598.  In *Simon,* though, the Circuit found jurisdiction under the expropriation exception even though plaintiff's substantive claims against Hungary for acts during the Holocaust were not based on takings.  812 F.3d at 141 ("Here, the plaintiffs' claim on the merits is not an expropriation claim asserting a taking without just compensation in violation of international law. The plaintiffs instead seek recovery based on garden-variety common-law causes of action such as conversion, unjust enrichment, and restitution.  The plaintiffs plead a violation of international laws only to give rise to jurisdiction under the FSIA's expropriation exception, not to establish liability on the merits.").  The expropriation exception is therefore not excluded as an available grounds of subject matter jurisdiction just because plaintiffs do not bring a straightforward takings claim.

Second, *Simon* joined the Seventh Circuit and other courts in holding that property seizures from Jews during the Holocaust constitute genocidal takings which violate international

law.  Such takings, the *Simon* Court held, "did more than effectuate genocide or serve as a means

of carrying out genocide. Rather, we see the expropriations *as themselves genocide*." *Id.* at 142.

It went on to cite the Circuit's previous *De Csepel* opinion to elaborate on its conclusion:

> The Holocaust's pattern of expropriation and ghettoization entailed more than
> just moving Hungarian Jews to inferior, concentrated living quarters, or seizing
> their property to finance Hungary's war effort. Those sorts of actions would not
> alone amount to genocide because of the absence of an intent to destroy a people.
> The systematic, "wholesale plunder of Jewish property" at issue here, however,
> aimed to deprive Hungarian Jews of the resources needed to survive as a people.
> Expropriations undertaken for the purpose of bringing about a protected group's
> physical destruction qualify as genocide.

*Id.* at 143 (citing *De Csepel,* 714 F.3d at 594); *see also Abelesz v. Magyar Nemzeti Bank*, 692

F.3d 661, 675 (7th Cir. 2012) (holding that, because genocide is universally recognized as a

violation of customary international law, property seizures from Jews during the Holocaust

occupy a special category of takings exempt from sovereign immunity).

As this Court has noted, defendants do not dispute that forty-two of the forty-four

artworks named in the Complaint were originally seized during the Holocaust in furtherance of

the Nazis' campaign of genocide in Europe, and there is no question that plaintiffs properly

characterized the art takings in their Complaint within the context of genocide.  (*See, e.g.*,

Compl. ¶¶ 1, 59 (noting that it was "the Hungarian government and their Nazi [ ] collaborators"

that "discovered the hiding place" of the Herzog Collection and confiscated the artwork, acting

"as part of a brutal campaign of genocide" against Hungarian Jews.)  Indeed, defense counsel

conceded at oral argument that the theory of genocidal takings articulated by the Seventh Circuit

in its 2012 *Abelesz* case (and now adopted by the D.C. Circuit) could appropriately be applied to

the facts of this case.  (*See* Hearing Transcript at 76-77 (admitting that where property is taken

"in connection with a genocidal act" like the "treatment of the Jewish people during World War

II," the taking may qualify as a taking in violation of international law).  The Court therefore

finds that the forty-two paintings that were indisputably seized by the Nazis and Hungary during World War II were "taken in violation of international law."

Finally, the *Simon* ruling forecloses defendants' treaty preclusion argument as to the 1947 Peace Treaty. The FSIA's baseline grant of immunity to foreign sovereigns is "[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment of th[e] Act." 28 U.S.C. § 1604. That proviso is known as the FSIA's treaty exception. Under the treaty exception, "if there is a conflict between the FSIA and such an agreement regarding the availability of a judicial remedy against a contracting state, the agreement prevails." *De Csepel,* 714 F.3d at 601 (quoting *Moore v. United Kingdom,* 384 F.3d 1079, 1085 (9th Cir. 2004)). "Any conflict between a [pre-existing] treaty and the FSIA immunity provisions, whether toward more or less immunity, is within the treaty exception." *Abelesz,* 692 F.3d at 669; *accord Moore,* 384 F.3d at 1084–85.

Defendants have argued that the 1947 Peace Treaty between Hungary and the Allied Powers addresses the adjudication of claims by Hungarian Holocaust victims seeking compensation for confiscated property. Article 27 of the 1947 Peace Treaty obligates Hungary to provide compensation for property rights and interests taken from Hungarian Holocaust victims. Defendants thus argue that claims relating to expropriation expressly conflict with the Peace Treaty. (Defs.' Ren. Mot. at 42.)

The *Simon* Court, however, flatly rejected Hungary's same argument that the 1947 Peace Treaty precluded claims for property confiscation by Hungarian Holocaust victims:

> [W]e understand Article 27 to establish a minimum obligation by Hungary to provide restoration or compensation to Hungarian Holocaust victims for their property losses. *But while Article 27 secures one mechanism by which Hungarian victims may seek recovery, it does not establish the exclusive means of doing so.*

*Simon*, 812 F.3d at 137 (emphasis added); *see also Abelesz*, 692 F.3d at 695-96 (adopting the same interpretation as *Simon* that the 1947 Peace Treaty is not the exclusive means for Hungarian Holocaust victims to adjudicate their claims for compensation).  With the impending *Simon* decision on the horizon, defendants conceded at oral argument that if the D.C. Circuit rejected Hungary's treaty preclusion argument in *Simon*, such a ruling would eliminate their argument here as to the 1947 Treaty.  (Hearing Transcript at 59.)  *Simon* thus controls, and the Peace Treaty is not a bar to jurisdiction under the expropriation exception.

This still requires the Court to address a number of other factual and legal arguments that have been raised by defendants.

### A.  Factual Attacks on Expropriation Jurisdiction

Defendants invoke two separate factual arguments.  First, they only concede that forty-two of the forty-four artworks named in the Complaint were originally seized by the Nazis and their Hungarian collaborators during World War II.  Two of the artworks, they contend, were first acquired years after the Holocaust, and therefore do not constitute genocidal takings that violate international law.  Indeed, Hungary appears to have acquired the Opie portrait from a third-party donor named Endre Gyamarthy in 1963.  (*See* Tatevosyan Decl. at Ex. 32.) Similarly, it first obtained the Cranach painting in 1952 from the home of Henrik Lorant, a former attorney for the Herzogs. (*See id*. at Ex. 29.)  With regard to the latter, the evidence suggests that in 1952, authorities for Hungary's Communist government searched Lorant's home in order to "seize items of property belonging to detainee Ferenc Kelemen." (*Id.*)  Kelemen confessed to having failed to properly register the Cranach painting in accordance with Hungarian customs decrees and hiding it in various individuals' homes, including Lorant's residence, in order to keep it safe for Erzsébet Herzog.  (*Id.*)

There is no evidence in the record that the two paintings were among the Collection items confiscated during World War II.  Because the Opie and Cranach paintings were not seized in furtherance of a campaign of genocide, therefore, they were not "taken in violation of international law" during World War II.  But plaintiffs argue that the two acquisitions may qualify as subsequent, *independent* takings in violation of international law.  (Pls.' Supplemental Brief, Dec. 22, 2015 [ECF No. 120] at 5-6.)  Clearly Hungary's acquisition of the Opie painting as a donation does not constitute a taking, and the Court cannot exercise jurisdiction over it.  The situation is a bit more complicated regarding the Cranach. United States courts generally do not consider property seized pursuant to criminal violations to be "taken."  *See Bennis v. Michigan,* 516 U.S. 442, 452–53 (1996); *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 680 (1974); *see also Acadia Technology, Inc. v. U.S.*, 458 F.3d 1327 (Fed. Cir. 2006) ("When property has been seized pursuant to the criminal laws or subjected to *in rem* forfeiture proceedings, such deprivations are not 'takings' for which the owner is entitled to compensation."); *Tate v. District of Columbia*, 627 F.3d 904, 909 (D.C. Cir. 2010) (in domestic takings context, seizure is not a taking if it is sanctioned by lawful government authority besides eminent domain).

According to plaintiffs, the Communist government's seizure of the Cranach for Kelemen's violation of Hungarian registration laws was pretextual, and defendants singled out the Cranach for seizure "because members of the Herzog family….were forced to flee during the Holocaust."  (Pls.' Supplemental Brief at 6.)  The Court does not find that the evidence supports a claim that the seizure was a pretext for discriminating against the Herzogs, as the police entered Lorant's apartment in order to "seize items of property belonging to detainee Ferenc Kelemen."  (Tatevosyan Decl. at Ex. 29.)  It thus declines to exercise jurisdiction over a painting

that was forfeited by Hungarian citizens as a result of domestic criminal violations, years after the Herzogs had fled the country.[13]

Defendants also argue that the Court cannot find jurisdiction under the expropriation exception for any artworks that Hungary temporarily returned to plaintiffs after the Holocaust, before those properties were subsequently re-acquired by the state.  Defendants are confusing the jurisdictional analysis with the merits.  As a general matter of takings law, the subsequent return of property confiscated by the government does not extinguish the earlier taking; it simply converts a permanent taking to a temporary one, altering the appropriate measure of damages. *See, e.g. First English Lutheran Church of Glendale v. Los Angeles Cty., Cal.*, 482 U.S. 304, 319 (1987) (after a government regulation effected a taking but was later invalidated, the taking became temporary rather than permanent); *San Diego Gas & Elec. Co. v. City of San Diego*, 450 U.S. 621, 657 (1981) (Brennan, J., dissenting) ("Nothing in the Just Compensation Clause suggests that 'takings' must be permanent and irrevocable.").

Similarly, the legislative history of the FSIA makes clear that the phrase "taken in violation of international law" refers to "the nationalization or expropriation of property without payment of the *prompt, adequate, and effective compensation required by international law*." H.R. Rep. No. 94-1487, at 19 (emphasis added).  Certainly the eventual return of a piece of art to

---

[13]    Again, plaintiffs suggest that the Court view the Herzog Collection as a unitary whole, rather than analyze jurisdiction as to each individual painting separately.  In the context of the expropriation exception, this holistic approach might lead the Court to simply exercise subject matter jurisdiction over the entire Collection when only forty-two of the artworks were actually taken in violation of international law.  As the Court has explained at note 7, *supra*, such an analytical methodology is unsupported by the law.  When the facts have warranted it, courts have applied the expropriation exception to each property separately, even when those properties arguably constituted a single "collection."  *See, e.g.*, *Chabad*, 528 F.3d at 938-39 (court separately analyzed the events surrounding seizures of two individual portions of a single collection of rabbinical books).

its owner years after the conclusion of World War II would be a bizarre reading of "prompt, adequate, and effective compensation."  Moreover, other FSIA cases have found a taking in violation of international law even though the property was subsequently returned to the owner. *See Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1203 (C.D. Cal. 2001), *aff'd*, 317 F.3d 954, 968 n.4 (9th Cir. 2002), *aff'd*, 541 U.S. 677 (2004) (finding at least two takings in violation of international law—one when the Nazis initially confiscated paintings, and a second after plaintiff re-acquired a painting but then was coerced to "donate" it to the Austrian gallery). Finally, the violation of international law here was not an ordinary discriminatory expropriation, but an act of genocide.  It is puzzling to suggest that artwork confiscated during the Holocaust as part of a campaign of genocide loses its status as property "taken in violation of international law" because it is eventually released to its owner after years of deprivation.

The facts therefore indicate that forty-two of the forty-four artworks named in the Complaint were "taken in violation of international law."  The Cranach and Opie paintings were not.

### B.   Museums as Agencies or Instrumentalities of Hungary

Defendants also advance a number of other legal arguments why the Court should not exercise subject matter jurisdiction under the expropriation exception.  First, Section 1605(a)(3) requires that the property at issue "is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."  28 U.S.C. § 1605(a)(3).  Defendants do not dispute the fact that the Hungarian museums are engaged in commercial activity in the United States; however, they do belatedly contend in their Reply for the first time that the museums are not "agencies or instrumentalit[ies]" of Hungary.  (Defs.' Reply at 22-23.)  Yet, defendants have already admitted that the museums and

university holding all of the art are agencies or instrumentalities.  (Defs.' Answer [ECF No. 76]

¶¶ 2, 14, 15.)  Since they have not amended their Answer, they are bound by their judicial

admissions.  *Amgen v. Conn. Ret. Plans and Trust Funds,* 133 S. Ct. 1184, 1197 n.6 (2013).  In

any event, defendants have offered no persuasive factual evidence to contradict their prior

admissions, and the law does not favor their position on the merits.  Section 1603(b) defines an

agency or instrumentality to include "an organ of a foreign state" or an entity that is majority-

owned by the foreign state.  Defendants' citation to the D.C. Circuit's decision in *Transaero v.

La Fuerza Aerea Boliviana* is unavailing.  *Transaero* held that the Bolivian Air Force was not an

agency or instrumentality because its core functions were governmental, rather than commercial.

30 F.3d 148, 151 (D.C. Cir. 1994).  The museums at issue here are not comparable to a purely

governmental unit such as the Bolivian Air Force.  Their function is largely commercial.

Defendants' "agency or instrumentality" argument is therefore without merit.

### C.  Treaty Preclusion

As the Court has noted, subject matter jurisdiction under the FSIA is subject to the treaty

exception.  And while the *Simon* decision held that the 1947 Peace Treaty does not conflict with

plaintiffs' claims, it did not definitively address the other treaty raised by defendants: the 1973

Agreement Between Hungary and the United States.  In its prior ruling, this Court declined to

interpret the 1973 Agreement as precluding expropriation-based jurisdiction, and it sees no

reason to reverse itself.  Prior to this case, the 1973 Agreement had been consistently interpreted

by both signatories to only bar claims against Hungary by U.S. citizens who were citizens at the

time their claims arose.  *See De Csepel*, 808 F. Supp. 2d at 134 (citing U.S. State Department

Legal Advisor and minutes of the 1973 Agreement negotiations).  The Agreement could

therefore only plausibly govern claims by Erzsébet Herzog (Elizabeth Weiss de Csepel) and her

American heirs for takings that occurred between 1952 and 1973.  It would not govern

confiscations that occurred during the Holocaust, when no Herzog was a U.S. citizen.  Thus,

neither treaty bars jurisdiction under the expropriation exception.

### D.  Exhaustion

As a final argument against the applicability of the FSIA's expropriation exception,

defendants argue that there can be no jurisdiction under Section 1605(a)(3) unless plaintiffs

demonstrate that they have exhausted available domestic remedies in Hungary.[14]  In theory,

defendants could assert three separate forms of an exhaustion argument in this case.  Because

defendants have not always delineated with precision which theory they are relying upon, the

Court will address the possible application of each theory to plaintiffs' claims.

First, defendants might contend that the FSIA itself imposes a statutory requirement that

plaintiffs exhaust all possible, non-futile domestic remedies before attempting to bring suit

against a foreign sovereign.  The D.C. Circuit, however, has consistently held that the statute

imposes no such exhaustion obligation.  *See Simon,* 812 F.3d at 148; *Chabad*, 528 F.3d at 948-

49; *accord Abelesz,* 692 F.3d at 678.

Second, defendants appear to argue that a plaintiff cannot actually demonstrate a

"violation of international law" as required by the expropriation exception without exhausting

domestic remedies.  When a case involves a basic expropriation claim asserting that a sovereign

has taken an individual's property without just compensation, it is plausible that no international

law violation has occurred until the plaintiff has sought compensation in a domestic forum.  *See*

*Altmann*, 541 U.S. at 714 (Breyer, J., concurring); *Fischer v. Magyar Allamvasutak Zrt.*, 777

---

[14]   Defendants' exhaustion arguments only apply to the paintings owned by the heirs of András and István.  Defendants concede that the Nierenberg litigation adequately exhausted remedies in Hungarian courts as to the paintings inherited by Erzsébet Herzog.  (*See* Defs.' Ren. Mot. at 52.)

F.3d 847, 857 (7th Cir. 2015).  Such a rule would serve as an analogue to an element of

constitutional takings law, which requires that a plaintiff who has suffered a taking under the

Fifth Amendment must unsuccessfully attempt to obtain compensation through local remedies

before a constitutional violation has occurred.  *See Williamson Cty. Reg'l Planning Comm'n v.*

*Hamilton Bank of Johnson City,* 473 U.S. 172, 194–95 (1985).

   A comparable rule in international law would not apply to this case. As the *Simon* Court

recently explained, when the international law violation at issue is genocide, a failure to seek

compensation from the foreign state is irrelevant to the jurisdictional analysis:

> As we have explained, the relevant international-law violation in this case for purposes
> of § 1605(a)(3) is not the basic prohibition against an uncompensated expropriation of a
> foreign national's property. Rather, the takings of property in this case violate
> international law because they constitute genocide. In the context of a genocidal taking,
> unlike a standard expropriation claim, the international-law violation does not derive
> from any failure to provide just compensation. The violation is the genocide itself, which
> occurs at the moment of the taking, whether or not a victim subsequently attempts to
> obtain relief through the violating sovereign's domestic laws.

812 F.3d at 149; *see also Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1035 (9th Cir. 2010)

(holding that the non-compensation theory of exhaustion does not apply where "the taking was in

violation of international law because it was part of Germany's genocide against Jews").  In this

case, as in *Simon* and *Cassirer*, the violation of international law was a "genocidal taking."  This

theory of exhaustion (which is less an exhaustion argument than a construction of Section

1605(a)(3)) is therefore inapplicable to plaintiffs' claims.

   The third and final type of exhaustion is prudential.  Even if plaintiffs' claims fit

comfortably within the expropriation exception, defendants might suggest that the Court decline

to exercise jurisdiction as a matter of international comity until plaintiffs either exhaust their

domestic remedies, or demonstrate that any such attempt would be futile.  The Seventh Circuit

has found this theory of exhaustion to be persuasive in a comparable FSIA case.  *See Fischer*,

777 F.3d at 859-66.  The relevant rule of customary international law may be found in the

Restatement (Third) of Foreign Relations Law of the United States, which notes: "*Exhaustion of*

*remedies*. Under international law, ordinarily a state is not required to consider a claim by

another state for an injury to its national until that person has exhausted domestic remedies,

unless such remedies are clearly sham or inadequate, or their application is unreasonably

prolonged."  Restatement § 714, cmt. f.

However, this international exhaustion rule appears to only apply to "claim[s] by another

state for an injury to its own national," *id.*—that is, cases where one state has adopted the claim

of its national and is opposing another state in litigation.  *See Interhandel (Switzerland v. United*

*States of America), Preliminary Objections*, 1959 I.C.J. 6, 26-27 (noting that the "rule that local

remedies must be exhausted…is a well-established rule of customary international law" and

applies to "cases in which a State has adopted the cause of its national whose rights are claimed

to have been disregarded in another State in violation of international law"); *see also Doe v.*

*Exxon Mobil Corporation*, 69 F. Supp. 3d 75, 89 n.3 (D.D.C. 2014) (citing the International

Court of Justice's interpretation of the international exhaustion rule).  The D.C. Circuit construed

the rule of customary international law the same way in its *Chabad* decision:

> But this provision [of the Restatement] addresses claims of one state against another.
> Its logic appears to be that before a country moves to a procedure as full of potential
> tension as nation vs. nation litigation, the person on whose behalf the plaintiff country
> seeks relief should first attempt to resolve his dispute in the domestic courts of the
> putative defendant country (if they provide an adequate remedy).

*Chabad,* 528 F.3d at 949.  In contrast, Section 1605(a)(3) of the FSIA "involves a suit that

necessarily pits an individual of one state against another state, in a court that by definition

cannot be in *both* the interested states." *Id.*  There is therefore "no apparent reason," the *Chabad*

Court concluded, "for systematically preferring the courts of the defendant state" for adjudicating FSIA claims.  *Id.*

Thus, both international and domestic courts (including the D.C. Circuit) have reasonably construed the prudential theory of exhaustion to be inapplicable to causes of action brought by individuals and not states.  The Court therefore respectfully disagrees with the Seventh Circuit's holding in *Fischer* and rejects defendants' exhaustion argument based on international comity. Because the other two theories of exhaustion are equally inapplicable, there is no reason to decline to exercise jurisdiction based on plaintiffs' failure to exhaust their domestic remedies.[15]

## CONCLUSION

For the foregoing reasons, defendants' Renewed Motion to Dismiss is granted in part and denied in part.  A separate Order accompanies this Memorandum Opinion.

> */s/   Ellen Segal Huvelle*
> ELLEN SEGAL HUVELLE
> United States District Judge

Date: March 14, 2016

---

[15]   Even if the Court were inclined to agree with the Seventh Circuit that international comity requires exhaustion of remedies, the Court finds that plaintiffs have adequately shown that further efforts to seek a remedy in Hungary would have likely proved futile.  First, Hungary instituted the 2013 administrative compensation procedure three years after the beginning of this lawsuit.  Where the jurisdictional question is a matter of exhaustion, "a defendant cannot defeat jurisdiction by simply creating a new avenue of exhaustion…of remedies that had not been available at the time of the original filing."  *Ford Motor Co. v. United States*, 688 F.3d 1319, 1326 (Fed. Cir. 2012).

Second, the Hungarian Metropolitan Appellate Court's dismissal of Nierenberg's complaint in 2008 reasonably suggested that any additional lawsuits filed by the other Herzog heirs would probably have failed.  Although the decision made some factual findings, it also determined that returning the paintings to Nierenberg was made impossible by customs laws protecting cultural patrimony.  (*See* Defs.' First Motion to Dismiss, Feb. 15, 2011 [ECF No. 15], Declaration of Orsolya Banki, Ex. M, Nierenberg Decision of Metropolitan Appellate Court of Hungary.) There would be no reason for the other Herzog heirs to think that those same laws would not have also barred their claims for specific performance.