**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **DAVID L. de CSEPEL,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **No. 1:10-cv-01261(ESH)** |
| | ) | |
| **REPUBLIC OF HUNGARY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs David L. de Csepel, Angela Maria Herzog, and Julia Alice Herzog bring this action to recover artwork they allege is being wrongfully held by the Republic of Hungary, Hungarian National Gallery, Museum of Fine Arts, Museum of Applied Arts, Budapest University of Technology and Economics, and the Hungarian National Asset Management Inc., otherwise known as "MNV" (collectively, "defendants"). Before the Court is defendants' motion to dismiss. (*See* Mot. to Dismiss, ECF No. 148.)

For the reasons stated herein, the Court will grant defendants' motion in part and deny it in part.

# BACKGROUND

## I.   FACTUAL BACKGROUND[1]

"Baron Mór Lipót Herzog was a Jewish Hungarian art collector who amassed a collection of over 2,000 paintings, sculptures, and other pieces of artwork" prior to his death in 1934. *de Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143, 148 (D.D.C. 2016). Upon his wife's death several years later, the collection was divided amongst their three children, Erzsébet (Elizabeth), István and András.[2] (*See* Am. Compl. ¶ 38, ECF No. 141.)

"During the Holocaust, Hungarian Jews, including the Herzogs, were required to register their art treasuries." *de Csepel*, 169 F. Supp. 3d at 148. A 1944 decree required Hungarian Jews to register all valuables in excess of a certain threshold amount. (*See* Am. Compl. ¶ 54.) A subsequent decree "established a so-called Commission for the Recording and Safeguarding of Impounded Art Objects of Jews (the 'Commission for Art Objects'), and required Hungarian Jews promptly to register all art objects in their possession." (*Id.* ¶ 55.) This Commission was led by Dénes Csánky, then-Director of the Museum of Fine Arts. (*See id.*)

In an attempt to avoid its confiscation, the Herzog family in 1943 hid much of their collection in the cellar of a family factory in Budafok. (*See id.* ¶ 57.) However, "[d]espite their

---

[1] The facts relating to this case have been set out in greater detail by this Court in its two prior opinions, *see de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113 (D.D.C. 2011), and 169 F. Supp. 3d 143 (D.D.C. 2016), as well as by the Court of Appeals in its two opinions, *see* 714 F.3d 591 (D.C. Cir. 2013), and 859 F.3d 1094 (D.C. Cir. 2017). As a result, the Court's recitation of the facts at this juncture will be brief; additional facts will be recounted as necessary to explain the Court's decision.

[2] Plaintiff David de Csepel has been assigned all rights to the works in this action attributable to his grandmother, Elizabeth, and her brother, István. (*See* Am. Compl. ¶¶ 39, 41.) Plaintiffs Angela and Julia Herzog, who now reside in Italy, have full rights to all the works in the action attributable to their father András. (*See id.* ¶ 40.)

efforts to prevent the looting of the art, the Hungarian government and their Nazi[]
collaborators discovered the hiding place." (*Id.* ¶ 58.)  A 1944 article quoted Csánky as saying
that "'[t]he Mór Herzog collection contains treasures the artistic value of which exceeds that of
any similar collection in the country. . . . If the state now takes over these treasures, the
Museum of Fine Arts will become a collection ranking just behind Madrid.'" (*Id.*)

The Herzog family scattered, trying to avoid extermination by the Nazis and the Nazi-
controlled Hungarian government.  In May 1944, Elizabeth and her children fled Hungary,
eventually settling in the United States in 1946.  (*See id.* ¶ 62.)  Elizabeth became a United
States citizen on June 23, 1952.  (*See id.*)  András was sent into forced labor in 1942 and died in
1943, but his wife and children escaped to Italy.  (*See id.* ¶¶ 40, 63.)  "Hungary attempted to
send István Herzog to the infamous Auschwitz death camp[, but h]e escaped after his former
sister-in-law's husband . . . arranged for him to be put in a safe house under the protection of
the Spanish Embassy." (*Id.* ¶ 41.)  He remained in Hungary until his death in 1966.  (*See id.*)

In May 1945, German rule in Hungary ended, and a 1947 Peace Treaty between
Hungary and the Allies confirmed "that Hungary was to act solely as a custodian or trustee of
looted or heirless property [and] under no circumstances could Hungary itself possess any right,
title or interest in that property." (*Id.* ¶ 68.)  Nevertheless, while some pieces of the Herzog
collection were returned to the siblings or their representatives, many others were not.
Moreover, the government sought "substantial fees to cover the cost of recovering the artwork
from the countries to which it had been dispersed during the war," as well as large payments for
export licenses to remove paintings from Hungary.  (*See id.* ¶ 70.)  For example, in lieu of a
duty of 40,000 *forints* to repay the cost of repatriating several of András's pieces from outside
the country, the Hungary's Minister of Finance accepted an artwork entitled "Still Life with

Turkey" by Chardin.  (*See* Declaration of Irene Scholl-Tatevosyan ("Scholl-Tatevosyan Decl.")
Ex. 5, ECF No. 148-2.)  The letter that memorialized that transaction also noted the Herzog
siblings' options should they want to export any of their returned artworks.  First, the state had
the option to purchase any piece for which its owners requested export permits.  (*See id.*)
Second, if the state chose not to exercise its option, "40% of the estimated value [of the piece
was] payable for the export permit" if Hungary's National Bank allowed the issuance of a
permit at all.  (*See id.* (noting some permit requests had been denied).)

Some pieces were returned to the siblings or to their representatives in Hungary but
were taken back into governmental custody soon thereafter either as "deposits" with the
museums or due to government actions, such as the smuggling prosecution of István's wife, or
payments of tax bills purportedly owed by István or his siblings.  (*See* Am. Compl. ¶ 71.)  In
1948, the Hungarian police investigated Ilona Kiss, István's former wife, on the charge of
smuggling several artworks out of the country for sale.  (*See* Declaration of Jessica Walker
("Walker Decl.") Ex. G-2, ECF No. 148-15.)  According to police reports, Kiss, along with her
brother and a third individual, smuggled to Switzerland at least three paintings that had
previously belonged to István.  (*See id.*)  Kiss was indicted in 1949 (*see* Declaration of Irene
Tatevosyan ("Tatevosyan Decl.") Ex. 19, ECF No. 106-3), and in October 1950 fourteen
artworks were forfeited and taken into permanent custody by the Museum of Fine Arts as a
result of the judgment in that case.  (*See* Walker Decl. Ex. G-6.)  These works included not only
those attributable to István or Kiss, but also several that belonged to András and Elizabeth.

In 1949, Hungary became the Hungarian People's Republic, and little was known about
the Herzog collection until the collapse of Communism in 1989.  (*See* Am. Compl. ¶ 74.)
However, "[w]ith the opening of Hungary to the West in 1989, the Herzog Heirs started making

inquiries and learned that many pieces of the Herzog Collection were being openly exhibited, hanging on the walls of the Hungarian National Gallery and the Museum of Fine Arts." (*Id.* ¶ 76.) Elizabeth negotiated with the Hungarian government and received seven pieces (all from lesser-known artists) before her death in 1992. (*See id.* ¶ 77.)

Her daughter, Martha Nierenberg, continued to negotiate on Elizabeth's behalf but ultimately decided to pursue legal remedies against Hungary, filing suit in a Hungarian court in 1999, in what has been referred to as the "Nierenberg Litigation." (*See id.* ¶ 78.) Her complaint identified a number of pieces she alleged belonged to the Herzog siblings, including artworks that belonged to István, András, and her mother, Elizabeth. However, she petitioned the court only for return of ten artworks (later amended to twelve) attributed to Elizabeth. (*See* Scholl-Tatevosyan Decl. Ex. 20, ECF 148-3; *see also* Pls.' Opp. at 13, ECF No. 153.) "To protect the interests of all three Herzog siblings, the heirs of András and István Herzog retained counsel and were brought into the lawsuit at the instruction of the Hungarian court" (*see* Mot. to Dismiss at 6); however, heirs of the other two siblings ultimately declined to participate. During the course of the litigation, Nierenberg received one of the paintings claimed in her petition, Mihály Munkácsy's "Half-Length Portrait of Christ" (also known as "Bust of Christ"), which was accepted by her attorney in Hungary in April 2000, as it could not be taken out of the country. (*See* Scholl-Tatevosyan Decl. Exs. 22-24, ECF No. 148-4.) "The Budapest Municipal Court initially recognized and acknowledged the Herzog Heirs' ownership rights in the paintings at issue . . . ." (Am. Compl. ¶ 78.) However, in January 2008, "an appellate court reversed the lower court's decision ordering restitution and rejected the demand" for return of the artworks. (*Id.*)

## II.      PROCEDURAL HISTORY

Plaintiffs filed this action in 2010 asserting claims based on bailment, conversion, constructive trust, accounting, unjust enrichment, replevin, and declaratory relief.  (*See* Compl., ECF No. 1; *see also* Am. Compl.)  They asked for either a return of the artworks or for monetary damages.  (*See* Compl. at 35-36.)

### A.      First Motion to Dismiss

Defendants filed their initial motion to dismiss on February 15, 2011.  (*See* First Mot. to Dismiss, ECF No. 15.)  Defendants claimed plaintiffs' case must be dismissed for several reasons: (1) various treaties and international agreements barred the suit; (2) the Court lacked jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*; (3) *forum non conveniens*; (4) statute of limitations; (5) act of state; and (3) comity, *res judicata*, and collateral estoppel arising from the Nierenberg Litigation.  (*See* First Mot. to Dismiss at ii.)

By memorandum opinion issued on September 1, 2011, this Court granted in part and denied in part defendant's motion.  *See de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113 (D.D.C. 2011).  The Court concluded that it had jurisdiction under the FSIA's expropriation exception, *see id.* at 132–33, and that the rest of defendants' defenses were either premature or without merit, with the exception of international comity.  Because "the record is devoid of evidence of either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect," the Court granted defendants' motion to dismiss with respect to the eleven pieces of artwork at issue in the Nierenberg Litigation.  *Id.* at 145 (internal quotation marks omitted).

Because the Court denied sovereign immunity, that portion of its order was immediately appealable.  *See de Csepel v. Republic of Hungary*, 2011 WL 13244741, at *1 n.2 (D.D.C. Nov. 30, 2011).  The Court also granted certification on the remaining issues addressed in the Memorandum Opinion, concluding that the statutory criteria for interlocutory appeal under 28 U.S.C. § 1292(b) were met.  *Id.* at *2.  On April 19, 2013, the Court of Appeals affirmed this Court's opinion in part and reversed it in part.  *See de Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013).  The Court of Appeals concluded that plaintiffs' complaint alleged sufficient facts to bring it within the FSIA's commercial activity exception, *see id.* at 601, and that the FSIA's treaty exception was not implicated.  *See id.* at 603.  The Court of Appeals, like this Court, rejected defendants' remaining defenses as either premature (statute of limitations) or lacking in merit (political question, act of state, and *forum non conveniens*).  The Court of Appeals, however, reversed this Court's decision to accord comity to the Nierenberg decision, concluding that "[t]he complaint's allegations of due process violations present just the kind of fact-intensive issues inappropriate for resolution on a Rule 12(b)(6) motion."  *Id.* at 607.

### B.        Renewed Motion to Dismiss

On remand, defendants filed an answer to plaintiffs' complaint (*see* Answer, ECF No. 76), and the parties conducted discovery.  On May 14, 2014, defendants filed their second motion to dismiss.  (*See* Second Mot. to Dismiss, ECF No. 86.)  This motion focused solely on defendants' contention that the Court lacked jurisdiction under the FSIA but was denied without prejudice while discovery continued.  *See* 75 F. Supp. 3d 380, 387 (D.D.C. 2014).  On May 18, 2015, defendants filed a renewed motion to dismiss again arguing that the Court lacked subject matter jurisdiction under either the FSIA's expropriation exception or its commercial activity exception.  (*See* Renewed Mot. to Dismiss, ECF No. 106.)

On March 14, 2016, the Court granted defendants' motion in part and denied it in part. *See de Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143 (D.D.C. 2016).  The Court concluded that while the FSIA's commercial activity exception did not apply, the expropriation exception did.  *See id.* at 163–64.  However, the Court dismissed plaintiffs' claims as to two of the artworks listed in the complaint, as "[t]here is no evidence in the record that the two paintings were among the Collection items confiscated during World War II."[3]  *Id.* at 165.  The Court also rejected defendants' remaining claims regarding subject matter jurisdiction, the FSIA's treaty exception, and exhaustion.

On June 20, 2017, the Court of Appeals again affirmed in part and reversed in part.  *See de Csepel v. Republic of Hungary*, 859 F.3d 1094 (D.C. Cir. 2017).  It approved this Court's conclusion that the FSIA's expropriation exception applied, as "'rights in property taken in violation of international law' are 'in issue' as to those twenty-five or so artworks taken by Hungary during the Holocaust and never returned."  *Id.* at 1103.  However, it directed this Court on remand to "consider, in the first instance, the Herzog family's claims to those pieces returned by Hungary," which it estimated to be approximately fifteen.  *Id.* at 1103-04.  And, following the standard announced in *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016), the Court of Appeals concluded that the Court lacked jurisdiction over Hungary, as the first clause of the commercial-activity nexus requirement of the expropriation exception to the FSIA had not been met in this case.  *See de Csepel*, 859 F.3d at 1107 ("Applying *Simon* to the facts of this case, we have jurisdiction through only the second clause of the commercial-activity nexus requirement, meaning that the Republic of Hungary retains its FSIA immunity.").

---

[3] The dismissed pieces were (1) Lucas Cranach the Elder, *The Annunciation to Saint Joachim*, 16(vi) in the complaint; and (2) John Opie, *Portrait of a Lady, half-length, in a White Bonnet*, 16(xiii).

Lastly, the Court of Appeals directed this Court on remand (1) to consider whether any artworks, other than the two already dismissed by this Court, were taken by Hungary after Elizabeth became a citizen in 1952, *see id.* at 1108; and (2) to allow plaintiffs to amend their complaint to account for the Holocaust Expropriated Art Recovery Act of 2016 (the "HEAR Act"). *See id.* at 1109. It declined to address defendants' exhaustion claim as defendants "made no argument that the collateral order doctrine applies to denial of a motion to dismiss on freestanding exhaustion grounds." *See id.* at 1109.

## C.    The Instant Motion to Dismiss

This case is now on remand from the Court of Appeals for the second time. Plaintiffs filed an amended complaint on December 18, 2017 (*see* Am. Compl., ECF No. 141), which not only added reference to the HEAR Act, but also added a new defendant, the Hungarian National Asset Management Inc. ("MNV"). (*See id.* ¶ 14.) Moreover, the amended complaint alleges that the "Court has jurisdiction over Hungary pursuant to 28 U.S.C. §1605(a)(3) because MNV is so extensively controlled by Hungary that a relationship of principal and agent exists between Hungary and MNV." (*Id.* ¶ 36.)

On February 9, 2018, defendants filed the instant motion to dismiss. Defendants' motion makes the following arguments: (1) MNV is not properly added, it is immune, and its actions cannot be attributed to Hungary for purposes of abrogating the latter's sovereign immunity; (2) Hungary is a necessary party and thus the case must be dismissed pursuant to Federal Rule of Civil Procedure Rule 19; (3) the Court lacks jurisdiction under the FSIA over certain pieces of art that were returned to the Herzog siblings after the war, or were settled under an agreement concluded between the United States and Hungary in 1973; and (4) as to the pieces over which the Court has jurisdiction, various other defenses require dismissal under

9

Rule 12(b)(6).

After the motion was fully briefed, plaintiffs requested the case be stayed pending resolution of their petition for a writ of certiorari, which defendants did not oppose. (*See* Mot. to Stay, ECF No. 158.)  Plaintiffs' question to the Supreme Court was whether the Court of Appeals correctly interpreted the FSIA's expropriation exception when it concluded that foreign states and agencies or instrumentalities had to meet different commercial-nexus requirements. *See* Petition for Cert. at i, Docket No. 17-1165 (Feb. 16, 2018).  The case was stayed until January 2019, when plaintiffs' petition was denied by the Supreme Court. (*See* Joint Status Report at 1, ECF No. 163.)  During the stay the Court of Appeals issued two opinions related to issues in this case: *Simon v. Republic of Hungary*, 911 F.3d 1172 (D.C. Cir. 2018), and *Philipp v. Federal Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018).  The parties submitted supplemental briefing regarding these cases. (*See* Joint Status Report at 2.) Argument was held on defendants' motion on January 13, 2020, and the parties filed additional supplemental briefing on January 24, 2020. (*See* ECF Nos. 175, 176.)

## ANALYSIS

## I.    AMENDMENT

In its most recent opinion, the Court of Appeals ordered Hungary dismissed from this litigation after concluding that Hungary's sovereign immunity was not abrogated under the expropriation exception.  On remand, plaintiffs filed an amended complaint that, *inter alia*, adds MNV as a defendant.  Plaintiffs argue that MNV is properly added as an agency or instrumentality of Hungary under the second clause of FSIA's expropriation exception. *See* note 4, *infra*.  Furthermore, they contend that MNV "is so extensively controlled by Hungary that a relationship of principal and agent exists between Hungary and MNV," such that MNV's actions

can be imputed to Hungary to abrogate *Hungary*'s sovereign immunity.  (*See* Am. Compl. ¶ 36.)
As a result, plaintiffs argue not only that MNV belongs in the case, but also that Hungary should
remain as a defendant.

Defendants, on the other hand, argue that MNV is not properly added for two reasons: (1)
plaintiffs' amended complaint goes beyond the Court of Appeals' mandate, which only allowed
for amendment to add allegations relating to the HEAR Act (*see* Mot. to Dismiss at 10–14); and
(2) MNV is properly analyzed as part of the Hungarian state itself, rather than as its agency or
instrumentality, so it is immune from suit for the same reason that Hungary was found to be
immune.  (*See id.* at 15 ("Because MNV's 'core functions' are governmental, not commercial,
MNV is part of the 'foreign state' and . . . is, therefore, entitled to the same immunity as
Hungary.").)  Moreover, defendants contend that even if MNV is properly added as a defendant,
its actions cannot be imputed to Hungary, so Hungary remains immune.  (*See id.* at 21–22.)

The Court concludes that MNV has been properly added as a defendant, since its addition
does not go beyond the Court of Appeals' mandate and is proper under the FSIA, but that
MNV's actions cannot be imputed to Hungary so as to abrogate its immunity.  Thus, Hungary is
dismissed in accordance with the Court of Appeals' opinion.  *See de Csepel*, 859 F.3d at 1110
("We also instruct the district court to dismiss the Republic of Hungary as a defendant . . . .").

### A.     The Addition of MNV as a Defendant

Defendants argue that "Plaintiffs' amendments go beyond the scope of the appellate
court's mandate as Plaintiffs did not seek, nor receive, leave to include a new defendant—a
defendant that Plaintiffs admit they learned of years ago."  (Mot. to Dismiss at 12.)  "The
decision of a federal appellate court establishes the law binding further action in the litigation by
another body subject to its authority."  *USPS v. Postal Regulatory Comm'n*, 747 F.3d 906, 910

(D.C. Cir. 2014) (quoting *City of Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 346 (D.C. Cir. 1977)).  A district court must "scrupulously avoid implementing the mandate in a manner that exceeds, or limits, the scope of the appellate decision."  *Texas Oil & Gas Corp. v. Hodel*, 654 F. Supp. 319, 323 (D.D.C. 1987).  However, "the only issues the reconsideration of which activate the doctrine [of law of the case] are those decided either explicitly or by necessary implication by the higher court."  *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 182 (D.D.C. 2005) (internal quotation marks omitted).

The Court concludes that plaintiffs' ability to add a new party is not foreclosed by the Court of Appeals' decision.  In *Simpson*, Judge Urbina rejected the argument that the principle of *inclusio unius est exclusio alterius* should apply to allow amendment on one issue but not another when the other issue was not considered by the appeals court.  *See id*.  At oral argument before the Court of Appeals in this case there was an exchange between Circuit Judge Tatel and plaintiffs' attorney in which she repeatedly suggested that plaintiffs would like to amend the complaint. While Judge Tatel suggested the amendment would be to amend plaintiffs' complaint to add the newly enacted HEAR Act (*see* Mot. to Dismiss at 13 n.3), his questions focused on whether plaintiffs needed anything from the Court *beyond* leave to amend, rather than suggesting that leave to amend had to be restricted to only one topic.  Furthermore, until Hungary was dismissed when the Court of Appeals issued its opinion, there was no need for plaintiffs to consider adding a new party, even one they may have known about since the beginning of the litigation.  As the Court of Appeals noted, the Federal Rules of Civil Procedure direct courts to "freely give leave [to amend] when justice so requires."  *See de Csepel*, 859 F.3d at 1110 (quoting Fed. R. Civ. P. 15(a)(2)).  The Court thus concludes that the Court of Appeals' mandate does not prevent MNV's addition.

**B.      Whether MNV's Core Functions are Commercial or Governmental**

Defendants next argue that, even if plaintiffs are permitted to amend their complaint to add MNV as a defendant, MNV is properly considered a part of Hungary and thus, like Hungary, retains its immunity.  (*See* Mot. to Dismiss at 15.)  Under the FSIA's expropriation exception, "[a] foreign state loses its immunity if the claim against it satisfies the exception by way of the first clause of the commercial-activity nexus requirement[, . . . while] an agency or instrumentality loses its immunity if the claim against it satisfies the exception by way of the second clause."  *de Csepel*, 859 F.3d at 1107.[4]  Defendants do not contest plaintiffs' allegations that MNV, as asset manager for the State of Hungary, "operates" the property at issue in Hungary, and that it also "engage[s] in a commercial activity in the United States."  *See* 28 U.S.C. § 1605(a)(3); (*see also* Am. Compl. ¶ 35).  As a result, the only question relevant to determining MNV's immunity under the FSIA is whether MNV is an "agency or

---

[4] The expropriation exception, 28 U.S.C. § 1605(a)(3), provides that a foreign state shall be stripped of its immunity:

> [I]n any case . . . in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state . . . .

An agency or instrumentality of a foreign state, on the other hand, is stripped of its immunity:

> [I]n any case . . . in which rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

*Id.*  For a more thorough explanation of the expropriation exception, *see de Csepel*, 859 F.3d at 1101 (explaining the two requirements of the expropriation exception, the "rights in property" requirement and the two clauses of the commercial-nexus requirement).

instrumentality" of Hungary or its political subdivision.

"Because Section 1603(a) defines 'foreign state' as including 'agencies and instrumentalities,' the distinction between the two is only relevant in [the] FSIA where explicitly drawn." *Jacobsen v. Oliver*, 451 F. Supp. 2d 181, 195 (D.D.C. 2006); *see also* 28 U.S.C. § 1603(a) (defining a "foreign state" to "include[] a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)") .  An "agency or instrumentality" is any entity:

> (1) [W]hich is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

*Id.* § 1603(b).

When a court is "concerned with the meaning of the statutory terms 'foreign state' and 'agency or instrumentality,'" *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 325 (D.C. Cir. 2005), the Court of Appeals has instructed courts to use the "core functions" test. *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994).  *Transaero* held that a court must look to "whether the core functions of the foreign entity are predominantly governmental or commercial" when determining whether it is a "separate legal person" from the foreign state.  30 F.3d at 151.  Because "any nation may well find it convenient (as does ours) to give powers of contract and litigation to entities that on any reasonable view must count as part of the state itself," this categorical approach "winnow[s] the applications" of the definition of agency or instrumentality to just those Congress intended, *i.e.*, primarily public commercial enterprises.  *See id.* at 152.  While *Transaero*'s test was originally formulated to analyze

§ 1608's requirements for service of process, the Court of Appeals has extended it to

§ 1605(a)(3).  *See Crist v. Republic of Turkey*, 107 F.3d 922, 1997 WL 71739, at *2 (D.C. Cir.

1997) ("Notably, section 1603 does provide a different definition of 'foreign state' for use in

section 1608 as opposed to the rest of the FSIA, and that section 1603 does not similarly

establish different definitions of 'agency or instrumentality' is even more compelling evidence

that 'agency or instrumentality' should be read the same in sections 1608 and 1605."); *see also

Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (applying the *Transaero*

test to § 1605).

Applying this test, most courts have concluded that "intelligence and security activities,"

for example, will almost always be governmental rather than commercial.  *See Jacobsen*, 451 F.

Supp. 2d at 197 (citing *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 102 (D.D.C.

2003), *abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d

1024, 1033 (D.C. Cir. 2004)); *see also S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 108

(D.D.C. 2012) (collecting cases).  On the other end of the spectrum, as described in *Transaero*,

are entities such as "a state trading corporation, a mining enterprise . . . or a steel company."  30

F.3d at 152 (quoting H.R. Rep. No. 94-1487, at 15-16 (1976)).  In the middle are cases involving

cultural and financial institutions.

For example, in *Taylor v. Kingdom of Sweden*, 2019 WL 3536599 (D.D.C. Aug. 2, 2019),

Judge Leon concluded that, under *Transaero*'s test, Sweden's National Museums of World

Culture ("NMWC"), a government agency, "is 'so closely bound up with the structure of the'

Swedish sovereign that it is properly 'considered as the "foreign state" itself' under §

1605(a)(3)."  *Id.* at *3 (quoting *Transaero*, 30 F.3d at 153).  According to *Taylor*, the NMWC's

functions "include the promotion of Sweden's view of world culture to its own citizens and the

international community as well as the country's ability to share that world view with people and institutions domestically and around the world." *Id.* And, in *Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006), the Second Circuit concluded that Poland's Ministry of Treasury was not an "agency or instrumentality" for purposes of the FSIA's takings exception, but an "integral part of Poland's political structure." *Id.* at 594 (internal quotation marks omitted).

Focusing on MNV's structure, the Court finds these cases inapposite. The non-governmental nature of MNV is apparent in light of Hungary's choice several decades ago to transform its asset manager from a governmental agency into a joint-stock company to take advantage of the benefits of corporate law. (*See* Declaration of Dr. Bernadette Somody ¶ 17 (quoting the Explanatory Memorandum to the 1992 Act creating MNV's predecessor organization, which said that "[f]or the management of the permanently state-owned entrepreneurial assets it is reasonable to establish a joint stock company *instead of a governmental agency*" (emphasis added)), ECF No. 153-1 ("Somody Decl.").) Hungary *used* to manage its assets using a state agency controlled by Parliament. (*See id.*) However, in 1992, it decided to transfer such functions to a joint-stock company, as such a structure would allow the company to more easily obtain loans, issue bonds, and act on the private market. (*See id.*) And Hungary's Constitutional Court has held that, because of this new structure, MNV cannot exempt itself from certain aspects of corporate law, as "the State's roles as the holder of public power and as an owner have to be consequently differentiated in the private sector." (*See id.* ¶ 18 (internal quotation marks omitted).)

Unlike the NMWC in *Taylor*, which was "created by Act of Swedish Parliament as a state agency within the Swedish Ministry of Culture, which is itself a department of the Government of the Kingdom of Sweden," *Taylor*, 2019 WL 3536599, at *3 (internal quotation

marks omitted), MNV is a joint-stock company. In other words, it is outside of the hierarchy of the Hungarian government and is instead considered a company, even though it is owned by the government. (*See* Somody Decl. ¶ 16 (noting that MNV is registered on Hungary's "Company Register," and that "company" is defined under Hungarian law as "a legal entity . . . engaging in business operations").) Similarly, in *Garb*, the Second Circuit observed that "all governmental units beneath the central government—and the Ministry of the Treasury is indisputably one such unit—constitute 'political subdivisions,' a category that is not congruent with 'agencies and instrumentalities.'" 440 F.3d at 596. Indeed, the Second Circuit then went on to compare foreign sovereign immunity to Eleventh Amendment immunity, saying "it is black letter Eleventh Amendment law that the political agencies and departments of states are entitled to the same sovereign immunity as the state." *Id.* at 597 n.23 (citing *Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Fed'n*, 361 F.3d 676, 688 (2d Cir. 2004)). Like *Taylor*, the result in *Garb* was driven by the entity's placement in the structure of Poland's government. But MNV is different. MNV is not a "governmental unit[] beneath the central government" like the Polish Ministry of the Treasury, *id.* at 596, Iran's Ministry of Foreign Affairs, *see Roeder*, 333 F.3d at 234, or the United States Department of State. *See Transaero*, 30 F.3d at 152. Rather, MNV is a joint-stock company.

To compensate for MNV's placement outside the governmental hierarchy, defendants ask the Court to blur the distinction between purpose and function. For example, they compare MNV's functions to that of Poland's Ministry of Treasury, which also engages in asset management on behalf of a sovereign state and represents the state against financial claims. *See Garb*, 440 F.3d at 595. However, while holding and administering assets for another "is an act that sovereigns may accomplish, . . . it is not an act that *only* a sovereign power can do." *Smith*

*v. Overseas Korean Cultural Heritage Found.*, 279 F. Supp. 3d 293, 297 (D.D.C. 2018) (emphasis added).  And, "[a]lthough [MNV's] interests and objectives may align with, or be directed by, a foreign state, [the Court] must look to the 'nature' of the act, rather than its 'purpose.'"  *Id.* (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)).  For example, in *Smith*, Judge McFadden concluded that "building and operating a museum . . . is the type of action by which a private party can engage in commerce," so the defendant was an agency or instrumentality rather than a foreign state.  *Id.*; *cf. Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 314 (D.D.C. 2005) (concluding that defendant engaged in commercial activities when lending art pieces because private parties may also loan artwork internationally, and "it is the *type* of activity—not its purpose—that must guide the analysis" (emphasis in original)).

In their recently-filed supplemental pleading, defendants cited a case from South Carolina, in which a district court concluded that the core functions of the Ministry of Education, Culture, and Science of the Netherlands, as well as the Cultural Heritage Agency of the Netherlands, were governmental rather than commercial and thus they were both immune under the FSIA.  *See Berg v. Kingdom of the Netherlands*, Slip. Op. at 15, Docket No. 18-cv-3123 (BHH) (D.S.C. Mar. 6, 2020); (*see also* ECF No. 177-1).  The district court in that case concluded that "[w]hile the Ministry may engage in some commercial transactions, there is no evidence that the commercial transactions occur for the purpose of individual profit, but rather for a civic and political purpose."  *Id.*  This analysis blends purpose and function.  *Cf. Weltover*, 504 U.S. at 614 ("[T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce."

(internal quotation marks omitted)).

Furthermore, MNV's situation is factually distinguishable from that of the entities in *Berg*. For example, the *Berg* court observed that "the Minister reports to the Prime Minister, not to a board of directors," and "there is no evidence that the commercial transactions [it engages in] occur for the purpose of individual profit." *See Berg*, Slip Op. at 15. MNV, on the other hand, has both a Board of Directors and a Board of Supervisors which oversee the organization's operations; while these Boards are accountable to the Hungarian government, which owns MNV's single share, they nonetheless are required to run the organization with certain levels of knowledge and expertise. (*See, e.g.,* Declaration of Zoltan Novak Ex. C, Act CVI of 2007 on State Assets at Section 20(3) ("Only Hungarian citizens with a degree from an institute of higher education who have exceptional theoretical or practical professional knowledge related to budgetary, financial and asset-management matters may be appointed chairman or members of the Board of Directors."), ECF No. 148-29 ("Novak Decl.").) And while MNV is required to manage the state's assets in an efficient and value-conserving manner, it also must "ensur[e] the . . . *value-enhancing* use of state assets." (*See id.* at Section 2(1) (emphasis added); *see also id.* at Section 22(7) ("MNV Zrt. shall . . . allocate the revenues from the utilisation and sale of the state assets to preserving *and increasing* the value of the . . . assets entrusted to it . . . ." (emphasis added)).)

The Hungarian Act CVI of 2007 on State Assets provides that "tasks conferred upon MNV . . . shall be recognized as government functions." (*See id.* at Section 17(2).) However, while managing the sovereign's property is undoubtedly "essential to the daily functioning and long-term survival of that government," *Garb*, 440 F.3d at 595 n.19, such an argument focuses on the *purpose* of the act, rather than its nature. *See Smith*, 279 F. Supp. 3d at 297. At their core,

MNV's functions are those that a private entity could engage in as well.  Moreover, MNV's placement outside of the Hungarian government, as a joint-stock company, further emphasizes its commercial, rather than governmental, nature.  The Court thus concludes MNV is an "agency or instrumentality" of Hungary, not a political subdivision, and it loses its sovereign immunity pursuant to the second clause of the FSIA's expropriation exception.  *See de Csepel*, 859 F.3d at 1107 ("[A]n agency or instrumentality loses its immunity if the claim against it satisfies the exception by way of the second clause [of the commercial-activity nexus requirement].").

### C.     The Addition of Hungary as a Defendant

Finally, defendants argue that, even if the Court can exercise jurisdiction over MNV, MNV's actions cannot be attributed to Hungary to abrogate *Hungary*'s immunity.  (*See* Defs.' Reply at 9 ("[E]ven if MNV was relegated to agency or instrumentality status, the theory fails because Hungary is not using MNV to shield itself from liability." (internal quotation marks omitted)), ECF No. 154.)  The Court agrees.

"[A]bsent an agency relationship, the court lacks subject matter jurisdiction over the foreign state for the acts of its instrumentality."  *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 447 (D.C. Cir. 1990).  However, "the activities of an agent may be attributed to the principal for jurisdictional purposes."  *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1026 n.16 (D.C. Cir. 1982) (internal quotation marks omitted), *abrogated on other grounds by In re Papandreou*, 139 F.3d 247, 254 n.4 (D.C. Cir. 1998); *see also TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 325 (D.C. Cir. 2005) ("[T]he presumption of independent status detailed in *Bancec* also applies to the question of subject matter jurisdiction under the FSIA; that is, a foreign state is amenable to suit based upon an exception in the FSIA and the acts of its instrumentality only if the sovereign exerts sufficient control over the instrumentality . . . to create a relationship of principal to agent." (internal quotation marks and

brackets omitted)).

The Supreme Court allowed what amounts to a "piercing of the corporate veil" between an instrumentality and a foreign sovereign in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 103 S. Ct. 2591 (1983) ("*Bancec*").  Although "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," *id.* at 626-27, this principle is not blindly adhered to when to do so would cause injustice.  *Id.* at 632.  According to "internationally recognized equitable principles," foreign sovereigns cannot "avoid the requirements of international law simply by creating juridical entities whenever the need arises."  *Id.* at 633.  To determine when separateness should not be respected, courts apply the so-called "*Bancec* factors":

> (1) the level of economic control by the government;
> (2) whether the entity's profits go to the government;
> (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs;
> (4) whether the government is the real beneficiary of the entity's conduct; and
> (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018) (internal quotation marks omitted).  Later courts have interpreted *Bancec* to allow them to disregard separate juridical status when "the foreign entity is exclusively controlled by the foreign state *or* where recognizing the separateness of that entity and the foreign state would work fraud or injustice."  *Estate of Heiser v. Islamic Republic of Iran*, 885 F. Supp. 2d 429, 435 (D.D.C. 2012) (internal quotation marks omitted) (emphasis added); *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000).

The Court concludes that MNV is properly characterized as a "typical government instrumentality" rather than one so exclusively controlled by Hungary that it should be deemed the same as the state.  *See Bancec*, 462 U.S. at 624.  While Hungary undoubtedly has the power

to exert substantial control over MNV—which has one share, owned by the government and exercised by the Minister—majority stock ownership or control of the Board of Directors is not, without more, sufficient to satisfy the control prong.  *See Transamerica Leasing, Inc.*, 200 F.3d at 849.  Furthermore, in other important ways MNV fits comfortably in *Bancec*'s "typical government instrumentality" definition: it is created by statute that prescribes powers and duties; it is managed by a board selected by the government "in a manner consistent with the enabling law"[5]; and it has its own budget, although the money comes from Hungary.  *Bancec*, 462 U.S. at 624; *see also DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 216-17 (D.D.C. 2014).

As to *Bancec*'s "fraud or injustice" factor, there is no evidence that Hungary is abusing the presumption of separateness with its relationship with MNV, a concern that motivated the piercing of the veil that the Supreme Court allowed in *Bancec*.  There, for example, treating the instrumentality (a bank) as separate from its sovereign principal (Cuba) "would permit the real beneficiary of such an action, the Government of the Republic of Cuba, to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of [the U.S. bank's] assets." *Bancec*, 462 U.S. at 632.  Here, plaintiffs do not suggest that Hungary is using MNV to shield it from liability—Hungary has not transferred ownership of state assets to MNV to thwart litigation, and MNV is not the entity that performed the acts of expropriation about which plaintiffs are suing.  *See Empresa Cubana*

---

[5] As described in the section on whether MNV is commercial or governmental, *supra*, although Hungary's Minister of Culture has the power to appoint and recall members of MNV's Board of Directors, he is constrained in who he can pick:

> Only Hungarian citizens with a degree from an institute of higher education who have exceptional theoretical or practical professional knowledge related to budgetary, financial and asset-management matters may be appointed chairman or members of the Board of Directors.

(Novak Decl. Ex. C, Act CVI of 2007 on State Assets at Section 20(3).

*Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 606 F. Supp. 2d 59, 78 (D.D.C. 2009) (concluding that presumption of separateness should be disregarded when the sovereign is "attempting to use the federal courts as a sword while invoking the Constitution as a shield").

Moreover, the amended complaint does not seek to hold Hungary liable for the purported unlawful acts of MNV.  Rather, it seeks to hold *Hungary* liable for the purported unlawful acts of *Hungary*.  If plaintiffs were suing about actions that *MNV* had taken that harmed them, it might be proper for this Court to consider whether "adherence to [Hungary and MNV's] separate identifies would entitle [Hungary] to benefits in United States courts while avoiding its obligations." *Rubin*, 138 S. Ct. at 823 (internal quotation marks omitted).  Here, however, while MNV manages the artwork at issue for Hungary, it had nothing to do with (and indeed it did not exist) when Hungary undertook the challenged actions.  Had plaintiffs alleged *MNV* undertook actions in the United States that might satisfy the first commercial nexus clause, as well as facts sufficient under *Bancec* to impute MNV's actions in the United States to Hungary, a different result might be required.  *See Kuo v. Gov't of Taiwan*, 2019 WL 120725, at *3 & n.2 (S.D.N.Y. Jan. 7, 2019).

Allowing plaintiffs to go forward under this theory would also circumvent the Court of Appeals' decision that foreign states and their instrumentalities need to satisfy different clauses of the FSIA's expropriation requirement before their sovereign immunity is waived.  *See de Csepel*, 859 F.3d at 1107.  The Court of Appeals found that Hungary was immune because the property it took is not located in the United States.  *See id.*  If this Court were now to conclude that because Hungary controls MNV, which engages in commercial activity in the United States, Hungary is *not* immune, this would destroy the distinction recognized by the Court of Appeals

between the expropriation exception's commercial nexus requirement for states, as opposed to their instrumentalities.  Given the allegations in plaintiffs' complaint, the Court concludes that actions undertaken by MNV cannot be used to bring Hungary back into this litigation.

## II.    RULE 19

Defendants argue that, in light of Hungary's dismissal by the Court of Appeals, the entire action should be dismissed.  (*See* Mot. to Dismiss at 22 ("Even if this Court found it could take jurisdiction over MNV, the action cannot go forward because Hungary, the sole owner of the artworks, is immune from this Court's jurisdiction.").)  As explained below, the Court concludes that Hungary is not an indispensable party.

### A.    Rule and Legal Standard

"Rule 19 of the Federal Rules of Civil Procedure establishes a two-step procedure for determining whether an action must be dismissed because of the absence of a party needed for a just adjudication." *Cherokee Nation of Oklahoma v. Babbitt*, 117 F.3d 1489, 1495–96 (D.C. Cir. 1997).  First, a court must determine whether the absent party is "necessary."  A party is necessary if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  "If the Court determines that [the absent party] is not required under Rule 19(a), it need not proceed to the second step of the test . . . ." *Cronin v. Adam A. Weschler & Son, Inc.*, 904 F. Supp. 2d 37, 41 (D.D.C. 2012).  However, if the absent party is necessary

and cannot be joined without depriving the court of subject-matter jurisdiction, the action must

be dismissed unless "in equity and good conscience, the action should proceed among the

existing parties."  Fed. R. Civ. P. 19(b).  Factors to consider in deciding whether the action

should proceed are:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
> > (A) protective provisions in the judgment;
> >
> > (B) shaping the relief; or
> >
> > (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.* 19(b)(1)-(4).

"Courts are generally reluctant to grant Rule 12(b)(7) motions, and dismissal is warranted

only when the defect is serious and cannot be cured."  *Cronin*, 904 F. Supp. 2d at 41 (internal

quotation marks omitted).  Moreover, defendants, as the moving parties, "bear[] the burden to

demonstrate that [the] absent party is required under Rule 19."  *Id.*

**B.**     **Necessary Party**

Defendants argue that Hungary is necessary to both plaintiffs' tort and contract claims.

(*See* Mot. to Dismiss at 24 ("Hungary is a party to the purported bailments—Plaintiffs allege

their predecessors entered into bailments with Hungary's legal representatives."); *see also id.*

("Only Hungary is alleged to have taken the artworks 'in violation of international law' and

converted them.").)  While "Rule 19 does not require the joinder of joint tortfeasors," *Cronin*,

904 F. Supp. 2d at 41, "in actions involving contractual rights, courts have frequently found that

25

the parties to a contract are required parties within the meaning of Rule 19." *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 390 (D.D.C. 2017) (citing *Ward v. Deavers*, 203 F.2d 72, 75 (D.C. Cir. 1953)).

At the outset, with one exception discussed below, even if one were to assume *arguendo* that in the absence of Hungary, the remaining parties cannot turn over the artworks, as they claim only to display and manage them on behalf of Hungary, a court is not required to be able to provide *all* forms of relief in order to provide sufficiently complete relief to the parties for purposes of Rule 19. *See Ward*, 203 F.2d at 75–76 (concluding that, without the absent party, contract rescission could not be ordered, but the case could still go forward against the remaining defendants for damages). And, plaintiffs have sufficiently alleged that the remaining defendants may be liable, at the very least, for monetary relief.

As a matter of law, defendants are incorrect that "neither MNV nor the museum defendants are joint tortfeasors" because only Hungary purports to own the artworks. (*See* Mot. to Dismiss at 24.) Under District of Columbia law, "[a] defendant will be liable for conversion if the plaintiff shows that the defendant *participated* in (1) an unlawful exercise, (2) of ownership, dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto." *Gov't of Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45, 62 (D.D.C. 2002) (emphasis added); *see also Mac'Avoy v. The Smithsonian Inst.*, 757 F. Supp. 60, 67 (D.D.C. 1991) ("The acquisition of the property is immaterial to a claim in replevin or conversion. The essence of the actions is the wrongful *withholding* of the property in question." (emphasis added)). Therefore, the remaining defendants may be determined to be converters even though they only purport to display or manage the property on behalf of Hungary. *See* Dan B. Dobbs *et al., The Law of Torts* § 61 ("[T]he defendant who exercises significant control over

the property is a converter even though he himself gains nothing from the property or his control over it."); *see also Dodd v. Pearson*, 279 F. Supp. 101, 104 (D.D.C. 1968) ("It is well settled, . . . that a person who receives and uses the property of another that has been wrongfully obtained, knowing that it was so obtained, is likewise guilty of conversion and liable for damages."), *rev'd in part on other grounds*, 410 F.2d 701 (D.C. Cir. 1969).

Second, plaintiffs allege that many of the bailments were actually entered into with representatives of the museums, so that Hungary may not be the only party, or even a party at all, to some of the bailments.[6]  Plaintiffs point to the 2004 *Sigray* decision of a Hungarian court, in which the Hungarian National Museum, as the sole defendant, was ordered to return a painting to the plaintiffs.  (*See* Supp. Declaration of Dr. Mark Peto Ex. A, ECF No. 175-1 ("*Sigray* Decision").)  According to the *Sigray* court, if there was a bailment between the plaintiff and the museum, the Hungarian State is not required to take any action prior to the museum releasing it, as "when the [artwork] is returned, there is . . . no alienation of property, only the return of possession."  (*Id.*)  Looking to the *Sigray* decision, the Court can see no reason why any similar claims by plaintiffs cannot go forward without Hungary's presence, at least to the extent plaintiffs prove that bailments exist between their predecessors and any of the remaining

---

[6] For example, in May 1950, a lawyer representing Elizabeth, Dr. Emil Oppler, "offer[ed]" several paintings belonging to the family "for deposit with the Museum of Fine Arts."  (*See* Walker Decl. Ex. B-3, ECF No. 148-10.)  Defendants claim in supplemental briefing that Elizabeth was in fact required to hand over such artwork under the Legislative Decree No. 13 of 1949, and that the National Center for Museums and Monuments, to which the letter was addressed, was a political subdivision of Hungary.  (*See* Defs.' Supp. Reply Br. at 1-2, ECF No. 176 ("Defs.' 2020 Reply").)  However, the Decree only *permitted* the government to require artwork be handed over (*see* Supp. Declaration of Zoltan Novak Ex. 1 at Art. 10, ECF No. 176-3), and defendants provide no proof that such a hand-over was ordered.  At this stage the Court considers plaintiffs' evidence sufficient to state a claim for bailment, and it need not resolve whether there was a breach of a bailment for which the remaining defendants may be liable.

defendants.[7]

The conclusion that the remaining defendants may be liable for damages or even in some cases for the return of the artwork is not altered by the Hungarian case cited by defendants in their motion to dismiss.  (*See* Mot. to Dismiss at 26 (citing Novak Decl. Ex. F, ECF No. 148-30).)  In that case, a claimant sued a private company and MNV for rights it claimed it had to use a government-owned property, alleging that the contracts for use between the private-company defendant and MNV were invalid under Hungarian law and that the private-company defendant had no right to terminate the claimant's use of the property.  (*See* Novak Decl. Ex. F at 3.)  The Metropolitan Court of Appeals concluded that "the court of first instance is required to call upon the claimant to involve the Hungarian State in the lawsuit[,] . . . failing which the proceedings should be stayed.  (*See id.* at 9.)  But from the outset, neither the claimant nor the defendants in that case disputed that the property at issue was owned by Hungary, and the only claims in the case were contract-based.  (*See id.* at 1.)  This differs from the instant case in two important ways: here, many of the claims are conversion-based, and joint tortfeasors generally need not be

---

[7] In *Sigray*, the court found a law requiring the permission of the minister to alienate state property inapplicable, as "[t]he court determined that a bailment agreement had been concluded between the plaintiffs' predecessor and the defendant," meaning that "in this instance **no alienation of property takes place**."  (*See Sigray* Decision (emphasis in original).)  Defendants argue that the *Sigray* case is inapposite because new laws on state property have been passed since the decision was published (*see* Defs.' 2020 Reply at 8–9); however, defendants do not explain how, if at all, these laws abrogate the principle at the heart of the decision, which is that "[u]nder [a] bailment agreement, no transfer of ownership or alienation of property takes place; the chattel remains in the ownership of the bailor, and only *possession* of the chattel is transferred to the bailee."  (*See Sigray* Decision (emphasis added).)

Moreover, the *Sigray* decision does not become irrelevant merely because in this case, unlike in *Sigray*, the defendant museums dispute the existence of a bailment.  (*See id.*)  The *Sigray* court "determined that a bailment agreement had been concluded between the plaintiffs' predecessor and the defendant."  (*Id.*)  If plaintiffs prove the existence of any bailments here, defendants will only have possession and not ownership and thus they can return the art.

joined.  Moreover, plaintiffs may be able to prove that bailment agreements existed with the defendants, therefore undercutting Hungary's claim of ownership of the property.

Nevertheless, even if the remaining defendants can provide some relief—monetary or otherwise—Hungary may still be a required party under the definition of one "claim[ing] an interest relating to the subject of the action" whose interest may be impeded.  Fed. R. Civ. P. 19(a)(1)(B)(i); *see also Wach v. Byrne, Goldenberg & Hamilton, PLLC*, 910 F. Supp. 2d 162, 169 n.5 (D.D.C. 2012) ("Notwithstanding a determination of complete relief, a party may still be necessary under subsection (a)(1)(B)." (internal alterations omitted) (quoting *Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir. 1996))).  Judge Kollar-Kotelly described "legally protected interest" as "exclud[ing] only those claimed interests that are 'patently frivolous.'"  *See Wach*, 910 F. Supp. 2d at 170 (quoting *Davis v. United States*, 192 F.3d 951, 959 (10th Cir. 1999)).  And as in *Wach*, plaintiffs and Hungary "lay opposing, irreconcilable claims to the same [pieces of artwork]."  *Id.* at 169.

In *Wach*, Judge Kollar-Kotelly went on to conclude under Rule 19(b) that because, *inter alia*, the absent party's interests were not protected by the remaining defendant, the absent party was indispensable.  *Id.* at 172.  This contrasts with an earlier decision of this Court where, at the Rule 19(a) stage, it decided that the absent parties' interests were not even "impede[d]" because they were adequately represented by the remaining defendant.  *See FDIC v. Bank of New York*, 479 F. Supp. 2d 1, 10 (D.D.C. 2007).  Whether an interest is "practically impeded" and whether interests are adequately protected undoubtedly overlap, and thus can be considered under either Rule 19(a) or 19(b).  *See Capital Med. Ctr., LLC v. Amerigroup Maryland, Inc.*, 677 F. Supp. 2d 188, 194 n.9 (D.D.C. 2010) ("Evaluation of the first Rule 19(b) factor overlaps considerably with the Rule 19(a) analysis." (internal quotation marks omitted)).

For this reason, courts often simply assume that an absent party meets the standard under Rule 19(a)(1)(B) and instead focus on the 19(b) factors.  *See, e.g., Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 108 (1968) (disposing of first step inquiry with the observation that there was "at least the possibility that a judgment might impede [the absent party's] ability to protect his interest"); *see also* Federal Practice & Procedure (Wright & Miller) § 1604 ("Rule 19(a) reflects an affirmative policy of bringing all interested persons before the court, whereas the object of Rule 19(b) is to determine whether it is possible to go forward with an action despite the nonjoinder of someone whose presence is desirable but not feasible."). While Hungary's presence may be desirable in this case, the Rule 19(b) factors are more illuminating, as they guide the Court's conclusion that continuation of the litigation, even without Hungary, is appropriate.

## C.      Indispensable Party

Because Hungary cannot be joined due to its sovereign immunity, the Court moves to the Rule's second step, whether "in equity and good conscience, the action should proceed."  Fed. R. Civ. P. 19(b).  The Court concludes that it should.

In arguing that Hungary is indispensable, defendants ask the Court to place dispositive weight on Hungary's sovereign immunity.  (*See* Mot. to Dismiss at 28 ("Because Hungary, a required party, is entitled to sovereign immunity, the action can be dismissed 'without consideration of any additional factors.' (quoting *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491, 1498 (D.C. Cir. 1995))).)  It is true that the Rule 19(b) inquiry in a case involving an absent sovereign may be somewhat "circumscribed," for "immunity may be viewed as one of those interests 'compelling by themselves.'"  *Kickapoo*, 43 F.3d at 1497, 1496 (quoting *Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765,

777 n.13 (D.C. Cir. 1986)).  And, the Supreme Court has held that "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action *must* be ordered where there is a potential for injury to the interests of the absent sovereign."  *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008) (emphasis added).

However, in contrast to the sovereign in *Pimentel*, Hungary's interests are adequately protected in this case by the remaining defendants.  "[P]rejudice to absent parties approaches the vanishing point when the remaining parties are represented by the same counsel, and when the absent and remaining parties' interests are aligned in all respects."  *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 134 (2d Cir. 2013).  This is precisely the case here, particularly with the addition of MNV as a defendant—as plaintiffs observe, "MNV is Hungary's agent with respect to the artworks at issue, and has represented Hungary in this action from day one."  (*See* Pls.' Opp. at 35.)  Defendants have cited no differences in interests between themselves and Hungary; indeed, all defendants are represented by the same legal team as Hungary was prior to its dismissal, a key point in the prejudice analysis.  *See Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 360 (2d Cir. 2015) (noting that defendant and absent party would be represented by same attorney, suggesting their interests must be "aligned in all respects" (internal quotation marks omitted)).  In many cases in which the absent sovereign was deemed indispensable, by contrast, the sovereign's interests were often only partially aligned with other defendants.  *See, e.g., Two Shields v. Wilkinson*, 790 F.3d 791, 799 (8th Cir. 2015) (noting that remaining defendants "have strong incentives to characterize any breach as resulting solely from the government's independent action and judgment" in order to reduce their own liability); *see also Kickapoo*, 43 F.3d at 1498; *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 69 (D.D.C. 2016).  In this case the remaining defendants and Hungary are not only aligned, they

31

"share a 'precisely' identical interest in the subject matter of the litigation," *i.e.*, that Hungary and its agencies and instrumentalities continue their possession of the artwork and pay no damages. *See Wach*, 910 F. Supp. 2d at 171.

The remaining factors also weigh in plaintiffs' favor. As discussed above, the Court concludes that limiting plaintiffs' remedies to damages to the extent defendants claim Hungarian law forbids them from alienating artwork without permission of the Hungarian government further reduces any prejudice or risk of inconsistent obligations. Plaintiffs do not claim that an action limited in such a way—to damages, rather than injunctive or declaratory relief—would be inadequate. (*See* Pls.' Opp. at 35–36 ("Even if Hungary were prejudiced [by an order to return the paintings in its absence], this Court could limit Plaintiffs' remedy to damages against the remaining Defendants, which would result in no prejudice to Hungary.").) And, this Court has previously observed that requiring plaintiffs to litigate in Hungary, defendants' proposed alternative forum, would be futile. *See de Csepel*, 169 F. Supp. 3d at 169 n.15 ("[T]he Court finds that plaintiffs have adequately shown that further efforts to seek a remedy in Hungary would have likely proved futile.").[8]

In briefing submitted after oral argument, defendants raised a new argument why Hungary is a necessary party—"[b]ecause a money judgment against the Museum Defendants alone could not be enforced without violating Hungary's recognized sovereign immunity (as any enforcement would necessarily implicate Hungarian state funds) Hungary is an indispensable

---

[8] Of course, in a case involving sovereign immunity this last factor is of limited probative value. *See Wichita & Affiliated Tribes*, 788 F.2d at 777 ("Although we are sensitive to the problem of dismissing an action where there is no alternative forum, we think the result is less troublesome in this case than in some others. . . . [T]he dismissal turns on the fact that society has consciously opted to shield Indian tribes from suit without congressional or tribal consent.").

party and the action cannot go forward." (*See* Defs.' Supp. Reply Br. at 10, ECF No. 176

("Defs.' 2020 Reply").)  This is a novel argument, particularly within the context of FSIA

actions.  However, even assuming that any and all damages ordered against the remaining

defendants would be paid out of Hungary's treasury,[9] the Court concludes that this action may

nonetheless continue.

Prior cases in which dismissal was ordered because the federal government was immune

yet faced potential monetary liability are distinguishable.  Defendants cite *Mine Safety*

*Appliances Co. v. Forrestal*, 326 U.S. 371 (1945), in which the Supreme Court concluded that

the suit against the Under Secretary of the Navy was "essentially one designed to reach money

which the government owns," meaning that the federal government was a necessary party.  *Id.* at

375.  However, the plaintiff in *Mine Safety* was effectively suing the Secretary in his official

capacity, and as a result, was suing the sovereign.  Having determined that MNV is not so

integral to Hungary's political structure that it should be considered Hungary's "political

subdivision," a conclusion already reached for the other remaining defendants, *see de Csepel*,

169 F. Supp. 3d at 167 ("[D]efendants have already admitted that the museums and university

holding all of the art are agencies or instrumentalities."), the Court will not reverse course and

collapse the distinction here.

Other cases where the federal government has been deemed indispensable based on the

potential for outlay of its funds, such as *Weeks v. Housing Auth. of Opp, Alabama*, 292 F.R.D.

689 (M.D. Ala. 2013), lack the identity of interest present in this case.  In *Weeks*, the district

---

[9] Although defendants claim that in the absence of Hungary, they cannot pay damages (*see* Declaration of David Kratchowill ¶ 7, ECF No. 154-1; *see also* Defs.' 2020 Reply at 9-10), this proposition is contested by plaintiffs.  (*See* Supp. Declaration of Dr. Mark Peto at 4-5, ECF No. 175-1.)

court concluded that the Department of Housing and Urban Development ("HUD") was an indispensable party because all the defendant's "funds and operating expenditures are subject to [its] oversight and approval," and it informed the defendant "that it would not approve any payments" to the plaintiff, who had been terminated from defendant's employment. *Id.* at 691. However, the local Housing Authority in *Weeks* did not have the same identity of interest with HUD as defendants have with Hungary, even if both receive all their funds from the absent sovereign entity. Defendants here are represented by the same attorneys as Hungary and are agencies and instrumentalities *of the state* itself. In contrast, the Housing Authority in *Weeks* had a contributions contract with HUD by which HUD paid its expenses, but the two clearly had different priorities. *See id.* at 691 (noting that the defendant "tried to negotiate further with HUD" prior to litigation to avoid terminating plaintiff in the first place). This case, by contrast, is more like *American Trucking*, in which the Second Circuit concluded that New York was not an essential party even though "as a practical matter, a defeat for the [remaining defendant, the New York State Thruway Authority,] may have downstream effects that cost the State money." *American Trucking*, 795 F.3d at 359. Although the effect on Hungary of a judgment adverse to defendants would be more direct than any potential effects of an adverse judgment on New York, which had no legal obligation to pay the defendant's liabilities, *see id.* at 358, this is a difference in degree, rather than in kind. As the Court there aptly observed, "having reserved and retained the benefits of corporate separation for all other purposes, [remaining defendants and absent parties] may not pierce their own arrangements to accommodate litigation strategy." *Id.* at 359.

Moreover, implicit in the structure of the FSIA is the proposition that a foreign state's agency or instrumentality may be sued even when the foreign state remains immune. For example, as has been clarified by the Court of Appeals, the FSIA's expropriation exception lays

out two different commercial-nexus standards—one that abrogates immunity for foreign states, and one for agencies and instrumentalities.  *See de Csepel*, 859 F.3d at 1107 ("hold[ing] that a foreign state retains its immunity unless the first clause of the commercial-activity nexus requirement is met").  Agencies and instrumentalities are *often* fully- or partially-funded by their foreign state.  *See Bancec*, 462 U.S. at 624 (describing how a "typical government instrumentality" may require "appropriations to provide capital or to cover losses"); (*see also* Pls.' Supp. Reply Br. at 3, ECF No. 175 ("Pls.' 2020 Reply")).  And even partial funding would "implicate" the sovereign's funds in some way.  But under the test proposed by defendants, this fact would necessarily render the foreign state an indispensable party.  (*See* Defs.' 2020 Reply at 10.)  If an agency or instrumentality with some budgetary ties to the sovereign could never be sued unless the sovereign itself were also a party, it would be pointless for the FSIA to treat immunity for agencies and instrumentalities differently than for foreign states.  Defendants' *per se* rule is thus in tension with the FSIA's mandate, as articulated by the Court of Appeals, that agencies and instrumentalities can be sued even when foreign states—which may fund their budgets, in whole or in part—cannot.  This conclusion is further bolstered by the FSIA provision § 1606:

> As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.

(*See* Pls.' 2020 Reply at 3 (quoting 28 U.S.C. § 1606).)  Again, this demonstrates that agencies and instrumentalities and foreign sovereigns,[10] which may at times lose immunity when the other does not, cannot use their budgetary connections to circumvent the different ways the FSIA may

---

[10] As discussed above, 28 U.S.C. § 1603(a) defines a foreign state to include an agency or instrumentality.

treat them.[11]

For all the above-described reasons, the Court concludes that Hungary is not an indispensable party under Rule 19(b).  The case may proceed in its absence.

## III.   JURISDICTION

### A.   Legal Standard

"The jurisdiction of the district court . . . is governed by the FSIA itself: A foreign state is immune from suit in both federal and state courts, 28 U.S.C. § 1604, unless the case comes within an express exception in the FSIA, *id.* § 1605."  *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 196 (D.C. Cir. 2004); *see also Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) ("If no exception applies, a foreign sovereign's immunity under the FSIA is complete: The district court lacks subject matter jurisdiction over the plaintiff's case . . . ." (internal citations omitted)).

While generally the Court is to assume all facts as true at the motion to dismiss stage, "[w]hen a foreign sovereign disputes the fact(s) upon which the district court's subject matter jurisdiction depend(s), the court 'must go beyond the pleadings and resolve any disputed issues

---

[11] The Court is also not persuaded by the district court decision in South Carolina, discussed above, *see* section II.B, *supra*, in which the district court observed that it "believes the Netherlands and the Ministry are necessary parties to this action involving contested ownership," because without their presence in the litigation it "cannot render an effective ruling regarding the ownership of the Artworks."  *See Berg*, Slip Op. at 41.  Before making this remark, the court had already concluded that the action must be dismissed due to a lack of personal jurisdiction over remaining defendants, *see id.* at 31, and because of improper venue. *See id.* at 38-39.  As a result, the court's standing analysis—which included its offhand observation regarding the Netherlands' "necessary" status—was mere dicta.  Moreover, the district court reached this conclusion while deciding whether plaintiffs had *standing* to press their claims.  *See id.* at 41 (concluding that without Netherlands or the Ministry, plaintiffs had not established redressability).  Rule 19 was not mentioned, let alone analyzed.

of fact the resolution of which is necessary to a ruling upon the motion to dismiss.'"  *Price*, 389

F.3d at 197 (quoting *Phoenix Consulting*, 216 F.3d at 40).  For example, under the expropriation

exception, "federal courts can maintain jurisdiction to hear the merits of a case only if they find

that the property in which the party claims to hold rights was indeed 'property taken in violation

of international law.'"  *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling

Co.*, 137 S. Ct. 1312, 1316 (2017).

Plaintiffs must produce evidence to show the absence of immunity based on an FSIA

exception.  *See Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 42 (D.D.C. 2000).  However,

"[i]n accordance with the restrictive view of sovereign immunity reflected in the FSIA, the

burden of proof in establishing the inapplicability of these exceptions is upon the party claiming

immunity."  *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002

(D.C. Cir. 1985).  As a result, "defendant[s] bear[] the burden of proving that the plaintiff's

allegations do not bring its case within a statutory exception to immunity."  *Phoenix Consulting*,

216 F.3d at 40; *see also Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir.

2015) (same).

## B.    The Court of Appeals' Remand

In its most recent opinion, the Court of Appeals approved this Court's use of the FSIA's

expropriation exception as to the remaining defendants (excluding Hungary), which satisfied the

second clause of the exception, relating to an agency or instrumentality of a foreign state.  *See* 28

U.S.C. § 1605(a)(3).  It then directed this Court to address several specific issues on remand.

First, the Court of Appeals determined that "most of [plaintiffs'] claims do in fact involve

a tight legal, factual, and temporal connection to Hungary's expropriation of the collection."  *de

Csepel*, 859 F.3d at 1102.  Indeed, the Circuit noted defendants' concession that "some twenty-

five pieces of art were *never* returned to the family" by Hungary.  *See id.* (emphasis added).  It thus "conclude[d] that 'rights in property taken in violation of international law' are 'in issue' as to those twenty-five or so artworks taken by Hungary during the Holocaust and never returned." *Id.* at 1103.  Therefore, the Court has jurisdiction under the FSIA's expropriation exception over these undisputed wartime takings.  The twenty-three pieces that defendants have conceded were never returned and over which the Court has jurisdiction pursuant to the Court of Appeals' decision are listed in Appendix A, attached hereto.[12]

However, the Court of Appeals also noted that "some fifteen pieces of the Herzog collection were physically returned to family members, and others were legally released to the family on paper (though the family disputes whether they were ever actually returned to their physical custody)."  *Id.* (internal quotation marks and brackets omitted).  As to these pieces, the Circuit instructed the Court to "determine[] whether the temporary return of the art severed the connection between Hungary's current possession and its Holocaust-era seizure."  *Id.*  For, "if Hungary returned the artworks free and clear to the family and then lawfully repossessed them, a claim for their return would not satisfy the expropriation exception."  *Id.* at 1104.  However, if the subsequent re-taking was "sufficiently intertwined with the Holocaust-era taking, or if the pieces were retaken in a new violation of international law," the expropriation exception would be satisfied despite the temporary return.  *See id.*  Defendants argue that nineteen pieces, listed in Appendix B, were returned to the Herzog siblings after World War II, and that sixteen of those were subsequently repossessed.  The Court analyzes below whether post-World War II actions caused these nineteen artworks to enter defendants' possession lawfully.

---

[12] Upon further review of the record, it is apparent that jurisdiction has been established as to twenty-*three* (not twenty-five) pieces of artwork.  (*Compare* Scholl-Tatevosyan Decl. Ex. 1, ECF No. 148-2 (listing all forty-two artworks in the amended complaint) *with* Ex. 2 (listing nineteen pieces allegedly returned to Herzog siblings).)

Second, the Court of Appeals instructed the Court to determine if the 1973 Agreement between Hungary and the United States that settled certain claims of American citizens barred claims to pieces attributable to Elizabeth because of the treaty exception to the FSIA.[13] *See* Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, March 6, 1973, 24 U.S.T. 522 (the "1973 Agreement").  The Court will discuss the claims settlement process in greater detail below, *see* Section III.D.1, *infra*, but for now, the claims process can be briefly summarized as follows: American citizens whose property was taken by Hungary up to the day the 1973 Agreement was signed on March 6, 1973, were able to make claims under two claims settlement processes, one in the 1950's and one in the 1970's.  While the first process allowed claimants to retain rights to the unpaid balance of their claims, the 1973 Agreement purported to settle *all* covered claims by American citizens and discharge them completely.  According to the Court of Appeals, this Court must determine whether "Hungary did take some of the art from [Elizabeth] *after* she became a [U.S.] citizen," as "the 1973 agreement could not have extinguished claims in any work of art taken from [her] before she became a citizen in 1952." *de Csepel,* 859 F.3d at 1108 (emphasis added).  However, claims relating to pieces taken between June 23, 1952, when she became a U.S. citizen, and 1973 would be barred by the 1973 Agreement in accordance with the FSIA's treaty exception.[14]  Again, this review is limited to those nineteen pieces defendants

---

[13] The FSIA provides that the abrogation of sovereign immunity under its exceptions is "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act." *See* 28 U.S.C. § 1604.  Therefore, "if there is a conflict between the FSIA and . . . [a pre-existing international] agreement regarding the availability of a judicial remedy against a contracting state, the agreement prevails." *de Csepel*, 714 F.3d at 601 (internal quotation marks omitted).

[14] This Court had previously concluded that two of the forty-four pieces of artwork in the complaint— Lucas Cranach's *Joachim with the Angel* and John Opie's *Portrait of an Old Lady*—were not take in violation of international law. *See de Csepel*, 169 F. Supp. 3d at 167.

argue were returned.  *See id.* (ordering the Court to review if pieces were taken from Elizabeth after she became a citizen "as part of its review of the artwork returned and retaken by Hungary").

The Court addresses each of these jurisdictional issues—allegedly returned and repossessed artworks, *see* Section III.C, *infra*, and pieces possibly barred by the 1973 Agreement between Hungary and the United States, *see* Section III.D, *infra*.  As to the nineteen pieces, Appendix B lists the artworks and designates the ones over which the Court has concluded that it retains jurisdiction.

### C.     Returned and Repossessed Artworks

Defendants' first jurisdictional argument is that nineteen pieces listed in the amended complaint were not taken in violation of international law for purpose of the FSIA's expropriation exception.  (*See* Mot. to Dismiss at 34.)  According to defendants, "Hungary returned the artworks free and clear to the family and then lawfully repossessed them, [so] a claim for their return would not satisfy the expropriation exception."  *de Csepel*, 859 F.3d at 1104.

The nineteen pieces allegedly returned and repossessed can be split into four categories: (1) ten pieces that were part of the forfeiture order in the smuggling case against Illona Kiss, István's former wife (the "Kiss Forfeiture"); (2) three that were not explicitly part of the Kiss Forfeiture, but which defendants argue were taken "in connection with" it; (3) two that defendants argue were returned to plaintiffs and never re-possessed by Hungary; and (4) four for

---

As found by this Court, the Opie was acquired from a third-party donor in 1963, and the Cranach was seized by Hungary's communist government in 1952 from the home of a former attorney for the Herzog family in connection with the prosecution of an individual (Ferenc Kelemen) who allegedly violated Hungarian registration laws and hid the painting to keep it safe for Elizabeth. *See id.* at 165-66; *see also* 859 F.3d at 1108.

which plaintiffs contest the return itself.  Beyond the four pieces in category (4) whose return

plaintiffs dispute, plaintiffs argue that, even if a piece had been returned, all subsequent re-

takings were "in violation of international law."

While plaintiffs are correct that "[a] taking violates international law if: (1) it was not for

a public purpose; (2) it was discriminatory; or (3) no just compensation was provided for the

property taken" (*see* Pls.' Opp. at 40 (quoting *de Csepel*, 808 F. Supp. 2d at 128)), they fail to

address an additional requirement—for a taking to constitute an expropriation in violation of

international law, it must also be of the property of a national of another state because otherwise

it would be blocked by what is referred to as the "domestic takings rule."  *See* Restatement

(Third) of the Foreign Relations Law of the United States § 712 ("A state is responsible under

international law for injury resulting from . . . a taking by the state of the property of a *national*

*of another state* . . . ." (emphasis added)).  "The domestic takings rule means that, as a general

matter, a plaintiff bringing an expropriation claim involving an intrastate taking cannot establish

jurisdiction under the FSIA's expropriation exception because the taking does not violate

international law."  *See Simon*, 812 F.3d at 144-45.  In cases arising out of takings from Jewish

people during World War II, the domestic takings rule has not been applied because the genocide

perpetrated by Germany and other Nazi-affiliated governments constitutes the predicate violation

of international law.  *See id.* at 144 ("The domestic takings rule has no application in the unique

circumstances of this case, in which, unlike in most cases involving expropriations in violation of

international law, *genocide* constitutes the pertinent international-law violation.").  For that

reason, the Court of Appeals instructed this Court to determine on remand whether the new,

post-World War II takings were "sufficiently intertwined with the Holocaust-era taking."  *See de*

*Csepel*, 859 F.3d at 1104.  Whether the later re-possessions are "sufficiently intertwined" with

the Holocaust will therefore guide the Court's analysis, as any "basic international-law

expropriation claim[s]," *Simon*, 812 F.3d at 145, severed from the Holocaust, will largely be

barred by the domestic takings rule and will not constitute violations of international law.[15]

### 1.    Kiss Forfeiture

Ten of the returned and repossessed pieces were taken as part of a smuggling prosecution

against Ilona Kiss, István's former wife and one-time guardian.  István "gifted" much of his art

to her in 1944 in an attempt to avoid its confiscation, as she was not Jewish and thus not subject

to the registration laws.  (*See* Pls.' Opp at 6; *see also* Walker Decl. Ex. R-2, ECF No. 148-26.)  A

police report written during the investigation described how in 1948 Ms. Kiss, along with several

others, smuggled three artworks out of Hungary for sale in Switzerland.  (*See* Walker Decl. Ex.

R-2.)  As a result of this investigation, the Hungarian government impounded a number of

artworks belonging to the Herzog family—some belonging to István, but also several belonging

to Elizabeth and András.  Following Kiss' conviction, fourteen pieces belonging to the Herzog

family were taken into state ownership by the Museum of Fine Arts on October 6, 1950, and

were inventoried on October 18, 1950.  (*See* Declaration of Alycia Regan Benenati ("Benenati

Decl.") Ex. 12, ECF No. 153-15; *see also* Walker Decl. Ex. K-7, ECF No. 148-19.)  Ten

artworks on this list of fourteen are part of the nineteen pieces the Court of Appeals directed this

Court to assess for jurisdictional purposes.[16]

---

[15] Thus, in 1952, when Elizabeth became an American citizen, and, for pieces attributed to
András, in 1959, when his first daughter became an Italian citizen (*see* Pls.' Opp. at 5), the
domestic takings rule would cease to apply, and a taking meeting plaintiffs' criteria (for example,
one made without compensation) *would* constitute a taking in violation of international law
unless barred by the FSIA's treaty exception.  *See* note 13, *supra*.

[16] The ten pieces included in the Kiss Forfeiture (that also belong to the group of nineteen
returned pieces) are:

(1) Barthel Bruyn, *Portrait of Petrus von Clapis, half-length, in a blue coat with*

Plaintiffs argue that "[t]he underlying criminal proceedings against Ilona Kiss were predicated on an invalid Holocaust-era agreement that Ilona Kiss and István Herzog entered into to attempt to shield István Herzog's property from Nazi confiscation," and thus, any takings associated with it must be viewed as intertwined with the earlier, Holocaust-era takings. (*See* Pls.' Opp. at 43.)   However, given that the Kiss prosecution was for smuggling and was undertaken by Hungary's communist government after the fall in 1945 of the German-controlled, Fascist regime and the repeal in March 1945 of the World War II-era discriminatory laws, the Court cannot agree.  The ten pieces were returned prior to their forfeiture, so their taking in 1950 due to a criminal proceeding "severed the connection between Hungary's current possession and its Holocaust-era seizure." *See de Csepel*, 859 F.3d at 1103.

However, the October 1950 forfeiture order does not close the chapter on the Kiss Forfeiture.  On March 20, 1951, Dr. Oltványi, then-director of the Museum of Fine Arts, wrote a letter memorializing his conversation with a representative of the Herzog family, Henrik Lorant, in which he stated that Mr. Lorant had informed him that several pieces had been "included in the criminal attachment [in the Kiss Forfeiture] by mistake."[17]  (*See* Tatevosyan Decl. Ex. 63,

---

*fur collar*, 17(i) in the amended complaint;

(2) Gustave Courbet, *The Spring (Artist and Model)*, 17(v);

(3) Pseudo Pier Francesco Fiorentino, *The Madonna and Child with the Infant Saint John, Saint Catherine and Angels*, 17(ix);

(4) Domenikos Theotokopoulos, El Greco, *The Holy Family with Saint Anne*, 17(x);

(5) Augustin Theodule Ribot, *Still Life with a Chicken, a Bottle of Wine, Asparagus, Artichoke, Tomatoes and other Vegetables, on a Table*, 17(xv);

(6) Sir Anthony Van Dyck, *Portrait of Margaret of Lothringen*, 17(xvii);

(7) Alvise Vivarini or Giovanni Battista da Udine, *Madonna and Child with Saints John the Baptist and a male Saint*, 17(xviii);

(8) Francisco de Zurbarán, *Saint Andrew*, 17(xix);

(9) *A Terracotta Group of the Virgin and Child*, Italian, 15th Century, 17(xxi); and

(10) József Borsos, *Portrait of the Architect Mátyás Zitterbarth*, 18(i).

[17] Another letter written by a Herzog representative, Dr. Emil Oppler, on May 3, 1950, refers to

ECF No. 106-6.)  Furthermore, he "request[ed] commencement of the procedure for terminating the criminal attachment." (*Id.*)  The five pieces listed in this "mistake letter" comprise the pieces attributed to Elizabeth and András that had previously been included in the Kiss Forfeiture.[18] Neither plaintiffs nor defendants have provided any further proof as to whether the criminal attachment was in fact terminated; however, at this stage, and given the burden of proof, the Court cannot conclude that these pieces were taken as a result of the Kiss Forfeiture and, therefore, cannot conclude that they passed to the state in 1950.

However, all five of these artworks are still in defendants' possession, so they must have been taken again at some later time.  And as noted, the pieces are attributable to András or Elizabeth, who either themselves (Elizabeth) or their heirs (András) eventually became non-Hungarian citizens.  *See* note 15, *supra*.  Therefore, these later takings of the five paintings will need to be analyzed to see if they constitute separate violations of international law.

Defendants have presented some evidence regarding the one piece that is attributable to András—József Borsos's *Portrait of the Architect Mátyás Zitterbarth*.  (*See* Walker Decl. Ex. D, ECF No. 148-12.)  Although there is no information regarding the painting's whereabouts after the Kiss Forfeiture, the next mention of this painting was in a letter dated December 11, 1973, in

---

these pieces, among others, as having been taken by the police "for the clarification of their legal status."  (*See* Walker Decl. Ex. B-3.)

[18] The five pieces included in the Kiss Forfeiture and also in this "mistake letter" are:

> (1) Barthel Bruyn the Elder, *Portrait of Petrus von Clapis, half-length, in a blue coat with fur collar*, 17(i) in the amended complaint;
> (2) Pseudo Pier Francesco Fiorentino, *The Madonna and Child, with the Infant Saint John, Saint Catherine and Angels*, 17(ix);
> (3) Domenikos Theotokopoulos, El Greco, *The Holy Family with Saint Anne*, 17(x);
> (4) Sir Anthony Van Dyck, *Portrait of Margaret of Lothringen*, 17(xvii); and
> (5) József Borsos, *Portrait of the Architect Mátyás Zitterbarth*, 18(i).

which the Hungarian Ministry of Culture asserted that it, along with the other pieces listed in the Kiss Forfeiture, "insofar [as] they have not already passed into the ownership of the State," have become state property.  (*See* Scholl-Tatevosyan Decl. Ex. 37, ECF No. 148-5.)  By 1973, András's daughters were Italian citizens, and they received no compensation for the painting's taking; as a result, the taking of this artwork is an expropriation in violation of international law over which the Court has jurisdiction.  As to the four pieces attributable to Elizabeth that were listed in the March 20, 1951 "mistake letter," it appears likely that any taking would have occurred after she became a U.S. citizen in June 1952 and would thereby implicate the 1973 Agreement, which is discussed below.  *See* Section III.D, *infra*.

### 2.  Kiss Forfeiture "In Connection With" Pieces

Defendants next argue that three pieces "were handed over to Hungary in 1950, all in connection with the Kiss smuggling action" (Mot. to Dismiss at 37)—(1) Alonso Cano, *Portrait of Don Balthasar Carlos (1629-1646), Standing full-length, in a Landscape*, 17(ii) in the amended complaint; (2) Giovanni Pedrini, called Giampietro, *Christ Carrying the Cross*, 17(xiii); and (3) Mihály Munkácsy, *In the Studio*, 18(iv).  While all three pieces were indeed offered to the defendants in May 1950, pursuant to a letter written by Elizabeth's representative, Dr. Emil Oppler (*see* Walker Decl. Ex. B-3, ECF No. 148-10), there is no evidence to suggest that these three pieces were taken "in connection with" the Kiss Forfeiture.  The letter recognized that several pieces were already in the custody of the Financial Police, but these three were not included with those pieces that were in the possession of the police.  (*See id*.)  As to these three pieces, as well as several others not at issue here, Dr. Oppler offered the paintings "for deposit . . . while maintaining the ownership title to the deposit."  (*Id.*)  Dr. Oppler's offer was made with reference to Legislative Decree No. 13/1949, which allowed the government to order certain collections of national interest be transferred to governmental custody for safekeeping.

(*See* Defs.' 2020 Reply at 2 ("This law, which explicitly applies to 'private collections of national interest,' states that the 'Minister of Religion and Public Education may order the transfer of the private collection into a public collection' to keep a collection secure or intact." (quoting Legislative Decree No. 13 of 1949 on Museums and Monuments at Art. 10)).) However, given that the letter purports only to bail the collection temporarily, and there is no other evidence that Dr. Oppler was ordered to surrender the works, the Court concludes that the May 1950 letter does not itself indicate that Hungary "took" the pieces in connection with the Kiss Forfeiture.

Defendants cite a document from June 1958 listing certain pieces from the deposit stock of the Old Masters Gallery "to be inventoried," *i.e.*, added to the Museum of Fine Art's core inventory.  (*See* Walker Decl. Ex. B-5.)  Included on this list is *Christ Carrying the Cross* by an Italian painter, with the same dimensions as were listed for the Giovanni Pedrini in the amended complaint.  (*Compare id. and* Am. Compl. ¶ 17(xiii).)  Given that it was returned before 1950, kept by a private individual, and then offered back to the government in 1950, any "taking" that occurred by 1958 of the *Christ Carrying the Cross* was "severed . . . [from] its Holocaust-era seizure."  *See de Csepel*, 859 F.3d at 1103.  Defendants have thus met their burden that the expropriation exception does not apply.

The remaining two pieces—Munkácsy's *In the Studio* and Cano's *Portrait of Don Balthasar Carlos*—present a different analysis.  While both came into defendants' possession in 1950 pursuant to the Oppler letter, there is no proof that they were "taken" by the Hungarian government into its possession until much later.  Given that both pieces belong to Elizabeth, their taking after 1952 could constitute a separate violation of international law unless the 1973 Agreement applies.  As a result, the Court will analyze these pieces under the 1973 Agreement

before deciding whether has jurisdiction over them.  *See* Section III.D, *infra*.

### 3.      Pieces Defendants Claim Not to Possess

Defendants claim not to be in possession of several artworks listed in the amended

complaint, two of which must be analyzed here—(1) *Four ancient Egyptian sculptures, statues,*

*and steles*, 17(xxxi); and (2) Lajos Deák Ébner, *Fair in Szolnok City*, 18(v).[19]  Plaintiffs

conceded at oral argument that they have no evidence to rebut defendants' evidence that Ébner's

*Fair in Szolnok City* was returned to the Herzog siblings after the war and was never repossessed

by defendants.  (*See* Jan. 13, 2020 Tr. at 115:13-17, ECF No. 174.)  Claims relating to this piece

are therefore dismissed for lack of jurisdiction.  However, as to the *Four Ancient Egyptian*

*sculptures, statues, and steles*, not only does defendants' evidence of return relates to, at most,

two of the four pieces (*see* Walker Decl. Ex. T, ECF No. 148-28), but plaintiffs also contest

defendants' assumption that the returned pieces are the same as those confiscated during World

War II.  (*See* Benenati Decl. Ex. 23 at 3, ECF No. 153-26.)   The Court agrees that a document

memorializing the receipt of "1 Egyptian stone tablet" and "1 Egyptian inscribed tablet" (*see*

Walker Decl. Ex. T-1), without more, is not sufficient to demonstrate a return of the pieces

described in 17(xxxi).  As a result, defendants have not "severed the connection between

Hungary's current possession and its Holocaust-era seizure."  *See de Csepel*, 859 F.3d at 1103.

The Court thus concludes that defendants have not met their burden to demonstrate that the

---

[19] The Court need not address the other three pieces defendants claim not to be in possession of:
(1) *Terracotta Group of the Virgin and Child*, Italian, 15th century, 17(xxi) in the amended
complaint; (2) *Four ancient silver coins*, 17(xxxiii); and (3) *Seventy-Eight Pieces: Ancient
Cameos, Intaglios, Other Carved Stones and Semi-Precious Stones*, 17(xxxiv), which defendants
noted for the first time at oral argument might also not be in their possession.  (*See* Jan. 13, 2020
Tr. at 119:10-14, ECF No. 174.)  The *Terracotta Group* was part of the Kiss Forfeiture and, as
noted above, its taking was not intertwined with the Holocaust-era takings.  *See* Section III.C.1,
*supra*.  The other two pieces are undisputed wartime takings (*see* Appendix A), so the Court
need not address them for purposes of jurisdiction.

expropriation exception does not apply to the artwork listed in 17(xxxi) of the amended complaint.

### 4.     Disputed-Return Artworks

Plaintiffs raise factual disputes as to four of defendants' alleged returns: (1) *Virgin of the Annunciation*, Austrian, circa 1400, 17(xxv) in the amended complaint; (2) Károly Ferenczy, *Landscape with a Fenced Enclosure (Houses in Fernezely with Sheepfold) 1912*, 20(i); (3) Giovanni Santi *Christ with a Fly*, also known as *Christ the Dolorous*, *Christ with a Fly*, 17(xvi); and (4) *A Painted Stucco Bust*, after Jacopo della Quercia, 17(xx).  As to the first and fourth, the Court concludes that defendants have failed to demonstrate that the expropriation exception does not apply, as they have not shown that the pieces were in fact returned "free and clear."  *See de Csepel*, 859 F.3d at 1104.  As to the second and third, the Court concludes that plaintiffs cannot rely on the expropriation exception.

Plaintiffs argue that the *Virgin of the Annunciation* was not returned in 1947, and that a statue closely resembling it in description is listed as part of the Museum of Fine Art's deposit inventory.  (*See* Pls.' Opp. at 40.)  The amended complaint describes this piece as an Austrian statue circa 1400, made of limestone, and approximately 90 centimeters tall.  (*See* Am. Compl. ¶ 17(xxv).)  Defendants cite a letter dated January 25, 1947, from Elizabeth's representative, saying he took possession of a "Female Saint" stone sculpture, as evidence that the piece in the complaint was returned after the war.  (*See* Walker Decl. Ex. C-1, ECF No. 148-11.)  A list of the pieces on deposit with the Museum of Fine Arts in 1958 includes a "Saint Woman," purportedly from a 15th-century German master, made of chalk (a variety of limestone) and 90 centimeters tall.  (*See id.* at Ex. C-4; *see also* Benenati Decl. Ex. 23.)  It is listed as acquired from the "Government Commissioner's Office."  (*See* Walker Decl. Ex. C-4.)  Plaintiffs seem to agree that the piece listed on the deposit register is the one described in the complaint, but dispute that

the "Female Saint" returned in 1947 is the same piece.  (*See* Benenati Decl. Ex. 23.)  The Court

concludes that such a sparse description as "Female Saint" is not sufficient to show that the

statue was in fact returned, particularly when there is no further evidence of its possession by the

Herzog siblings *or* of its bailment back to defendants.  And, the piece's current placement in the

"deposit" catalog casts doubts on defendants' representations of ownership.[20]  The Court will

therefore retain jurisdiction over claims related to this artwork.

Plaintiffs claim that "[t]here is also a dispute of fact as to whether . . . [Ferenczy's

*Landscape*] was returned in 1947 and sold."  (*See* Pls.' Opp. at 41.)  However, it is clear from a

letter from January 25, 1947, that a representative of the Herzog family took possession of the

painting (*see* Walker Decl. Ex. E-1, ECF No. 148-13), and a subsequent letter in June 1948

indicates that the same representative "sold . . . [the Ferenczy *Landscape*] through professor

Elemer Varju."  (*See id.* at E-2.)  Contrary to plaintiffs' contention (*see* Pls.' Opp. at 41), the

exhibit relied on by defendants specifies which paintings were sold.  (*See* Walker Decl. Ex. E-2.)

Although in light of this sale it is odd that a 1958 Museum of Fine Arts document lists the piece

as deposited by the Herzogs (*see* Benenati Decl. Ex. 25, ECF No. 153-28), the piece is no longer

on deposit and the Court sees no reason to disregard the record evidence attesting to the release

of the painting to a Herzog representative and its subsequent sale.  Any later repossession by the

---

[20] As the name suggests, pieces that are on "deposit" with the museums, as opposed to in their "core" inventory, do not belong to the museums but are merely on loan, for example from a private collection.  (*See* Benenati Decl. Ex. 13, Deposition of Samuel Balász, at 33:17-19 ("Q: So if an artwork is a deposit, it is not owned by the state? A: Yes."), ECF No. 153-16.)  This different status between core and deposit pieces is reflected in how the two are treated under Hungarian law.  For example, core pieces "are subject to restricted marketability" and cannot be alienated without government permission (*see* Novak Decl. Ex. E, Act CXL of 1997 on Museological Institutions, Public Library Services and Public Culture at Section 38(1), ECF No. 148-30), because they are government property.  This restriction does not apply to pieces that are on deposit.

Hungarian government of the painting was thus "severed . . . [from] its Holocaust-era seizure." *See de Csepel*, 859 F.3d at 1103.

Plaintiffs take issue with defendants' contention that Giovanni Santi's *Christ with a Fly* "was actually returned in 1947." (Pls.' Opp. at 41.) A memorandum dated June 25, 1947, described the Santi being released to Mrs. István Herzog as István's guardian. (*See* Walker Decl. Ex. R-1.) And, a November 1948 report of the Hungarian State Police's Economy Policy Department says that in the summer of 1947, Mrs. István Herzog transferred her guardianship to Dr. Odon Berzsenyi, "at the same time handing over" several paintings belonging to István, including the Santi. (*See id.* at Ex. R-2.) The painting entered state possession by sometime in 1948, when it was listed among pieces that a Hungarian ministry had placed "at the disposal of the Museum of Fine Arts, as a temporary deposit." (*See* Benenati Decl. Ex. 26, ECF No. 153-29.) Then, as of January 1949, the piece had been seized to secure tax debts. (*See* Walker Decl. Ex. R-3.) Again, however, the evidence suggests that the painting was returned and, indeed, transferred freely between István's two guardians. Deeming this return "free and clear" is not inconsistent with the painting's repossession by the Hungarian government, on deposit or otherwise, approximately one year later. And, there is no basis to infer that the repossession by the communist Hungarian government in 1948 or 1949 was "intertwined" with the earlier, Holocaust-era taking.

Lastly, plaintiffs argue that *A Painted Stucco Bust*, after Jacopo della Quercia, was not "actually 'legally returned and physically released' in 1948 as Defendants claim." (Pls.' Opp. at 41.) The Court agrees that it is unclear whether the bust was returned "free and clear" to the Herzog family. Although defendants contend that the bust was returned to the Herzog family on April 15, 1948 (*see* Walker Decl. Ex. Q-2, ECF No. 148-25), an "acknowledgment of receipt"

from Dr. Jeszenszky, a Hungarian government official, states that the Hungarian government received the piece "for safeguarding" the *exact same day*. (*See id.* at Ex. Q-3.)  Since there does not appear to be any time between the piece's purported return to the Herzogs and its immediate repossession by the government, there is a lack of evidence that the return was "free and clear" such that it "severed the connection between Hungary's current possession and its Holocaust-era seizure." *See de Csepel*, 859 F.3d at 1103-04.  The Court concludes defendants have not met their burden as to *A Painted Stucco Bust*, and thus, the Court will retain jurisdiction over this piece.

Because the defendants have demonstrated that two pieces were returned "free and clear," their repossessions were sufficiently separate from the Holocaust-era takings and thus not "in violation of international law."  Claims related to these pieces will be dismissed.  Claims as to the *Virgin of the Annunciation* and *A Painted Stucco Bust*, however, are subject to the Court's jurisdiction pursuant to the FSIA's expropriation exception.

## 6.      Conclusion as to Returned Pieces

The Court of Appeals instructed this Court to "review . . . the artwork returned and retaken by Hungary." *See de Csepel*, 859 F.3d at 1108.  Defendants alleged that nineteen pieces were returned to the Herzog siblings or their representatives, and that sixteen of those were subsequently retaken.  After reviewing the evidence, the Court has concluded that the expropriation exception applies to at least four of the group of nineteen.  For the following three pieces, the takings were "sufficiently intertwined with the Holocaust-era taking," *See de Csepel*, 859 F.3d at 1104:

> (1) *A Painted Stucco Bust*, after Jacopo della Quercia, 17(xx) in the amended complaint;
>
> (2) *The Virgin of the Annunciation*, Austrian, circa 1400, 17(xxv); and

(3) *Four Ancient Egyptian Sculptures, Statues, and Steles*, 17(xxxi);

And as to one piece—József Borsos, *Portrait of the Architect Mátyás Zitterbarth*, 18(i)—
the Court concludes it was "retaken in a new violation of international law" and thus the
expropriation exception applies.  *See id.*

As to nine other pieces, defendants have demonstrated that they were returned and re-
taken (if re-taken at all) in a way that "severed the connection between Hungary's current
possession and its Holocaust-era seizure."  *Id.* at 1103.  The Court therefore lacks jurisdiction
over these pieces:

(1) Gustave Courbet, *The Spring (Artist and Model)*, 17(v);

(2) Giovanni Pedrini, called Giampietro, *Christ Carrying the Cross*, 17(xiii);

(3) Augustin Theodule Ribot, *Still Life with a Chicken, a Bottle of Wine,
Asparagus, Artichoke, Tomatoes and other Vegetables, on a Table*, 17(xv);

(4) Giovanni Santi, *The Dead Christ with Two Angels*, also known as *Christ the
Dolorous, Christ with a Fly*, 17(xvi);

(5) Alvise Vivarini or Giovanni Battista da Udine, *Madonna and Child with
Saints John the Baptist and a male Saint*, 17(xviii);

(6) Francisco de Zurbarán, *Saint Andrew*, 17(xix);

(7) *A Terracotta Group of the Virgin and Child*, Italian, 15th century, 17(xxi);

(8) Lajos Deák Ébner, *Fair in Szolnok City*, 18(v); and

(9) Károly Ferenczy, *Landscape with a Fenced Enclosure (Houses in Fernezely
with Sheepfold)*, 20(i).

Lastly, as to the remaining six pieces—all of which belong to Elizabeth—the Court finds
that while defendants have adequately demonstrated their return, their later repossession must
still be analyzed to determine whether claims related to them are subsumed by the 1973
Agreement and are thereby covered by the FSIA's treaty exception.  *See note 13, supra.*  Those
pieces are:

(1) Barthel Bruyn the Elder, *Portrait of Petrus von Clapis, half-length, in a blue coat with fur collar*, 17(i);

(2) Alonso Cano, *Portrait of Don Balthasar Carlos (1629-1646), Standing full-length, in a Landscape*, 17(ii);

(3) Pseudo Pier Francesco Fiorentino, *The Madonna and Child, with the Infant Saint John, Saint Catherine and Angels*, 17(ix);

(4) Domenikos Theotokopoulos, El Greco, *The Holy Family with Saint Anne*, 17(x);

(5) Sir Anthony Van Dyck, *Portrait of Margaret of Lothringen*, 17(xvii); and

(6) Mihály Munkácsy, *In the Studio*, 18(iv).

## D.   1973 AGREEMENT

Defendants argue that "[t]he documentary evidence makes clear that [Elizabeth] sought and received compensation for property that she affirmatively claimed was taken from her *after* she became a U.S. citizen," and as a result, the Court lacks jurisdiction over her claims that were settled pursuant to the 1973 Agreement between the United States and Hungary. (*See* Mot. to Dismiss at 31 (emphasis in original).)  Plaintiffs respond that the 1973 Agreement does not apply, for defendants fail to point to any evidence that defendants took any of the artworks at issue after Elizabeth became a citizen in June 1952 and before March 6, 1973, when the 1973 Agreement was signed, and second, the United States cannot espouse claims that arose when an individual was not yet an American citizen.  (*See* Pls.' Opp. at 37.)

Throughout these proceedings, this Court has consistently held that the 1973 Agreement does not bar claims except for those takings from Elizabeth between 1952 and 1973.  The Court of Appeals agreed and directed this Court on remand to determine whether any of the returned artworks were taken from Elizabeth after June 1952.  *See de Csepel*, 859 F.3d at 1108 ("Although, as the district court explained, the 1973 agreement could not have extinguished claims in any work of art taken from Erzsébet before she became a citizen in 1952, the remaining

defendants insist that Hungary did take some of the art from Erzsébet after she became a citizen." (internal citation omitted)); *see also id.* ("[W]e think it best to leave it to the district court to address this issue in the first instance as part of its review of the artwork returned and retaken by Hungary.").

As noted in Section III.C, *supra*, there are six pieces attributable to Elizabeth that may have been taken during the relevant time period covered by the 1973 Agreement.  In accordance with the Court of Appeals' mandate, the Court will analyze only those six pieces, which were returned by Hungary post-war.  Elizabeth's remaining pieces are undisputed wartime takings and thus could not have been settled by the 1973 Agreement, as will be further explained below.[21] *See* Section III.D.1, *infra* (explaining the claims process).

### 1.     The Claims Process

The International Claims Settlement Act of 1949 established a process by which American citizens could receive compensation from the United States government for losses caused by certain foreign governments during certain periods of time.  *See* International Claims Settlement Act of 1949, 22 U.S.C. § 1621 *et seq.*; (*see also* Scholl-Tatevosyan Decl. Ex. 40 at 13

---

[21] For example, defendants contend that the 1973 Agreement subsumed Elizabeth's claims to two pieces—József Borsos, *Girls with Flowers (The Three Graces)*, 17(xxxii) in the amended complaint, and Károly Brocky, *Bacchanale*, 18(ii)—although they were never raised to either the United States or Hungary.  (*See* Mot. to Dismiss at 33 (citing art. 6(1) of the 1973 Agreement (settling all claims of U.S. nationals, whether they were brought to Hungary's attention or not)).)  As the Court of Appeals limited this Court's jurisdictional review to those pieces returned to the Herzog siblings after the war (*see* Appendix B), this argument must fail, for both pieces are undisputedly wartime takings (*see* Appendix A), and thus, they could not be settled by the 1973 Agreement, which requires that claimants be U.S. nationals at the time they suffered their losses. *See de Csepel*, 808 F. Supp. 2d at 133 ("Both Hungary and the United States expressly recognized the inherent limitations on espousal authority during negotiations of the 1973 Agreement."); *see also de Csepel*, 859 F.3d at 1108 (citing this Court's opinion for the proposition that "the 1973 agreement could not have extinguished claims in any work of art taken from Erzsébet before she became a [U.S.] citizen in 1952").

("These programs have involved claims of U.S. nationals for losses in specific foreign countries as a result of the nationalization or other taking of property during specific periods of time by the governments of those countries.").)  The Foreign Claims Settlement Commission ("FCSC"), which replaced the International Claims Commission by amendment of the Act in 1954, decides whether evidence submitted in support of claims for compensation under the Act establishes the requisite elements.  (*See* Scholl-Tatevosyan Decl. Ex. 40 at 1; *see also id.* at 3 (describing those elements as "United States nationality, ownership, value and the date and circumstances of the asserted loss").)  The FCSC determination is "final and conclusive on all questions of law and fact and not subject to review by any other official of the United States or by any court by mandamus or otherwise."  22 U.S.C. §1641m.

The First Hungarian Claims Program, which was completed on August 9, 1959, and funded by "the vesting and liquidation of enemy assets which had been blocked by the United States during World War II" (*see* Scholl-Tatevosyan Decl. Ex. 40 at 17), provided compensation for American citizens for losses suffered before August 9, 1955.  *See* 22 U.S.C. § 1641b(2).

The Second Hungarian Claims Program came into existence following the conclusion of an executive agreement between the United States and Hungary on March 6, 1973.  *See* Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, March 6, 1973, 24 U.S.T. 522 (the "1973 Agreement").  The 1973 Agreement provided that, in exchange for the sum of $18,900,000, the government of the United States "shall discharge the Government of the Hungarian People's Republic and Hungarian nationals from their obligations to the Government of the United States and its nationals in respect of all claims referred to in Article 2 of [the] Agreement."  *See* 1973 Agreement at Art. 6(1).  Article 2 listed as discharged and settled any

claims that, *inter alia*, related to "property, rights and interests affected by Hungarian measures

of nationalization, compulsory liquidation, expropriation, or other taking on or before the date of

this Agreement."  *See id.* at Art 2(1).  The Second Program was completed on May 16, 1977, and

authorized the FCSC to determine claims for losses after August 9, 1955, up through the date the

1973 Agreement was signed on March 6, 1973.  (*See* Scholl-Tatevosyan Decl. Ex. 40 at 19.)

The FCSC "was also authorized to adjudicate certain claims which should have been filed in the

first Hungarian Claims Program, but were not, due to an administrative error."  (*Id.*)  While

funds from the Second Program could be used to pay pre-1955 claims, it could only do so once

post-1955 claims and previously-unfiled claims were funded to the same level as claims had

been under the First Program.  *See* 22 U.S.C. § 1641i(a)(7).

Under the 1973 Agreement once Hungary paid the $18,900,000 as provided for in Article

1, "the Government of the United States will consider as finally settled all claims for which

compensation is provided under Article 1, whether or not they have been brought to the attention

of the Government of the Hungarian People's Republic."  *See* 1973 Agreement at Art. 6(1).

Moreover, the Agreement provided that "[t]he distribution of [the $18.9 million] . . . falls within

the exclusive competence of the Government of the United States in accordance with its

legislation, without any responsibility arising therefrom for the Government of the Hungarian

People's Republic."  *See id.* at Art. 5.  As a result, the 1973 Agreement settled *all* claims of U.S.

citizens against Hungary in their entirety and required U.S. citizens to deal with the United States

government (not Hungary) to the extent they required compensation.  Both the United States and

Hungary understood that to be deemed a "national of the United States," an individual had to

have been a U.S. citizen at the time the loss was suffered.  (*See* Benenati Decl. Ex. 22,

Deposition of Dr. István Kiss, at 32:14-17 ("The prime principle applied in this agreement was

that the person whose claim was submitted should be or should have been an American citizen at the time of suffering the damage . . . ."), ECF No. 110-7); *see also de Csepel*, 808 F. Supp. 2d at 133 ("Both Hungary and the United States expressly recognized the inherent limitations on espousal authority during negotiations of the 1973 Agreement.").

### 2.      Elizabeth's Claims

The evidence is clear as to the artworks that were included in Elizabeth's 1959 claim to the FCSC, as well as the compensation she received.  In 1959 she received $457,290.80 for real and personal property she asserted was taken from her by the Hungarian government after she became a U.S. citizen and before August 9, 1955.  (*See* Scholl-Tatevosyan Decl. Ex. 34.)  This total included $210,000 for art in which she claimed a full or a one-third interest along with her two siblings.[22]  (*See* Scholl-Tatevosyan Decl. Ex. 33.)  She claimed that the art was taken on

---

[22] Of the twelve pieces which she claimed were taken by Hungary in 1954, eleven are included in the amended complaint:

> (1) Barthel Bruyn the Elder, *Portrait of Petrus von Clapis, half-length, in a blue coat with fur collar*, 17(i) in the amended complaint;
> (2) Alonso Cano, *Portrait of Don Balthasar Carlos (1629-1646), Standing full-length, in a Landscape*, 17(ii);
> (3) Gustave Courbet, *Le Chateau de Blonay (neige), (The Chateau of Blonay (snow))*, 17(iv);
> (4) Pseudo Pier Francesco Fiorentino, *The Madonna and Child, with the Infant Saint John, Saint Catherine and Angels*, 17(ix);
> (5) Domenikos Theotokopoulos, El Greco, *The Holy Family with Saint Anne*, 17(x);
> (6) Bernardino Licinio da Pordenone, *Portrait of a Lady, half-length, in a Black Robe, Holding a Book*, 17(xiv);
> (7) Augustin Theodule Ribot, *Still Life with a Chicken, a Bottle of Wine, Asparagus, Artichoke, Tomatoes and other Vegetables, on a Table*, 17(xv);
> (8) Sir Anthony Van Dyck, *Portrait of Margaret of Lothringen*, 17(xvii);
> (9) Alvise Vivarini or Giovanni Battista da Udine, *Madonna and Child with Saints John the Baptist and a male Saint*, 17(xviii);
> (10) Mihály Munkácsy, *"La Visite" (The Afternoon Visit)*, 18(iii); and
> (11) Mihály Munkácsy, *In the Studio*, 18(iv).

May 12, 1954, the date of passage of Hungary's 1954 Museum Decree (*see id.*), which allowed

the Hungarian government to nationalize art with no apparent owner or when the owner had fled

the country without permission.  (*See* Declaration of Orsolya Banki Ex. C, Legislative Decree

No. 13 of 1954 at Sec. 9(1), ECF No. 13-2.)  It appears now that Elizabeth's claim that her art

was taken on May 12, 1954, pursuant to the Museum Decree, was made in error.[23]  (*See* Pls.'

2020 Reply at 7 ("Elizabeth's claim was predicated on the erroneous belief that her art had been

nationalized pursuant to the 1954 Museum Decree . . . ."); *see also* Defs.' 2020 Reply at 6

("Early in the course of the 1973 Agreement negotiations, the Hungarian delegation rejected the

claims advanced by the United States on behalf of Erzsébet on the grounds that, while the

artworks had been placed in a public collection and would not be returned, they may not have

been formally 'nationalized.'").)  She was paid $210,000 based on the assessments of an art

dealer and an employee of the Smithsonian Institute that the amount represented her "total

interest" in the claimed works.  (*See* Scholl-Tatevosyan Decl. Ex. 33.)  Nevertheless, the FCSC's

decision provided that "[p]ayment of any part of this award shall not be construed to have

divested the claimant herein, or the Government of the United States on her behalf, of any rights

against the Government of Hungary for the unpaid balance of the claim, if any." (*See* Scholl-

---

[23] It is unclear when Elizabeth or her heirs understood that the pieces that she claimed
compensation for in 1959 had not in fact been taken or placed in the state's ownership under the
1954 Museum Decree.  From the record, it appears that as late as 2000, Hungary was still
claiming that at least some of the artwork at issue in the Nierenberg litigation was acquired as
either "abandoned goods" or "marked as having an unknown owner and thus were acquired
through legal regulation." (*See* Scholl-Tatevosyan Decl. Ex. 48 at 21, ECF No. 148-6.)  In
October 2000, the Metropolitan Court concluded that the state had *not* gained ownership of the
art in this way (*see id.* at 35), and this conclusion carried through to the Metropolitan Court of
Appeals' final decision in 2008, which agreed with the lower court's determination that the 1954
Museum Decree did not apply to Elizabeth's paintings, except for one. (*See* Scholl-Tatevosyan
Decl. Ex. 26 at 3 (court concluded that the state could not establish ownership pursuant to the
1954 Museum Decree "because the plaintiff's legal predecessor emigrated with permission"),
ECF No. 148-4; *see also id.* at 14 (concluding that as to the Opie, the conditions of the 1954
Museum Decree were met).)

Tatevosyan Decl. Ex. 34.)

After the conclusion of the 1973 Agreement, Elizabeth made another claim, which was adjudicated in 1977.  This claim contained none of the art listed in the 1959 decision.  (*See* Scholl-Tatevosyan Decl. Ex. 16 (1977 FCSC decision).)  Rather, it covered only property taken after 1955.  (*See* Scholl-Tatevosyan Decl. Ex. 17 (citing Section 303(5) of the International Claims Settlement Act of 1949, which provided for compensation for losses after August 9, 1955).)  The claimed property consisted of several pieces of real estate, as well as the two paintings, Lucas Cranach's *Joachim with the Angel* and John Opie's *Portrait of an Old Lady*, which have already been dismissed from this case.  *See de Csepel*, 169 F. Supp. 3d at 167; *see also* note 14, *supra*.   The decision provided for payment of $33,000 for the Cranach and the Opie and $31,000 for real property, plus interest.  (*See* Scholl-Tatevosyan Decl. Exs. 16, 17.)  While defendants claim that Elizabeth also received additional money for the pieces listed in her 1959 claim under the 1973 Agreement (*see* Defs.' 2020 Reply at 3), there is no evidence to support such a finding.[24]

### 3.     Pieces Settled Under 1973 Agreement

The Court concludes that five of the nineteen returned pieces were taken by Hungary after Elizabeth became a U.S. citizen in June 1952 and before 1973, and thus claims related to them must be dismissed for lack of jurisdiction due to the FSIA's treaty exception.  *See* note 13, *supra*.  These pieces are:

---

[24] Defendants point to Martha Nierenberg's comment that although she found no evidence of further payment, "her mother, as all other claimants, must have received USD 1,000 and 37% of the amount determined by the Foreign Claims Settlement Commission." (*See* Scholl-Tatevosyan Decl. Ex. 49 at 9, ECF No. 148-6.)  However, as discussed below, *see* Section III.D.3, the pertinent question is not whether Elizabeth was paid more money for those pieces under the 1973 Agreement—it is whether the pieces described in the FCSC decision were actually taken by the Hungarian government, and if so, *when*.

(1) Barthel Bruyn the Elder, *Portrait of Petrus Von Clapis, half-length, in a blue coat with fur collar*, 17(i) in the amended complaint;

(2) Alonso Cano, *Portrait of Don Balthasar Carlos (1629-1646), Standing full-length, in a Landscape*, 17(ii);

(3) Pseudo Pier Francesco Fiorentino, *The Madonna and Child, with the Infant Saint John, Saint Catherine and Angels*, 17(ix);

(4) Domenikos Theotokopoulos, El Greco, *The Holy Family with Saint Anne*, 17(x); and

(5) Sir Anthony Van Dyck, *Portrait of Margaret of Lothringen*, 17(xvii).

On May 10, 1966, Hungary's Financial Institutions Authority wrote a letter to the Museum of Fine Arts asking the museum to assess "whether [certain artworks] in fact came into the possession of one of our public collections and, if they did, whether they are still there, otherwise what ha[s] happened to them." (*See* Scholl-Tatevosyan Decl. Ex. 38.) This letter listed—as part of a longer list containing all pieces claimed by Elizabeth in her 1959 FCSC claim—the five above-named pieces. In September 1966, a letter was written by the Director of the Museum of Fine Arts to the Ministry of Cultural Affairs stating that "of the artworks listed by the Financial Institutions Authority, 10 pictures that once comprised the property of the Herzog family are now the property of the Museum of Fine Arts." (*See* Walker Decl. Ex. L-6, ECF No. 148-20.) Included in that list of ten were the five paintings. This letter explained that the pieces had entered the property of the state as a result of the Kiss Forfeiture order. (*See id.*) While a number of the pieces in that list had never been mentioned in connection with the Kiss Forfeiture, and at least four on them were included in Dr. Oltványi's 1951 "mistake letter," the question is not whether Hungary accurately described *how* it obtained possession. Rather, the question is *when* the pieces were taken, and what that means for plaintiffs' claims in the lawsuit given the September 1966 letter's affirmation that the Hungarian government considered these pieces to be "the property of the Museum of Fine Arts." (*See id.*)

Hungarian documents from the time period directly following the enactment of the 1973 Agreement also corroborate the state's ownership of the five pieces.  A letter dated March 14, 1973 (eight days after the signing of the Agreement), referenced the May 1966 letter and said that "[t]he scope of the claims settlement agreement includes . . . paintings that formerly belonged to the Weiss de Csepel family as listed in our letter of May 10, 1966."  (*See* Scholl-Tatevosyan Decl. Ex. 39.)  This underscores the conclusion that, regardless of *exactly* when the pieces were taken, the Hungarian government considered them to be state property at least by the time the 1973 Agreement was signed, if not before.  The Hungarian government reiterated this position in a December 11, 1973 letter to the Minister of Culture, wherein these five paintings, as well as others, were listed as belonging to the state based on the 1973 Agreement.  (*See* Scholl-Tatevosyan Decl. Ex 37.)  This is consistent with the ledger presented to the Hungarian government by the United States in conjunction with the negotiation of the 1973 Agreement. (*See* Scholl-Tatevosyan Decl. Ex. 36.)  This ledger contained a list of Americans with claims and made a specific reference to the $457,290.80 that was paid to Elizabeth in 1959 (which included $210,000 for the twelve paintings).  *See* Section III.D.2, *supra*.

Whether the Hungarian government agreed with Elizabeth's representation in 1959 that her pieces were taken pursuant to the 1954 Museum Decree, or whether her representation was incorrect, is simply not relevant to the outcome of plaintiffs' claims.  For example, the September 1966 letter—which post-dated the 1973 Agreement negotiations cited by plaintiffs in which the Hungarian negotiators appeared to reject Elizabeth's claims (*see* Benenati Decl. Ex. E at 239, ECF No. 22-7)—stated that Elizabeth's pieces were taken as a result of the Kiss Forfeiture.  (*See* Walker Decl. Ex. L-6.)  If the pieces had in fact become state property as a result of the Kiss Forfeiture, they would not be covered by the 1973 Agreement, as that pre-dated

her U.S. citizenship.  The Court would still need to dismiss claims related to these pieces, however, because the Kiss Forfeiture was not sufficiently "intertwined" with the Holocaust-era taking to constitute a taking in violation of international law.  *See* Section III.C.1, *supra*.  And, if the 1966 letter itself constituted a taking by declaring the pieces "state property," they would be covered by the 1973 Agreement.  Because Elizabeth's claims to these pieces must fail either way, the Court need not determine exactly when the pieces were taken.

Moreover, plaintiffs may be correct that Elizabeth received no additional compensation for the settlement of these claims pursuant to the 1973 Agreement (or the nationalization of her pieces sometime in the late 1950's or 1960's).  But this is immaterial under the text of the 1973 Agreement, which provides that once Hungary pays the $18,900,000, it is discharged from *all* claims, whether or not they were presented to Hungary.  *See* 1973 Agreement at Art. 6(1).  Under the Agreement, the United States government was solely responsible for distributing money to potential claimants.  *See id.* at Art. 5.  Therefore, if Elizabeth did not receive any additional money after the signing of the 1973 Agreement, she would have to take that up with the United States government, not Hungary.  Furthermore, even though the Court does not doubt that Elizabeth made her 1959 claim in good faith, she likely received funds for pieces that were in fact taken before 1952.  Whether Elizabeth received from the FCSC more or less than she was entitled to is beyond the Court's purview, since by statute, it cannot review the FCSC's decisions.  *See* 22 U.S.C. §1641m.  And, since the Hungarian and U.S. negotiations included these same pieces under the umbrella of the 1973 Agreement, the Court has no jurisdiction over these pieces due the FSIA's treaty exception.  *See* 28 U.S.C. § 1604; *see also* note 13, *supra*.

However, for one piece not discussed in the September 1966 letter—Munkácsy's *In the Studio*—the Court will retain jurisdiction.  The painting was deposited with the Museum of Fine

Arts in the 1950's.  (*See* Walker Decl. Ex. P-5, ECF No. 148-24.)  While it was listed in the May 10, 1966 letter asking whether certain pieces belonged to the state, the September 1966 letter failed to include it in the list of the Herzog pieces that "are now the property of the Museum of Fine Arts."  (*Compare* Scholl-Tatevosyan Decl. Ex. 38 *with* Walker Decl. Ex. L-6.)  Defendants provided no further information about the painting's whereabouts after the 1950's deposit until March 14, 1973, when a Hungarian government official wrote that "[t]he works of art in question [including the Munkácsy]—should they have not yet passed into Hungarian state ownership— have become property of the Hungarian State by virtue of the claims settlement agreement." (*See* Scholl-Tatevosyan Decl. Ex. 39; *see also* Scholl-Tatevosyan Decl. Ex. 37 (listing the 12 pieces claimed by Elizabeth "including two paintings by Munkácsy" as among those now in state ownership).)  However, *In the Studio* is still listed by defendants as "on deposit."  (*See* Scholl-Tatevosyan Decl. Ex. 1); *see also* note 20, *supra*.  This suggests that the piece may not actually have been taken in 1973, as indicated by the March and December 1973 letters.  And, any taking after 1973 would be a taking in violation of international law *not* settled by the 1973 Agreement. As a result, the Court will retain jurisdiction over claims related to this piece, as defendants have not met their burden to demonstrate that the expropriation exception does not apply.

## VI.    MOTION TO DISMISS

### A.    Legal Standard

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks, brackets, and citations omitted). A plaintiff's allegations must be facially plausible, which requires that "the plaintiff plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. If the facts alleged in the complaint taken as true fail to state a claim upon which relief could be granted, under Rule 12(b)(6) a court must dismiss the case. *See Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

In addition to their jurisdictional challenge as to the 19 pieces of allegedly returned artwork (*see* Appendix B), defendants renew their arguments as to four issues raised in their previous motions to dismiss—act of state, international comity, exhaustion, and statute of limitations. These arguments were all rejected by this Court or the Court of Appeals. *See, e.g., de Csepel*, 808 F. Supp. 2d at 142-43 (declining to address statute of limitations at motion to dismiss stage, rejecting act of state); *see also de Csepel*, 714 F.3d at 604 (same); *see also id.* at 608 (concluding that international comity should not be decided on a motion to dismiss); *de Csepel*, 169 F. Supp. 3d at 168-69 (rejecting exhaustion). Defendants now argue that since fact discovery is over, the Court should revisit its rulings in view of the facts that have come to light through discovery. But, as explained below, the Court is still unwilling to decide many of these fact-intensive issues within the context of a motion to dismiss.

B.      **Act of State Doctrine**

Defendants argue that "[t]he 1950 Confiscation Order [from the Kiss Forfeiture] is an 'act of state' that memorializes a legitimate confiscation allowed by the pre-war, non-biased Act No XI of 1929," and thus should not be reviewed by the Court.  (*See* Mot. to Dismiss at 40.) "The act of state doctrine 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.'" *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)).

Defendants' act of state argument requires little attention in light of the conclusion of Section III.C.6, *supra*, that the Court lacks jurisdiction over nine of the eleven pieces from the amended complaint that were also included in the Kiss Forfeiture.  As a result, defendants' argument is moot as to those nine pieces.  Moreover, as the Court found that Dr. Oltványi's 1951 "mistake letter" meant that József Borsos, *Portrait of the Architect Mátyás Zitterbarth*, 18(i) in the amended complaint, was *not* in fact taken by the Kiss Forfeiture, the only remaining piece the 1950 Order could apply to is El Greco's *The Espolio*, 17(viii).  However, defendants have conceded that this piece was a wartime taking by Hungary in its alliance with Nazi Germany and *never* returned to the Herzog siblings.  The piece's subsequent inclusion in the Kiss Forfeiture is therefore irrelevant, as it did not change the painting's status as art initially expropriated and taken into ownership by the World War II-era Hungarian government in cooperation with the Nazis.  Therefore, the act of state doctrine does not apply to El Greco's *The Espolio*.

C.      **International Comity**

Defendants argue that "the principles of international comity warrant recognition of the 2008 Hungarian Judgment [in the Nierenberg litigation], and this Court should reject Plaintiffs'

demand to re-litigate ownership of . . . artworks adjudicated in that action." (*See* Mot. to Dismiss at 46.) In its first opinion, the Court dismissed claims relating to any artworks litigated in the Nierenberg action, concluding that "the record is devoid of evidence of 'either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect.'" *de Csepel*, 808 F. Supp. 2d at 145 (quoting *Hilton v. Guyot*, 159 U.S. 113, 202 (1895)). However, the Court of Appeals reversed, "[b]ecause nothing in the complaint contradicts the family's claims of due process violations, [so] dismissal at this stage [is] inappropriate." *de Csepel*, 714 F.3d at 608. Defendants contend that the Court can now decide to accord comity to the judgment despite plaintiffs' allegations because, "as is clear from all of the materials filed in the Nierenberg proceedings, Ms. Nierenberg was afforded significant due process rights in Hungary." (*See* Mot. to Dismiss at 44.)

### 1.    Nierenberg Litigation

Martha Nierenberg filed her suit in Hungary in 1999 and listed in her complaint a number of works owned by her mother, Elizabeth, and her uncles István and András. (*See* Scholl-Tatevosyan Decl. Ex. 20.) She petitioned for the return of twelve pieces belonging to Elizabeth. Nine of those twelve are in the amended complaint.[25] Another two listed in the petition, Lucas

---

[25] Those nine pieces are:

> (1) Barthel Bruyn the Elder, *Portrait of Petrus von Clapis, half-length, in a blue coat with fur collar*, 17(i) in the amended complaint;
> (2) Alonso Cano, *Portrait of Don Balthasar Carlos (1629-1646), Standing full-length, in a Landscape*, 17(ii);
> (3) Gustave Courbet, *Le Chateau de Blonay (neige), (The Chateau of Blonay (snow))*, 17(iv);
> (4) Pseudo Pier Francesco Fiorentino, *The Madonna and Child, with the Infant Saint John, Saint Catherine and Angels*, 17(ix);
> (5) Domenikos Theotokopoulos, El Greco, *The Holy Family with Saint Anne*,

Cranach's *Joachim with the Angel* and John Opie's *Portrait of an Old Lady*, have already been dismissed from this case.  *See de Csepel*, 169 F. Supp. 3d at 167.  The last of the twelve, Munkácsy's *Bust of Christ*, was returned to Nierenberg while the case was ongoing.  (*See* Scholl-Tatevosyan Decl. Exs. 22-24.)

The pieces listed in Nierenberg's complaint as attributable to András and István include at least eighteen pieces included in the amended complaint.  (*See* Scholl-Tatevosyan Decl. Ex. 20.)  However, as András and István's heirs declined to participate in the Nierenberg Litigation (*see* Scholl-Tatevosyan Decl. Ex. 27 (letter from Julia Alice and Maria Angela declining to participate)), the Hungarian court did not render any decision with regard to those pieces, and thus, defendants do not argue they should be dismissed from the case on the ground of comity. (*See* Mot. to Dismiss at 46 ("[T]he principles of international comity warrant recognition of the 2008 Hungarian Judgment, and this Court should reject Plaintiffs' demand to re-litigate ownership of . . .artworks *adjudicated* in that action." (emphasis added)).)

"On October 20, 2000 the Budapest Metropolitan Court ordered that all paintings except one be returned to Martha."  (*See* Pls.' Opp. at 14; *see also* Scholl-Tatevosyan Decl. Ex. 47 at 35 (describing judgment requiring return of all pieces except John Opie's *Portrait of an Old Lady*, which it found was acquired by the state).)  In November 2002, Hungary's Supreme Court

---

17(x);

(6) Sir Anthony Van Dyck, *Portrait of Margaret of Lothringen*, 17(xvii);

(7) Károly Brocky, *Bacchanale*, 18(ii);

(8) Mihály Munkácsy, *"La Visite" (The Afternoon Visit)*, 18(iii); and

(9) Mihály Munkácsy, *In the Studio*, 18(iv).

The Court notes that numbers (1), (2), (4), (5), and (6) in this list have already been dismissed for lack of jurisdiction.  As a result, whether comity is accorded to the Nierenberg decision only affects claims as to four pieces (numbers (3), (7), (8), and (9)).

vacated the Metropolitan Court's judgment primarily on the basis that Nierenberg had not proven that she, as opposed to the heirs of the other siblings, owned all the claimed paintings.  (*See id.* at 36-38 (describing 2002 judgment).)

In 2005, the Metropolitan Court concluded that Nierenberg was entitled to only one painting, El Greco's *Holy Family*.  (*See id.* at 63.)  This judgment was once again appealed, and on January 10, 2008, Nierenberg's claim was rejected in its entirety by the Metropolitan Court of Appeals.  (*See id.* at 67 (describing 2008 decision); *see also* Scholl-Tatevosyan Decl. Ex. 26 (2008 decision).)  The Hungarian court concluded that the defendants had acquired ownership to all the claimed paintings by, *inter alia*, uscucapation (*i.e.*, adverse possession), a criminal decision (*i.e.*, the Kiss Forfeiture), and international claims settlement (*i.e.*, Elizabeth's 1959 claim and the 1973 Agreement).  (*See* Scholl-Tatevosyan Decl. Ex. 48 at 68-69.)

## 2.    Analysis

"'Comity' summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum."  *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984).  However, "the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act."  *Id.*  The application of comity "varies according to the factual circumstances surrounding each claim for its recognition," *id.*; the presence of such "fact-intensive issues" often makes the defense "inappropriate for resolution on a Rule 12(b)(6) motion."  *de Csepel*, 714 F.3d at 607.

Defendants contend that since fact discovery is closed and "the factual record [is] now well developed," but "the FAC makes no new allegations regarding the Hungarian proceedings," it is appropriate to dismiss claims related to artworks adjudicated in the Nierenberg Litigation.

(*See* Mot. to Dismiss at 44.)  It is true that plaintiffs' allegations regarding the Nierenberg proceedings have not been fleshed out since the end of fact discovery.  (*See* Am. Compl. ¶ 78 (alleging only that the Hungarian proceedings "were not conducted in accordance with internationally recognized standards of due process or in accordance with international law").) And, defendants, referring to a voluminous record relating to the Nierenberg Litigation, describe myriad due process rights they claim Martha Nierenberg was afforded during the litigation in Hungary.  (*See* Mot. to Dismiss at 44–46.)  But, defendants base their argument that the Nierenberg proceedings "were . . . conducted in accordance with internationally recognized standards of due process [and] in accordance with international law" (*see* Mot. to Dismiss at 44 (internal quotation marks omitted)), on a summary docket they created to describe the proceedings.  (*See* Scholl-Tatevosyan Decl. Exs. 47-49.)  This docket includes citations to "thousands of pages of motions, briefs, expert opinions, petitions, orders [and] judgments."  (*See* Mot. to Dismiss at 44.)  This is certainly not the type of evidence the Court is expected to wade through at the motion to dismiss stage, when plaintiffs' complaint is presumed to be true.

Moreover, plaintiffs argue that "while fact discovery has concluded, expert discovery has not even commenced," and that the issue of comity should not be decided at this stage.  (*See* Pls.' Opp. at 48.)  Contrary to defendants' position (*see* Defs.' Reply at 22), expert testimony comparing the Hungarian court system to the U.S. common law judicial system could well be relevant.  Moreover, the Court has already stated that resolution of non-jurisdictional factual issues would need to wait for summary judgment.  (*See* Oct. 26, 2017 Tr. at 11:11-12, ECF No. 140.)  And, the Court of Appeals observed that allegations of due process violations present "just the kind of fact-intensive issues that are inappropriate for resolution on a Rule 12(b)(6) motion," and therefore, "are properly addressed at summary judgment or trial."  *See de Csepel*, 714 F.3d at

607, 608.  The Court therefore declines to revisit the issue of comity at this stage.

### D.  Exhaustion

Defendants also revive their argument that claims for which plaintiffs did not exhaust their remedies in Hungary should be dismissed.  They expanded upon this argument in their supplemental briefing, which argued that despite the Court of Appeals' subsequent opinions in *Simon* and *Philipp*, this Court could grant the motion to dismiss on prudential exhaustion grounds, as those actions "are factually and procedural[ly] distinct from this action."  (*See* Defs.' Supp. Br. at 1, ECF No. 166.)  The Court cannot agree.

Binding Circuit precedent forecloses defendants' argument that prudential exhaustion bars plaintiffs' claims.  In *Philipp*, the Court of Appeals observed that "although courts once decided on a case-by-case basis whether to grant foreign states immunity as matter of international comity, Congress abated the bedlam in 1976, replacing the old executive-driven, factor-intensive, loosely common-law-based immunity regime with the FSIA's comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." *Philipp*, 894 F.3d at 415 (internal quotation marks and brackets omitted).  As again explained by the Circuit several months later in *Simon*, this means that under the FSIA, there is no requirement of prudential exhaustion in cases against foreign states.  *See Simon*, 911 F.3d at 1181 ("When Congress wanted to require the pursuit of foreign remedies as a predicate to FSIA jurisdiction, it said so explicitly.").  Although defendants suggest that these cases are procedurally different and thus need not be applied here, there is no suggestion in *Philipp* or *Simon* that their conclusions were so limited; on the contrary, they observed that "controlling circuit and Supreme Court precedent give *no* quarter to [the defendants'] theory of judicial immunity wrapped in exhaustion clothing."  *See id.* (emphasis added).  Given this binding precedent, plaintiffs do not need to

exhaust their remedies in Hungary prior to bringing suit here.

### E.     Statute of Limitations

Defendants also argue that plaintiffs' claims are not timely.  In particular, they argue that "[b]ecause Plaintiffs could have brought timely claims within six years of learning of the artworks' location but failed to do so, the HEAR Act does not apply to retroactively extend the statute of limitations for claims to non-exhausted artworks," and without the HEAR Act, all other claims are barred by the District's three-year statute of limitations.  (*See* Mot. to Dismiss at 54 (internal quotation marks omitted).)

The Holocaust Expropriated Art Recovery Act of 2016, commonly referred to as the "HEAR Act," was passed in recognition of "[t]he unique and horrific circumstances of World War II and the Holocaust[, which makes] statutes of limitations especially burdensome to the victims and their heirs."  *See* P.L. 114-308, 130 Stat. 1524, Sec. 2(6).  As "[t]hose seeking recovery of Nazi-confiscated art must painstakingly piece together their cases from a fragmentary historical record ravaged by persecution, war, and genocide," they are often unable to complete the process within the time constraints of existing statutes of limitations.  *See id.*  To provide some relief to those undergoing this process, Congress provided that "[n]otwithstanding any other provision of Federal or State law or any defense at law relating to the passage of time, . . . a civil claim or cause of action against a defendant to recover any artwork or other property that was lost during the covered period because of Nazi persecution may be commenced," at the latest, six years after "actual discovery" by the claimant of his possessory interest in a work and of the work's location.  *See id.* at Sec. 5(a).

This default six-year statute of limitations may be modified in two other potential circumstances—for "preexisting" or "stale" claims.  A "preexisting" claim is one that the

claimant already knew about, but which was barred even before the passage of the Act or which is not yet barred. *See id.* at Section 5(c). Under the Act, unless the preexisting claim also fits within the ambit of Section 5(e), it "shall be deemed to have been actually discovered on the date of enactment of this Act." *See id.* This revival of preexisting claims is meant to combat, for example, the unfair situation where "claims expired before World War II even ended." *See id.* at Sec. 2(6). However, some preexisting claims may also be considered "stale," defined as where:

> (1) the claimant or a predecessor-in-interest of the claimant had knowledge of the elements set forth in subsection (a) on or after January 1, 1999; and

> (2) not less than 6 years have passed from the date such claimant or predecessor-in-interest acquired such knowledge and during which time the civil claim or cause of action was not barred by a Federal or State statute of limitations.

*See id.* at Sec. 5(e). Stale claims are *not* revived by the HEAR Act.

Plaintiffs' claims are based in two theories: conversion and bailment. Under DC law, conversion claims accrue as soon as the defendant acquires the property unlawfully and must be brought within three years. *See Sea Search Armada v. Republic of Colombia*, 821 F. Supp. 2d 268, 273 (D.D.C. 2011); *see also Malewicz v. City of Amsterdam*, 517 F. Supp. 2d 322, 335 (D.D.C. 2007) ("[W]hen the defendant did not acquire the property lawfully in the first instance, the claim accrues immediately . . . ."). Plaintiffs' conversion claims qualify as preexisting claims that will be revived by the HEAR Act, as claims arising from paintings taken during World War II would have expired long before the Herzog siblings or their successors had the ability to bring them.

The same three-year statute of limitations also applies to plaintiffs' bailment claims. *See de Csepel*, 714 F.3d at 603. However, a bailment claim only accrues "when the plaintiff demands the return of the property and the defendant refuses, or when the defendant takes some action that a reasonable person would understand to be either an act of conversion or inconsistent

with a bailment." *Malewicz*, 517 F. Supp. 2d at 335.  While defendants argue (as they did in previous motions to dismiss) that plaintiffs' claims accrued as early as 1999 (*see* Mot. to Dismiss at 54), the Court of Appeals concluded in its first opinion that "nothing in the complaint indicates that the family's claims did in fact accrue in 1999 when Martha Nierenberg filed suit in the Hungarian court." *See de Csepel*, 714 F.3d at 603.  This is because "although litigation is often filed in response to refusal of a demand, it can also serve as a vehicle for increasing pressure to settle during ongoing negotiations." *Id.* at 604.  For that reason, the Court of Appeals concluded that "at the motion to dismiss stage, we look only at the complaint, in which we see nothing that conflicts with the family's allegation that their bailment claims accrued in January 2008." *Id.*  If such facts are ultimately proven, plaintiffs' bailment claims would be timely even *without* the HEAR Act, as the complaint was filed in 2010.

As this Court stated in its earlier opinion, "[m]otions to dismiss 'based on a limitations defense are disfavored because resolution generally requires the development of a record and the adjudication of factual issues.'" *See de Csepel*, 808 F. Supp. 2d at 139 (quoting *Malewicz*, 517 F. Supp. 2d at 335).  For instance, "[a]lthough what constitutes the accrual of a cause of action is a question of law, determining when accrual occurs in a specific case is a question of fact." *Lee v. Wolfson*, 265 F. Supp. 2d 14, 19 (D.D.C. 2003) (internal quotation marks and brackets omitted).  So even if plaintiffs must rely on the HEAR Act with respect to their bailment claims, there are a host of factual issues that must be resolved regarding when plaintiffs (or their predecessors) may have learned about their claims or might have been able to bring them.[26]

---

[26] Moreover, the Court has not even begun to "wade into . . . equitable-tolling waters," *see de Csepel*, 714 F.3d at 603, as it has previously suggested may be appropriate given plaintiffs' allegations that "for years, Hungary actively misled the Herzog Heirs into believing that it accepted their ownership rights to the Herzog Collection, was giving their claims serious consideration, and repeatedly advised them that it would reach a favorable decision, at which

As a result, the Court will not revisit its earlier ruling.  It will decline to resolve defendants' statute of limitations defense as to plaintiffs' bailment claims.  The Court, however, concludes that plaintiffs' conversion claims are revived by the HEAR Act as "preexisting claims."

## CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion to dismiss in part and deny it in part.  A separate Order accompanies this Memorandum Opinion.



ELLEN S. HUVELLE
United States District Judge

Date: May 11, 2020

---

time they could decide if any further action would be required."  *See de Csepel*, 808 F. Supp. 2d at 141 (quoting Compl. ¶ 94.)  As the Supreme Court has stated, "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass," *Young v. United States*, 535 U.S. 43, 50 (2002) (internal quotation marks omitted), the application of equitable tolling may be warranted.  Moreover, in previous motions as in the current motion to dismiss, "defendants allege[d] that plaintiffs were *required* to exhaust their remedies in Hungary prior to filing suit here, a fact that, if anything, supports plaintiffs' plea for equitable tolling."  *See de Csepel*, 808 F. Supp. 2d at 142 (emphasis in original) (internal citation omitted).

**APPENDIX A**

Undisputed wartime takings for which the Court of Appeals approved jurisdiction

| Art Piece | FAC ¶ | Owner |
|---|---|---|
| **(1)** Camille Corot, *Portrait of a Woman (Lady with a Marguerite (Daisy))* | 17(iii) | András |
| **(2)** Gustave Courbet, *Le Chateau de Blonay (neige), (The Chateau of Blonay (snow))* | 17(iv) | Erzsébet |
| **(3)** Domenikos Theotokopoulos, El Greco, *Saint Andrew* | 17(vi) | András |
| **(4)** Domenikos Theotokopoulos, El Greco, *The Espolio*, also known as *El Expolio, The Disrobing of Christ* | 17(vii) | István |
| **(5)** Domenikos Theotokopoulos, El Greco, *The Agony in the Garden*, also known as *Christ on the Mount of Olives* | 17(viii) | András |
| **(6)** Polidoro Da Lanciano, *Christ and the Woman Taken in Adultery* | 17(xi) | András |
| **(7)** Eugenio Lucas Padilla (Eugenio Velázquez), *The Revolution (8 May 1808)* | 17(xii) | András |
| **(8)** Bernardino Licinio da Pordenone, *Portrait of a Lady, half-length, in a Black Robe, Holding a Book* | 17(xiv) | András |
| **(9)** *Figure of Saint Agnes*, Schwarzwald Sculptor, German, circa 1430 | 17(xxii) | András |
| **(10)** *Figure of Saint Catherine of Alexandria*, German, early 16th century | 17(xxiii) | András |
| **(11)** *Figure of Saint Barbara*, German, early 16th century | 17(xxiv) | András |
| **(12)** *A Carved Bust of a Prophet*, South German, probably workshop of Erasmus Grasser, circa 1500 | 17(xxvi) | András |

| **Art Piece** | **FAC ¶** | **Owner** |
|---|---|---|
| | | |
| **(13)** *The Virgin and Child*, Florentine, circa 1540 | 17(xxvii) | András |
| **(14)** *The Nativity*, Anonymous, 14th century | 17(xxviii) | András |
| **(15)** *A Greek Marble Hero Relief, showing the Deceased at a Funerary Banquet*, Greek, 4th century BC | 17(xxix) | András |
| **(16)** *One Hundred and Seventy-Seven Items of Ancient Gold Jewels and Coins* | 17(xxx) | András |
| **(17)** József Borsos, *Girls with Garlands of Flowers (The Three Graces)* | 17(xxxii) | Erzsébet |
| **(18)** *Four ancient silver coins* | 17(xxxiii) | András |
| **(19)** *Seventy-Eight Pieces: Ancient Cameos, Intaglios, Other Carved Stones and Semi-Precious Stones* | 17(xxxiv) | András |
| **(20)** Károly Brocky, *Bacchanale* | 18(ii) | Erzsébet |
| **(21)** Mihály Munkácsy, *"La Visite" (The Afternoon Visit)* | 18(iii) | Erzsébet |
| **(22)** *"Meuron a Paris" Musical Clock*, 18th century | 19(i) | András |
| **(23)** Sebastianus Hann, *Jewelry Bowl* | 19(ii) | András |

**APPENDIX B**

Artworks for which the Court was directed to address jurisdiction

| **Artwork** | **FAC ¶** | **Owner** | **Jurisdiction** |
|---|---|---|---|
| **(1)** Barthel Bruyn the Elder, *Portrait of Petrus von Clapis, half-length, in a blue coat with fur collar* | 17(i) | Erzsébet | No |
| **(2)** Alonso Cano, *Portrait of Don Balthasar Carlos (1629-1646), Standing full-length, in a Landscape* | 17(ii) | Erzsébet | No |
| **(3)** Gustave Courbet, *The Spring (Artist and Model)* | 17(v) | István | No |
| **(4)** Pseudo Pier Francesco Fiorentino, *The Madonna and Child, with the Infant Saint John, Saint Catherine and Angels* | 17(ix) | Erzsébet | No |
| **(5)** Domenikos Theotokopoulos, El Greco, *The Holy Family with Saint Anne* | 17(x) | Erzsébet | No |
| **(6)** Giovanni Pedrini, called Giampietro, *Christ Carrying the Cross* | 17(xiii) | András | No |
| **(7)** Augustin Theodule Ribot, *Still Life with a Chicken, a Bottle of Wine, Asparagus, Artichoke, Tomatoes and other Vegetables, on a Table* | 17(xv) | István | No |
| **(8)** Giovanni Santi, *The Dead Christ with Two Angels*, also known as *Christ the Dolorous*, *Christ with a Fly* | 17(xvi) | István | No |
| **(9)** Sir Anthony Van Dyck, *Portrait of Margaret of Lothringen* | 17(xvii) | Erzsébet | No |

| Artwork | FAC ¶ | Owner | Jurisdiction |
|---|---|---|---|
| **(10)** Alvise Vivarini or Giovanni Battista da Udine, *Madonna and Child with Saint John the Baptist and a male Saint* | 17(xviii) | István | No |
| **(11)** Francisco de Zurbarán, *Saint Andrew* | 17(xix) | István | No |
| **(12)** *A Painted Stucco Bust Representing Prudence*, After Jacopo della Quercia | 17(xx) | István | **Yes** |
| **(13)** *A Terracotta Group of the Virgin and Child*, Italian, 15th Century | 17(xxi) | István | No |
| **(14)** *The Virgin of the Annunciation*, Austrian, circa 1400 | 17(xxv) | András | **Yes** |
| **(15)** *Four Ancient Egyptian Sculptures, Statues, and Steles* | 17(xxxi) | András | **Yes** |
| **(16)** József Borsos, *Portrait of the Architect Mátyás Zitterbarth* | 18(i) | András | **Yes** |
| **(17)** Mihály Munkácsy, *In the Studio* | 18(iv) | Erzsébet | **Yes** |
| **(18)** Lajos Deák Ébner, *Fair in Szolnok City* | 18(v) | András | No |
| **(19)** Károly Ferenczy, *Landscape with a Fenced Enclosure (Houses in Fernezely with Sheepfold) 1912* | 20(i) | András | No |