### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**DAVID L. de CSEPEL et al.,**

    **Plaintiffs,**

    **v.**

**REPUBLIC OF HUNGARY et al.,**

    **Defendants.**

**Civil Action No. 10-1261 (JDB)**

### <u>MEMORANDUM OPINION</u>

This case involves the Court's power to adjudicate "a family's decades-long effort to recover a valuable art collection that the World War II-era Hungarian government and its Nazi collaborators seized during their wholesale plunder of Jewish property during the Holocaust." <u>de Csepel v. Republic of Hungary</u> ("<u>de Csepel VI</u>"), 27 F.4th 736, 739 (D.C. Cir. 2022), <u>cert. denied</u>, 143 S. Ct. 630 (2023). The defendants—a Hungarian asset management company, a university, and three art museums associated with the Hungarian government—seek to dismiss nearly all of plaintiffs' claims pursuant to Rule 12(b)(1) for lack of jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 et seq.

The domestic takings rule precludes waiving sovereign immunity when, as here, a state expropriates property from its own nationals. Plaintiffs argue that they can avoid the domestic takings rule because Germany is also responsible for such takings from Hungarians due to its military occupation of Hungary during World War II. But plaintiffs do not produce sufficient evidence that Germany either directed and controlled these takings or coerced Hungary into committing them. Plaintiffs also insist that their predecessors were <u>de facto</u> stateless—and thus not Hungarians—at the time of the takings, but even if that were true, plaintiffs fail to demonstrate

that a state's taking of property from a <u>de facto</u> stateless person is a violation of the international law of expropriation that could support jurisdiction under the FSIA.  For these reasons, the Court will grant defendants' motion.

<u>**Background**</u>

The background of this case is long and complex.  It has been recounted at length in numerous opinions over the last dozen years.  <u>See, e.g.</u>, <u>de Csepel v. Republic of Hungary</u> ("<u>de Csepel I</u>"), 808 F. Supp. 2d 113, 120–26 (D.D.C. 2011); <u>de Csepel v. Republic of Hungary</u> ("<u>de Csepel II</u>"), 714 F.3d 591, 594–96 (D.C. Cir. 2013); <u>de Csepel v. Republic of Hungary</u> ("<u>de Csepel III</u>"), 169 F. Supp. 3d 143, 147–56 (D.D.C. 2016); <u>de Csepel v. Republic of Hungary</u> ("<u>de Csepel IV</u>"), 859 F.3d 1094, 1097–99 (D.C. Cir. 2017); <u>de Csepel v. Republic of Hungary</u> ("<u>de Csepel V</u>"), 613 F. Supp. 3d 255, 264–66 (D.D.C. 2020); <u>de Csepel VI</u>, 27 F.4th at 739–741.  Because "[t]he facts relating to this case have been set out in greater detail" in these prior opinions, "the Court's recitation of the facts at this juncture will be brief."  <u>de Csepel V</u>, 613 F. Supp. 3d at 264 n.1.  Specific facts relevant to this Opinion will be addressed as they arise.

Plaintiffs' predecessors were Hungarian Jewish art collectors who assembled a collection of more than two thousand paintings, sculptures, and other artworks.  Am. Compl. [ECF No. 141] ¶ 37.  The "Herzog Collection," as it was known, was "one of Europe's great private collections of art, and the largest in Hungary."  <u>Id.</u>  During World War II, Hungary joined the Axis powers and, in March 1944, was occupied by German troops.  <u>Id.</u> ¶¶ 45, 47, 50.  Throughout the war, Hungarian Jews were persecuted, subjected to anti-Semitic laws, and deported to German concentration camps.  <u>Id.</u> ¶¶ 43, 44, 46, 51.  As an integral part of its genocide against Hungarian Jews, "[t]he Hungarian government, including the Hungarian state police, authorized, fully supported and carried out a program of wholesale plunder of Jewish property, stripping anyone 'of

Jewish origin' of their assets." Id. ¶ 53.  The Herzog family attempted to save their collection from confiscation, but "the Hungarian government and their Nazi[] collaborators" ultimately found and seized the artworks.  Id. ¶ 58.

"Following the end of World War II, the Herzog family began a seven-decade effort to reclaim the art collection," including through Hungarian and U.S. courts.  de Csepel VI, 27 F.4th at 741.  In 2010, three heirs to the collection—plaintiffs David L. de Csepel, Julia Alice Herzog, and Angela Maria Herzog—filed this suit in U.S. district court, seeking to reclaim more than forty artworks from defendants.  See Compl. [ECF No. 1].  Over the course of more than a decade, courts have decided several motions to dismiss, some defendants have been dismissed and others have been added, the case has been up to the Court of Appeals three times, and the number of artworks at issue has dwindled to twenty-eight.

Before the Court is defendants' most recent amended motion to dismiss for lack of subject matter jurisdiction.  See Am. Mot. to Dismiss by The Hungarian Nat'l Gallery, The Museum of Fine Arts, The Museum of Applied Arts, The Budapest Univ. of Tech. & Econ., & Magyar Nemzeti Vagyonkezelő Zrt. [ECF No. 215] ("Mot. to Dismiss").  The motion seeks to dismiss plaintiffs' claims for twenty-seven of the remaining twenty-eight artworks based on a recent Supreme Court decision holding that the domestic takings rule bars jurisdiction under the FSIA's expropriation exception when a sovereign state takes property from its own nationals.  Id. at 27–30.  Plaintiffs responded in opposition to the motion, see Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss [ECF No. 221-1] ("Opp'n to Mot. to Dismiss"), and defendants filed a reply in support of their motion, see Reply in Supp. of Mot. to Dismiss [ECF No. 223] ("Reply ISO Mot. to Dismiss").

After the parties submitted their briefing on the motion to dismiss, the D.C. Circuit issued its decision in Simon v. Republic of Hungary, 77 F.4th 1077 (D.C. Cir. 2023); see Defs.' Notice of Suppl. Authority [ECF No. 233].  The Simon court addressed many issues relevant to this case, including questions related to statelessness that were directly raised by the de Csepel parties. Accordingly, the Court requested supplemental briefing on a narrow set of issues that arose because of Simon.  See Order [ECF No. 234] ("Suppl. Br. Order").  Each side filed a supplemental brief.  See Pls.' Suppl. Mem. of P. & A. in Opp'n to Mot. to Dismiss [ECF No. 237] ("Pls.' Suppl. Br."); Defs.' Suppl. Br. on the Issue of Stateless Persons Under the Int'l Law of Expropriations [ECF No. 238] ("Defs.' Suppl. Br.").  The motion to dismiss is now fully briefed and ripe for decision.

## Legal Standard

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts."  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).  "Absent a pre-existing agreement with the United States affecting the scope of sovereign immunity, a foreign sovereign is generally immune, unless one of the FSIA's enumerated exceptions applies." Simon, 77 F.4th at 1090 (citing 28 U.S.C. §§ 1604, 1605–1605B, 1607).  One such exception— the expropriation exception—provides in relevant part that a foreign sovereign shall not be immune from the jurisdiction of U.S. courts in any case

> in which rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3).

Plaintiffs seeking to invoke the FSIA's expropriation exception must make "a legally valid claim that a certain kind of right is at issue (property rights) and that the relevant property was

taken in a certain way (in violation of international law)."  Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co. ("Helmerich I"), 581 U.S. 170, 174 (2017); see Simon, 77 F.4th at 1103 (explaining that Helmerich I required "that courts decide at the jurisdictional threshold whether plaintiffs actually have a claim that is legally cognizable under the FSIA").

The legal standard that a court must apply when considering a motion to dismiss for lack of jurisdiction on FSIA grounds depends on the nature of the state defendant's argument.  "'If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff,' drawing 'all reasonable inferences in [the plaintiff's] favor.'"  Simon, 77 F.4th at 1116 (first quoting Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000); and then quoting Schubarth v. Fed. Republic of Germany, 891 F.3d 392, 401 (D.C. Cir. 2018)).  That is, the typical "plausibility-pleading standard" applies to such legal sufficiency challenges.  On the other hand,  "when a defendant moves beyond assuming the truth of well-pleaded facts and seeks at the jurisdictional threshold to challenge the factual basis of the court's jurisdiction . . . 'the court must go beyond the pleadings and resolve any disputed issues of fact'" necessary to decide the Rule 12(b)(1) motion.  Id. (emphasis added) (quoting Phoenix Consulting, 216 F.3d at 40).

While plaintiffs "bear[] the 'initial burden' of overcoming the Act's 'presumption of immunity' by making out a legally sufficient case that an exception does apply in the first place," Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela ("Helmerich II"), 743 F. App'x 442, 449 (D.C. Cir. 2018) (quoting Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1183 (D.C. Cir. 2013)), ultimately, "the sovereign 'defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to

immunity.'" Simon, 77 F.4th at 1116 (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 389 F.3d 192, 197 (D.C. Cir. 2004)); see also Simon v. Republic of Hungary, 812 F.3d 127, 147 (D.C. Cir. 2016) ("Upon any factual challenge by the [state] defendants . . . the plaintiffs will bear the burden of production, and the defendants will bear the burden of persuasion to establish the absence of the factual basis by a preponderance of the evidence." (internal quotation marks omitted)).

## Analysis

### I.   Motion to Dismiss for Lack of Jurisdiction

Plaintiffs plead jurisdiction under the FSIA's expropriation exception, which "[g]enerally speaking, . . . has two requirements: (1) the claim must put in issue 'rights in property taken in violation of international law,' and (2) there must be an adequate connection between the defendant and both the expropriated property and some form of commercial activity in the United States. Simon, 77 F.4th at 1091 (quoting 28 U.S.C. § 1605(a)(3)).   The defendants are all instrumentalities or agencies of Hungary that are sufficiently engaged in commercial activity in the United States for purposes of the expropriation exception.   See, e.g., de Csepel III, 169 F. Supp. 3d at 167; de Csepel IV, 859 F.3d at 1104 (affirming, in relevant part, the district court's conclusion that this requirement was met and noting that none of Hungary's "various agencies and instrumentalities, i.e., the three museums and the university, dispute that conclusion").   And there is no dispute that rights in property—namely, artworks—are at issue.   Accordingly, the sole jurisdictional question that remains is whether the artworks were "taken in violation of international law."   28 U.S.C. § 1605(a)(3).

Defendants' argument for dismissal is deceptively simple.   The Supreme Court decided in Federal Republic of Germany v. Philipp, 141 S. Ct. 703 (2021), that the FSIA's expropriation

exception incorporates the domestic takings rule, which "assumes that what a country does to property belonging to its own citizens within its own borders is not the subject of international law," id. at 709.  Accordingly, "[j]urisdiction under the expropriation exception does not exist for claims to any artwork that Hungary seized from its own nationals or citizens."  Mot. to Dismiss at 27.  Because, defendants argue, "[p]laintiffs do not dispute that they, or their predecessors, were all Hungarian, and only Hungarian, at the time of the takings," and because "[p]laintiffs do not dispute that Hungary seized their predecessors' artworks," nearly all of their claims must be dismissed for lack of jurisdiction.  Mot. to Dismiss at 27.[1]

Plaintiffs respond with two distinct arguments.  First, they insist that because "[p]laintiffs' predecessors were de facto stripped of their status as Hungarian nationals prior to the takings of their property" (i.e., became stateless), Hungary did not actually seize property from its own citizens and "the domestic takings rule should not apply."  Opp'n to Mot. to Dismiss at 21.  In the alternative, they argue that because "Hungary was occupied by Nazi Germany" at the relevant times, "even if Plaintiffs' predecessors remained Hungarian nationals, under international law, Germany as the occupying power bears responsibility for those takings irrespective of the nationality of the individuals who actually carried them out."  Id.[2]

---

[1] Defendants do not seek the dismissal of claims related to one artwork, the Santa Barbara sculpture, see Am. Compl. ¶ 17(xxiv), because "there is at least some evidence that this artwork was not taken by Hungarian officials, but was instead taken by non-Hungarian forces," Mot. to Dismiss at 19, which would mean that the domestic takings rule would not apply.  See Ex. F-17 to Decl. of Kornél Farkas ("Farkas Decl.") [ECF No. 210-15] at HUNG0111553 ("All that is known about the goods is that SS units brought them in trucks to Bad Ischl, and stored them in the building of the salt mine."); Ex. F-18 to Farkas Decl. [ECF No. 210-15] at HUNG011085 (indicating that the Santa Barbara sculpture was among the "art works repatriated from Bad-Ischl").

Additionally, defendants effectively seek reconsideration of a prior judge's determination that there is jurisdiction over two paintings, Portrait of the Architect Mátyás Zitterbarth and In the Studio, which were returned to the Herzog family after the war, and then later retaken by Hungary.  See Mot. to Dismiss at 11–12 n.4.  The Court will address these artworks toward the end of this Opinion.

[2] Due to the expropriation exception's use of the "passive voice to focus on the act of the taking rather than on the actor involved," "the defendant-state need not be the state that took the property in violation of international law."  Agudas Chasidei Chabad of U.S. v. Russian Fed'n, 466 F. Supp. 2d 6, 19 (D.D.C. 2006), aff'd in relevant part,

### A.  German Responsibility for the Takings

Plaintiffs suggest that—even if the Court ultimately determines that their predecessors were Hungarian, i.e., not stateless—the domestic takings rule should not bar these claims because Germany "bears responsibility" for taking the relevant artworks.  Opp'n to Mot. to Dismiss at 21. Plaintiffs raise valid theories of law under which Germany <u>could</u> theoretically bear legal responsibility for such takings.  But here, defendants have shown that plaintiffs' factual evidence "do[es] not bring [their] case within a statutory exception to immunity'" based on a theory of German responsibility.  <u>Simon</u>, 77 F.4th at 1116 (quoting <u>Price</u>, 389 F.3d at 197).

#### 1.   <u>Direct German Responsibility</u>

As a preliminary matter, plaintiffs produce no evidence from which the Court could determine that German officials were <u>directly</u> responsible for the seizure of relevant artworks, with the exception of the <u>Santa Barbara</u> sculpture.  Plaintiffs' primary expert, Dr. Tamás Kende (a Hungarian attorney and university lecturer providing expertise on Hungarian and international law) concedes as much.  <u>See, e.g.</u>, Decl. of Dr. Tamás Kende [ECF No. 220-13] ("Kende Decl.") ¶ 8 (not disputing defendants' assertion that "the confiscation of pieces of the Herzog Collection throughout the course of 1944 was generally carried out by agents of Hungarian nationality").[3] This is to be expected, given that plaintiffs' amended complaint generally only alleges that Hungary or Hungarian officials seized the artworks at issue.  <u>See, e.g.</u>, Am. Compl. ¶ 1 ("The artworks comprising the Herzog Collection were among the valuable art and other objects deliberately looted and seized by Hungary, a war-time ally of Nazi Germany . . . ."); <u>id.</u> ¶ 53 ("The

---

528 F.3d 934, 955 (D.C. Cir. 2008).  Accordingly, plaintiffs could maintain this suit against Hungary if it is now in possession of art that was unlawfully taken from their predecessors by Germany.

[3] Given the extensive declarations, documentary evidence, and secondary sources—many of which are written in foreign languages—referenced in the parties' briefing, throughout this Opinion the Court will frequently cite to the parties' declarations and attached exhibits to reference their sources and arguments.

Hungarian government, including the Hungarian state police, authorized, fully supported and carried out a program of wholesale plunder of Jewish property, stripping anyone 'of Jewish origin' of their assets.").  At most, the complaint alleges that the Herzog Collection was taken by "Hungary and its Nazi collaborators," id. ¶ 30 (emphasis added), but that allegation is not borne out by the evidence before the Court.

Defendants, by contrast, presented substantial additional evidence with their motion to dismiss that only Hungarian officials were directly responsible for the takings.[4]  Plaintiffs suggest that defendants' documentary evidence—which largely consists of "various inventory lists and other similar records prepared by Hungarian officials"—is insufficient to show that foreign officials were not involved because there is "no evidence that these inventories and records were prepared at the same time as the actual seizures or that they represent a comprehensive list of who was involved."  Opp'n to Mot. to Dismiss at 15, 16 n.11; see id. at 16 ("While German personnel may not have been expressly listed in these records, that does not mean that they played no role in the seizures."); id. at 31 n.18.  But plaintiffs' speculation is insufficient at this stage.  See Simon, 77 F.4th at 1116 ("[W]hen a defendant . . . seeks at the jurisdictional threshold to challenge the

---

[4] The Court incorporates by reference the numerous record citations at the relevant portions of defendant's motion to dismiss.  See Mot. to Dismiss at 10 (citing evidence that "[o]n May 16, 1944, Hungarian officials impounded portions of the Herzog Collection located at the Herzog Palace" and noting that "[t]here is no evidence any foreign official was present or otherwise involved in the impoundment of these artworks"); id. at 12 (citing evidence that another work, "which was built into the walls of the palace, was similarly taken by Hungarian authorities," and noting that no evidence indicates the involvement of foreign officials); id. at 13–14 (citing evidence that "Hungarian officials were in attendance" on May 20 and 22, 1944 when "boxes containing artworks from the Herzog Collection that were found in the cellars at Budafok were opened at the offices of the Hungarian Royal State Security Police" and that no evidence indicates the involvement of foreign officials); id. at 14–16 (citing evidence that "Hungarian officials" were involved in the taking of additional artworks from the Herzog Palace on June 14, 15, and 27, and July 5, 1944, and that no evidence indicates the involvement of foreign officials); id. at 16 (citing evidence that "Hungarian officials" were involved in the taking of artworks from István Herzog on Szemlöhegy Street in Budapest on July 24, 1944, and that no evidence indicates the involvement of foreign officials); id. at 16–18 (citing evidence, both direct and circumstantial, that "officials from the Hungarian National Museum of Applied Arts" took additional artworks from the Herzog Palace on July 31, 1944, at the direction of Hungarian government officials, and that no evidence indicates the involvement of foreign officials); see also id. at 18–19 (explaining that there is no evidence about the taking of three artworks but noting that "[t]here is no evidence that any of these three artworks were taken by foreign officials"); Reply ISO Mot. to Dismiss at 25–28.

factual basis of the court's jurisdiction . . . 'the court must go beyond the pleadings and resolve any disputed issues of fact.'" (quoting <u>Phoenix Consulting</u>, 216 F.3d at 40)).  The Court concludes, then, that there is no evidence of direct German responsibility for the seizures.

### 2.   Legal Theories of Derived German Responsibility

Plaintiffs quickly pivot from that argument and instead primarily argue that, even though German officials were not directly engaged in the seizures, Germany is nevertheless legally responsible because Hungary was either a <u>de facto</u> State organ of Germany or acting as a result of German coercion.  Opp'n to Mot. to Dismiss at 16–17; 31–35; <u>see also</u> Kende Decl. ¶ 8 ("[T]he determination of international responsibility for the conduct of persons or entities is, at times, made irrespective of the nationality of the actors involved.").[5]

The Court will analyze this issue in two parts:  In this section, it will address whether plaintiffs have presented a "legally valid" theory under which Germany could be held responsible

---

[5] As a threshold argument, plaintiffs insist that

> [i]n its 2011 decision denying Defendants' first motion to dismiss, this Court found in the alternative that even if defendants were correct that the seizure of the Herzog Collection by Hungary alone would not constitute a violation of international law because Plaintiffs' predecessors were Hungarian nationals at the time of the takings, the Complaint nevertheless stated a taking in violation of international law based on the alleged involvement of German Nazi officials in the takings.

Opp'n to Mot. to Dismiss at 30–31 (citing <u>de Csepel I</u>, 808 F. Supp. 2d at 130).  However, the Court concludes that it is not bound by these prior statements.

In <u>Simon</u>, the D.C. Circuit clarified the effect of the "law-of-the-case" doctrine on FSIA jurisdictional analyses.  "Law-of-the-case doctrine applies only where a prior ruling in the case resolved the same question that a party asks the court to revisit."  <u>Simon</u>, 77 F.4th at 1120.  A court's prior determination "that the plaintiffs had adequately pleaded" facts supporting jurisdiction is no longer "dispositive" when the court is later faced with "a factual challenge with respect to" those allegations.  <u>Id.</u>  This is because the introduction of such a "factual challenge . . . obligate[s] the district court to go beyond the pleadings to resolve that dispute."  <u>Id.</u>

Here, the previously assigned district court judge held that "the Complaint . . . states a substantial and non-frivolous taking in violation of international law based on the active involvement of German Nazi officials in the taking of at least a portion of the Herzog Collection."  <u>de Csepel I</u>, 808 F. Supp. 2d at 130.  "Specifically, the Complaint avers that the German Nazis assisted the Hungarian government in the discovery of the bulk of the Herzog Collection in Budafok . . . ."  <u>Id.</u>  This prior holding, which dealt with the adequacy of the pleadings, is not dispositive now that defendants have disputed the factual allegations and the parties have provided additional evidence to the Court.  Although the Court is entitled "to draw on the [prior] legal ruling," <u>Simon</u>, 77 F.4th at 1120, the Court declines to do so because—as it will explain in detail—the factual evidence does not support a conclusion that German officials were involved in the seizures of artwork in Budafok.  <u>See de Csepel I</u>, 808 F. Supp. 2d at 130 n.2.

at international law for takings executed by Hungarian officials against Hungarian citizens. Helmerich I, 581 U.S. at 174; see id. ("[A] party's nonfrivolous, but ultimately incorrect, argument that property was taken in violation of international law is insufficient to confer jurisdiction."); see also Simon, 77 F.4th at 1103 (explaining that, under Helmerich I, the fact that "the plaintiffs might have such a claim" is not enough to confer jurisdiction; rather, courts must "decide at the jurisdictional threshold whether plaintiffs actually have a claim that is legally cognizable under the FSIA" (internal quotation marks omitted)).  Then, the Court will consider whether there is sufficient evidence in the record to conclude that Germany was in fact responsible under those theories.

The precise contours of plaintiffs' legal theory for holding Germany responsible is not clearly articulated in their briefing; however, it appears to the Court that plaintiffs arguably invoke three distinct legal arguments: (1) that Germany can be held responsible by virtue of its military occupation of Hungary alone; (2) that Hungary was a de facto state organ directed and controlled by Germany; and (3) that Hungary's takings were coerced by Germany.[6]

Where applicable, the Court will primarily analyze the parties' arguments through reference to the International Law Commission's Articles on the Responsibility of States for Internationally Wrongful Acts ("ARSIWA"), which both sides agree details the customary rules of international law for determining state responsibility.  See generally Ex. 3 to Novak Suppl. [ECF No. 223-4] (text of ARSIWA as adopted by the International Law Commission at its fifty-third

---

[6] On the face of their briefing, plaintiffs do not expressly articulate any additional legal theories beyond the first theory of mere occupation.  See, e.g., Opp'n to Mot. to Dismiss at 32 (stating only generally that "[u]nder international law, as the occupying power, Germany may be held responsible for the taking of Jewish property in Hungary even if persons of Hungarian nationality actually carried out the takings").  However, plaintiffs' opposition brief adopts by reference the international law arguments in the supporting expert declaration from Dr. Tamás Kende. Kende analyzes two "potential bases for attributing conduct to a State" under customary international law: (1) "attributability of the conduct of a de facto State organ," and (2) "attributability of State conduct carried out as a result of coercion."  Kende Decl. ¶ 8.

session, in 2001).[7]

### a. Mere Occupation

First and foremost, plaintiffs argue that Germany was responsible for actions taken by Hungary during the relevant timeframe simply because "Hungary was under German occupation as of March 19, 1944."  Opp'n to Mot. to Dismiss at 31; see id. at 30 (arguing that "this Court should sustain jurisdiction over the artworks seized in 1944" on the ground "that the taking of Plaintiffs' property was done while Hungary was under occupation by Nazi Germany"); id. at 32 ("Under international law, as the occupying power, Germany may be held responsible for the taking of Jewish property in Hungary even if persons of Hungarian nationality actually carried out the takings" (citing Kende Decl. ¶¶ 37–38)).

The Court disagrees.  Defendants cite sources of international law asserting that "[m]ilitary occupation" standing alone, "even if it extends to the entire territory, . . . brings about no change in sovereignty over the occupied territory and does not affect the international personality of the State subjected to occupation," Ex. 4 to Suppl. Decl. of Zoltán Novák ("Novak Suppl.") [ECF No. 223-5] (Report of the International Law Commission on the work of its thirty-first session, Yearbook of the International Law Commission, 1979, vol. II (2)) ("1979 ILC Report") at 20.  In

---

[7] See Kende Decl. ¶ 8 (stating that, for purposes of determining "international responsibility for the conduct of persons or entities . . . , the standards of attribution were laid down in the [ARSIWA], which is, by and large, reflective of customary international law"); Reply ISO Mot. to Dismiss at 28 (agreeing that Kende "correctly recognize[d] that the relevant rules of international law were 'laid down in the [ARSIWA]'" (quoting Kende Decl. ¶ 8)).  The Court recognizes that the "ARSIWA is not a treaty and therefore is not binding under international law." Maddocks, Outsourcing of Governmental Functions in Contemporary Conflict: Rethinking the Issue of Attribution, 59 Va. J. Int'l L. 47, 49 n.5 (2019).  However, the ARSIWA and its accompanying commentary are routinely cited by "international courts, tribunals, and other legal bodies" and are described by such bodies as being "reflective of customary international law." Id.; see, e.g., Case Concerning Application of The Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro), Judgment, 2007 I.C.J. Rep. 43, ¶¶ 419–420 (Feb. 26) [https://perma.cc/3VHS-N69N] (citing the ARSIWA as "reflecting" "the customary rules constituting the law of State responsibility").  Given that international legal authorities—and these parties—agree that the principles codified in the ARSIWA accurately reflect customary international law, the Court will treat the ARSIWA as largely authoritative.

fact, plaintiffs' primary expert declaration appears to concede this position.  See Kende Decl. ¶ 30 ("[T]his is not to suggest that military occupation of territory as such automatically leads to attribution of the conduct of actors exercising authority in the occupied territory . . . .").

In support of their argument, plaintiffs point to several Articles of the 1907 Hague Convention No. IV on the Laws and Customs of War on Land (the "Hague Convention"), which Hungary has ratified.  See Opp'n at 32 (citing Hague Convention, arts. 43, 46, 47, Oct. 18, 1907, 36 Stat. 2277).  But the referenced portions of the Hague Convention do not supply standards for determining state responsibility for actions taken by organs of an occupied state.  See Reply ISO Mot. to Dismiss at 29 n.15.  Rather, those Articles identify obligations of an occupying state that go into effect once "[t]he authority of the legitimate power [has] in fact passed into the hands of the occupant," including "tak[ing] all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country," Hague Convention, art. 43, "respect[ing]" "[f]amily honour and rights, the lives of persons, and private property," id. art. 46, and refraining from "[p]illag[ing]," id. art. 47.  Even if plaintiffs are correct that "[a]s the occupying power," Germany failed to uphold a separate responsibility to "ensur[e] that private property rights were honored and looting [was] prohibited," Opp'n to Mot. to Dismiss at 32, it does not necessarily follow that an occupying nation is derivatively responsible for any expropriations carried out by officials of the occupied state. Accordingly, the Court is not persuaded by plaintiffs' argument on this point.

Hence, the Court must look further to determine whether plaintiffs identify a more specific principle of international law that could render Germany responsible for the takings.

      b.   Direction and Control

Plaintiffs next argue that Hungary qualified as a de facto state organ of Germany.

Plaintiffs' expert, Dr. Kende, claims that

> international law posits that in principle, it is possible to attribute to a State the conduct of persons or entities even if they do not have the legal status of State organs, provided that the relationship between them is one of dependence and control to the degree that it can be qualified as 'complete dependence' on the State. The notion of 'complete dependence' suggests that the actor is but a mere instrument in the hands of the State, lacking any real autonomy.

Kende Decl. ¶ 10 (footnotes omitted). Kende concedes that the standard for qualifying an entity as a de facto state organ is "arguably a highly demanding one," id. ¶ 11, but he ultimately concludes that "the historical evidence . . . , taken together with the historical context of German occupation suggests that Hungary was completely dependent on Germany, rendering the war-time taking of artworks belonging to the Herzog Collection attributable to the latter," id. ¶ 32. Plaintiffs' argument could be understood to invoke two articles of the ARSIWA: Article 8, which deals with conduct of private persons or entities directed or controlled by a state, or Article 17, which deals with one state's direction or control of another state's acts.

Article 8 concerns "[c]onduct directed or controlled by a State," and states that "[t]he conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct." Ex. 3 to Novak Suppl. at 47.[8] The Commentary to Article 8 clarifies that this rule pertains to "the conduct of private persons or entities," while "[s]eparate issues"—including those addressed by Articles 17 and 18, which are

---

[8] Kende's repeated emphasis of the term "de facto" is perhaps the best evidence that he intends to invoke Article 8 of ARSIWA, rather than Article 17 which the Court discusses next. The ARSIWA's commentary explains that "Article 8 uses the words 'person or group of persons', reflecting the fact that conduct covered by the article may be that of a group lacking separate legal personality but acting on a de facto basis." Ex. 3 to Novak Suppl. at 49; see id. at 67–69 (ARSIWA art. 17 and accompanying commentary, not using that term). Further, to describe the degree of "dependence" required to qualify as a de facto organ, Kende relies on Military and Paramilitary Activities in and Against Nicaragua (Nicaragua v. United States of America), Judgment, I.C.J. Rep. (1986) ("Nicaragua"), see Kende Decl. at p.3 nn.6, 8 & p.9 n.50 (citing Nicaragua), which is discussed at length for the same purposes in the commentary to Article 8, see Ex. 3 to Novak Suppl. at 47–48 & nn.155–56.

discussed next—"are raised where one <u>State</u> engages in internationally wrongful conduct at the direction or under the control of another State." <u>Id.</u> at 47 & n.153 (emphasis added).[9] Plaintiffs, through Kende, do not argue that takings were committed by private persons under the direction or control of Germany; rather, they claim that the state of "Hungary qualified as a <u>de facto</u> organ of Germany during its occupation." Kende Decl. at p.3. Accordingly, the principles of international law embodied in Article 8 of the ARSIWA are inapposite.

Article 17 of the ARSIWA is more applicable to plaintiffs' argument. Per Article 17,

[a] State which directs and controls another State in the commission of an internationally wrongful act by the latter is internationally responsible for that act if: (a) that State does so with knowledge of the circumstances of the internationally wrongful act; and (b) the act would be internationally wrongful if committed by that State.

Ex. 3 to Novak Suppl. at 67–68. The commentaries note that many circumstances that might have triggered the "direction and control" provisions of Article 17 are "now largely of historical significance," including "[i]nternational dependency relationships such as 'suzerainty' or 'protectorate.'" <u>Id.</u> at 68 (commentary to ARSIWA art. 17). However, some "instances exist or can be envisaged where one State exercises the power to direct and control the activities of another State . . . as a result of a military occupation." <u>Id.</u> As an example, the commentaries explain that "during the belligerent occupation of Italy by Germany in the Second World War, it was generally acknowledged that the Italian police in Rome operated under the control of the occupying Power," and the Holy See (the government of the Vatican City) asserted that German authorities were

---

[9] A snippet of commentary to a separate article in the ARSIWA includes an example that could appear to conflict with this commentary to Article 8. It states that "[w]here one State bribes an organ of another to perform some official act, the corrupting State would be responsible either under article 8 or article 17." Ex. 3 to Novak Suppl. at 46 n.150 (commentary to ARSIWA art. 7). Yet, these portions of the commentary can be harmonized, in theory: if the "State whose official had been bribed" sanctioned the "official act," <u>id.</u>, it might implicate Article 17, but if the bribed official engaged in the act outside of the scope of his lawful authority, he would effectively be a private actor, which could implicate Article 8.

responsible for "wrongful acts committed by Italian police who forcibly entered the Basilica of St. Paul." Id.

However, the commentaries to Article 17 highlight the narrow scope of the provision. "Article 17 is limited to cases where a dominant State actually directs and controls conduct which is a breach of an international obligation of the dependent State." Ex. 3 to Novak Suppl. at 68 (emphasis added). Accordingly, a court should "refuse[] to infer responsibility on the part of a dominant State merely because the latter may have the power to interfere in matters of administration internal to a dependent State, if that power is not exercised in the particular case." Id. at 68–69 (emphasis added). Moreover, Article 17 requires that "[b]oth direction and control must be exercised over the wrongful conduct in order for a dominant State to incur responsibility." Id. at 69 (emphasis added). As used, "the term 'controls' refers to cases of domination over the commission of wrongful conduct and not simply the exercise of oversight, still less mere influence or concern." Id. "[T]he word 'directs' does not encompass mere incitement or suggestion but rather connotes actual direction of an operative kind." Id. Finally, as is clear from the text of Article 17, "the dominant State is only responsible if it has knowledge of the circumstances making the conduct of the dependent State wrongful," and "it has to be shown that the completed act would have been wrongful had it been committed by the directing and controlling State itself." Id.

Accordingly, per Article 17, if (a) Hungary's taking of its Jewish citizens' artworks is an "internationally wrongful act," and (b) if Germany actually directed and controlled Hungary's commission of those takings, then Germany could be internationally responsible so long as (c) it knew of the circumstances which made those takings wrongful, and (d) the takings would independently be internationally wrongful if Germany had committed them. Ex. 3 to Novak Suppl. at 67–68. Two of these questions—whether Germany controlled or directed the takings, and

16

whether Germany knew of the wrongfulness—are factual issues that the Court will address at a later point in this Opinion.  Defendants have already conceded the fourth issue: the takings would be internationally wrongful if committed by Germany.  See Mot. to Dismiss at 28 n.11, 30 (not disputing that the Court has jurisdiction over the Santa Barbara sculpture in light of evidence that it "was brought by German troops into Austria during the war").  Accordingly, the only question remaining to determine the legal validity of a theory of German responsibility based on "direction and control" is the first one: whether Hungary's taking of its own Jewish citizens' artworks could be an internationally wrongful act for purposes of the ARSIWA.  For the sake of avoiding duplicative discussion, the Court will wait to address that question until discussing plaintiffs' remaining theory.[10]

### c.  Coercion

Plaintiffs' final theory is that Germany is responsible because "Hungary was coerced into taking the Herzog Collection by Germany."  Kende Decl. at p.10.  In support of this theory, Kende invokes Article 18 of the ARSIWA, which states that "[a] State which coerces another State to commit an act is internationally responsible for that act if: (a) the act would, but for the coercion, be an internationally wrongful act of the coerced State; and (b) the coercing State does so with knowledge of the circumstances of the act."  Ex. 3 to Novak Suppl. at 69; see Kende Decl. ¶¶ 33– 35.  Although the theory of state responsibility described in Article 18 closely resembles that in Article 17, there are key differences.  "[U]nder article 17, the acting State commits the

---

[10] The Court recognizes that it requires performing a significant amount of work on plaintiffs' behalf to reach this point of the analysis.  Even though the Court agrees with defendants that plaintiffs (through Kende's declaration) likely intended to base their "de facto organ" argument on the inapplicable rule recognized in Article 8 of the ARSIWA, it is at least plausible to construe their claims through the lens of the rule expressed in Article 17.  The two Articles have obvious similarities, and Article 17 is more obviously relevant to one state's control over another.  It is telling that defendants also addressed Article 17 briefly in their reply.  See Reply ISO Mot. to Dismiss 31–32 n.21. Given that the Court will ultimately conclude that plaintiffs have not made sufficient factual showings to maintain jurisdiction based on this theory, it sees little harm in engaging in this analysis for the sake of eliminating any doubt.

internationally wrongful act, albeit under the direction and control of another State," but "in the case of coercion under article 18, the coercing State is the prime mover in respect of the conduct and the coerced State is merely its instrument."  Ex. 3 to Novak Suppl. at 65.  Further, "coercion for the purpose of article 18 is narrowly defined":

> Nothing less than conduct which forces the will of the coerced State will suffice, giving it no effective choice but to comply with the wishes of the coercing State.  It is not sufficient that compliance with the obligation is made more difficult or onerous, or that the acting State is assisted or directed in its conduct . . . .  Moreover, the coercing State must coerce the very act which is internationally wrongful.  It is not enough that the consequences of the coerced act merely make it more difficult for the coerced State to comply with the obligation.

Id. at 69–70.

Accordingly, per Article 18, if (a) Germany coerced Hungary into taking its own Jewish citizens' artworks, Germany would be internationally responsible for those takings if (b) Germany knew of the circumstances of the takings, and (c) the takings would, but for the coercion, be an internationally wrongful act of Hungary.  As before, two of these questions—whether Germany actually coerced Hungary and whether Germany knew the circumstances—are factual questions that the Court will address shortly.  Accordingly, the only question that must be answered to determine the legal validity of plaintiffs' coercion theory is, again, whether Hungary's taking of its own Jewish citizens' artworks could be an internationally wrongful act for purposes of the ARSIWA.

### d.   International Wrongfulness of Hungary's Expropriation

To summarize, there are two potentially viable theories of German derived responsibility[11]:

(1) that Germany directed and controlled Hungary's takings of the artworks, or (2) that Germany

---

[11]   The ARSIWA refers to both Article 17 and Article 18 as addressing distinct cases of "derived responsibility."  See Ex. 3 to Novak Suppl. at 68–69.

coerced Hungary into committing the takings.  Determining whether either of these "derived responsibility" arguments presents a legally valid theory to hold Germany responsible for the takings—and thereby permit plaintiffs to invoke the FSIA's expropriation exception without raising a domestic takings issue—turns on whether Hungary's taking of its own Jewish citizens' artworks could be an internationally wrongful act for purposes of the ARSIWA.

Defendants argue that Germany cannot be derivatively responsible under either theory because Hungary's taking of property from its own citizens would not be internationally wrongful.  See Reply ISO Mot. to Dismiss at 31–32 & n.21.  They insist "[t]hat condition cannot be met here because Hungary's seizure of property from its own citizens is not a violation of the international law of expropriation—the only international law which supports jurisdiction under the expropriation exception."  Id. at 32 (emphasis added).  As support, defendants cite Philipp's application of the domestic takings rule.  Id. (citing Philipp, 141 S. Ct. at 709, 715).

The Court disagrees with defendants' reasoning.  The determination of which state is responsible for an act under international law looks to whether the occupied state could be held internationally responsible for the act generally.  Thus, if Hungary's takings would be internationally wrongful under some other body of law—for example, the law of genocide—it would suffice to render Germany responsible under the ARSIWA.  To be sure, defendants are correct that Hungary could not be held responsible under the international law of expropriation for what it does to the property of its own citizens in light of the domestic takings rule.  They are also correct that Philipp interpreted the term "property taken in violation of international law" in the FSIA's expropriation exception to require the application of the international law of expropriation—rather than some other law, such as the international law of genocide—to determine whether a sovereign state that engaged in a taking is subject to the jurisdiction of U.S.

courts by virtue of the expropriation exception.  See Philipp, 141 S. Ct. at 715.  But the Court sees

no reason why the scope of its analysis of state responsibility under the ARSIWA would also be

confined to the international law of expropriation.[12]

The Court's approach is supported by a comparison of international state responsibility law

with the FSIA's expropriation exception.  The Philipp Court carefully explained why the FSIA's

expropriation exception should be understood to incorporate only the international law of property

rights:

> The exception places repeated emphasis on property and property-related rights,
> while injuries and acts we might associate with genocide are notably lacking.  That
> would be remarkable if the provision were intended to provide relief for atrocities
> such as the Holocaust.  A statutory phrase concerning property rights most sensibly
> references the international law governing property rights, rather than the law of
> genocide.

Philipp, 141 S. Ct. at 712–13.  Because the principles articulated in the ARSIWA are not limited

to responsibility for acts relating to property, none of these same considerations are present when

analyzing state responsibility, even if that analysis ultimately happens to be for the purpose of

attributing responsibility for a taking.  Compare Ex. 3 to Novak Suppl. at 69 (ARSIWA art. 18)

(asking, in general, whether "the act would, but for the coercion, be an internationally wrongful

act of the coerced State"), and id. at 67 (ARSIWA art. 17) (requiring, in general, that the controlled

state engaged in "the commission of an internationally wrongful act"), with 28 U.S.C. § 1605(a)(3)

---

[12] To clarify the somewhat complex logic at work: the Court must first determine whether Germany is internationally responsible for the relevant acts (here, takings from Hungarian Jews).  It makes that determination based on the customary international law of state responsibility, which is reflected in the ARSIWA.  A portion of that responsibility determination requires the Court to imagine whether the controlled or coerced state's acts would be internationally wrongful absent such control or coercion.  That hypothetical determination of wrongfulness—for the sole purpose of determining whether the allegedly controlling state is legally responsible—can be made by reference to any body of international law.  Then, once the Court has identified the responsible state, the Court must separately analyze whether it can exercise jurisdiction over that state through the FSIA's expropriation exception.  That jurisdictional analysis requires the Court to determine if the responsible state's takings were violative of the international law of expropriation.  Thus, while the availability of jurisdiction under the FSIA's expropriation exception demands reference to the international law of expropriation exclusively, no such restriction applies when determining international wrongfulness for the purpose of assigning state responsibility under the ARSIWA.

(waiving sovereign immunity in any case "in which rights in property taken in violation of international law are in issue" based in part on whether "that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state").  In fact, it would be "remarkable" if the rules outlined in the ARSIWA were interpreted to <u>preclude</u> a determination of state liability for acts committed in service of "atrocities such as the Holocaust," <u>Philipp</u>, 141 S. Ct. at 712–13, simply because those acts involved property rights.

Accordingly, the broader context of the acts at issue could matter significantly for determining state responsibility.  That is, responsibility determinations for takings may differ based on whether those takings were part and parcel of other international law violations.  For example, imagine that Germany coerced Hungary into seizing artworks from its citizens and did so in a vacuum, i.e., outside of the Holocaust, World War II, or any other broader circumstance.  Under those circumstances, Germany might not be internationally responsible for such takings.  If the only body of international law that happened to bear on the wrongfulness of such isolated takings were the law of expropriation, the domestic takings rule would preclude plaintiffs from demonstrating that "the act would, but for the coercion, be an internationally wrongful act of [Hungary]." Ex. 3 to Novak Suppl. At 69.  But now assume that Germany coerced Hungary into seizing property from its Jewish citizens as part of a broader effort to ghettoize and eradicate the European Jewish population.  Those takings would be wrongful under other areas of international law, such as the laws of genocide and human rights.

Here, there is little room for dispute that, given the broader context in which these takings occurred—i.e., the Holocaust—they would be internationally wrongful if committed by Hungary.  As the D.C. Circuit held earlier in the <u>Simon</u> litigation, Hungary's taking of property from its own Jewish citizens was internationally wrongful because the "alleged takings of property . . .

amounted to the commission of genocide, and genocide violates international law."  Simon v. Republic of Hungary, 812 F.3d 127, 142 (D.C. Cir. 2016), abrogated by Philipp, 141 S. Ct. 703 (2021).[13]  In fact, by raising a theory that has since been rejected by the D.C. Circuit, defendants implicitly argue that Hungary's takings were acts of genocide.  See Mot. to Dismiss at 29–30 (arguing that these takings should be considered "genocidal expropriations").

Accordingly, understood in historical context, Hungary's taking of its own Jewish citizens' artworks would be an internationally wrongful act for purposes of determining state responsibility. Hence, the Court determines that plaintiffs have presented two valid legal theories of German derived responsibility, one based on direction and control, and another based on coercion.

### 3.  Analysis of German Responsibility

The Court must now determine whether plaintiffs have demonstrated that Germany, as a matter of fact, directed and controlled Hungary's takings or coerced Hungary to commit them. Upon review, the Court concludes that plaintiffs' evidence is not sufficient to support a viable theory of Germany responsibility for these specific takings.

Plaintiffs first emphasize the pre-occupation relationship between the two countries. "During the 1930s, Hungary increasingly fell under the influence of Nazi Germany," and soon it "enacted a series of anti-Semitic laws designed to exclude Jews from meaningful roles in Hungarian society."  Opp'n to Mot. to Dismiss at 8 (citing Am. Compl. ¶¶ 42–43).  In 1940,

---

[13] Although Philipp held that a violation of the international law of genocide is insufficient to support jurisdiction under the FSIA's expropriation exception, the Supreme Court did not disagree with the conclusion that domestic takings could also amount to acts of genocide.  Rather, the Philipp Court explicitly avoided reaching that issue because it was irrelevant to the FSIA jurisdictional question before it.  141 S. Ct. at 712 ("We need not decide whether the sale of the consortium's property was an act of genocide, because the expropriation exception is best read as referencing the international law of expropriation rather than of human rights.").  Accordingly, Philipp did not disturb the reasoning behind the D.C. Circuit's conclusion that "[t]he systematic, 'wholesale plunder of Jewish property' at issue here" was "aimed to deprive Hungarian Jews of the resources needed to survive as a people," and that "[e]xpropriations undertaken for the purpose of bringing about a protected group's physical destruction qualify as genocide."  Simon, 812 F.3d at 143 (citation omitted) (quoting de Csepel II, 714 F.3d at 594).

Hungary became the first country outside of Germany, Italy, and Japan to join the Axis Powers. Id. at 9 (citing Am. Compl. ¶ 45).  Then, in June 1941, when Germany invaded the Soviet Union, Hungary also declared war and provided supporting troops.   Id. (citing Am. Compl. ¶ 47). Plaintiffs explain that, "[d]uring 1941 and 1942, thousands of Jews were deported by the Hungarian government to territories under German control where they were mistreated and massacred," and that "[i]n January 1942, Hungarian military and gendarme units murdered hundreds of Jews in the territories that were attached to Hungary in the previous year." Id. (citing Am. Compl. ¶ 48).  Hungary continued to send its Jewish citizens into forced labor "under the command of Hungarian military officers" in inhumane conditions, resulting in thousands of additional deaths. Id. (citing Am. Compl. ¶ 49).

Plaintiffs then rely on two expert declarations from Dr. Kende and Dr. Gábor Kádár (a scholar of history of the Holocaust-era plunder of Jewish assets) to describe the circumstances of Germany's occupation of Hungary.  "In 1943, Germany became increasingly frustrated with what it perceived as Hungary's comparatively 'mild' treatment of its Jews and Hitler resolved to obtain control of the Hungarian government to strip Hungary of most of its powers as a sovereign nation and to exploit its resources."  Opp'n to Mot. to Dismiss at 9–10 (citing Kende Decl. ¶¶ 16–17; Decl. of Dr. Gábor Kádár [ECF No. 220-1] ("Kadar Decl.") ¶ 9).  Hitler opted to "heed the advice of Edmund Veesenmayer, the German Foreign Office's regional advisor," and developed a plan "to occupy Hungary in a 'peaceful manner'" and "change only the highest echelons of the government and military while leaving most state and municipal authorities intact."  Kadar Decl. ¶ 9; see Opp'n to Mot. to Dismiss at 10.  Hitler appointed Veesenmayer as Reich Plenipotentiary in Hungary, entrusting him with overseeing the formation of a new national government in Hungary.  Opp'n to Mot. to Dismiss at 10 (citing Kende Decl. ¶¶ 19–20; Kadar Decl. ¶ 10); see

id. at 32–33; see also Kende Decl. ¶ 24 (suggesting that, according to the judgment of the Nuremberg Trial, "Veesenmayer was the 'de facto ruler of Hungary'").

On March 19, 1944, Hitler sent German troops into Hungary to begin the occupation. Opp'n to Mot. to Dismiss at 10 (citing Am. Compl ¶ 50; Kende Decl. ¶ 21).  The Hungarian Regent, Miklós Horthy, formally remained in power—after "he was forced to agree to [Veesenmayer's] plans for the annihilation of Hungarian Jews"—but the Hungarian "prime minister [Miklós] Kállay and his government were removed and replaced by a puppet government."   Kende Decl. ¶¶ 18, 21–22; see Opp'n to Mot. to Dismiss at 10.   This new government "was not recognized by any states outside of Germany and its closest allies."  Opp'n to Mot. to Dismiss at 10 (citing Kende Decl. ¶ 22).

Plaintiffs explain that "Hungarian policies directed towards Jews and their property changed drastically for the worse following the German invasion and occupation of Hungary." Opp'n to Mot. to Dismiss at 32.  Plaintiffs describe new laws that were passed by Hungary targeting Jews and their property rights.  See id. at 11–12.  In particular, Decree of the Ministry for the Interior No. 1830 of 1944—which was issued by Andor Jaross, the Minister of Interior who "Veesenmayer . . . insisted on appointing," Kende Decl. ¶ 24—created a "Commission for the Recording and Safeguarding of Impounded Art Objects of Jews" and "required Hungarian Jews promptly to register all art objects in their possession."  Opp'n to Mot. to Dismiss at 12 (citing Kende Decl. ¶ 24; Am. Compl. ¶ 55).[14]  The Hungarian government "created a special government organization to confiscate and register Jewish-owned artifacts, headed by the Director of the Museum of Fine Arts, Dénes Csánky."  Kadar Decl. ¶ 22; see Opp'n to Mot. to Dismiss at 33.

---

[14] Plaintiffs later state that Jaross "direct[ed] the confiscation of Jewish property" by "issu[ing]" a different law, namely "Decree No. 1600/1944 ME (IV. 14)."  Opp'n to Mot. to Dismiss at 33.  But, according to plaintiffs' expert and other portions of their own opposition, that particular decree was actually issued by the Prime Minister of Hungary.  See Kende Decl. ¶ 24; Opp'n to Mot. to Dismiss at 12.

Plaintiffs allege that Germans were broadly in charge of the confiscation of Jewish-owned art.  They attempt to demonstrate German involvement through a chain of associations between Csánky's office and certain police agencies.  They offer "documentary evidence [that] shows that officials from the Hungarian State Security Police ("SSP") were . . . involved in the takings of certain artworks" and "operated in official cooperation with" Csánky's office.  Opp'n to Mot. to Dismiss at 16, 33 (citing Kadar Decl. ¶ 28).  The SSP was established after the onset of the German occupation, allegedly at the direction of German security services.  Id. at 33 (citing Kadar Decl. ¶ 29).  To draw a further connection between the SSP and German authorities, plaintiffs explain that "[t]he German SS and Gestapo forces occupied a large building compound . . . located in the Hotel Majestic" in Budapest, and "[t]he SSP's offices were also located in the Majestic and the neighboring Hotel Lomnic and Mirabel," making it the only "Hungarian policing agency . . . work[ing] in such close physical proximity to the Gestapo."  Id. at 16–17 (citing Kadar Decl. ¶ 31).  The Chief Police Counsellor of the SSP allegedly "told his men that any 'advice' or 'request' coming from the Germans must be considered orders."  Kadar Decl. ¶ 32.

In addition to these more general assertions, plaintiffs also strive to connect the Hungarian SSP and German authorities to a few of the specific takings at issue in this case.  Plaintiffs first present evidence that some of the artworks in the Herzog Collection were confiscated through coordinated efforts between Csánky's office and the Hungarian SSP.  See Opp'n to Mot. to Dismiss at 16–17; Kadar Decl. ¶ 28.  According to contemporary records, four relevant paintings were taken from a cellar in Budafok by Csánky and SSP officers and transferred to the "building compound" that housed the headquarters of both the SSP and German police forces.  See Opp'n to Mot. to Dismiss at 17 (citing Kadar Decl. ¶ 33; Farkas Decl. Ex. F-7 at HUNG010275–10276).  As far as proof of Germany's "actual control" over the confiscation of these specific artworks,

plaintiffs only point to "documentary evidence" which they claim "suggests that two paintings . . . were most likely removed from the villa belonging to [Erzsébet] Weiss de Csepel and her husband . . . by Csánky's emissary while it was occupied by Germans officers who refused to allow him to remove more than the two artworks." Id. at 33 (citing Kadar Decl. ¶ 24).  Finally, plaintiffs explain that toward the end of the war "in late 1944 and early 1945 . . . , a number of the artworks were moved first to Western Hungary, then to Austria, which was part of Nazi Germany, and eventually to Germany itself" as "part of a German-controlled evacuation process." Id. at 34 (citing Kadar Decl. ¶¶ 18–20, 26).  Those artworks were not returned from Germany to Hungary until after the end of the war.  See id.

Plaintiffs assert that, "[t]aken together, all of these facts demonstrate that Hungarian officials were following the directives of the occupying power and that Hungary lacked political independence during its occupation." Opp'n to Mot. to Dismiss at 34; see Kende Decl. ¶ 32; Kadar Decl. ¶ 34.

Indeed, the Court has no doubt that Nazi Germany wielded substantial influence over Hungary over the course of the German occupation—and plaintiffs have demonstrated as much. But based on this record, plaintiffs have not produced evidence from which the Court could conclude that Germany controlled and directed or coerced Hungary's taking of these artworks from these plaintiffs' predecessors to an extent that would render Germany responsible under international law.  Plaintiffs "bear the burden of production," Simon, 812 F.3d at 147, and "the initial burden of overcoming the Act's presumption of immunity by making out a legally sufficient case that an exception does apply in the first place," Helmerich II, 743 F. App'x at 449 (internal quotation marks omitted).  But even if the Court were to resolve all "disputed issues of fact" in their favor, Simon, 77 F.4th at 1116 (internal quotation marks omitted), plaintiffs have failed to

produce evidence that could support a legally sufficient case that the expropriation exception applies due to German responsibility for the takings.  Accordingly, defendants meet their "burden of persuasion to establish the absence of the factual basis by a preponderance of the evidence." Simon, 812 F.3d at 147 (internal quotation marks omitted).

First, as explained above, for Germany to be internationally responsible under a theory of direction and control, it must have "actually direct[ed] and control[led]" Hungary's commission of these takings.  Ex. 3 to Novak Suppl. at 68 (emphases added).  That means that Germany must have exercised "domination over [Hungary's] commission" of these wrongful takings and must have engaged in "actual direction of an operative kind."  Id. at 69.  "[T]he exercise of oversight" or "influence or concern" does not suffice to show control, and similarly, "mere incitement" does not rise to the level of direction.  Id.

Plaintiffs' factual evidence is not enough to show sufficient direction and control. Plaintiffs clearly demonstrate that Germany had a firm grasp over the upper echelons of the new government in Hungary, which—in plaintiffs' own words—"operate[d] under German oversight." Opp'n to Mot. to Dismiss at 10; see Kadar Decl. ¶ 9; Kende Decl. ¶ 24.  But as the Court has noted, the "exercise of oversight" does not suffice to show control.  Ex. 3 to Novak Suppl. at 69.  Plaintiffs argue that Germany wielded its influence to "fill in the[] ranks" of "the Hungarian political elite . . . with ideologically committed" Hungarians, pointing, for example, to Veesenmayer's successful insistence on appointing the Hungarian Minister of the Interior who went on to issue the "very ministerial decree that enabled a lawful de facto confiscation of Jewish artwork."  Kende Decl. ¶¶ 23–24; see Opp'n to Mot. to Dismiss at 11–12.  But their evidence does not show that Veensenmayer (or any other German) "actually direct[ed]" either the passage of that decree or these takings.  Ex. 3 to Novak Suppl. at 68.

Plaintiffs' argument about the physical proximity and coordination between the SSP and German police agencies is also not enough.  Even if the Chief Police Counsellor of the SSP did "t[ell] his men that any 'advice' or 'request' coming from the Germans must be considered orders," Kadar Decl. ¶ 32, that would at most suggest that German authorities had an ability to control the SSP's actions, not that they actually wielded such power over any relevant takings.  See Ex. 3 to Novak Suppl. at 68–69 ("International tribunals have consistently refused to infer responsibility on the part of a dominant State merely because the latter may have the power to interfere in matters of administration internal to a dependent State, if that power is not exercised in the particular case.").

Rather, the only evidence that plaintiffs produce for the purpose of demonstrating "actual control" by German officials cuts against a finding of direction and control.  Even if it were proven true that German officers occupying Erzsébet Weiss de Csepel's villa prevented Csánky's emissary from taking more than two paintings, see Opp'n to Mot. to Dismiss at 33 (citing Kadar Decl. ¶ 24); but see Reply ISO Mot. to Dismiss at 27 (disputing these facts), that would suggest that Csánky's team's orders were detached from German control.  That is, plaintiffs' evidence does not indicate that these German officials ordered Csánky's emissary to seize the two artworks at issue, but rather that they reluctantly permitted the Hungarian taking.  Moreover, if some other high-ranking German authority had exercised "domination over" Csánky's emissary and given him "actual direction of an operative kind" to seize artwork from the villa, Ex. 3 to Novak Suppl. at 69, one would not expect the German officers occupying the villa to "refuse[] to allow him to remove" artworks he had been commanded to take, Opp'n to Mot. to Dismiss at 33 (citing Kadar Decl. ¶ 24).  Accordingly, the Court is unable to conclude on this record that Germany controlled and directed Hungary's takings in this particular case.

The Court is similarly unable to conclude that Germany is responsible because it coerced Hungary into committing the takings. Coercion "is narrowly defined" such that "[n]othing less than conduct which forces the will of the coerced State will suffice, giving it no effective choice but to comply with the wishes of the coercing State." Ex. 3 to Novak Suppl. at 69–70. Plaintiffs must demonstrate that Germany "coerce[d] the very act" at issue here, namely, the takings of these artworks from plaintiffs' predecessors. Id. Ultimately, this theory would require the Court to determine that Germany was "the prime mover" behind these specific takings and that Hungary was "merely its instrument," id. at 65, but the facts do not support such a conclusion.

As the Court has explained, plaintiffs have presented no evidence that Germany was directly involved in "the very act[s]" at issue here. Ex. 3 to Novak Suppl. at 69. At most, plaintiffs' evidence about the SSP's proximity and ties to German police forces could suggest that Germany may have "assisted or directed" Hungarian officials who participated in some of these expropriations, but that would be insufficient to confer responsibility under international law. Id. ("It is not sufficient . . . that the acting State is assisted or directed in its conduct . . . .").

And even if the Court could probe for such coercion at a more abstract level—i.e., if it mattered whether Germany coerced Hungary's implementation of some general expropriation policy rather than "the very act[s]" at issue—the Court is not certain that plaintiffs have shown that Germany entirely "force[d] the will" of Hungary. Ex. 3 to Novak Suppl. at 69. Hungary was already engaged in genocidal acts against its Jewish citizens prior to the German occupation, many of which were significantly more serious than property takings. See Opp'n to Mot. to Dismiss at 8–9. According to plaintiffs' own briefing, Hungary began enacting "anti-Semitic laws" intended to "exclude Jews from meaningful roles in Hungarian society" as early as 1938, and "excluded [Jews] from the armed forces," forced them "to perform labor service," and "prohibited sexual

relations between Jews and non-Jews" by 1941.  Id. at 9.  Even worse, between 1941 and 1942,

Hungary deported "thousands of Jews . . . to territories under German control where they were

mistreated and massacred," and "Hungarian military and gendarme units murdered hundreds of

Jews" in territories attached to Hungary.  Id.  Indeed, Hungary was the first new country to

willingly join the Axis powers in 1940.  Id.  Hungary's atrocities against Jews prior to the German

occupation cuts against the notion that Hungary was wholly coerced into committing these types

of wrongs after the occupation began.  See Ex. 3 to Novak Suppl. at 69 ("Nothing less than conduct

which forces the will of the coerced State will suffice . . . .").  Plaintiffs undoubtedly present

evidence that German influence and oppression made it substantially "more difficult or onerous"

for Hungarian officials to resist employing even harsher abuses against Hungary's Jewish citizens

than they already had been employing, but that "is not sufficient" to confer legal responsibility.

Ex. 3 to Novak Suppl. at 69.[15]  Hence, the Court is unable to determine on this record that Germany

coerced Hungary into committing the takings at issue in this case.[16]

        None of plaintiffs' additional arguments warrant a different conclusion.  Plaintiffs urge the

Court to adopt a more lenient standard for attributing state responsibility based on a 2004 decision

by the Bundesverfassungsgericht (the German Federal Constitutional Court ("GFCC")) related to

expropriations carried out in the former Soviet Occupation Zone of Germany between 1945 and

---

        [15] To some degree, plaintiffs seem to admit that some of the very officials they claim had been coerced were nevertheless able to defy other German demands.  Kende explains that, after the German occupation, "many [Hungarian] State officials either resigned or attempted to combat anti-Jew measures in other ways."  Kende Decl. ¶ 25.  As an example, he points to the Hungarian Regent, Horthy, who refused "to sign any of the decrees affecting Jews adopted by the Sztójay government."  Id.

        [16] Plaintiffs' argument that Hungary was coerced into these takings is further undermined by plaintiffs' insistence that they "do[] not seek to absolve the State of Hungary and Hungarian actors from any legal or moral responsibility accrued in connection with the mistreatment of Hungarian Jews."  Kende Decl. ¶ 9.  But under customary international law, if Hungary were coerced by Germany into these takings, Hungary would likely not be responsible.  See Ex. 3 to Kende Decl. at 70 ("[I]n most cases where article 18 is applicable, the responsibility of the coerced State will be precluded vis-à-vis the injured third State.  This is reflected in the phrase 'but for the coercion' in subparagraph (a) of article 18.  Coercion amounting to force majeure may be the reason why the wrongfulness of an act is precluded vis-à-vis the coerced State.").

1949.  See Opp'n to Mot. to Dismiss at 34–35.  According to plaintiffs, the GFCC determined that

such takings were "unobjectionably attributable to the Soviet Union, irrespective of whether the

expropriations were formally based on legal acts of the occupying power (i.e., the Soviet Union)

or of the German authorities established by that power."  Kende Decl. ¶ 36; see Opp'n to Mot to

Dismiss at 34–35.  "[W]hilst the expropriations were formally undertaken by German agencies,

they were carried out at the 'suggestion or wish of the occupying power', and as such, they are

attributable to the Soviet Union, due to 'its overall responsibility as occupying power and its

formative influence on the events.'"  Kende Decl. ¶ 36 (quoting Bundesverfassungsgericht

[BVerfG] [GFCC] Oct. 26, 2004, 2 BvR 955/00 (¶ 139)); see Opp'n to Mot to Dismiss at 35.

Plaintiffs believe that "[t]he same rationale applies here because Germany, as the occupying

power, had ultimate responsibility for the war-time seizures of the Herzog family's art."  Opp'n to

Mot to Dismiss at 35.

      The  Court  is  not  inclined  to  employ  the  GFCC's  reasoning  here,  given  substantial

differences  in  the  nature  of  the  respective  occupations.    As  defendants  explain,  Germany's

statehood was "abolished . . . at the end of the war, which played a determining factor in the

[GFCC's] decision."  Reply ISO Mot. to Dismiss at 19.  When the expropriations occurred, the

Soviet Military Administration in Germany  "was, by order, the 'supreme organ of power'" in that

part of post-war Germany," which led the GFCC to "confirm[] that 'the German authorities to be

newly created could act only as auxiliary agencies of the Soviet authorities.'"  Id. (quoting 2 BvR

955/00 (¶ 7)).   In contrast, here, Hungary remained a sovereign state throughout the war

notwithstanding its occupation, and its responsibility for at least some expropriations that occurred

during the German occupation has been reaffirmed by international courts.  See id. at 20.[17]

---

[17] Defendants point to a decision by the Court of Appeal in Berlin that concluded that a Hungarian Jewish
Holocaust survivor could not seek restitution against Germany for expropriations.  See Ex. 2 to Novak. Suppl. [ECF

Plaintiffs also direct the Court to Hungary's modern constitution, but that document does not provide the support that plaintiffs seek. Plaintiffs emphasize that the constitution "states that Hungary lost its right to 'self-determination' as of the German invasion of March 19, 1944." Opp'n to Mot. to Dismiss at 35 (citing Kende Decl. ¶ 39; Kadar Decl. ¶ 7). They argue that Hungary should be estopped from arguing in litigation that these were "domestic takings" when it otherwise publicly disclaims liability for its actions against its Jewish citizens. Id.; see Kende Decl. ¶ 39–40. But as defendants note, this sentence in the preamble of the Hungarian Constitution goes on to explain that "self-determination was only restored on May 2, 1990, when the first freely elected organ of popular representation was formed," but that "does not mean that Hungary does not take responsibility for its actions during this almost 50 year[] period." Reply ISO Mot. to Dismiss at 21.

Indeed, Hungary has not shirked responsibility for its heinous past in the way plaintiffs suggest. Defendants refer the Court to the 1947 peace treaty that Hungary signed with the Allies, in which Hungary acknowledged that it "bears [its] share of responsibility for this war" and agreed to "restore[]" or provide "fair compensation" for "property" "in all cases where the property . . . in Hungary of persons under Hungarian jurisdiction have, since 1 September 1939, been the

---

No. 223-3] (Restitution of Household Effects Belonging to Jews Deported from Hungary (Germany), Federal Republic of Germany, Kammergericht (Court of Appeal) of Berlin, July 2, 1965, Int'l Law Reps., vol. 44 (1972), pp. 301–58). The Court of Appeal of Berlin reached a similar conclusion as this Court does. It explained that

> seizure and confiscation of Jewish goods was regularly carried out by Hungarian authorities and in favour of Hungary. At no time was the Hungarian government a mere tool of the German Reich. It did not even lose its independence and freedom of action after the occupation of Hungary by German troops on 19 March 1944, since this was not the intention of the politicians concerned. The same applied to the time after the revolutionary change of Government on 16 October 1944, which was carried out with strong German assistance and led to the installation of a strongly pro-German and pro-Nazi orientated Government. This event did not destroy the Hungarian State. Hungary therefore remained fully responsible for the measures of persecution against Jews even if they may have been strongly influenced by Germany.

Id. at 302.

subject of measures of sequestration, confiscation[,] or control on account of the racial origin or religion of such persons." Reply ISO Mot. to Dismiss at 21–22 (quoting Treaty of Peace with Hungary art. 27, Feb. 10, 1947, 61 Stat. 2109). Hungary then reaffirmed its commitment to the 1947 peace treaty in a 1973 settlement agreement with the United States that resolved all "taken property" claims suffered by U.S. nationals prior to 1973. Id. at 22 (quoting Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, March 6, 1973, 24 U.S.T. 522). Defendants also highlight a more recent piece of legislation passed by Hungary in 1992, which provides partial compensation to Hungarian citizens (and then-citizens) for "war-time and post wartime property deprivations that occurred between May 1, 1939, and June 8, 1949." Id. at 23–24 (citing Ex. G to Decl. of Orsolya Bánki [ECF No. 15-2] (Act XXIV of 1992, "On Providing, in Order to Settle Ownership Relations, Partial Compensation for Damages Unjustly Caused by the State in the Properties of Citizens through the Enforcement of Legal Rules Framed from 1 May 1939 to 8 June 1949") §§ 1(2), 2(3)). Accordingly, defendants have provided substantial evidence that Hungary has not, in fact, otherwise disclaimed its own responsibility for expropriations against its Jewish citizens during World War II.

In sum, the Court concludes that, for the purpose of determining state responsibility at international law, plaintiffs have not mustered enough evidence to show that Germany either directed and controlled Hungary's takings from plaintiffs' predecessors or coerced Hungary into committing those takings. Accordingly, plaintiffs cannot avoid the barrier posed by the domestic takings rule by arguing that Germany was responsible for these takings from Hungarian nationals.

4. Additional Considerations

33

The Court feels compelled to dispel any impression that its Opinion might absolve Nazi Germany for some part of the genocide it committed against the European Jewish population. As the Court has repeatedly emphasized, it is indisputable that Germany bears immense moral—and in other circumstances legal—responsibility for the Holocaust generally and, more particularly, for its corrupting influence on and oversight of Hungarian officials who committed atrocities against Hungarian Jews. The scope of this decision however is limited: the Court can only apply the relevant law to the evidence put before it by these parties and, based on that evidence, the Court is unable to assign legal responsibility to Germany for these specific takings under the relevant principles of international law. There is no doubt that Germany's conduct toward Hungarian Jews was horrendous, and that Hungary's was as well. But the Court must apply the law to the facts on the specific, narrow issue of FSIA jurisdiction now before it.

The Court is reassured that it has reached the correct conclusion on Germany's legal responsibility when its decision is considered in the context of both this case and FSIA jurisprudence more broadly.

First, consider the framing of this case, as articulated by plaintiffs. The Court has thoroughly engaged with plaintiffs' theories of German control and coercion, but those legal theories (and much of the evidence that plaintiffs marshal in support) extend well beyond the scope of plaintiffs' own allegations. Plaintiffs could have alleged that Germany was responsible for these takings, but "[a]s masters of the complaint . . . they chose not to do so." Caterpillar Inc. v. Williams, 482 U.S. 386, 395 (1987).

Plaintiffs have "always sought to hold Hungary responsible for the atrocities that took place in Hungary during the war." Reply ISO Mot. to Dismiss at 17–18. The opening paragraph of the complaint alleges that "[t]he artworks comprising the Herzog Collection were among the valuable

art and other objects deliberately looted and seized <u>by Hungary</u>, a war-time ally of Nazi Germany." Am. Compl. ¶ 1 (emphasis added).  It goes on to insist that "[d]efendants would never have obtained possession of the Herzog Collection had it not been for the deliberately orchestrated, malicious campaign of genocide <u>that Hungary perpetrated</u> during WWII."  <u>Id.</u> ¶ 4 (emphasis added).  More directly related to these takings, the thrust of the complaint is that "<u>Hungary</u> . . . <u>directed and actively engaged</u> in the genocide that was perpetuated against the Hungarian Jews, including the Herzog family and its property, and specifically the Herzog Collection."  <u>Id.</u> ¶ 29 (emphasis added); <u>see also</u> Reply ISO Mot. to Dismiss at 18 (collecting similar allegations).

To the extent that the complaint implicates Germany, it is to first explain that "Hungary [v]oluntarily [a]llie[d] [w]ith Nazi Germany," Am. Compl. at p.18, and then that, "[i]n March 1944, Adolf Hitler sent German troops into Hungary to <u>ensure Hungary's loyalty</u> and to <u>assist the Hungarian government</u> in resisting the advancing Russian army," <u>id.</u> ¶ 50 (emphasis added).  Thus, the complaint paints a different picture that is not framed in terms of coercion and control, but rather mutual interest.  Regarding the Holocaust at large, plaintiffs allege that "[t]he Hungarian government worked hand-in-hand with the infamous SS commander Adolf Eichmann in organizing large-scale deportations of Hungarian Jews to German death camps."  <u>Id.</u> ¶ 51.  As to these specific takings, the complaint alleges at most that "the Hungarian government . . . discovered the hiding place" of some relevant artworks in Budafok with the help of unspecified "Nazi[] collaborators."  <u>Id.</u> ¶ 58; <u>see id.</u> ¶¶ 30, 110.  The Court does not doubt that plaintiffs make their derived responsibility arguments in good faith, but it seems clear that these are not the arguments plaintiffs thought they would be making when they wrote their amended complaint.

Further, the D.C. Circuit has consistently framed this litigation and other closely related cases in terms of <u>Hungary's</u> wrongdoing.  Most recently, the D.C. Circuit described the closely

related <u>Simon</u> case as "aris[ing] out of the Hungarian government's confiscation of property owned by Jews during the Holocaust," and explained that toward the end of World War II, "the Hungarian government implemented an accelerated campaign to exterminate its remaining Jewish population," in which "the [Hungarian] government systematically executed over half a million Jews—roughly two-thirds of the Jewish population in Hungary at the war's outset." <u>Simon</u>, 77 F.4th at 1087–88.   The <u>Simon</u> court emphasized that Hungary's "state-perpetrated genocidal campaign ranks among the greatest crimes in human history." <u>Id.</u> at 1088; <u>see id.</u> at 1090 ("Winston Churchill described Hungary's genocidal campaign as 'probably the greatest and most horrible crime ever committed in the history of the world.'" (quoting <u>Simon</u>, 812 F.3d at 132). Prior appeals in this case reflect the same understanding of Hungarian responsibility. <u>See, e.g.</u>, <u>de Csepel IV</u>, 859 F.3d at 1103 (framing this case as involving "artworks taken by Hungary during the Holocaust and never returned").

Finally, the Court's conclusion on state responsibility comports with the public policy concerns expressed by the Supreme Court in <u>Philipp</u>.   The <u>Philipp</u> Court rejected a broad interpretation of the expropriation exception's scope—under which sovereign immunity would have been waived effectively "whenever a violation of international human rights law is accompanied by a taking of property," 141 S. Ct. at 713—in part because it would overextend the reach of United States law and bring too many Nazi-era claims into our courts, <u>see id.</u> at 714.   The <u>Philipp</u> Court emphasized that "United States law governs domestically but does not rule the world," <u>id.</u> at 714 (quoting <u>Kiobel v. Royal Dutch Petroleum Co.</u>, 569 U.S. 108, 115 (2013)), and accordingly courts should "interpret the FSIA . . . to avoid, where possible, 'producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation,'" <u>id.</u> (quoting

Helmerich I, 581 U.S., at 183); see id. ("As a Nation, we would be surprised—and might even initiate reciprocal action—if a court in Germany adjudicated claims by Americans that they were entitled to hundreds of millions of dollars because of human rights violations committed by the United States Government years ago. There is no reason to anticipate that Germany's reaction would be any different were American courts to exercise the jurisdiction claimed in this case.").

Plaintiffs' arguments to this Court raise similar policy concerns:  if the Court were to agree that "this Court should sustain jurisdiction" merely because "the taking of Plaintiffs' property was done while Hungary was under occupation by Nazi Germany," Opp'n to Mot. to Dismiss at 30, it could render the domestic takings rule effectively inapplicable to Nazi-era takings in every country that was under Nazi occupation or influence during World War II—which was "most of Europe," U.S. Holocaust Memorial Museum, German Rule in Occupied Europe (last visited Sept. 25, 2023) [https://perma.cc/LMQ5-JEF7].  Moreover, it could lead to a broad expansion of U.S. jurisdiction to include claims for otherwise-domestic takings by any country under military occupation at other points in history.  Accordingly, the Court finds support for its determination in the Supreme Court's guidance in Philipp.

\*      \*      \*

For all these reasons, the Court concludes that plaintiffs' claims related to these artworks cannot survive defendants' motion to dismiss on the ground that Germany was responsible for the takings.

### e.  **De Facto Statelessness**

Having rejected plaintiffs' alternative argument of German responsibility, the Court will now turn to their primary position: that the domestic takings rule should not bar plaintiffs from invoking the FSIA's expropriation exception because their predecessors were de facto stateless

and, therefore, were not nationals of the expropriating state at the time of the takings.  See Opp'n

to Mot. to Dismiss at 24–30.  The Court concludes that, even assuming plaintiffs' predecessors

were de facto stateless at the time of the takings, plaintiffs "have not mustered adequate support

for their contention that a state's taking of a de facto stateless person's property violates the

international law of expropriation."  Simon, 77 F.4th at 1097.  Accordingly, plaintiffs cannot

invoke the expropriation exception on these grounds.

Recall that, in Philipp, the Supreme Court held "that the phrase 'rights in property taken in

violation of international law,' as used in the FSIA's expropriation exception, refers to violations

of the international law of expropriation and thereby incorporates the domestic takings rule."  141

S. Ct. at 715 (quoting 28 U.S.C. § 1605(a)(3)).  The domestic takings rule "assumes that what a

country does to property belonging to its own citizens within its own borders is not the subject of

international law."  Id. at 709.  In the aftermath of Philipp, a new question arose as to whether a

sovereign state's taking of property from stateless persons could amount to a taking "in violation

of international law" within the meaning of the FSIA.

This question was squarely at issue in the Simon litigation.  Based on a broad interpretation

of Philipp, the Simon district court dismissed the claims of certain plaintiffs who had asserted de

facto statelessness as a means of avoiding the barrier posed by the domestic takings rule.  See

Simon v. Republic of Hungary, 579 F. Supp. 3d 91, 115–119 (D.D.C. 2021).  The D.C. Circuit

affirmed that dismissal but offered more nuanced reasons for doing so.  First, the panel explained

"the relevant framework" for invoking the expropriation exception as it stands "post-Philipp":

> The international law of expropriation incorporates the domestic takings rule,
> which treats a state's taking of its own national's property as a domestic legal matter
> not governed by international law.  That rule is grounded in the traditional view
> that international law customarily concerns relations among sovereign states, not
> relations between states and individuals. . . .  Accordingly, in determining whether
> the expropriation exception applies post-Philipp, courts generally must identify a

> plaintiff's nationality for purposes of the domestic takings rule. Absent any superseding principle or rule encompassed in the international law of expropriation, the threshold question is: Was the victim of the alleged taking a national of the foreign-state defendant at the time of the taking? If yes, the domestic takings rule bars application of the FSIA's expropriation exception; if no, that bar is inapplicable.

Simon, 77 F.4th at 1095 (citations and internal quotation marks omitted).

The Simon panel disagreed with the district court and explained that the plaintiffs asserting statelessness "ha[d] attempted to advance a viable theory within the framework established by Philipp—that is, based on an argument about their nationality at the time of the alleged takings." Simon, 77 F.4th at 1095. Specifically, those plaintiffs "acknowledge[d] that they were Hungarian nationals before the war and d[id] not claim that Hungary had formally denationalized its Jewish population de jure by the time of the alleged takings," but "[t]hey nonetheless contend[ed] the domestic takings rule [was] inapplicable because Hungary had rendered them de facto stateless for purposes of international law before it took their property." Id. Even though the theory presented by these Simon plaintiffs "d[id] not conflict with Philipp itself" (as the Hungarian defendants had argued), the D.C. Circuit determined that it "face[d] other obstacles." Id. Namely, "[e]ven assuming [these plaintiffs] were de facto stateless at the time of the alleged takings, [they] ha[d] not mustered adequate support for their contention that a state's taking of a de facto stateless person's property violates the international law of expropriation." Id. at 1097.

The Simon plaintiffs had attempted to argue that, under international law, stateless individuals are considered "aliens," and a state's taking of property from an alien is internationally wrongful. See Simon, 77 F.4th at 1097–98. They pointed to § 185 of the Second Restatement, "which identifies a 'taking by a state of property of an alien' as 'wrongful under international law' when certain conditions are met," id. at 1097 (quoting Second Restatement § 185), and then emphasized that § 171 "establishes that the term 'alien' encompasses both foreign nationals and

39

stateless persons 'for purposes of the responsibility of a state for injury' to an individual," id. (quoting Second Restatement § 171).

But the D.C. Circuit disagreed, explaining that "[n]otably . . . Section 175 of the Second Restatement makes clear that stateless persons are 'without remedy' under international law for takings claims against an expropriating state, with certain exceptions." Simon, 77 F.4th at 1097; see also Second Restatement § 171 cmt. g ("A stateless person comes within the definition of 'alien' in this Section, but responsibility for injury to such a person is limited as indicated in § 175, and Comment d thereto."). That is, § 175 provides that "[t]he responsibility of [a] state under international law for an injury to an alien cannot be invoked directly by the alien against the state except as provided by (a) the law of the state, (b) international agreement, or (c) agreement between the state and the alien." Second Restatement § 175. Further, "the lack of any remedy under customary international law for a stateless alien is spelled out in Comment (d) to that section," which states:

> Stateless aliens. Under traditional principles of international law, a state, being responsible only to other states, could not be responsible to anyone for an injury to a stateless alien. Under the rule stated in this Section, a stateless alien may himself assert the responsibility of a state in those situations where an alien who is a national of another state may do so. However, in those situations not covered by the rule stated in this Section or by an international agreement providing some other remedy, a stateless alien is without remedy, since there is no state with standing to espouse his claim.

Simon, 77 F.4th at 1097–98 (quoting Second Restatement § 175 cmt. d). The Simon plaintiffs had "identif[ied] no Hungarian law, international agreement, or agreement between Hungary and [themselves] relevant to section 175 of the Second Restatement." Id. at 1098. And the D.C. Circuit further held that the plaintiffs' other cited sources "likewise fail[ed] to address th[e] issue." Id.

However, the Simon court added a caveat: although those plaintiffs "failed to persuade [the court] that a state's taking of a de facto stateless person's property violates the customary

international law of expropriation," the court added, "[t]o be clear," that its decision "d[id] not foreclose the possibility that such support exists in sources of international law not before [the court] in th[at] case or based on arguments not advanced [t]here."  Simon, 77 F.4th at 1098.  The court noted one such argument (which it did not reach because it was raised "for the first time" at oral argument): it could be possible "that a state's taking of a stateless person's property may violate the international law of expropriation even if stateless persons are 'without remedy' under international law for such violation."  Id. (quoting Second Restatement § 175 cmt. d).

The instant motion to dismiss in de Csepel was already briefed when the D.C. Circuit released its Simon opinion.  See Defs.' Notice of Suppl. Authority [ECF No. 233].  The Court addresses the Simon plaintiffs' arguments in such detail because, here, the de Csepel plaintiffs' opposition raised nearly identical points.  See Opp'n to Mot. to Dismiss at 24–30.[18]  In fairness to the parties, the Court ordered them to submit limited supplemental briefing addressing "whether 'support exists in sources of international law' that were 'not before [the D.C. Circuit] in [Simon] or based on arguments not advanced [t]here' for the proposition 'that a state's taking of a de facto stateless person's property violates the customary international law of expropriation.'"  Suppl. Br. Order at 5 (alterations in original) (quoting Simon, 77 F.4th at 1098); see Pls.' Suppl. Br.; Defs.' Suppl. Br.

_____

[18] The de Csepel plaintiffs relied nearly exclusively on the same sections of the Second Restatement to argue that taking property from a stateless individual is a violation of international law.  However, in a brief footnote, they also cited to the 1954 Convention Relating to the Status of Stateless Persons.  See Opp'n to Mot. to Dismiss at 30 n.16 (citing Convention Relating to the Status of Stateless Persons, arts. 1 & 8, Sept. 28, 1954, 360 U.N.T.S. 117) ("Stateless Persons Convention").  Although the Stateless Persons Convention was not directly addressed by the Simon opinion, it was presented to the D.C. Circuit in briefing by the Simon plaintiffs, see Br. for Pls.-Appellees/Cross-Appellants at 19 n.9 & 20, Simon, 22-7010 (D.C. Cir. Dec. 21, 2022), and the D.C. Circuit expressly rejected arguments based on a secondary source invoking the Stateless Persons Convention, see Simon, 77 F.4th at 1098 (rejecting argument based on Marc Vishniak, The Legal Status of Stateless Persons, in 6 Jews and the Post-War World 37 (Abraham G. Duker ed., 1945), which plaintiffs in Simon had cited for its discussion of the Stateless Persons Convention).

The Court will take the same approach as the Simon court: it will assume for the sake of argument that plaintiffs' predecessors were de facto stateless at the time of any taking and analyze whether they have provided sufficient support to conclude that a state's taking of a de facto stateless person's property violates customary international law.

Given the opportunity to provide new sources of international law, plaintiffs have declined to do so.  Instead, they focus exclusively on the untouched thread from oral argument in Simon and insist that expropriations from de facto stateless individuals could be "wrongful under international law," even if stateless individuals are "without remedy" for such violations.  Pls.' Suppl. Br. at 2.  According to plaintiffs, "[n]either the Second Restatement nor the plain terms of the FSIA mandates that the injured party have a particular international law remedy available at the time of the taking in order for the conduct at issue to be wrongful and constitute a violation of international law in the first place."  Id. at 6.  Accordingly, plaintiffs urge against imposing such a remedy requirement for a stateless person to invoke jurisdiction through the FSIA's expropriation exception.  Id.

Defendants respond that plaintiffs' "focus on remedies is misplaced," as "[d]efendants are not asking the Court to impose a remedy requirement."  Defs.' Suppl. Br. at 2.  Rather, even assuming that plaintiffs are correct and "the Second Restatement does not foreclose the possibility that a state's taking from a de facto stateless person might violate [the] international law of expropriation even if such person is left 'without remedy,'" it remains true that "[p]laintiffs must still identify sources of positive law that show their legal theory has crystallized into an international norm that bears the heft of customary law."  Id. at 2–3 (citing Helmerich II, 743 F. App'x at 453).  Defendants reiterate that plaintiffs have failed to identify any such customary international law.  See id. at 3–4.

The Court ultimately agrees with defendants that plaintiffs have not presented a winning argument. To begin, plaintiffs rely exclusively on the Second Restatement as their source of international law, noting that it is considered "an authoritative statement of the law of expropriation." Pls.' Suppl. Br. at 2. Plaintiffs are correct that courts consistently "look[] to the contemporary Restatement for guidance" when "interpreting the FSIA in keeping with 'international law at the time of the FSIA's enactment.'" Philipp, 141 S. Ct. at 712 (quoting Permanent Mission of India to United Nations v. City of New York, 551 U.S. 193, 199–200 (2007)); see Simon, 77 F.4th at 1097 ("As the Restatement in effect when Congress enacted the FSIA, [the Second Restatement] bears authoritative weight in interpreting the Act."). But the Restatement is not law in and of itself; rather, as the D.C. Circuit has warned, "given that the Restatement purports to codify international law, not to create it, its pronouncements are useful only if they flow from sources of positive law such as judicial authority or reasoned scholarly commentary." Helmerich II, 743 F. App'x at 453.[19]

Moreover, even if plaintiffs' exclusive reliance on the Second Restatement were sufficient, at most they argue that the language of the Second Restatement does not foreclose the possibility that a state's expropriation from a de facto stateless person amounts to a violation of international law. See, e.g., Pls.' Suppl. Br. at 6 ("Neither the Second Restatement nor the plain terms of the FSIA mandates that the injured party have a particular international law remedy available at the time of the taking in order for the conduct at issue to be wrongful and constitute a violation of

---

[19] The Court is cognizant that its hesitancy to rely too heavily on the Restatement because it "purports to codify international law, not to create it," Helmerich II, 743 F. App'x at 453, could appear to conflict with its prior reliance on the ARSIWA—a nonbinding source that is reflective of customary international law—to identify rules of state attribution. However, there are meaningful differences. For one, the parties agree on the accuracy of the rules reflected in the ARSIWA, but they vehemently dispute whether the Second Restatement stands for certain propositions. Moreover, the relied-upon portions of the ARSIWA are bolstered by extensive commentary that cites numerous sources of positive law, while no such support appears in the relevant parts of the Second Restatement.

international law in the first place.").  But that is not the same as proving that "their legal theory 'has in fact crystallized into an international norm that bears the heft of customary law.'"  <u>Simon</u>, 77 F.4th at 1097 (quoting <u>Helmerich II</u>, 743 F. App'x at 449).

The closest that plaintiffs come to identifying affirmative support for their position is a passing citation to <u>Ambar v. Federal Republic of Germany</u>, 596 F. Supp. 3d 76 (D.D.C. 2022). <u>See</u> Pls.' Suppl. Br. at 7.  In that case, a judge of this court declined to apply the domestic-taking rule to a Nazi-era expropriation by Germany because the Austria-based victim of the takings was "denationalized" by operation of a German decree that legally "denationalized German Jewish nationals residing abroad and allowed confiscation of their property."  <u>Ambar</u>, 596 F. Supp. 3d at 84.  The court found that the victim in question "was not a German national," <u>id.</u>, which led the court to conclude that the plaintiffs had "sufficiently demonstrated that the alleged expropriation . . . was not a 'domestic' taking," <u>id.</u> at 88.

There are multiple reasons not to rely on <u>Ambar</u>.  To begin, <u>Ambar</u> appears to simply assume that any expropriation against a non-national is not a "domestic" taking, without addressing the unique situation posed by stateless individuals.  <u>See</u> <u>Ambar</u>, 596 F. Supp. 3d at 84 ("Plaintiffs have the better argument that Mr. Feuerwerk was <u>not</u> a national of Germany, and therefore have sufficiently alleged that the Building was taken in violation of <u>international</u> law.").  Hence, it does not provide proof of the customary international law norm that plaintiffs seek.  Moreover, even if there were some implicit rule to draw from <u>Ambar</u>, it would be inapposite here because that case dealt with jurisdiction based on an act of <u>de jure</u> denationalization, which is not at issue in this case.  <u>See</u> Opp'n to Mot. to Dismiss at 28 (arguing that Hungary "<u>de facto</u> stripped Jews of their rights as citizens and nationals of Hungary").[20]  In any event, <u>Ambar</u> does not provide

---

[20] Although the Court need not (and does not) decide the issue here, the distinction between <u>de jure</u> and <u>de facto</u> statelessness may unravel plaintiffs' own interpretation of the Second Restatement.  It may be that the Second

the support that plaintiffs need.

Accordingly, although plaintiffs have identified a possible interpretation of the interplay between various provisions of the Second Restatement that would leave room for their claims, the Court is not able to divine from that interpretation any definitive principle of customary international law, especially without any cited source of positive law.

To the contrary, defendants offer plentiful sources that counsel <u>against</u> adopting such a rule. In the Restatement (Third) of Foreign Relations Law (Am. L. Inst. 1987) (the "Third Restatement"), "the sections [p]laintiffs relied on from the Second Restatement were removed, or revised in a way that undermines [p]laintiffs' proposition." Defs.' Suppl. Br. at 3; <u>see id.</u> at 3–4 (noting that "[t]he Third Restatement used 'national of a foreign state' instead of 'alien' for the section on expropriation, and [the] Third Restatement clearly stated that stateless persons are not protected under the section on expropriation" (citing Third Restatement §§ 712(1) & 713 cmt. d)). Although the Second Restatement, as the "contemporary Restatement," provides "guidance" on interpretation of the FSIA, <u>Philipp</u>, 141 S. Ct. at 712, on at least one occasion the D.C. Circuit has emphasized the deliberate omission of material in the Third Restatement when rejecting a party's argument based on a provision in the Second Restatement when that provision otherwise "cite[d]

_____

Restatement only intended to include <u>de jure</u> stateless individuals—rather than <u>de facto</u> stateless persons—in § 171's limited definition of "alien." Because § 171 defines "alien" to include someone who is "not a national of the respondent state," one could argue that the definition includes <u>de jure</u> stateless persons, who are legally non-nationals, <u>see, e.g.</u>, <u>Ambar</u>, 596 F. Supp. 3d at 84, but does not extend to <u>de facto</u> stateless individuals, who technically remain nationals as a matter of domestic law, <u>see Simon</u>, 77 F.4th at 1095 (describing the plaintiffs' argument that Hungary had rendered them <u>de facto</u> stateless despite the fact that "they were Hungarian nationals before the war and do not claim that Hungary had formally denationalized its Jewish population <u>de jure</u> by the time of the alleged takings"); <u>see also Ambar</u>, 596 F. Supp. 3d at 83 (explaining that "under general principles of international law, it is for each State to determine under its own law who are its nationals" (cleaned up)); Reply ISO Mot. to Dismiss at 13 (arguing that, "[u]nder Hungarian law," plaintiffs' "predecessors remained Hungarian citizens and nationals throughout the war" and noting that "[p]laintiffs' own expert previously acknowledged that the persecution of Hungarian Jews during the Second World War was conducted 'without a formal act of deprivation of citizenship by Hungary'" (quoting Decl. of Tamás Lattmann [ECF No. 22-24] ¶ 18)). Accordingly, it may be that comment (g) to § 171 only refers to <u>de jure</u> stateless individuals when it notes that "[a] stateless person comes within the definition of 'alien' in this Section."

no support."  Helmerich II, 743 F. App'x at 453.

Further, defendants identify relevant sources of international law indicating that a state's taking of property from a de facto stateless person does not violate the customary international law of expropriation.  See Defs. Suppl. Br. at 6–9 (collecting sources).  Prior to World War II, L.F.L. Oppenheim's renowned treatise on international law explained that "[s]uch individuals as do not possess any nationality enjoy no protection whatever, and if they are aggrieved by a State they have no way of redress, there being no State which would be competent to take their case in hand." Ex. A to Decl. of Zoltán Novák in Support of Defs.' Suppl. Br. ("Second Novak Suppl.") [ECF No. 238-2] (1 Oppenheim, International Law: A Treatise (2d ed. 1912)) § 291; see id. ("As far as the Law of Nations is concerned, apart from morality, there is no restriction whatever to cause a State to abstain from maltreating to any extent such stateless individuals.").  Positive international law from a 1931 arbitral decision by the Mexico-USA General Claims Commission voiced a similar sentiment, stating that "[a] State . . . does not commit an international delinquency in inflicting an injury upon an individual lacking nationality."  Ex. B to Second Novak Suppl. [ECF No. 238-3] (Dickson Car Wheel Company (U.S.A.) v. United Mexican States, 4 R.I.A.A. 669, 678 (Mex.-U.S. General Claim Comm'n (July 1931)).  Shortly after the war, a 1949 United Nations study conducted in the lead-up to the seminal 1954 Stateless Persons Convention described how, under the "existing situation in regard to the protection of stateless persons," "[t]he provisions of international law which determine the status of foreigners are designed to apply to foreigners having a nationality."  Ex. C to Second Novak Suppl. [ECF No. 238-4] (United Nations, A Study of Statelessness (1949)), intro. §§ I.1., V.1.1.  The U.N. concluded that "[s]tateless persons, not being nationals of any country, are deprived of protection in all its forms."  Id., part 1, § I, ch. 3(2). Defendants produce further post-WWII sources that demonstrate the continued refusal of

international law to provide protection to stateless persons outside of limited human rights contexts.  See Defs. Suppl. Br. at 7–8.  The Court is substantially more persuaded by defendants' supporting materials.

Hence, plaintiffs have "failed to persuade [the Court] that a state's taking of a de facto stateless person's property violates the customary international law of expropriation."  Simon, 77 F.4th at 1098.  Accordingly, the Court need not determine whether plaintiffs' predecessors were, in fact, rendered de facto stateless because—even assuming they were—the Court concludes that plaintiffs' claims cannot survive defendants' motion to dismiss on that basis.

### f. Reconsideration of the Court's Jurisdiction over Portrait of the Architect Mátyás Zitterbarth and In the Studio

Defendants also ask the Court to effectively reconsider a prior judge's determination that the Court has jurisdiction over claims relating to two paintings, Portrait of the Architect Mátyás Zitterbarth and In the Studio, each of which was returned to the Herzog family after the war and then later retaken by Hungary.  See Mot. to Dismiss at 11 n.4.  These paintings pose unique jurisdictional questions related to whether they were taken before some of plaintiffs' predecessors became U.S. and Italian citizens, and whether one was taken before Hungary entered into a settlement agreement with the United States barring certain claims.

In a prior motion to dismiss, defendants argued that "U.S. courts lacked jurisdiction over these two artworks because their post-war return severed connection to the original wartime taking, and their communist-era retaking did not violate international law."  Mot. to Dismiss at 11 n.4 (describing prior argument).  Defendants further insisted that "plaintiffs' claims for In the Studio were settled as part of the 1973 claims settlement agreement between the U.S. and Hungary."  Id.

In 2020, a prior judge assigned to this case held that the Court had jurisdiction over these two artworks under the expropriation exception.  See generally de Csepel V, 613 F. Supp. 3d at

47

287–300.[21]   First, "[a]lthough there [wa]s no information regarding [Portrait of the Architect

Mátyás Zitterbarth's] whereabouts" after 1950, "the next mention of this painting was in a letter

dated December 11, 1973," which was after the claimants became Italian citizens.  Id. at 289. "[A]s

a result," the prior judge concluded, "the taking of this artwork [wa]s an expropriation in violation

of international law over which the Court has jurisdiction." Id.  Second, In the Studio (which "was

deposited with the Museum of Fine Arts in the 1950's") "was listed in [a] May 10, 1966 letter

asking whether certain pieces belonged to the state," but the responsive letter written by the

Director of the Museum of Fine Arts to the Ministry of Cultural Affairs in September of 1966

"failed to include it in the list of the Herzog pieces" identified as "now the property of the Museum

of Fine Arts." Id. at 299 (internal quotation marks omitted).  At that time, "[d]efendants provided

no further information about the painting's whereabouts after the 1950's deposit until March 14,

1973, when a Hungarian government official wrote that '[t]he works of art in question . . . —

should they have not yet passed into Hungarian state ownership—have become property of the

Hungarian State by virtue of the [1973] claims settlement agreement.'"  Id. at 300 (first alteration

in original; citation omitted).  However, the prior judge relied heavily on the fact that "In the Studio

[wa]s still listed by defendants as 'on deposit,'" which "suggest[ed] that the piece may not actually

have been taken in 1973, as indicated by the March . . . 1973 letter[]." Id.  Because "any taking

after 1973 would be a taking in violation of international law not settled by the 1973 Agreement,"

the prior court "retain[ed] jurisdiction over claims related to [In the Studio], as defendants ha[d]

not met their burden to demonstrate that the expropriation exception does not apply." Id.

Defendants now re-raise evidence originally submitted with their prior motion to dismiss,

---

[21] These particular conclusions have not been addressed by the D.C. Circuit on appeal.  See de Csepel VI, 27
F.4th at 753 (declining to review "the district court's determinations asserting or declining jurisdiction over specific
artworks").

see Reply ISO Mot. to Dismiss at 27, which they think requires reconsideration of the Court's prior jurisdictional determinations.[22]   To begin, defendants produce documentary evidence that confirms that <u>Portrait of the Architect Mátyás Zitterbarth</u> was "'transferred to the ownership of the Museum [of Fine Arts]' by May 8, 1951,' at a time when claimants Julia and Alice Herzog were still Hungarian citizens."   Mot. to Dismiss at 11 n.4 (quoting Ex. B-22 to Suppl. Decl. of Aaron M. Brian ("Suppl. Brian Decl.") [ECF No. 215-2]).   By all indications, then, this evidence rebuts the prior finding that "there [wa]s no information regarding [<u>Portrait of the Architect Mátyás Zitterbarth</u>'s] whereabouts" after October 6, 1950.   <u>de Csepel V</u>, 613 F. Supp. 3d at 289.   To the contrary, the artwork seems to have been retaken in the very early 1950s when the relevant claimants were Hungarian citizens.

As for <u>In the Studio</u>, defendants first re-raise "[d]ocumentary evidence" that was discussed in the prior opinion and "shows that the Hungarian Financial Institution Authority identified <u>In the Studio</u> as one of the artworks covered by the 1973 Agreement and confirmed it had passed into Hungarian state ownership."   Mot. to Dismiss at 11 n.4 (citing Ex. B-24 to Suppl. Brian Decl. [ECF No. 215-4], and Ex. B-25 to Suppl. Brian Decl. [ECF No. 215-5] at HUNG002297).   Further, defendants note that "Erzsébet Weiss de Csepel identified this artwork in her 1959 claim to the U.S. Foreign Claims Settlement Commission ("FCSC"), which was approved and paid in full."   Id. (citing <u>de Csepel V</u>, 613 F. Supp. 3d at 296–97; Ex. B-26 to Suppl. Brian Decl. [ECF No. 215-6]; and Ex. B-27 to Suppl. Brian Decl. [ECF No. 215-7] at HUNG021473–477).   Such determinations by the FCSC are "final and conclusive on all questions of law and fact and not

---

[22] Although the motion to dismiss does not explicitly ask for reconsideration of this determination, it is a necessary implication of defendants' request to dismiss all claims but those related to the <u>Santa Barbara</u> sculpture.  In their reply, defendants concede that reconsideration is needed in order to rule in their favor.  <u>See</u> Reply ISO Mot. to Dismiss at 28 ("Defendants acknowledge the Court did not dismiss these claims previously, but that ruling was in error.").

subject to review by any other official of the United States or by any court by mandamus or otherwise." 22 U.S.C. § 1641m; see de Csepel V, 613 F. Supp. 3d at 295, 299 (quoting 22 U.S.C. § 1641m and explaining that the Court "cannot review the FCSC's decisions").[23]   Finally, defendants add that in a related Hungarian lawsuit in 2008, "it was determined this artwork had been seized prior to the 1973 Agreement and was covered by that Agreement."  Mot. to Dismiss at 11 n.4 (citing Ex. B-28 to Suppl. Brian Decl. [ECF No. 215-8] at 11–12 and Ex. B-29 to Suppl. Brian Decl. [ECF No. 215-9]).

The prior court's jurisdictional determination was largely based on the fact that In the Studio was technically "still listed by defendants as 'on deposit,'" a fact from which the court drew a "suggest[ion] that the piece may not actually have been taken [prior to or] in 1973," despite documentary evidence indicating that it was.  de Csepel V, 613 F. Supp. 3d at 300 (emphasis added).   But that evidence in favor of jurisdiction now seems quite meager and hardly justifies jurisdiction at this stage.  Cf. Simon, 77 F.4th at 1116 ("[W]hen a defendant moves beyond assuming the truth of well-pleaded facts and seeks at the jurisdictional threshold to challenge the factual basis of the court's jurisdiction . . . 'the court must go beyond the pleadings and resolve any disputed issues of fact . . . necessary' to resolve the Rule 12(b)(1) motion." (quoting Phoenix Consulting, 216 F.3d at 40)).  To the contrary, the largely unrebutted evidence now shows that the artwork was taken well before 1973, although it could theoretically be possible that the taking occurred before Erzsébet became a U.S. citizen.  See de Csepel V, 613 F. Supp. 3d at 299 ("[E]ven

---

[23] The prior judge explained that "the FCSC's decision provided that '[p]ayment of any part of this award shall not be construed to have divested the claimant herein, or the Government of the United States on her behalf, of any rights against the Government of Hungary for the unpaid balance of the claim, if any."  de Csepel V, 613 F. Supp. 3d at 297.  But that point is not decisive here.  FCSC determinations are final and conclusive on questions of fact, see 22 U.S.C. § 1641m, and this determination was premised on the factual notion that In the Studio and other artworks were "taken from [Erzsébet Weiss de Csepel] by the Hungarian government after she became a U.S. citizen and before August 9, 1955."  de Csepel V, 613 F. Supp. 3d at 296.  As the prior court itself noted, "the pertinent question is . . . whether the pieces described in the FCSC decision were actually taken by the Hungarian government, and if so, when."  Id. at 297 n.24.

though the Court does not doubt that [Erzsébet] made her 1959 claim in good faith, she likely received funds for pieces that were in fact taken before 1952."). In either case, it seems clear the Court would lack jurisdiction. <u>See</u> Mot. to Dismiss at 11 n.4 ("[<u>In the Studio</u>] was either retaken between 1952 and 1973, and covered by the 1973 Agreement, or it was retaken earlier, when Erzsébet was a Hungarian citizen, and its taking is subject to the domestic takings rule.").

This reexamined evidence leads the Court to the conclusion that it does not have jurisdiction over these two paintings, either by nature of the domestic takings rule or the 1973 settlement agreement. Yet, the Court cannot ignore that defendants raise these arguments—which are effectively a motion for reconsideration—years after the prior decision and bury them in a single footnote within the background section of their new motion to dismiss. In fact, the language used in the body of the motion obscures the fact that these artworks raise entirely distinct jurisdictional questions. <u>Compare</u> Mot. to Dismiss at 30 ("Pursuant to the domestic takings rule, this Court lacks jurisdiction over twenty-seven (27) artworks (excluding only the <u>Santa Barbara</u> sculpture) . . . ."), <u>with</u> Reply ISO Mot. to Dismiss at 28 (insisting that "the claim for <u>In the Studio</u> is barred by the 1973 Settlement Agreement").

Understandably, plaintiffs' primary complaint is that defendants should not be allowed to relitigate these issues because they "offer no facts or law that were not available to them at the time of the original motion that warrant this Court reconsidering its conclusion." Opp'n to Mot. to Dismiss at 40; <u>accord id.</u> at 39. That point is well taken. Nevertheless, the Court is mindful that it "has an 'affirmative obligation to ensure that it is acting within the scope of its . . . authority." <u>Arch Coal, Inc. v. Hugler</u>, 242 F. Supp. 3d 13, 17 (D.D.C. 2017) (alteration in original) (quoting <u>Grand Lodge of Fraternal Ord. of Police v. Ashcroft</u>, 185 F. Supp. 2d 9, 13 (D.D.C. 2001)), <u>aff'd</u>, 888 F.3d 493 (D.C. Cir. 2018). And the Court has serious reservations about relying on the law-

of-the-case doctrine or principles of forfeiture to retain jurisdiction over a foreign sovereign, especially when the facts before the Court strongly indicate that its continued exercise of jurisdiction would be in error.  This is especially important in light of the Supreme Court's warnings about the need "to avoid, where possible, 'producing friction in our relations with [other] nations'" due to overbroad waivers of sovereign immunity.  Philipp, 141 S. Ct. at 714 (alteration in original) (quoting Helmerich I, 581 U.S. at 183).

Hence, in light of these principles, and in recognition of the Court's "'inherent authority to revisit and alter its own orders' sua sponte prior to the entry of judgment," Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp., Civ. A. No. 20-784 (JDB), 2023 WL 5206142, at *5 (D.D.C. Aug. 14, 2023) (quoting Bailey v. Potter, 498 F. Supp. 2d 320, 321 (D.D.C. 2007)), the Court concludes that it lacks jurisdiction over plaintiffs' claims related to Portrait of the Architect Mátyás Zitterbarth and In the Studio.

*      *      *

Accordingly, for all the reasons stated above, the Court will grant defendants' motion to dismiss plaintiffs' claims related to all remaining artworks except for the Santa Barbara sculpture.

## II.    The Santa Barbara Sculpture and Remaining Motions

As a result of these conclusions, the vast majority of plaintiffs' claims will be dismissed, leaving only one sculpture at issue.  However, the Court also has concerns about maintaining jurisdiction over that last artwork.  As explained, defendants did not seek dismissal of the Santa Barbara sculpture because "there is at least some evidence that this artwork was not taken by Hungarian officials, but was instead taken by non-Hungarian forces," Mot. to Dismiss at 19, which would mean that the domestic takings rule would not apply.  However, defendants' conclusion assumes that plaintiffs' predecessors were Hungarian citizens.

Plaintiffs have argued in their briefing that their predecessors were stateless because they had been "stripped of their status as Hungarian nationals." Opp'n to Mot. to Dismiss at 21; see id. at 21, 30 (identifying statelessness as plaintiffs' "[f]irst" ground for denying the motion and only arguing German responsibility "[i]n the alternative"). In this Opinion, the Court did not reach the factual issue of the predecessors' statelessness; rather, it assumed statelessness for the sake of argument and concluded that plaintiffs had not demonstrated a violation of the customary international law of expropriation. But the question of statelessness is also significant to jurisdiction over plaintiffs' Santa Barbara sculpture claims. If plaintiffs' predecessors were Hungarian when that taking occurred, the Court presumably has jurisdiction. But if they were stateless, it does not matter which nation took the sculpture, as the Court has held that plaintiffs cannot state a violation of international law sufficient to invoke the FSIA's expropriation exception. In light of the Court's holdings, plaintiffs may prefer to abandon their statelessness arguments to preserve their claims to this artwork, but the Court is not certain that it would allow plaintiffs to do so.

"Judicial estoppel prevents a party from obtaining an unfair advantage by 'prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" Simon, 77 F.4th at 1100 (quoting New Hampshire v. Maine, 532 U.S. 742, 749 (2001)). As explained in Simon, "[c]ourts invoke judicial estoppel at their discretion to protect the integrity of the judicial process." Id. When considering whether the balance of equities favors "apply[ing] the doctrine of judicial estoppel, courts consider" the following "guideposts":

> (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing

party if not estopped."

Id. (quoting Temple Univ. Hosp., Inc. v. NLRB, 929 F.3d 729, 733 (D.C. Cir. 2019)).

If the Court were to allow plaintiffs to later argue that they are not stateless, that would clearly be inconsistent with their current position.  And although the Court does not now decide whether it is persuaded to accept plaintiffs' argument that their predecessors were actually stateless, plaintiffs insist that they have already persuaded a prior judge of that fact.  In their opposition, plaintiffs insist that "this Court should follow the law of the case doctrine and affirm its 2011 holding that . . . [plaintiffs'] predecessors were not nationals of Hungary at the time of the takings" because they were de facto stateless.  Opp'n to Mot. to Dismiss at 30; see de Csepel I, 808 F. Supp. 2d at 130 ("[I]t is clear that under these extraordinary facts, the government of Hungary . . . had de facto stripped [plaintiffs' predecessor] and all Hungarian Jews of their citizenship rights.").  The Court will not conclude at this juncture whether it is, in fact, bound by that prior determination, but it would seem unfair to permit plaintiffs to argue the exact opposite position now that it is necessary to keep the remaining claims alive.  In other words, by arguing in favor of applying the law-of-the-case doctrine, plaintiffs effectively argued in favor of judicial estoppel preventing them from withdrawing their statelessness argument.

In any event, the Court does not know for certain how plaintiffs will attempt to proceed and does not have the benefit of briefing on this question from the parties.  Importantly, defendants' motion does not seek to dismiss any claims related to the Santa Barbara sculpture at this time.  For these reasons, the Court will allow claims pertaining to this artwork to stay alive at this time and will instruct the parties to file additional briefing on this issue.

Further, the Court will deny without prejudice the pending cross-motions for summary adjudication on choice-of-law issues, and defendants' motions for partial summary judgment on issues of international comity and statute of limitations.  The Court will allow the parties to refile

those motions to the extent that they bear on any claim that survives after the Court resolves the

remaining jurisdictional question related to the Santa Barbara sculpture.

### **Conclusion**

For the foregoing reasons, the Court will grant defendants' motion to dismiss.  A separate

Order to this effect shall issue on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: September 28, 2023