**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**DAVID L. de CSEPEL et al.,**

    **Plaintiffs,**

        **v.**

**REPUBLIC OF HUNGARY et al.,**
    **Defendants.**

---

**Civil Action No. 10-1261 (JDB)**

## MEMORANDUM OPINION

Before the Court is defendants' motion to dismiss or, in the alternative, for summary judgment on plaintiffs' claims relating to a single work of art: the Sculptor of Sixteenth Century, Circle of Ludwig Jupan von Marburg, Saint Barbara, limewood, 129 x. 53 x. 30 cm ("Santa Barbara sculpture").  For the reasons that follow, the Court will grant defendants' motion and dismiss plaintiffs' Santa Barbara claims.

## Background

The background of this case is long and complex. It has been recounted at length in numerous opinions over the last dozen years. See, e.g., de Csepel v. Republic of Hungary ("de Csepel I"), 808 F. Supp. 2d 113, 120–26 (D.D.C. 2011); de Csepel v. Republic of Hungary ("de Csepel II"), 714 F.3d 591, 594–96 (D.C. Cir. 2013); de Csepel v. Republic of Hungary ("de Csepel III"), 169 F. Supp. 3d 143, 147–56 (D.D.C. 2016); de Csepel v. Republic of Hungary ("de Csepel IV"), 859 F.3d 1094, 1097–99 (D.C. Cir. 2017); de Csepel v. Republic of Hungary ("de Csepel V"), 613 F. Supp. 3d 255, 264–66 (D.D.C. 2020); de Csepel v. Republic of Hungary ("de Csepel VI"), 27 F.4th 736, 739–41 (D.C. Cir. 2022), cert. denied, 143 S. Ct. 630 (2023); de Csepel v. Republic of Hungary ("de Csepel VII"), 695 F. Supp. 3d 1, 6–8 (D.D.C. 2023).  Because "[t]he facts relating to this case have been set out in greater detail" in these prior opinions, "the Court's

recitation of the facts at this juncture will be brief." <u>de Csepel V</u>, 613 F. Supp. 3d at 264 n.1. Specific facts relevant to this Opinion will be addressed as they arise.

Plaintiffs' predecessors were Hungarian Jewish art collectors who assembled a collection of more than two thousand paintings, sculptures, and other artworks.  Am. Compl. [ECF No. 141] ¶ 37.  The "Herzog Collection," as it was known, was "one of Europe's great private collections of art, and the largest in Hungary."  <u>Id.</u>  The collection included the Santa Barbara sculpture, which—at the time Germany invaded Hungary in 1944—belonged to two heirs of the collection, plaintiffs Angela Maria Herzog and Julia Alice Herzog (the "Herzog sisters").[1]

During the war, "[t]he Hungarian government, including the Hungarian state police, authorized, fully supported and carried out a program of wholesale plunder of Jewish property, stripping anyone 'of Jewish origin' of their assets."  <u>Id.</u> ¶ 53.  The Herzog family attempted to save their collection from confiscation, but "the Hungarian government and their Nazi[] collaborators" ultimately found and seized the artworks.  <u>Id.</u> ¶ 58.

In 1947, the Santa Barbara sculpture was found as part of a larger discovery of artworks contained in boxes in Bad Ischl, Austria.  <u>See</u> Ex. F-17, Declaration of Kornél Farkas [ECF No. 210-15], at *21 ("Farkas Decl.").  The mayor of Bad Ischl explained at the time that:

> All that is known about the goods is that SS units brought them in trucks to Bad Ischl, and stored them in the building of the salt mine. . . . [B]esides the 18 paintings and two sculptures other goods were also put in storage here, and these were taken or stolen in the last days of the war, and in the days that followed the liberation.

<u>Id.</u>  The sculpture was then repatriated to Hungary.  Mot. to Dismiss or for Summ. J. by the Hungarian Nat'l Gallery, The Museum of Fine Arts, The Museum of Applied Arts, The Budapest Univ. of Tech. & Econ., & Magyar Nemzeti Vagyonkezelő Zrt. [ECF No. 246] ("Mot.") at 40.

---

[1] The Herzog sisters, who escaped to Italy in 1944, are Italian citizens residing in Italy.  Am. Compl. ¶¶ 7, 8, 63.

In 1949, Hungary seized and attached the Santa Barbara sculpture in connection with a police investigation into Mrs. István Herzog (the aunt of the Herzog sisters). See id. Following the criminal attachment, the Santa Barbara sculpture was kept by the Museum of Fine Arts in Hungary. Id.

As relevant to the Herzog family's "seven-decade effort to reclaim the art collection," de Csepel VI, 27 F.4th at 741, Martha Nierenberg filed suit in 1999 in Hungary, seeking recovery of certain Herzog Collection pieces. Mot. at 41. In 2000, the Herzog sisters petitioned to intervene in the Hungarian litigation and sent written demands to Hungarian officials for return of the Santa Barbara sculpture and other artworks. Id. Their letters were never answered. Id. In 2010, the Herzog sisters and David L. de Csepel—another heir of the Herzog collection—filed this suit in U.S. district court, seeking to reclaim more than forty artworks from defendants. See Compl. [ECF No. 1]. After more than a decade of litigation, only the Santa Barbara sculpture remains at issue and the only remaining plaintiffs are the Herzog sisters.[2]

Before the Court is defendants' most recent motion to dismiss or, in the alternative, motion for summary judgment on plaintiffs' claims for the Santa Barbara sculpture on various grounds. See Mot. Plaintiffs responded in opposition to the motion, see Pls.' Mem. of P. & A. in Opp'n to

---

[2] Most recently, this Court rejected plaintiffs' argument that Germany was responsible for the seizure of the non-Santa Barbara artwork, either directly or by exerting some form of control over Hungary. See de Csepel VII, 695 F. Supp. 3d at 10–28. The Court also concluded that even if plaintiffs' predecessors were de facto stateless, plaintiffs failed to establish that a state's taking of a de facto stateless person's property violates the international law of expropriation. Id. at 28–34. Finally, the Court reconsidered its previous ruling regarding two paintings and found that they were seized by Hungarian officials when plaintiffs' predecessors were Hungarian citizens. Id. at 34–37. Thus, the Court dismissed plaintiffs' claims for all non-Santa Barbara artwork under the domestic takings rule, which treats a state's taking of its own national's property as a domestic legal matter not governed by international law. The Court did not dismiss the Herzog sisters' Santa Barbara claims because there was evidence indicating that non-Hungarian forces had seized the sculpture. Id. at 9 n.1. But the Court questioned whether it could maintain jurisdiction over the sculpture if the Herzog sisters' predecessors were de facto stateless and denied without prejudice defendants' motions seeking to dismiss plaintiffs' claims on other grounds. Id. at 38. Defendants now re-assert their defense that the Court lacks subject-matter jurisdiction over plaintiffs' Santa Barbara claims and move to dismiss those claims.

Mot. [ECF No. 247] ("Opp'n"), and defendants filed a reply in support, see Reply Br. in Supp. of

Mot. [ECF No. 249] ("Reply").  The motion is now fully briefed and ripe for decision.

## Legal Standard

The Foreign Sovereign Immunities Act ("FSIA") provides "the sole basis for obtaining

jurisdiction over a foreign state in our courts."  Simon v. Republic of Hungary, 77 F.4th 1077,

1090 (D.C. Cir. 2023) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S.

428, 434 (1989)).  "Absent a pre-existing agreement with the United States affecting the scope of

sovereign immunity, a foreign sovereign is generally immune, unless one of the FSIA's

enumerated exceptions applies."  Simon, 77 F.4th at 1090 (citing 28 U.S.C. §§ 1604, 1605–1605B,

1607).  One such exception—the expropriation exception—provides in relevant part that a foreign

sovereign shall not be immune from the jurisdiction of U.S. courts in any case

> in which rights in property taken in violation of international law are in issue
> and . . . that property or any property exchanged for such property is owned or
> operated by an agency or instrumentality of the foreign state and that agency or
> instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3).

Plaintiffs seeking to invoke the FSIA's expropriation exception must make "a legally valid

claim that a certain kind of right is at issue (property rights) and that the relevant property was

taken in a certain way (in violation of international law)."  Bolivarian Republic of Venezuela v.

Helmerich & Payne Int'l Drilling Co. ("Helmerich I"), 581 U.S. 170, 174 (2017); see Simon, 77

F.4th at 1103 (explaining that Helmerich I required "that courts decide at the jurisdictional

threshold whether plaintiffs actually have a claim that is legally cognizable under the FSIA").

The legal standard that a court must apply when considering a motion to dismiss for lack

of jurisdiction on FSIA grounds depends on the nature of the state defendant's argument. "'If the

defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the

district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff,' drawing 'all reasonable inferences in [the plaintiff's] favor.'" Simon, 77 F.4th at 1116 (first quoting Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000); and then quoting Schubarth v. Fed. Republic of Germany, 891 F.3d 392, 401 (D.C. Cir. 2018)). That is, the typical "plausible-pleading standard" applies to such legal sufficiency challenges. Id. at 1102. On the other hand, "when a defendant moves beyond assuming the truth of well-pleaded facts and seeks at the jurisdictional threshold to challenge the factual basis of the court's jurisdiction . . . 'the court must go beyond the pleadings and resolve any disputed issues of fact'" necessary to decide the Rule 12(b)(1) motion. Id. (quoting Phoenix Consulting, 216 F.3d at 40).

While plaintiffs "bear[] the 'initial burden' of overcoming the Act's 'presumption of immunity' by making out a legally sufficient case that an exception does apply in the first place," Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela ("Helmerich II"), 743 F. App'x 442, 449 (D.C. Cir. 2018) (quoting Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1183 (D.C. Cir. 2013)), ultimately, "the sovereign 'defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.'" Simon, 77 F.4th at 1116 (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 389 F.3d 192, 197 (D.C. Cir. 2004)); see also Simon v. Republic of Hungary, 812 F.3d 127, 147 (D.C. Cir. 2016), abrogated on other grounds by Fed. Republic of Germany v. Philipp, 141 S. Ct. 703 (2021)) ("Upon any factual challenge by the [state] defendants . . . the plaintiffs will bear the burden of production, and the defendants will bear the burden of persuasion to establish the absence of the factual basis by a preponderance of the evidence." (internal quotation marks omitted)).

## Analysis

Defendants move to dismiss plaintiffs' claims to the Santa Barbara sculpture due to (1) a lack of subject matter jurisdiction under the FSIA; (2) forum non conveniens; (3) plaintiffs' failure to exhaust their remedies in Hungary; and (4) the statute of limitations on plaintiffs' claims.[3]  The Court addresses each argument in turn.

### I.   Subject Matter Jurisdiction

#### A.  Statelessness

The question of statelessness is significant to jurisdiction over plaintiffs' Santa Barbara sculpture claims.  In Philipp, the Supreme Court held "that the phrase 'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation and thereby incorporates the domestic takings rule."  141 S. Ct. at 715 (quoting 28 U.S.C. § 1605(a)(3)).  The domestic takings rule "assumes that what a country does to property belonging to its own citizens within its own borders is not the subject of international law."  Id. at 709.  Most of the artworks subject to plaintiffs' claims were seized by Hungarian officials, but plaintiffs argued that their predecessors were de facto stateless at the time of the takings and thus not subject to the domestic takings rule.  See de Csepel I, 808 F. Supp. 2d at 130.

Philipp left open whether a sovereign state's taking of property from stateless persons could amount to a taking "in violation of international law" within the meaning of the FSIA, but the D.C. Circuit later answered this question in the negative.  In Simon, the D.C. Circuit found that "Section 175 of the Second Restatement [of Foreign Relations Law] makes clear that stateless persons are 'without remedy' under international law for takings claims against an expropriating

---

[3] Defendants also moved to dismiss any post-war criminal attachment claim under the Act of State doctrine, Mot. at 37–40, but have since withdrawn that argument, Reply at 21.

state, with certain exceptions."  77 F.4th at 1097.  While the Simon court then clarified that it was

not "foreclos[ing] the possibility that such support exists in [other] sources of international law,"

id. at 1098, this Court subsequently agreed with defendants that plaintiffs had not "identif[ied]

sources of positive law that show their legal theory has crystallized into an international norm that

bears the heft of customary law," de Csepel VII, 695 F. Supp. 3d at 31–32.  Said otherwise, this

Court held that even if plaintiffs were de facto stateless (rather than Hungarian citizens)[4] plaintiffs

could not "state a violation of international law sufficient to invoke the FSIA's expropriation

exception." Id. at 38.  The Court thus assumed arguendo that plaintiffs' predecessors were de facto

stateless and dismissed plaintiffs' claims related to all remaining artworks taken by Hungarian

officials.  Id. at 37–38.  That decision is now on appeal.

The Court did not dismiss plaintiffs' claims relating to the Santa Barbara sculpture,

however, because "there is at least some evidence that this artwork was not taken by Hungarian

officials but was instead taken by non-Hungarian forces."  Id. at 38.  But the Court raised concerns

that plaintiffs might be estopped from arguing that their predecessors were Hungarian citizens

when German officers allegedly seized the Santa Barbara sculpture.  Id. at 38–39.  Because this

Court only has jurisdiction over plaintiffs' Santa Barbara claims if their predecessors were

Hungarian citizens, jurisdiction turns on whether plaintiffs are estopped from arguing here that

their predecessors were de jure Hungarian citizens.

The discretionary doctrine of judicial estoppel "prevents a party from obtaining an unfair

advantage by 'prevailing in one phase of a case on an argument and then relying on a contradictory

argument to prevail in another phase.'"  Simon, 77 F.4th at 1100 (quoting New Hampshire v.

---

[4] Recall that if the Court had found that plaintiffs' predecessors were de facto Hungarian citizens, Philipp
would have barred them from bringing their claims under the domestic takings rule.

Maine, 532 U.S. 742, 749 (2001)).  When deciding whether to apply the doctrine of judicial

estoppel, courts consider:

> (1) whether the party's later position is clearly inconsistent with its earlier position;
> (2) whether the party has succeeded in persuading a court to accept that party's
> earlier position, so that judicial acceptance of an inconsistent position in a later
> proceeding would create the perception that either the first or the second court was
> misled; and (3) whether the party seeking to assert an inconsistent position would
> derive an unfair advantage or impose an unfair detriment on the opposing party if
> not estopped.

Temple Univ. Hosp., Inc. v. NLRB, 929 F.3d 729, 733 (D.C. Cir. 2019) (internal quotation marks

omitted).  The three factors are not a formulaic test, but rather serve as guideposts to determining

whether the "balance of equities" weighs in favor of invoking the doctrine in a given case.  See

New Hampshire, 532 U.S. at 751.  Here, the Court will decline to apply judicial estoppel to

plaintiffs' claims that their predecessors were de jure Hungarian citizens.

The first factor—whether a party's later position is "clearly inconsistent" with the earlier

position—weighs against judicial estoppel.  Defendants urge the Court to find that because

plaintiffs previously argued that they were stateless at the time of the taking, it would be

inconsistent to now argue that they "should be considered Hungarian citizens under the operation

of Hungarian law." Mot. at 18.  Plaintiffs respond that although they argued that their predecessors

were de facto stateless, they have never claimed that they were de jure stateless. Opp'n at 15–18.

Thus, they believe their position has remained consistent throughout the proceedings.

There is support for defendants' position.  Although plaintiffs contend that they only ever

argued that their predecessors were de facto stateless, their arguments have more broadly claimed

that "their predecessors were not nationals of Hungary at the time of the takings."  Pls.' Mem. of

P. & A. in Opp'n to Defs.' Am. Mot. to Dismiss Am. Compl. [ECF No. 220] ("Pls.' 2023 Opp'n")

at 30; see also id. at 29 (arguing that their "predecessors were effectively rendered 'stateless'

during the period" and "there is ample support for treating such persons as 'aliens' rather than as 'nationals' of the expropriating state").

Defendants base their argument on the fact that, "in 2011, to oppose a motion to dismiss, plaintiffs took the position their predecessors were not Hungarian citizens as evidenced by the anti-Semitic laws passed by Hungary during World War II." Mot. at 18 (cleaned up). But that only supports plaintiffs' position. In their 2011 opposition, plaintiffs argued that "restrictions placed on Hungarian Jews as a result of the anti-Semitic laws passed by Hungary during World War II . . . constituted a de facto removal of the citizenship rights of Hungarian Jews." Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss the Compl. [ECF No. 22] ("Pls.' 2011 Opp'n") at 30. At the same time, they provided evidence that their predecessors "did not surrender [their] Hungarian citizenship; [were] not deprived of it; [were] not dismissed from the ties of Hungarian citizenship." de Csepel I, 808 F. Supp. 2d at 129–30. Plaintiffs still maintain that position, arguing that while Hungary never severed their predecessors' Hungarian citizenship, Hungary's antisemitic laws de facto stripped them of their citizenship.

In previous opinions this Court has acknowledged the potential legal distinction between de jure and de facto statelessness for jurisdictional purposes. See de Csepel VII, 695 F. Supp. 3d at 33 (distinguishing a case that "dealt with jurisdiction based on an act of de jure denationalization, which is not at issue in this case"). The Court has also noted that the Second Restatement's "limited definition of 'alien'" arguably only "includes de jure stateless persons, who are legally non-nationals, but does not extend to de facto stateless individuals, who technically remain nationals as a matter of domestic law." Id. at 33 n.20. While this distinction might ultimately hurt, not help, the plaintiffs, it supports plaintiffs' argument that it is not "clearly inconsistent" to take the position that their predecessors were de facto stateless and de jure Hungarian citizens. Cf.

United States v. Supreme Ct. of N.M., 839 F.3d 888, 911 (10th Cir. 2016) (noting that circuits take a "narrow and cautious approach" to finding "that two positions are clearly inconsistent"); Simon v. Safelite Glass Corp., 128 F.3d 68, 73 (2d Cir. 1997) ("If the statements can be reconciled there is no occasion to apply an estoppel.").

The second factor—whether the party "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"—weighs somewhat in favor of judicial estoppel. Defendants argue that "[p]laintiffs successfully argued their predecessors were de facto stateless" at the initial motion-to-dismiss stage. Mot. at 17. In support of this position, defendants point out that plaintiffs recently argued that "this Court should follow the law of the case doctrine and affirm its 2011 holding that the domestic takings rule does not bar [p]laintiffs' claims because their predecessors were not nationals of Hungary at the time of the takings." Mot. at 19 (quoting Pls.' 2023 Opp'n at 30).

As an initial matter, plaintiffs did not succeed in persuading this Court to apply the law-of-the-case doctrine to find that their predecessors were not Hungarian nationals.[5] Instead, the Court assumed, without deciding, that plaintiffs' predecessors were de facto stateless and analyzed

---

[5] The law-of-the-case doctrine dictates that "[t]he same issue presented a second time in the same case in the same court should lead to the same result." LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc). This Court previously declined to conclude "whether it [was], in fact, bound by that prior [2011] determination," de Csepel VII, 695 F. Supp. 3d at 39, but now concludes it would not be bound by the law-of-the-case doctrine regarding plaintiffs' de facto statelessness. "The law of the case doctrine is a principle that guides courts in the exercise of their discretion, not a binding rule." Wye Oak Tech., Inc. v. Republic of Iraq, 24 F.4th 686, 697 (D.C. Cir. 2022). "Thus, rigid adherence to rulings made at an earlier stage of a case is not required under all circumstances." Id. To begin, it is not clear whether the D.C. Circuit considered the prior judge's de facto stateless conclusion a factual one or a legal one. See de Csepel II, 714 F.3d at 598 ("[W]e have no quarrel with the historical underpinnings of the district court's analysis." (emphasis added)). Regardless, fact discovery—which had not yet begun at the time of the Court's initial ruling—is now complete. "[W]here new evidence is available, revisiting the law of the case is proper." Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d 258, 262 (D.D.C. 2002) (citing Hayman Cash Register Co. v. Sarokin, 669 F.2d 162, 169 (3d Cir. 1982)). Further, the Court's ultimate conclusion that plaintiffs "satisfie[d] the second requirement of the FSIA's expropriation exception," de Csepel I, 808 F. Supp. 2d at 131, relied on pre-Philipp and pre-Simon law. See Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 740 (D.C. Cir. 1995) (courts should not apply the law-of-the-case doctrine where there has been an intervening change in the law).

whether plaintiffs had "provided sufficient support to conclude that a state's taking of a <u>de facto</u> stateless person's property violates customary international law." <u>de Csepel VII</u>, 695 F. Supp. 3d at 31.

Despite this Court's most recent position of assuming statelessness without deciding it, defendants are correct that plaintiffs previously persuaded the Court that their predecessors were <u>de facto</u> stateless.  <u>See</u> <u>de Csepel I</u>, 808 F. Supp. 2d at 130 (finding that while plaintiffs' predecessors may have considered themselves to be Hungarian citizens, "the government of Hungary thought otherwise and had <u>de facto</u> stripped . . . all Hungarian Jews of their citizenship rights"); <u>see also</u> <u>de Csepel II</u>, 714 F.3d at 597 (noting that "the district court concluded" that Hungary had <u>de facto</u> stripped plaintiffs' predecessors of their citizenship rights).  Plaintiffs agree that "the prior District Judge indisputably accepted Plaintiffs' argument that members of the Herzog family were rendered <u>de facto</u> stateless by Hungary during the war for purposes of the FSIA's expropriation exception," but argue that the "acceptance had a very limited effect and did not cause Plaintiffs to 'prevail' at any stage of this litigation."  Opp'n at 18.  Plaintiffs miss the mark, because the question is not whether plaintiffs <u>prevailed</u> in the case because of their position, but only whether they <u>succeeded</u> in convincing a court of their position.  And plaintiffs did succeed in persuading the Court that they were <u>de facto</u> stateless and thus not subject to the domestic takings rule.  <u>See</u> <u>de Csepel I</u>, 808 F. Supp. 2d at 130 ("[T]he alleged Hungarian 'citizenship' of plaintiffs' predecessors does not preclude the application of the expropriation exception in this case.").

It is not clear to the Court, however, "that judicial acceptance of" plaintiffs' position would "create the perception that either the first or the second court was misled."  The Court's earlier finding came on defendants' initial motion to dismiss before discovery in the case had begun.  At

that stage, the Court only needed to find that plaintiffs' allegations "could plausibly support a finding that the [FSIA] exception applies such that sovereign immunity did not preclude continued litigation of [their] claims." Wye Oak Tech., Inc. v. Republic of Iraq, 24 F.4th 686, 698 (D.C. Cir. 2022).[6] Said otherwise, the Court simply needed to assess "the legal sufficiency of [the] complaint for the purpose of proceeding to discovery." Id. Thirteen years later, the Court has the benefit of "completed fact discovery," which includes depositions of witnesses in Italy and Hungary and the exchange of thousands of documents. See Opp'n at 28. A finding now that plaintiffs did not sufficiently prove their de facto statelessness would not necessarily cast doubt on the Court's previous finding.[7]

The third factor—the degree to which the party seeking to assert an inconsistent position will derive an unfair advantage if not estopped—weighs against estoppel. Defendants themselves have consistently maintained that plaintiffs were Hungarian citizens and they have not explained why they would be prejudiced by having to continue defending plaintiffs' claims on that same basis. Furthermore, this Court has routinely retained jurisdiction over plaintiffs' claims on bases that did suppose that plaintiffs were de facto stateless. See, e.g., de Csepel I, 808 F. Supp. 2d at 130 ("[T]he Complaint also states a substantial and non-frivolous taking in violation of international law based on the active involvement of German Nazi officials in the taking of at least a portion of the Herzog Collection."); de Csepel V, 613 F. Supp. 3d at 287 ("In cases arising out of takings from Jewish people during World War II, the domestic takings rule has not been applied

---

[6] Wye Oak considered the application of the law-of-the-case doctrine, not judicial estoppel, but the Court considers Wye Oak's analysis instructive.

[7] Furthermore, the parties appeared to treat the question of the parties' statelessness as an open question, notwithstanding plaintiffs' law-of-the-case argument, as recently as last year. See Pls.' 2023 Opp'n at 21 ("[E]ven if Plaintiffs' predecessors remained Hungarian nationals . . . ." (emphasis added)); Reply in Supp. of Mot. to Dismiss [ECF No. 223] at 2 ("The evidence confirms that Plaintiffs and their predecessors were Hungarians at the time of the takings.").

because the genocide perpetrated by Germany and other Nazi-affiliated governments constitutes the predicate violation of international law."); see also de Csepel II, 714 F.3d at 598 ("[W]ithout ruling on the availability of the expropriation exception, we believe the family's claims fall comfortably within the FSIA's commercial activity exception.").  Thus, any unfairness caused by declining to invoke estoppel is, at most, slight, and the Court will not prevent plaintiffs from now arguing their predecessors were de jure Hungarian nationals.

### B.  Expropriation Exception

Defendants next argue that even if plaintiffs' predecessors were de jure Hungarian nationals, plaintiffs have not adequately shown that the expropriation exception applies to their Santa Barbara sculpture claims.  Recall that if the Santa Barbara sculpture was taken by Hungarian officials, plaintiffs' Santa Barbara claims would be barred by the domestic takings rule or, alternatively, would be dismissed for reasons this Court has previously explained.  See de Csepel VII, 695 F. Supp. 3d at 28–34.  Defendants first argue that plaintiffs have not proven that the Santa Barbara sculpture "was in fact taken from Plaintiffs' predecessors by German officials."  Mot. at 21.  They further argue that even if plaintiffs could prove that German forces took the Santa Barbara sculpture, Philipp bars their claims.  Id. at 21–25.

Beginning with the first argument, defendants concede that "there is at least some evidence that this artwork was not taken by Hungarian officials, but was instead taken by non-Hungarian forces."  Am. Mot. to Dismiss [ECF No. 215] ("2023 MTD") at 19.  They agree, therefore, that plaintiffs' allegations are not frivolous.  Reply at 7.  Rather, they contend that plaintiffs have not presented "more than a non-frivolous allegation" that the Santa Barbara sculpture was taken by German officials.  Id. at 7–8; see also Helmerich I, 581 U.S. at 174 ("[A] party's nonfrivolous, but ultimately incorrect, argument that property was taken in violation of international law is

insufficient to confer jurisdiction.").  Where "the facts are not in dispute, those facts bring the case within the scope of the expropriation exception only if they do show (and not just arguably show) a taking of property in violation of international law."  Id. at 187.  But it appears that the facts here are in dispute, and "[i]f a decision about the matter requires resolution of factual disputes, the court will have to resolve those disputes."  Id.[8]

Plaintiffs have met their burden of production with regards to German officials' takings of the Santa Barbara sculpture.  They have produced evidence in the record that plaintiffs' predecessor owned the sculpture at the time of the German invasion, "that SS units brought" the sculpture "to Bad Ischl, and stored [it] in the building of the salt mine,"  Farkas Decl. at *21, and that "the expropriation of Jewish property started immediately after the [German] occupation began," Decl. of Dr. Tamás Kende [ECF No. 220-13] ¶ 28.  Defendants argue that given the fact that "[a]ll other artworks in this litigation where the war-time taking is documented were seized by Hungarian officials," the "lack of evidence that the Santa Barbara . . . was seized by German troops" favors finding that the Santa Barbara sculpture was also seized by Hungarian officials. Reply at 8 (emphases added).  Defendants have it backwards.  That so many of the artworks at issue were documented by Hungarian officials at the time of their takings only lends credit to plaintiffs' argument that the Santa Barbara sculpture was taken by German officials: after all, not only does no Hungarian documentation exist for the Santa Barbara sculpture (despite existing for other artworks), but the only evidence that does exist points to Nazi involvement.

The Court therefore assumes, without deciding, that German officials took the Santa Barbara sculpture, and turns to defendants' defense that the expropriation exception "may not be

---

[8] Defendants could have previously moved to dismiss the Santa Barbara sculpture on this ground, as it is not implicated by the Supreme Court's decision in Philipp or the D.C. Circuit's decision in Simon.

invoked based on a state's public (sovereign) acts that violate a body of international law other than the international law of expropriation."  Mot. at 23.

In <u>Philipp</u>, the Supreme Court interpreted the term "property taken in violation of international law" to require the application of the international law of <u>expropriation</u>—rather than some other law (there, the international law of genocide)—to determine whether a sovereign state that engaged in a taking is subject to the jurisdiction of U.S. courts by virtue of the expropriation exception.  <u>Philipp</u>, 141 S. Ct. at 715 (quoting 28 U.S.C. § 1605(a)(3)).  Said otherwise, the <u>Philipp</u> Court clarified that the immunity exception found in § 1605(a)(3) only applies if the sovereign violates the international law of expropriation.  <u>Id.</u>

In doing so, the Court rejected a broad interpretation of the exception's scope, under which sovereign immunity would essentially be waived "whenever a violation of international human rights law is accompanied by a taking of property."  <u>Id.</u> at 713.  The <u>Philipp</u> Court emphasized that because the FSIA "affect[s] international relations," it should be interpreted "to avoid, where possible, 'producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.'"  <u>Id.</u> at 714 (quoting <u>Helmerich I</u>, 581 U.S. at 183).  The Court further explained that:

> As a Nation, we would be surprised—and might even initiate reciprocal action—if a court in Germany adjudicated claims by Americans that they were entitled to hundreds of millions of dollars because of human rights violations committed by the United States Government years ago.  There is no reason to anticipate that Germany's reaction would be any different were American courts to exercise the jurisdiction claimed in this case.

<u>Philipp</u>, 141 S. Ct. at 714.  In essence, the Supreme Court cautioned lower courts against using the FSIA's limited sovereign immunity exceptions to address a sovereign nation's alleged international human rights violations.

Relying on <u>Philipp</u>, defendants argue that even if the Santa Barbara sculpture was taken by German forces during Germany's wartime occupation of Hungary, "confiscation of private property by the armed forces of an occupying power is clearly a sovereign act that is governed by the international law of armed conflicts . . . and not by the international law of expropriation." Mot. at 23.  Plaintiffs, on the other hand, argue that in holding that "takings <u>could be brought under the expropriation exception where the claims involve the taking of a foreign national's property</u>," the Supreme Court clearly directed courts to sustain jurisdiction under the expropriation exception for claims concerning the Nazi-era takings of a foreign national's property.  Opp'n at 23 (quoting <u>Philipp</u>, 141 S. Ct. at 715).

Plaintiffs would extend <u>Philipp</u>'s holding too far: that a claim for a Nazi-era taking <u>could</u> be brought "where the claims involve the taking of a foreign national's property" does not necessitate that courts will have jurisdiction over <u>all</u> claims for Nazi-era wartime takings of foreign nationals.  In fact, in the very next sentence, the Court rejected the argument that Congress intended to abrogate immunity for all Nazi-era claims.  <u>Philipp</u>, 141 S. Ct. at 715; <u>see</u> <u>id.</u> ("[W]e do not interpret Congress's effort to <u>preserve</u> sovereign immunity in a narrow, particularized context— art shows—as supporting the broad <u>elimination</u> of sovereign immunity across all areas of law."); <u>de Csepel VII</u>, 695 F. Supp. 3d at 28 ("The <u>Philipp</u> Court rejected a broad interpretation of the expropriation exception's scope . . . in part because it would overextend the reach of United States law <u>and bring too many Nazi-era claims into our courts</u>." (emphasis added)).

Before analyzing the specific question whether <u>Philipp</u>'s holding bars jurisdiction here, it is useful to clarify the timeline of the taking.  Plaintiffs allege that Nazi officers seized the Santa Barbara sculpture during the German occupation of Hungary.  <u>See</u> Opp'n at 22 ("[T]he seizure of property and valuables belonging to Hungarian Jews began in earnest after the Germans invaded

16

and occupied Hungary in March 1944. Given the occupation, the only logical conclusion is that German SS troops transported the sculpture to Nazi German territory in Austria." (citations omitted)).  It is important that plaintiffs allege that the sculpture was taken during Germany's occupation because not every taking that occurred during the Nazi era necessarily occurred in a time of war.  The Nazi era spanned "the period from January 1933 through May 1945," but Germany only occupied Hungary in 1944.  Philipp, 141 S. Ct. at 715.  Assuming plaintiffs are correct, then, the Santa Barbara sculpture taking occurred during wartime and therefore violated international laws of war.  See Mot. at 24 (taking of the Santa Barbara sculpture "would fall squarely within the ambit of pillaging prohibited by Section II Chapter I, Article 46 of Annex I of the Hague Convention," as well as Articles 47 and 28); Opp'n at 24 ("[T]he sculpture's theft may also have violated Articles 43, 46 and 47 of the Hague Convention No. IV of October 18, 1907 Respecting the Laws and Customs of War on Land, 36 Stat. 2277 which, inter alia, prohibits pillage and directs an occupying power to respect private property.").

The Court now turns back to the question whether it has jurisdiction over plaintiffs' claims under the expropriation exception.  Because the "exception places repeated emphasis on property and property-related rights," the Court must "look to the law of property."  Philipp, 141 S. Ct. at 712.  As did the Phillip Court, this Court directs its attention to the Restatement (Second) of Foreign Relations Law of the United States § 185 as representative of the state of the law of property at the time the FSIA was enacted in 1976.  Section 185 provides:

> The taking by a state of property of an alien is wrongful under international law if either
>> (a) it is not for a public purpose,
>> (b) there is not reasonable provision for the determination and payment of just compensation, as defined in § 187, under the law and practice of the state in effect at the time of taking, or
>> (c) the property is merely in transit through the territory of the state, or has

> otherwise been temporarily subjected to its jurisdiction, and is not required
> by the state because of serious emergency.

Restatement (Second) of Foreign Relations Law of the United States § 185 (Am. L. Inst. 1965). Comment a to § 185 adds that "[a] taking of property is also wrongful under international law if . . . it is discriminatory as indicated in § 166." Id. cmt. a. Plaintiffs contend that because the taking of the Santa Barbara sculpture was an uncompensated, discriminatory taking (thereby invoking both § 185 and § 166), the taking violates the international law of expropriation even if it "may also have violated other [international] laws [of war]." Opp'n at 23–24.

Fatal to plaintiffs' argument is the introductory note to Part IV of the Restatement—titled "Responsibility of States for Injuries to Aliens"—in which §§ 185 and 166 are found. The introductory note clarifies that the rules in Part IV "relate only to injuries to aliens in times of peace. The effect of war or hostilities on the responsibility of a state for injury to aliens is beyond the scope of the Restatement of this Subject." Restatement (Second) of Foreign Relations Law pt. IV, Intro. Note ¶ 1. Accordingly, at the time of the FSIA's enactment, the international law of expropriation did not include takings in violation of the international laws of war.

In an effort to persuade the Court that the taking can violate both the international law of expropriation and the international laws of war, plaintiffs argue that "[t]he Supreme Court sustained jurisdiction over a war-time taking in Altmann and expressly reaffirmed its support for sustaining jurisdiction over Nazi-era takings of foreign nationals' property in Philipp." Opp'n at 25. But the Court agrees with defendants that "[w]ar did not rage everywhere and all the time in Europe" during the Nazi era, so the fact that the Supreme Court has sustained jurisdiction over Nazi-era takings does not necessarily imply that it has sustained jurisdiction over all Nazi-era takings, including wartime Nazi takings. Reply at 9. And in fact, it has not. In Altmann, the

Supreme Court considered actions taken in 1948, after the war ended.[9] See Republic of Austria v. Altmann, 541 U.S. 677, 697 (2004) (holding that nothing "in the FSIA or the circumstances surrounding its enactment suggests that it should not be applied to petitioners' 1948 actions"). And Philipp, as discussed above, reaffirmed its support over some, not all, Nazi-era takings.

More importantly, Philipp instructs courts "to preserve a dichotomy between private and public acts." Philipp, 141 S. Ct. at 713. The FSIA's various restrictions on exceptions to sovereign immunity "would be of little consequence if human rights abuses could be packaged as violations of property rights and thereby brought within the expropriation exception to sovereign immunity." Id. at 714.

Although Philipp specifically addressed genocide or human rights abuses, the Court sees no reason to suppose the Supreme Court would treat war crimes, a similar type of "public act," any differently. Cf. Philipp, 141 S. Ct. at 709 ("In [Judge Katsas's] view, the majority's analysis erroneously 'made the district court sit as a war crimes tribunal to adjudicate claims of genocide.'" (emphasis added) (quoting Philipp v. Fed. Republic of Germany, 925 F.3d 1349, 1350 (D.C. Cir. 2019) (Katsas, J., dissenting from denial of reh'g en banc)); Kadic v. Karadzic, 70 F.3d 232, 243 (2d Cir. 1995) (referring to "genocide or war crimes" as acts "proscribed by international law" under the Torture Victim Protection Act); Restatement (Third) of Foreign Relations Law of the United States pt. II, Intro. Note (Am. L. Inst. 1987) ("Individuals may be held liable for offenses against international law, such as piracy, war crimes, or genocide."); Int'l Crim. Ct., Rome Statute of the International Criminal Court 3–11 (2021), https://www.icc-cpi.int/sites/default/files/2024-05/Rome-Statute-eng.pdf (grouping together the crime of genocide, crimes against humanity, war

---

[9] While the Ninth Circuit concluded on remand that certain takings between 1938–1941 violated the international law of expropriation, the international laws of war were not necessarily implicated there, given that Germany annexed Austria before any taking occurred. Altmann v. Republic of Austria, 317 F.3d 954, 959 (9th Cir. 2002).

crimes, and the crime of aggression); U.S. Inst. of Peace, Model Codes for Post-Conflict Criminal Justice User's Guide Section 1: Genocide, Crimes Against Humanity, and War Crimes 195, https://www.usip.org/sites/default/files/MC1/MC1-Part2Section1.pdf ("The criminal offenses of genocide, crimes against humanity, and war crimes . . . have long been recognized as crimes under international law.").  Just as there was "no reason to suppose Congress thought acts of genocide or other human rights violations to be especially deserving of redress only when accompanied by infringement of property rights," Philipp, 141 S. Ct. at 714, there is no reason to suppose Congress thought war crimes to be especially deserving of redress when accompanied by infringement of property rights.

Philipp even positively cited the International Court of Justice ("ICJ") ruling, which held that "a State is not deprived of immunity by reason of the fact that it is accused of serious violations of international human rights law or the international law of armed conflict."  Jurisdictional Immunities of the State (Germany v. Italy), 2012 I.C.J. 99, 139 (J. of Feb. 3) (emphasis added).  While plaintiffs note that the Supreme Court omitted the language "or the international law of armed conflict" in Philipp, the ICJ's decision centered around Germany's sovereign immunity for claims of "violations of international humanitarian law committed by the German Reich during the Second World War."  Id.  The Philipp Court, however, dealt with the question of genocide, and thus had no reason to discuss other war crimes.  The Supreme Court also cited an article that noted that Italy's treatment of Germany was "contrary" to the general international consensus that "sovereign immunity is appropriate in civil cases even for alleged violations of jus cogens norms," further supporting the idea that genocide and war crimes belong in the same category.  See Curtis A. Bradley, Jack L. Goldsmith, Foreign Sovereign Immunity, Individual Officials, and Human Rights Litigation, 13 Green Bag 2d 9, 21 & n.42 (2009).

"[T]he phrase 'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation." Philipp, 141 S. Ct. at 715.  At the time of the FSIA's enactment in 1976, the international law of expropriation did not include the taking of property of foreign nationals during war.  Accordingly, the FSIA does not waive sovereign immunity under the expropriation exception for a sovereign's wartime taking of property from a foreign national.  The Santa Barbara sculpture was taken, according to plaintiffs, by Nazi officials during Germany's wartime occupation of Hungary, thereby not violating the international law of expropriation.  Hence, this Court does not have jurisdiction under the expropriation exception to adjudicate plaintiffs' Santa Barbara claims.

## II.    Forum Non Conveniens

Alternatively, the Court would dismiss plaintiffs' claims based on forum non conveniens, which permits courts to "decline jurisdiction in exceptional circumstances."  Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 504 (1947).  In deciding whether to apply the forum non conveniens doctrine, courts must first determine whether an alternative forum for the dispute exists.  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 (1981).  If a court finds that plaintiffs have an alternative forum in which to bring their claims, it must then balance both the "private interest factors" affecting the convenience of the litigants and the "public interest factors" affecting the convenience of the forum.  Id. at 241.  The parties agree that an adequate alternative forum is available in Hungary, so the Court turns to the convenience factors.  See Mot. at 26–27; Opp'n at 3; Reply at 13.

Although this Court (through a prior judge) previously concluded that defendants had "failed to show that the balance of private and public factors favors dismissal in this case," de Csepel I, 808 F. Supp. 2d at 138, the Court agrees with defendants that under the current factual

circumstances, the private and public factors now favor dismissal. Plaintiffs' citizenship weighs heavily in favor of defendants' position. As plaintiffs note, "in its 2011 decision, this Court correctly observed that 'there is a substantial presumption in favor of a plaintiff's choice of forum.'" Opp'n at 27 (quoting de Csepel I, 808 F. Supp. 2d at 138) (cleaned up). But the only plaintiffs remaining in this case—the Herzog sisters—are Italian citizens residing in Italy, Am. Compl. ¶¶ 7–8, and the Supreme Court has held that the plaintiff-friendly presumption does not apply to a foreign plaintiff, whose "choice [of forum] deserves less deference," Piper, 454 U.S. at 256.[10] Moreover, review of the private and public interest factors convinces the Court that Hungary is the more convenient forum to litigate the Santa Barbara sculpture claims.

"The relevant private interest factors are: (1) relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling witnesses; (3) cost of attendance of witnesses; (4) enforceability of a judgment, if obtained; and (5) other practical problems that make trial of a case easy, expeditious and inexpensive." de Csepel I, 808 F. Supp. 2d at 138 (internal quotation marks omitted). These factors favor defendants. First, all defendants and the Santa Barbara sculpture are located in Hungary. And while it is true that plaintiffs would have to travel irrespective of the litigation's forum, plaintiffs' travel burden would be much less from Italy to Hungary than to here. Requiring defendants and witnesses (as well as the Herzog sisters) to fly approximately ten hours from Europe to the United States imposes a much heavier burden on the parties. Additionally, although "the Court has the power to attach Hungary's property in the

---

[10] Plaintiffs contend that "[t]there is no indication in this Court's 2011 decision or the 2013 decision of the Court of Appeals suggesting that either court viewed the presence of a U.S. plaintiff alongside the two Italian plaintiffs as the dispositive factor in its forum non conveniens analysis." Opp'n at 27. That may be so. But in Simon v. Republic of Hungary, the D.C. Circuit wrote that "the addition of foreign plaintiffs does not render for naught the weighty interest of Americans seeking justice in their own courts." 911 F.3d 1172, 1183 (D.C. Cir. 2018), vacated on other grounds, 592 U.S. 207 (2021) (emphasis added). Central to the Simon court's analysis was that the inclusion of foreign plaintiffs does not justify a preference for Hungary where other plaintiffs resided in the United States. The Court thus finds that the absence of a U.S. citizen plaintiff is a strong consideration in a court's forum non conveniens analysis.

United States in aid of executing any judgment rendered under the FSIA," id. at 139, the United States does not have the power to compel Hungarian witnesses to testify in U.S. courts.  Finally, Hungary's dismissal from this suit calls into question the enforceability of a judgment rendered under the FSIA.

The relevant public interest factors include: "(1) administrative difficulties caused by foreign litigation congesting local court dockets; (2) local interest in having localized controversies decided at home; (3) imposing jury duty on residents of a jurisdiction having little relation to the case; and (4) avoiding unnecessary problems in choice-of-law and the application of foreign law." MBI Grp. v. Credit Foncier du Cameroun, 558 F. Supp. 2d 21, 34 (D.D.C. 2008) (quoting Irwin v. World Wildlife Fund, Inc., 448 F. Supp. 2d 29, 35 (D.D.C. 2006)).[11]  These factors weigh in favor of dismissal.  As defendants have shown, this controversy is not local to this forum.  Rather, it "is now a dispute between Italian plaintiffs and Hungarian defendants, over a single artwork located in Hungary, with no factual connection to this forum, concerning events that took place in Hungary between Hungarian victims for actions allegedly committed by German officials."  Reply at 16.  "This Court is a designated forum for all actions brought under the FSIA," de Csepel I, 808 F. Supp. 2d at 139, but Hungary is plainly a more central forum for all parties involved.  Finally, although the Court agrees with plaintiffs that it has "repeatedly demonstrated its ability to interpret various Hungarian laws in motion practice over the past decade," Opp'n at 29, plaintiffs do not appear to dispute that Hungarian law would govern their surviving claims.  Given Hungary's familiarity with its own laws, the Court agrees that Hungary is the preferred forum in which to bring the few remaining claims.

---

[11] There is, of course, "no burden on potential jurors, as jury trials are not available in suits brought under the FSIA." de Csepel I, 808 F. Supp. 2d at 139; see also Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil, 212 F. Supp. 2d 30, 40 (D.D.C. 2002).

Admittedly, "it is indisputably inconvenient to further delay" plaintiffs' decade-long pursuit of justice.  See Simon v. Republic of Hungary, 911 F.3d 1172, 1183–84 (D.C. Cir. 2018).  And "[d]istrict courts must ensure that a decision to dismiss on forum non conveniens grounds will not lead to a foreign sovereign 'delaying exhaustion of a plaintiff's remedies under its own laws' in a way that could end up foreclosing the claims altogether."  Id. at 1184 (quoting Schubarth v. Federal Republic of Germany, 891 F.3d 392, 396, 399 n.5 (D.C. Cir. 2018)).  But while plaintiffs have sought relief for over a decade, this iteration of the case—in which no plaintiff is a U.S. citizen and only one piece of art remains at issue—has only been before this Court for a few months.  And the Court cannot ignore the factual reality that this case, as now before it, should not proceed in the United States given its lack of connection to this forum.  Plaintiffs have not provided the Court with any reason to think that Hungary's laws would foreclose their claims.  Accordingly, plaintiffs' Santa Barbara sculpture claims should be dismissed on forum non conveniens grounds.

## III.   Exhaustion

Defendants further argue that a sovereign's taking of an individual's property in violation of the international law of expropriation has not occurred until the plaintiff has sought compensation in the domestic forum.  Reply at 19.  Plaintiffs respond that the D.C. Circuit has held that "no exhaustion requirement exists under the expropriation exception to the FSIA," and that this Court has already rejected defendants' theory of exhaustion.  Opp'n at 31–32 (citing de Csepel VI, 27 F.4th at 753; de Csepel III, 169 F. Supp. 3d at 168–69).

The D.C. Circuit has held, and defendants acknowledge, that "the FSIA does not include an exhaustion requirement."  Reply at 19 (citing de Csepel VI, 27 F.4th at 753).  They further agree that prudential exhaustion is "disfavored in FSIA cases."  Id.  But defendants do not argue for dismissal of plaintiffs' claims on prudential exhaustion grounds.  Contra de Csepel V, 613 F. Supp.

3d at 303 (defendants argued there that "this Court could grant the motion to dismiss on prudential exhaustion grounds").  Rather, they argue that the Court lacks jurisdiction under the FSIA appropriation exception because no violation has occurred until plaintiffs exhaust their efforts to recover in Hungary.  See Reply at 19.

Plaintiffs respond that the Court already rejected this specific theory of exhaustion in finding that "when the international law violation at issue is genocide, a failure to seek compensation from the foreign state is irrelevant to the jurisdictional analysis." de Csepel III, 169 F. Supp. 3d at 168 (citing Simon, 812 F.3d at 149).  But plaintiffs may no longer premise their § 1605(a)(3) jurisdictional argument on the international-law violation of genocide.  See Philipp, 141 S. Ct. at 712.  Thus, unlike in Simon, where "the international-law violation on which the plaintiffs premise[d] their argument for jurisdiction under § 1605(a)(3) [was] not the traditional prohibition against uncompensated takings," Simon, 812 F.3d at 145, the relevant international-law violation here is a traditional uncompensated taking by a foreign sovereign.

This Court has previously explained that "[w]hen a case involves a basic expropriation claim asserting that a sovereign has taken an individual's property without just compensation, it is plausible that no international law violation has occurred until the plaintiff has sought compensation in a domestic forum." de Csepel III, 169 F. Supp. 3d at 168 (citing Altmann, 541 U.S. at 714 (Breyer, J., concurring)).  "Such a rule would serve as an analogue to an element of constitutional takings law, which requires that a plaintiff who has suffered a taking under the Fifth Amendment must unsuccessfully attempt to obtain compensation through local remedies before a constitutional violation has occurred." de Csepel III, 169 F. Supp. 3d at 168.

The Court need not decide here whether a taking in violation of international law requires a plaintiff to first exhaust any available Hungarian remedies because exhaustion is not required

where the identified remedy is "inadequate."  Mot. at 33; <u>see</u> <u>Agudas Chasidei Chabad of U.S. v.</u> <u>Russian Fed'n</u>, 528 F.3d 934, 949 (D.C. Cir. 2008).  Here, "plaintiffs have adequately shown that further efforts to seek a remedy in Hungary would have likely proved futile" at the time they brought this suit.  <u>See</u> <u>de Csepel III</u>, 169 F. Supp. 3d at 169 n.15.[12]  True, in 2013, the Hungarian government passed the <u>Government Decree No. 449/2013. (XI. 28.) on the Order of Restitution of</u> <u>Cultural Assets Held in Public Collections Whose Ownership Status is Disputed</u>, which established a formal procedure to adjudicate art restitution claims submitted against Hungarian public collections.  But plaintiffs brought this lawsuit three years <u>before</u> Hungary implemented the administrative compensation procedure.  <u>See</u> <u>de Csepel III</u>, 169 F. Supp. 3d at 169 n.15.  "Where the jurisdictional question is a matter of exhaustion, 'a defendant cannot defeat jurisdiction by simply creating a new avenue of exhaustion . . . of remedies that had not been available at the time of the original filing.'"  <u>Id.</u> (quoting <u>Ford Motor Co. v. United States</u>, 688 F.3d 1319, 1326 (Fed. Cir. 2012)).  Further, "the Hungarian Metropolitan Appellate Court's dismissal of Nierenberg's complaint in 2008 reasonably suggested that any additional lawsuits filed by the other Herzog heirs would probably have failed," in part due to "customs laws protecting cultural patrimony."  <u>Id.</u> Accordingly, this Court found that "[t]here would be no reason for the other Herzog heirs to think that those same laws would not have also barred their claims for specific performance."  <u>Id.</u>

---

[12] Defendants, relying on the Seventh Circuit's decision in <u>Abelesz v. Magyar Nemzeti Bank,</u> focus on whether the remedy is adequate as of the time of the present suit.  <u>See</u> 692 F.3d 661, 684 (7th Cir. 2012); Mot. at 33–37.  But in <u>Abalesz</u>, the Seventh Circuit considered as part of its decision that any present remedy was not unreasonably prolonged, and furthermore, signaled that it might consider plaintiffs' pre-2010 Hungarian remedies to be adequate. 692 F.3d at 683.  In direct contrast, this Court has found it likely that plaintiffs' pre-2010 Hungarian remedies were inadequate.  <u>de Csepel III</u>, 169 F. Supp. 3d at 169 n.15.  Additionally, the <u>Abelesz</u> court relied heavily on the principles of international comity in reaching its decision, which has already been rejected as a basis to require exhaustion here. <u>Compare</u> <u>Abelesz</u>, 692 F.3d at 682–83, <u>with</u> <u>de Csepel VI</u>, 27 F.4th at 753, <u>and</u> <u>de Csepel III</u>, 169 F. Supp. 3d at 169.

Because plaintiffs could not have pursued an adequate remedy in Hungary at the time they filed this suit in the United States,[13] their claims are not barred by the exhaustion requirement.

## IV.    Statute of Limitations

Finally, defendants move for partial summary judgment on the basis that plaintiffs' claims are time-barred.  Mot. at 40.  Summary judgment is proper when the movant can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  And a dispute of material fact is genuine when "the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party."  Figueroa v. Pompeo, 923 F.3d 1078, 1085 (D.C. Cir. 2019) (quoting Hairston v. Vance-Cooks, 773 F.3d 266, 271 (D.C. Cir. 2014)).

Defendants argue that plaintiffs' Santa Barbara claims "are subject to a three-year limitations period" and cannot be revived by the HEAR Act because they "were time-barred by the time the HEAR Act was passed in 2016."  Mot. at 41, 43.  The Holocaust Expropriated Art Recovery Act of 2016, commonly referred to as the "HEAR Act," was passed in recognition of "[t]he unique and horrific circumstances of World War II and the Holocaust," which made "statutes of limitations especially burdensome to the victims and their heirs."  Holocaust Expropriated Art Recovery Act of 2016, Pub. L. No. 114-308, § 2, 130 Stat. 1524, 1525 (2016).  Due to the difficulties faced by "[t]hose seeking recovery of Nazi-confiscated art," id., Congress provided that "notwithstanding any other provision of Federal or State law or . . . defense at law

---

[13] This conclusion does not conflict with the Court's forum non conveniens analysis.  There, the Court focused on whether the forum is currently adequate.  Here, the Court considers whether the forum was adequate at the time plaintiffs filed their claims in 2010.  Hungary's post-2010 policies, including its 2013 restitution adjudication procedure, satisfy the Court that Hungary is an adequate forum for plaintiffs' claims now.

relating to the passage of time, a civil claim . . . against a defendant to recover any artwork or other property that was lost during the covered period because of Nazi persecution may be commenced [within] six years" of a claimant's "actual discovery" of his possessory interest in a work and of the work's location.  Id. at § 5(a) (cleaned up).  Where the claim is "preexisting," that is, where the claim was barred even before the passage of the Act, the claim is "deemed to have been actually discovered on the date" of the Act's enactment.  Id. at § 5(c).

Plaintiffs bring claims for conversion, bailment, replevin, constructive trust, and unjust enrichment.  Am. Compl. ¶¶ 99–147.  At bottom, their "claims are based in two theories: conversion and bailment."  de Csepel V, 613 F. Supp. 3d at 305; accord Mot. at 41 (agreeing with Court's characterization).[14]  This Court has already found that plaintiffs' conversion claims "qualify as preexisting claims that will be revived by the HEAR Act," and it will not now depart from its earlier ruling.  de Csepel V, 613 F. Supp. 3d at 305.[15]  But the Court will consider defendants' argument that plaintiffs' bailment claims are time-barred under the HEAR Act's stale claims exception.[16]

---

[14] The relevant statute of limitations for each claim is three years, but some of plaintiffs' claims (conversion) begin to accrue "as soon as the defendant acquires the property," and some of their claims (bailment) begin to accrue when the plaintiff is aware of the defendant's refusal to return the property.  de Csepel V, 613 F. Supp. 3d at 305; see also Mot. at 44 ("The three-year limitation periods for constructive trust and unjust enrichment are triggered by the same conduct as bailment; some act by the defendant that disavows claimant's rights to the property.").

[15] In their reply brief, defendants admit that plaintiffs' conversion claims are "[a]rguably . . . covered by the HEAR Act because the limitation period may have started at the alleged wartime taking, and not when demands for the sculpture's return were rejected in 2000."  Reply at 20.  Instead, they rely on plaintiffs' position that their conversion claims were tolled during the War as proof that they could have brought these claims in 2000.  The Court confirms its earlier finding that plaintiffs were barred from bringing their conversion claims, and that the HEAR Act revived those claims.

[16] The Court is not persuaded by defendants' initial argument that the HEAR Act, which covers "property that was lost from January 1, 1933–December 31, 1945, due to Nazi persecution," does not cover the Santa Barbara sculpture because "all that is known is that it was found in Bad Ischl, Austria after the war and that it was understood to have been taken there by SS units."  Mot. at 46.  Defendants do not explain why such evidence would not be enough, at a minimum, to raise a genuine dispute of material fact as to whether the Santa Barbara sculpture was taken from the Herzog family during the covered period.

Where a claim is "stale," it cannot be revived by the HEAR Act, even if the claim is preexisting.  Claims are stale if:

> (1) the claimant or a predecessor-in-interest of the claimant had knowledge of the elements set forth in subsection (a) on or after January 1, 1999; and
> (2) not less than 6 years have passed from the date such claimant or predecessor-in-interest acquired such knowledge and during which time the civil claim or cause of action was not barred by a Federal or State statute of limitations.

§ 5(e), 130 Stat. at 1527.  Defendants argue that plaintiffs' Santa Barbara claims are stale because (1) they knew of the sculpture's identity and location as of June 14, 2000, when they demanded the return of the sculpture, (2) more than six years had passed between the time plaintiffs had relevant knowledge of the Santa Barbara sculpture and the time the HEAR Act was passed in 2016, and (3) their claims were not barred by the District of Columbia's statute of limitations between 2000 and 2003.  Mot. at 47–49.  Plaintiffs respond that their bailment claims did not begin to accrue until 2008, and thus were timely when plaintiffs filed suit in 2010.  Opp'n at 40–41.

The Court will not resolve this dispute at the summary judgment stage because there exists a genuine dispute of material fact as to when plaintiffs' bailment claims began to accrue.  "Although what constitutes the accrual of a cause of action is a question of law, determining when accrual occurs in a specific case is a question of fact."  Lee v. Wolfson, 265 F. Supp. 2d 14, 19 (D.D.C. 2003) (cleaned up).  Courts may not decide as a matter of law whether a plaintiff knew or should have known of the defendant's alleged wrongdoing.  See Riddell v. Riddell Washington Corp., 866 F.2d 1480, 1484 (D.C. Cir. 1989) ("[W]hat a plaintiff knew and when [she] knew it, in the context of a statute of limitations defense, are questions of fact."); see also Dawson v. Eli Lilly & Co., 543 F. Supp. 1330, 1339 (D.D.C. 1982) ("We cannot decide as a matter of law that plaintiff did not exercise due diligence in discovering defendants' alleged wrongdoing.  This is a question of fact to be decided by the jury."); Ehrenhaft v. Malcolm Price, Inc., 483 A.2d 1192, 1204 (D.C.

1984) ("[W]e cannot decide as a matter of law that [a plaintiff] knew or should have known of the alleged defects for more than three years at the time the complaint was filed, which would thereby make his claims untimely.").  Accordingly, summary judgment would only be proper if, viewing the evidence in the light most favorable to the non-moving plaintiffs, "no reasonable person could disagree on the date on which the cause of action accrued."  Wolfson, 265 F. Supp. 2d at 19 (internal quotation marks omitted).

This Court has previously noted that "there are a host of factual issues that must be resolved regarding when plaintiffs (or their predecessors) may have learned about their claims or might have been able to bring them."  de Csepel V, 613 F. Supp. 3d at 305–06.  As relevant here, the parties dispute whether certain actions taken by the Hungarian government in 2000, including formal court submissions stating Hungary's position that the artworks were State property, and Hungary's silence in response to plaintiffs' letters demanding the return of their artworks, made it clear that defendants would not return the sculpture.  See Mot. at 45–46; Opp'n at 40–41; Reply at 20.  This dispute is material because plaintiffs' claims would have begun to accrue when defendants' refusal to return the artworks was "absolute and unconditional" or when defendants took "some action that a reasonable person would understand to be either an act of conversion or inconsistent with a bailment."  Malewicz v. City of Amsterdam, 517 F. Supp. 2d 322, 335 (D.D.C. 2007); see also In re McCagg's Est., 450 A.2d 414, 416 (D.C. 1982) ("[A] cause of action for return of the property does not arise until demand has been made and refused, or the bailee takes some action inconsistent with the bailment.").

Defendants may be able to prove that plaintiffs' claims began to accrue by 2000 at the latest.  But viewing the evidence in the light most favorable to plaintiffs, the Court cannot say that no reasonable person could disagree on the accrual date.  Because summary judgment is not proper

where "there is a genuine issue of material fact as to when, through the exercise of due diligence, the plaintiff knew or should have known of her injury," <u>Goldman v. Bequai</u>, 19 F.3d 666, 672 (D.C. Cir. 1994), the Court will not grant summary judgment to defendants on their statute-of-limitations defenses.[17]

### <u>Conclusion</u>

For the foregoing reasons, the Court concludes it does not have jurisdiction over plaintiffs' Santa Barbara claims and will grant defendants' motion to dismiss. An accompanying Order will issue on this date.

_____
/s/
John D. Bates
United States District Judge

Dated: <u>September 30, 2024</u>

---

[17] For purposes of summary judgment, it makes no difference that this case would never reach a jury. <u>See</u> <u>In re Unisys Sav. Plan Litig.</u>, 74 F.3d 420, 433 n.10 (3d Cir. 1996) ("Even where a case will be heard without a jury, the court on summary judgment does not sit as the trier of fact; it only determines whether there are issues which must be tried."); <u>Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Sch.</u>, 817 F.2d 1310, 1315 (8th Cir. 1987) ("A judge does not sit as a trier of fact when deciding a motion for summary judgment even if the case is scheduled to be heard without a jury."); <u>cf.</u> <u>Thompson v. McDonald</u>, 169 F. Supp. 3d 170, 173 n.2 (D.D.C. 2016) "(Because [plaintiff's] claims are not triable by a jury, the Court's statements about reasonable jurors' potential findings also refer to potential findings of the Court as the factfinder in a bench trial."). As the factfinder in this case, this Court could decide at trial that plaintiffs' claims began to accrue in 2000. But a "District Court should grant summary judgment <u>only if</u> 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,'" <u>Figueroa</u>, 923 F.3d at 1085 (emphasis added) (quoting Fed. R. Civ. P. 56(a)), and here, this Court has found that such genuine dispute exists.